# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------------x
|  |  |
|---|---|
| In re: | Chapter 11 |
| **COLDWATER CREEK INC.**, *et al.*,[1] | Case No. 14–10867 (____) |
| Debtors. | (Joint Administration Requested) |

---------------------------------------------------------------------x

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POSTPETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE PRIORITY, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS, (V) MODIFYING THE AUTOMATIC STAY AND (VI) SCHEDULING A FINAL HEARING

Coldwater Creek Inc., on behalf of itself and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**"), hereby submits this motion (this "**Motion**") for interim and final orders:

    a)    authorizing Coldwater Creek U.S. Inc., Coldwater Creek The Spa Inc. and Coldwater Creek Merchandising & Logistics Inc. (the "**Borrowers**") to obtain senior secured superpriority postpetition debtor in possession financing (the "**DIP Financing**"), and each of the other Debtors (the "**Guarantors**") to guaranty the Borrowers' obligations in connection with the DIP Financing, up to an aggregate principal amount of $75 million, pursuant to the terms set forth in an Interim Order substantially in the form attached hereto as <u>Exhibit A</u> (the "**Interim Order**") and that certain Senior Secured Superpriority Debtor in Possession Credit Agreement, in substantially the form attached hereto as <u>Exhibit B</u> (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**"; together with all other Loan Documents, the "**DIP Financing Agreements**"),[2] by and among the Borrowers, the Guarantors and Wells

---

[1] The Debtors in these proceedings (including the last four digits of their respective taxpayer identification numbers) are:  Coldwater Creek Inc. (9266), Coldwater Creek U.S. Inc. (8831), Aspenwood Advertising, Inc. (7427), Coldwater Creek The Spa Inc. (7592), CWC Rewards Inc. (5382), Coldwater Creek Merchandising & Logistics Inc. (3904) and Coldwater Creek Sourcing Inc. (8530).  Debtor CWC Sourcing LLC has the following Idaho organizational identification number:  W38677.  The Debtors' corporate headquarters is located at One Coldwater Creek Drive, Sandpoint, Idaho  83864.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Financing Agreements.

Fargo, National Association in its capacity as administrative agent and collateral agent (in such capacities, the "**DIP Agents**"), swing line lender and lender (in such capacities, the "**DIP Lender**");

b)      authorizing the Debtors to execute and deliver or cause to be executed and delivered, any and all such other documents, agreements, certificates, writings, instruments and promissory notes to be delivered in connection with the DIP Financing Agreements and to perform such other and further acts as may be necessary or appropriate in connection therewith;

c)      authorizing the Debtors to (i) use the cash collateral in which the Prepetition Secured Term Loan Lenders (defined below) have a security interest (the "**Cash Collateral**") pursuant to sections 361, 362 and 363 of the Bankruptcy Code, and all other collateral in which the Prepetition Term Loan Lenders hold a security interest pursuant to the Prepetition Financing Agreements (defined below) (the "**Prepetition Collateral**") and (ii) provide adequate protection to the Prepetition ABL Lender on an interim basis  (pending the refinancing of the Roll-Up Obligations (defined below)) and to the Prepetition Term Loan Lenders;

d)      approving certain stipulations by the Debtors with respect to the Prepetition Financing Agreements;

e)      subject to entry of an order granting the relief requested in this Motion on a final basis (the "**Final Order**"), authorizing the Debtors to grant first priority priming, valid, perfected and enforceable Liens pursuant to section 364(d), subject only to the Carve Out (defined below) and the Permitted Prior Liens (defined below) in favor of the DIP Lender, upon substantially all of the Debtors' real and personal property as contemplated by the DIP Financing Agreements (the "**DIP Collateral**");

f)      subject to entry of the Final Order, granting the DIP Lender a superpriority administrative claim in respect of all obligations under the DIP Financing Agreements (collectively, the "**DIP Obligations**"), subject to the Carve Out;

g)      entering on an interim basis following an interim hearing (the "**Interim Hearing**") the Interim Order (i) authorizing the Borrower, on an interim basis, to borrow under the DIP Credit Agreement an aggregate principal amount of $42 million to be used for the wind-down of the Debtors' operations in accordance with a budget approved by the DIP Lender (the "**Budget**") subject to permitted variances, and (ii) authorizing the Debtors to use the Cash Collateral and the other Prepetition Collateral; and

h)      scheduling, pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), a final hearing (the "**Final Hearing**") for the Court to consider entry of the Final Order authorizing and approving on a final basis the relief requested in this Motion, including without limitation, for the Borrower to utilize the DIP Financing on a final basis, including access to a maximum amount of (i) $42 million on an interim basis and (ii) $75 million on a final basis, and for the Debtors to continue to use the Cash Collateral and the other Prepetition Collateral subject to the terms of the DIP Financing Agreements and the Final Order.

In support of this Motion, the Debtors respectfully represent and set forth as follows:

**Background**

1.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition with the Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**").  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.  As of the date hereof, no creditors' committee has been appointed.

2.      The Debtors and their non-debtor affiliate (collectively, "**Coldwater**") have operated as a specialty retailer of women's apparel, jewelry and accessories.  Coldwater has been a multi-channel retailer that offers its merchandise through retail stores across the country, its catalog and its e-commerce website, www.coldwatercreek.com.  Originally founded in Sandpoint, Idaho in 1984 as a direct, catalog-based marketer, Coldwater evolved into a multi-channel specialty retailer operating 334 premium retail stores, 31 factory outlet stores and seven day spa locations throughout the United States.  As of the Petition Date, the Debtors employ 339 full and part-time employees in their corporate headquarters and 5,571 full and part-time employees in other locations, including their retail stores, spas, design center, call center and distribution center.

3.      The Debtors have filed these chapter 11 cases because they have concluded that they are unable to reorganize on a stand-alone basis.  After months of declining sales and failed out-of-court sales and refinancing processes, the Debtors have determined that the best way to maximize value for the benefit of all interested parties is a prompt and orderly wind-down of their business.  As more fully discussed in the *Declaration of James A. Bell in Support of Voluntary Petitions, First Day Motions and Applications* (the "**First Day**

**Declaration**"), which was filed contemporaneously with this Motion, the conclusion to liquidate was reached following a lengthy process in which the Debtors considered and explored all reasonable strategic alternatives. Additional factual background relating to the Debtors' business, capital structure and the commencement of these chapter 11 cases is set forth in detail in the First Day Declaration and is incorporated herein by reference.

4.      In order to liquidate their business as expeditiously as possible, contemporaneously with the filing of this Motion, the Debtors have filed the *Debtors' Motion for Orders (I)(A) Authorizing Entry into Agency Agreement, (B) Authorizing Bidding Protections, (C) Authorizing Bidding Procedures and Auction and (D) Scheduling Sale Hearing and Approving Notice Thereof, (II) Authorizing (A) Sale of Assets and (B) Store Closing Sales and (III) Granting Related Relief* seeking authority to conduct chain-wide store closing sales and liquidate their inventory. The Debtors believe that commencing store closing sales prior to the Mother's Day weekend, which historically is a peak sales time for the Debtors, will maximize value for the Debtors' estates while minimizing the administrative expenses incurred in these chapter 11 cases.

5.      Additionally, the Debtors have filed on the date hereof the *Debtors' Joint Plan of Liquidation of Coldwater Creek Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Plan**") and a related Disclosure Statement. The Plan provides for the orderly resolution of the Debtors' remaining assets following completion of liquidation of their inventory through "going out of business" sales. The Plan is supported by the Debtors' prepetition secured lenders.

## Facts Specific to the Relief Requested

6.      As described in the First Day Declaration, after a prolonged period of declining sales and financial distress, the Debtors have determined that a liquidation of their assets will yield the greatest recovery to creditors.  The DIP Financing, coupled with cash flow from the liquidation, will permit the Debtors to fund the administration of these chapter 11 cases and implement an efficient and orderly wind-down within the timeframes and on the terms set forth in the DIP Financing Agreements.  Without the DIP Financing the Debtors will very likely experience an immediate liquidity shortfall and will lack the capital necessary to liquidate in a manner that maximizes creditor recoveries.  Approval of the DIP Financing is necessary to implement store closing sales and wind-down operations in an efficient and orderly manner.

**A.      The Debtors' Prepetition Indebtedness**

7.      <u>The Prepetition Term Loan Agreement</u>:  On July 9, 2012, Coldwater Creek U.S. Inc., as lead borrower, and the other Debtors, as borrowers and guarantors, entered into a Term Loan Agreement (as amended, restated, modified, supplemented, or replaced from time to time and including all ancillary and related documents, the "**Prepetition Term Loan Agreement**") with CC Holdings Agency Corp., as administrative agent and collateral agent and the lenders thereunder (the "**Prepetition Term Loan Lenders**").  The Prepetition Term Loan Agreement provided for a single borrowing in an aggregate principal amount of $65 million (the "**Prepetition Term Loan**").  The outstanding amount due under the Prepetition Term Loan Agreement as of the Petition Date is approximately $96 million, which includes accrued interest and approximately $23 million representing a prepayment premium payable under the Prepetition Term Loan Agreement as a result an acceleration of the Prepetition Term Loan.  The Prepetition Term Loan is secured by a second priority lien on accounts receivable and inventory

and first priority liens on substantially all of the Debtors' remaining property (collectively, the "**Prepetition Term Loan Collateral**").

8.    <u>The Prepetition ABL Facility</u>:  On May 16, 2011, Coldwater Creek U.S. Inc., as lead borrower, and the other Debtors, as borrowers and guarantors, entered into an Amended and Restated Credit Agreement (as amended by that certain First Amendment to Amended and Restated Credit Agreement dated July 9, 2012 and as further amended, restated, modified, supplemented, or replaced from time to time and including all ancillary and related documents, the "**Prepetition ABL Credit Agreement**") with Wells Fargo Bank, National Association as administrative agent, collateral agent and swing line lender (the "**Prepetition ABL Lender**"; together with the Prepetition Term Loan Lenders, the "**Prepetition Secured Lenders**"). The Prepetition ABL Credit Agreement provided the Debtors with an asset-based credit facility (the "**Prepetition ABL Facility**") with $70 million as an initial commitment, subject to a borrowing base (as reduced by availability reserves), as set forth in the Prepetition ABL Credit Agreement.  As of the Petition Date, the Debtors have drawn approximately $37.5 million and have approximately $10 million in letters of credit outstanding under the Prepetition ABL.  The Prepetition ABL is secured by a first priority lien on inventory and accounts receivable and a second priority lien on substantially all of the Debtors' remain property (the "**Prepetition ABL Collateral**" and together with the Prepetition Term Loan Collateral, the "**Prepetition Collateral**").

9.    <u>Intercreditor Agreement</u>:  Also on July 9, 2012, the Prepetition Term Loan Lenders and the Prepetition ABL Lender entered into an Intercreditor Agreement that, among other things, assigned relative priorities to certain claims and liens arising under the Prepetition Term Loan Agreement and the Prepetition ABL Credit Agreement and defined certain rights of

the parties thereto in connection with a chapter 11 filing (together with the Prepetition Term

Loan Agreement and the Prepetition ABL Credit Agreement, the "**Prepetition Financing**

**Agreements**").

**B.      The Debtors' Efforts to Obtain DIP Financing**

             10.      In connection with the planning for these chapter 11 cases, the Debtors

and their advisors determined that the Debtors would require the DIP Financing to meet their

ongoing liquidity needs during an orderly wind-down of their estates.  Without such financing,

the Debtors will not be able to liquidate in a manner that maximizes recoveries for creditors.  The

Debtors' ability to pay their employees and otherwise to finance their wind-down, is dependent

on their ability to obtain and use the funds that would be made available under the DIP Financing

Agreements.

             11.      As set forth in greater detail in the *Declaration of Agnes K. Tang in*

*Support of Debtors' Motion for Interim and Final Orders (I) Authorizing Postpetition Financing,*

*(II) Granting Liens and Providing Superpriority Administrative Expense Priority,*

*(III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection to Prepetition*

*Secured Lenders (V) Modifying the Automatic Stay and (VI) Scheduling a Final Hearing*

attached hereto as <u>Exhibit C</u>, in addition to seeking financing proposals from the Prepetition

Term Loan Lenders and the Prepetition ABL Lender, the Debtors' investment banker, Perella

Weinberg Partners LP ("**PWP**"), contacted 11 potential third-party lenders, including six

traditional financial institution lenders and five alternative lenders that are active in the debtor in

possession financing market to determine whether they would be interested in providing the

Debtors with alternative debtor in possession financing.  PWP had a number of follow-up

discussions with the prospective lenders to discuss the Debtors' financing needs and financial

situation.  Despite these efforts, however, the Debtors were unable to obtain any proposals for

debtor in possession financing in the form of unsecured credit repayable as an administrative expense under section 503(b) of the Bankruptcy Code, nor under the terms of sections 364(a) or 364(b) of the Bankruptcy Code.

12.    Immediately prior to the filing of these chapter 11 cases, when it became evident that the Debtors may pursue a chapter 11 liquidation, the Prepetition Term Loan Lenders confirmed to the Debtors' advisors that the Prepetition Term Loan Lenders would not agree to a priming DIP from a third-party lender.  Based on prior conversations with potential financing sources and the potential for a priming dispute, PWP did not believe seeking additional financing proposals in connection with the liquidation scenario would result in additional interest from third-party financing sources without the support and consent of the Prepetition Term Loan Lenders.

13.    Indeed, no third-party lenders indicated that they would be willing to provide postpetition financing to the Debtors on more favorable terms than those negotiated in the DIP Credit Agreement.  Accordingly, the Debtors' management determined, in their sound business judgment, that the liquidity provided by the DIP Financing will allow the Debtors to continue to operate their business until such time as the liquidation can be completed.  The Debtors therefore seek authorization from the Court to enter into the DIP Credit Agreement in order to obtain the DIP Financing thereunder on an interim basis and final basis as proposed herein.

### C.    The DIP Credit Agreement

14.    Prior to the Petition Date, the Debtors engaged in good faith, arm's-length negotiations with the DIP Lender, leading to the terms and conditions contained in DIP Credit Agreement.  The significant terms of the DIP Credit Agreement are as follows:[3]

| Local Rule Requirement | Description of Provision |
|---|---|
| **Borrowers**<br><br>*Local Rule 4001-2(a)(ii)* | Coldwater Creek U.S. Inc., as Lead Borrower, Coldwater Creek The Spa Inc. and Coldwater Creek Merchandising & Logistics Inc.<br><br>*See* DIP Credit Agreement Preamble. |
| **Guarantors**<br><br>*Local Rule 4001-2(a)(ii)* | Coldwater Creek Inc., Aspenwood Advertising, Inc., CWC Rewards Inc., CWC Sourcing LLC, and Coldwater Creek Sourcing Inc.<br><br>*See* DIP Credit Agreement Preamble. |
| **DIP Lenders**<br><br>*Local Rule 4001-2(a)(ii)* | Wells Fargo Bank, National Association as Lender and Swing Line Lender and the other lenders party to the DIP Credit Agreement from time to time.<br><br>*See* DIP Credit Agreement Preamble. |
| **Administrative Agent**<br><br>*Local Rule 4001-2(a)(ii)* | Wells Fargo Bank, National Association as administrative agent and collateral agent.<br><br>*See* DIP Credit Agreement Section 1.01. |
| **Commitment/ Availability**<br><br>*Local Rule 4001-2(a)(ii)* | The Aggregate Commitments of all Lenders is $75,000,000.<br><br>Availability is: (a) the Loan Cap minus (b) the aggregate Outstanding Amount of all Credit Extensions to, or for the account of, the Borrowers.<br><br>*See* DIP Credit Agreement Section 1.01. |

---

[3]    This summary is provided in accordance with Rule 4001-2(a)(ii) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") and is qualified in its entirety by reference to the provisions of the DIP Credit Agreement.  Each capitalized term used and not otherwise defined herein shall have the meaning assigned thereto in the DIP Credit Agreement.  To the extent there exists any inconsistency between this summary and the provisions of the DIP Financing Agreements, the Interim Order or the Final Order, the provisions of the DIP Financing Agreements, the Interim Order and the Final Order, as applicable, shall control.

| Local Rule Requirement | Description of Provision |
|---|---|
| **Priming**<br><br>*Local Rule 4001-2(a)(ii)* | The DIP Liens shall be first priority priming liens with seniority over the Prepetition Secured Debt.<br><br>*See* Interim Order ¶6. |
| **Use of Proceeds**<br><br>*Local Rule 4001-2(a)(ii)* | The Borrowers shall use the proceeds of the DIP Financing to (a) to pay costs, expenses and fees in connection with the preparation, negotiation, execution and delivery of the DIP Credit Agreement and the other DIP Financing Agreements; (b) for general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with these chapter 11 cases, and other proper corporate purposes of the Debtors not otherwise prohibited by the terms hereof for working capital, capital expenditures, and other lawful corporate purposes of the Debtors; (c) upon entry of the Final Order, to refinance the Roll-Up Obligations, as provided in the summary of Adequate Protection provided below; and (d) upon entry of the Final Order, if not previously funded, to fund the Prepetition Indemnity Account.<br><br>*See* Interim Order ¶4; DIP Credit Agreement Section 6.11. |
| **Maturity Date**<br><br>*Local Rule 4001-2(a)(ii)* | The earliest of (a) May 8, 2014, unless a Final Order has been entered, (b) August 31, 2014, (c) the third Business day after the entry of a GOB Sale Order by the Bankruptcy Court authorizing a Permitted Sale, (d) 14 days following the entry of an order by the Bankruptcy Court confirming a plan and (e) the Consummation Date.<br><br>*See* DIP Credit Agreement Section 1.01. |
| **Termination Date**<br><br>*Local Rule 4001-2(a)(ii)* | The earliest to occur of (i) the Maturity Date, (ii) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Commitments are irrevocably terminated (or deemed terminated) in accordance with the provisions of Section 8.02 of the DIP Credit Agreement, (iii) the date of termination of the Aggregate Commitments pursuant to Section 2.06 of the DIP Credit Agreement or (iv) the date which is 45 days following the Closing Date, unless a Final Order has been entered on or prior to such date.<br><br>*See* DIP Credit Agreement Section 1.01. |

| Local Rule Requirement | Description of Provision |
|---|---|
| **Interest Rate**<br><br>*Local Rule 4001-2(a)(ii)* | A fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate, as in effect from time to time, plus one-half of one percent (0.50%), (b) the Adjusted LIBO Rate plus one percent (1.00%), or (c) the rate of interest in effect for such day as publicly announced from time to time by Wells Fargo Bank, National Association as its "prime rate".<br><br>*See* DIP Credit Agreement Sections 1.01, 2.08. |
| **Default Interest**<br><br>*Local Rule 4001-2(a)(ii)* | When used with respect to DIP Obligations other than Letter of Credit Fees, an interest rate equal to (i) the Interest Rate plus (ii) the Applicable Margin plus (iii) 2% per annum.<br><br>When used with respect to Letter of Credit Fees, a rate equal to the Applicable Rate for Standby Letters of Credit or Commercial Letters of Credit, as applicable, plus 2% per annum.<br><br>*See* DIP Credit Agreement Section 1.01. |

| Local Rule Requirement | Description of Provision |
|---|---|
| **Fees** | <u>Commitment Fee</u>:  The Borrowers shall pay 0.500% times the average daily amount by which the Aggregate Commitments exceed the sum of (i) the Outstanding Amount of Loans and (ii) the Outstanding Amount of L/C Obligations.  The Commitment Fee shall be due and payable monthly in arrears on the first calendar day of each month, commencing with the first such date to occur after the Closing Date. |
| | <u>Closing Fee</u>:  On the Closing Date, the Borrowers shall pay a closing fee in the amount of $750,000. Such closing fee shall be paid in immediately available funds, shall be fully earned when paid and shall not be refundable for any reason whatsoever. |
| | <u>Letter of Credit Fees</u>:  The Borrowers shall pay 1.50% times the stated amount of each Commercial Letters of Credit and 2.00% times the stated amount of Standby Letters of Credit.  The Letter of Credit Fees are due on the first calendar day of each month, commencing with the first such date to occur after the issuance of the letter of credit. |
| | <u>Fronting Fee and Documentary and Processing Charges Payable to L/C Issuer</u>: The Borrowers shall pay a fronting fee (i) with respect to each Commercial Letter of Credit, at a rate equal to 0.125% per annum, computed on the amount of such Letter of Credit, and payable upon the issuance thereof, (ii) with respect to each Standby Letter of Credit, at a rate equal to 0.125% per annum, computed on the daily amount available to be drawn under such Letter of Credit and on a monthly basis in arrears. |
| | In addition, the Borrowers shall pay to the Administrative Agent the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of the L/C Issuer relating to letters of credit as from time to time in effect. Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable. |
| | Any amendment of a Commercial Letter of Credit increasing the amount of such Letter of Credit may result in a fee to be separately agreed between the Lead Borrower and the L/C Issuer. |
| *Local Rule 4001-2(a)(ii)* | *See* DIP Credit Agreement Sections 2.03 and 2.09. |

| Local Rule Requirement | Description of Provision |
|---|---|
| **Security**<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>*Local Rule 4001-2(a)(ii)* | Solely to the extent of the diminution in the value of the interests of the Prepetition Secured Lenders in the Prepetition Collateral, the Prepetition Lenders shall each have an allowed superpriority administrative expense claim (the "**Adequate Protection Superpriority Claim**") which shall have priority (except with respect to (i) the DIP Liens, (ii) the DIP Superpriority Claim, and (iii) the Carve Out), in these chapter 11 cases under sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552, 726, 1113, and 1114 of the Bankruptcy Code, and, upon entry of the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment; *provided, however*, that the Adequate Protection Superpriority Claim shall not attach to any Bankruptcy Recoveries other than the Specified Bankruptcy Recoveries.<br><br>Other than the DIP Liens, the DIP Superpriority Claim, and the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these chapter 11 cases, or in any Successor Case, will be senior to, prior to, or on parity with the Adequate Protection Superpriority Claims.<br><br>*See* Interim Order ¶14. |
| **Priority** | <u>First</u>, to pay accrued and unpaid Professional Fees and Expenses up to an aggregate amount not to exceed the Professional Fee Carve Out;<br><br><u>Second</u>, to payment in full of the Pre-Petition ABL Liabilities and to fund the Pre-Petition Indemnity Account (to the extent not previously, funded in full);<br><br><u>Third</u>, to payment of that portion of the Obligations (excluding the Other Liabilities) constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and the Collateral Agent and amounts payable under Article III of the DIP Credit Agreement) due and payable to the Administrative Agent and the Collateral Agent, each in its capacity as such;<br><br><u>Fourth</u>, to payment of that portion of the Obligations (excluding the Other Liabilities) constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Lenders and the L/C Issuer (including fees, charges and disbursements of counsel to the respective Lenders and the L/C Issuer and amounts payable under <u>Article III of the DIP Credit Agreement</u>), ratably among them in proportion to the amounts described in this |

| Local Rule Requirement | Description of Provision |
|---|---|
| | clause <u>Fourth</u> payable to them;<br><br><u>Fifth</u>, to the extent not previously reimbursed by the Lenders, to payment to the Lenders of that portion of the Obligations constituting principal and accrued and unpaid interest on any Permitted Overadvances and Unintentional Overadvances, ratably among the Lenders in proportion to the amounts described in this clause <u>Fifth</u> payable to them;<br><br><u>Sixth</u>, to the extent that Swing Line Loans have not been refinanced by a Committed Loan, payment to the Swing Line Lender of that portion of the Obligations constituting accrued and unpaid interest on the Swing Line Loans;<br><br><u>Seventh</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Committed Loans, L/C Borrowings and other Obligations, and fees (including Letter of Credit Fees), ratably among the Lenders and the L/C Issuer in proportion to the respective amounts described in this clause <u>Seventh</u> payable to them;<br><br><u>Eighth</u>, to the extent that Swing Line Loans have not been refinanced by a Committed Loan, to payment to the Swing Line Lender of that portion of the Obligations constituting unpaid principal of the Swing Line Loans;<br><br><u>Ninth</u>, to payment of that portion of the Obligations constituting unpaid principal of the Committed Loans and L/C Borrowings, ratably among the Lenders and the L/C Issuer in proportion to the respective amounts described in this clause <u>Ninth</u> held by them until paid in full;<br><br><u>Tenth</u>, to the Administrative Agent for the account of the L/C Issuer, to Cash Collateralize that portion of L/C Obligations comprised of the aggregate undrawn amount of Letters of Credit;<br><br><u>Eleventh</u>, to payment of all other Obligations (including without limitation, to Cash Collateralize all Unliquidated Claims, but excluding any Other Liabilities), ratably among the Credit Parties in proportion to the respective amounts described in this clause <u>Eleventh</u> held by them;<br><br><u>Twelfth</u>, to payment of all other Obligations arising from Bank Products, ratably among the Credit Parties in proportion to the respective amounts described in this clause <u>Twelfth</u> held by them; and<br><br><u>Thirteenth</u>, to payment of all other Obligations; and<br><br><u>Last</u>, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law or the DIP Orders. |
| *Local Rule 4001-2(a)(ii)* | DIP Credit Agreement Section 8.03. |

| Local Rule Requirement | Description of Provision |
|---|---|
| **Adequate Protection**[4] | The Prepetition Lenders shall receive adequate protection in the form of the following: (a) the current payment of the reasonable documented out-of-pocket costs and expenses of its financial advisors and attorneys, (b) on the first day of each calendar month, commencing May 1, 2014, cash interest at the Default Rate as provided in the Prepetition Financing Agreements, (c) all products and proceeds of the Prepetition Collateral and the DIP Collateral (including, for the avoidance of doubt, proceeds from receivables and sales in the ordinary course of business, insurance proceeds, and proceeds of all dispositions thereof, whether or not in the ordinary course,) regardless of whether such collateral came into existence prior to the Petition Date, shall be applied as follows: (x) first, to reduce the Prepetition ABL Debt until paid in full, and (y) second, to reduce the DIP Obligations until paid in full, and (d) upon entry of the Final Order, payment in full of the remaining Prepetition ABL Debt (the "**Roll-Up Obligations**"). |
| | **Adequate Protection Liens**.  Solely to the extent of the diminution in the value of the interest of the Prepetition Secured Lenders in the Prepetition Collateral, the Prepetition Secured Lenders shall have, subject to the terms and conditions set forth in the DIP Credit Agreement, the Adequate Protection Liens which shall be (a) junior only to the Carve Out, the DIP Liens securing the DIP Facility, and Permitted Prior Liens and (b) in all instances, subject to the Prepetition Intercreditor Agreement; provided that the Adequate Protection Liens shall be subject to disgorgement to the extent the Prepetition Liens are successfully challenged pursuant to a Final Order. |
| | **Adequate Protection Superpriority Claim**.  Solely to the extent of the diminution in the value of the interests of the Prepetition Secured Lenders in the Prepetition Collateral, the Prepetition Secured Lenders shall have an allowed Adequate Protection Superpriority Claim which shall have priority (except with respect to (a) the DIP Liens, (b) the DIP Superpriority Claim and (c) the Carve Out), in the chapter 11 cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and, upon entry of the Final Order, sections 506(c) and 502 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment; *provided*, *however*, that the Adequate Protection Superpriority Claim shall not attach to any Bankruptcy Recoveries other than the Specified Bankruptcy Recoveries. |
| | Other than the DIP Liens, the DIP Superpriority Claim, and the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330 and 331 of the Bankruptcy |

---

[4]      In accordance with Local Rule 4001-2(a)(i)(E), the Debtors highlight this provision, which provides for the roll-up of the obligations under the Prepetition ABL Facility upon entry of the Final Order.

| Local Rule Requirement | Description of Provision |
|---|---|
| | Code, or otherwise, that have been or may be incurred in the chapter 11 cases, or in any Successor Case, will be senior to, prior to, or on parity with the Adequate Protection Superpriority Claim.<br><br>**Adequate Protection With Respect to GOB Sale Order**.  The sale process to be implemented under Section 363 of the Bankruptcy Code as provided in the GOB Sale Order, including the timeline and milestones contained therein, shall not be materially modified without the prior written consent of the Prepetition Secured Lenders.  Upon the disposition of Prepetition Collateral as contemplated in the GOB Sale Order, any such Prepetition Collateral shall be sold free and clear of the Prepetition Liens, the Adequate Protection Liens, and the DIP Liens, *provided*, *however*, that (x) such Prepetition Liens, Adequate Protection Liens, and DIP Liens shall attach to the proceeds of any such sale and (y) those proceeds shall be paid to the Prepetition ABL Lender and the DIP Lender at the closing of such sale in the order and priority set forth in the Interim Order.<br><br>**Access to Records**.  In addition to, and without limiting, whatever rights to access the Prepetition Secured Lenders have under their respective Prepetition Financing Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the Prepetition Secured Parties (a) to have access to and inspect the Debtors' properties, (b) to examine the Debtors' books and records and (c) to discuss the Debtors' affairs, finances, and condition with the Debtors' officers and financial advisors.<br><br>*See* Interim Order ¶14. |
| *Local Rule 4001-2(a)(i)(E)* | |
| **Cross-Collateralization** | All products and proceeds of the Prepetition Collateral and the DIP Collateral (including, for the avoidance of doubt, proceeds from receivables and sales in the ordinary course of business, insurance proceeds, and proceeds of all dispositions thereof, whether or not in the ordinary course), regardless of whether such collateral came into existence prior to the Petition Date, shall be applied as follows: (x) first, to reduce the Prepetition ABL Debt until paid in full, and (y) second, to reduce the DIP Obligations until paid in full.<br><br>*See* Interim Order ¶14. |
| *Local Rule 4001-2(a)(i)(A)* | |

| Local Rule Requirement | Description of Provision |
|---|---|
| **Prepetition Indemnity Account** | Upon the earlier of the entry of the Final Order or the closing on the sale of the Debtors' assets, the Debtors shall establish the Prepetition Indemnity Account, into which the sum of $250,000 of Cash Collateral shall be deposited as security for any reimbursement, indemnification, or similar continuing obligations of the Debtors in favor of the Prepetition Secured Lenders under the Prepetition Financing Documents (collectively, the "**Prepetition Indemnity Obligations**"). <br><br> (i) Upon the Challenge Period Termination Date if, as of such date, no party has filed (x) an adversary proceeding, cause of action, objection, claim, defense, or (y) an adversary proceeding, cause of action, objection, claim, defense, or other challenge against the Prepetition Secured Lenders related to the Prepetition Secured Debt, whether in the Chapter 11 Cases or independently in another forum, court, or venue (together, a "Challenge Proceeding"), all amounts held in the Prepetition Indemnity Account shall be released to the Debtors. <br><br> (ii) The Prepetition Indemnity Obligations shall be secured by a first priority lien on the Prepetition Indemnity Account and by a lien on the Prepetition Collateral, Adequate Protection Liens, and the Adequate Protection Superpriority Claim. <br><br> (iii) The Prepetition Secured Lenders may apply amounts in the Prepetition Indemnity Account against the Prepetition Indemnity Obligations as and when they arise, without further notice to or consent from the Debtors, the Committee or any other parties in interest and without further order of this Court. <br><br> *See* Interim Order ¶14. |

| Local Rule Requirement | Description of Provision |
|---|---|
| **Section 552(b)**[5]<br><br>*Local Rule 4001-2(a)(i)(E)* | In light of their agreement to subordinate their Liens and superpriority claims (1) to the Carve Out, in the case of the DIP Lender, and (2) to the Carve Out and the DIP Liens, in the case of the Prepetition Secured Lenders, the DIP Lender and the Prepetition Secured Lenders are each entitled to all rights and benefits of section 552(b) of the Bankruptcy Code and upon entry of the Final Order, the Debtors shall not assert that the "equities of the case" exception shall apply.<br><br>Upon entry of the Final Order, the DIP Lender and the Prepetition Lenders shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the Debtors shall not assert that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall apply to the DIP Lender or the Prepetition Secured Lenders with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or the DIP Collateral.<br><br>*See* Interim Order ¶49. |
| **Carve Out**<br><br>*Local Rule 4001-2(a)(i)(F)* | The Carve Out shall mean, collectively: (a) allowed administrative expenses pursuant to 28 U.S.C. Section 1930(a)(6) and 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee (the "**U.S. Trustee**"); (b) all accrued and unpaid fees, disbursements, costs and expenses, to the extent allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice and the Case Professionals, through the date of service by the DIP Lender of a Carve Out Trigger Notice, as limited by the respective Budget amounts for each Case Professional or category of Case Professional through the date of service of said Carve Out Trigger Notice (including partial amounts for any Carve Out Trigger Notice given other than at the end of a week), less the amount of prepetition retainers received by such Case Professionals; and (c) all accrued and unpaid fees, disbursements, costs and expenses incurred by the Case Professionals after the date of service of a Carve Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $750,000 less the amount of prepetition retainers received by such Case Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (b) above.  The Carve Out shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals. For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by the DIP Lender to the Borrowers and their counsel, the U.S. Trustee, and lead counsel to any Committee, which notice may be delivered at any time following the occurrence and continuance of any DIP Order Event of Default.<br><br>*See* Interim Order ¶26; DIP Credit Agreement Section 1.01. |

---

[5]     In accordance with Local Rule 4001-2(a)(i)(H), the Debtors highlight this provision, which provides for the waiver of the "equities of the case" exception of section 552(b) of the Bankruptcy Code upon entry of the Final Order.

| Local Rule Requirement | Description of Provision |
|---|---|
| **Budget**<br><br>*Local Rule 4001-2(a)(ii)* | The use of the proceeds of the DIP Financing shall be in compliance with the Budget, a copy of which is attached to the DIP Credit Agreement as Schedule 1.03, and which Budget may be adjusted only in accordance with the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement Schedule 1.03. |
| **Cash Collateral**<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>*Local Rule 4001-2(a)(ii)* | The Debtors are authorized to use Cash Collateral and to use the advances under the DIP Facility during the period commencing immediately after the entry of the Interim Order and terminating upon notice being provided by the DIP Lender to the Debtors that (i) a DIP Order Event of Default has occurred and is continuing and (ii) the termination of the DIP Credit Facility. During the Post-ABL/DIP Payoff Period, the Debtors are authorized to continue to use Prepetition Term Loan Lenders' Cash Collateral pursuant to the terms of the Interim Order and the Final Order unless and until the date on which the Court enters a subsequent order authorizing the Debtors' use of the Prepetition Term Loan Lenders' Cash Collateral, which order shall be subject to the express consent of the Prepetition Term Loan Lenders and shall be submitted for approval to the Court within ten days of a written request therefor to the Debtors from the Prepetition Term Loan Lenders; *provided*, that (i) the Borrowers shall give notice to the Prepetition Term Lenders in accordance with the provisions of Section 2.01(b) with respect to each such use and, to the extent applicable prior to a "Store Closing Sale" as defined in the GOB Sale Order, deliver an updated Borrowing Base Certificate in accordance with Section 4.02(d) in support thereof, and (ii) the use of the Prepetition Term Loan Lenders' Cash Collateral during the Post-ABL/DIP Payoff Period shall at all times be conditioned upon (A) the Debtors' compliance (subject to variances permitted pursuant to the DIP Credit Agreement) with the Approved Budget and the covenants set forth in Sections VI and VII of the DIP Credit Agreement, (B) the accuracy, in all material respects, of the representations and warranties set forth in Section V of the DIP Credit Agreement and (C) the delivery by the Debtors to the Prepetition Term Loan Lenders, on each business day of a "flash" cash report for the Debtors substantially in the form of, and containing substantially the information (to the extent applicable) as set forth in, daily cash reporting provided by or on behalf of the Debtors to the DIP Lender. Subject to the Sections VI 26 and VII 32(ii)(A), 34 and 36 hereof, the provisions of which are incorporated herein *mutatis mutandis* with respect to the Prepetition Term Lenders, the Debtors' authorization to use the Prepetition Term Loan Lenders' Cash Collateral shall terminate upon the failure of the Debtors to comply with any of the items set forth in clause (A) through (C) in the immediately preceding *proviso* in the preceding sentence.<br><br>*See* Interim Order ¶12. |

| Local Rule Requirement | Description of Provision |
|---|---|
| **DIP Collateral**<br><br>*Local Rule 4001-2(a)(ii)* | The DIP Collateral, as defined in the DIP Financing Agreements, including: (a) all Accounts; (b) all Goods, including Equipment, Inventory and Fixtures; (c) all Documents, Instruments and Chattel Paper; (d) all Letters of Credit and Letter-of-Credit Rights; (e) all Securities Collateral; (f) all Investment Property; (g) all Intellectual Property Collateral; (h) all Commercial Tort Claims, including, without limitation, those described in Section IV of the Information Certificate; (i) all General Intangibles; (j) all Deposit Accounts; (k) all Supporting Obligations; (l) all books and records relating to the Collateral; and (m) to the extent not covered by the foregoing clauses (a) through (l), all other personal property of the Debtors, whether tangible or intangible, and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtors from time to time with respect to any of the foregoing.<br><br>The DIP Collateral shall also include Bankruptcy Recoveries, <u>but only</u> (A) the full amount of any such recovery or settlement thereof to the extent arising under section 549 of the Bankruptcy Code and (B) subject to entry of the Final Order, all amounts necessary to reimburse the DIP Lender for the amount of the Carve Out, if any, used to finance the pursuit of such recovery or settlement with respect to all other Bankruptcy Recoveries.  As used herein, Bankruptcy Recoveries shall mean any claims and causes of action to which the Debtors may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtors or the estates of the Debtors under Chapter 5 of the Bankruptcy Code and any and all recoveries and settlements thereof.<br><br>Finally, the Collateral includes the proceeds of all of the Debtors' interests in leaseholds, but not the leaseholds themselves, whether or not so perfected prior to the Petition Date.<br><br>*See* Interim Order ¶6. |
| **Covenants**<br><br>*Local Rule 4001-2(a)(ii)* | The DIP Credit Agreement requires compliance with affirmative and negative covenants that are usual and customary for DIP financings.<br><br>*See* DIP Credit Agreement art. VI, VII. |
| **Events of Default** | Usual and customary for comparable financings including, without limitation: (a) failure to pay any principal, interest, or other amount payable under any Loan Document; (b) failure to perform or observe covenants or agreements; (c) material impairment of the priority of the Credit Parties' interest; (d) material inaccuracy of a representation or warranty; (e) cross-default to any Indebtedness except defaults occasioned by the filing of these chapter 11 cases; (f) failure or admission of inability to pay debts as they become due; (g) entry of a final judgment for payment of money in excess of $3 million to the extent not covered by insurance; (h) the occurrence of certain ERISA Events; (i) any provision of the Loan Documents ceases to be in full force and effect in any material respect; (j) the occurrence of any uninsured loss to any material portion of the Collateral; |

| Local Rule Requirement | Description of Provision |
|---|---|
| | (k) a breach of any Material Contract; (l) the indictment or institution of any legal process or proceeding against, any Loan Party or any Subsidiary; (m) the termination or attempted termination of any Facility Guaranty other than in accordance with the terms of the Loan Documents; (n) the subordination provisions of the Subordinated Debt Documents terminate, cease to be effective, or cease to be legally valid; (o) the invalidation of any provision of the Intercreditor Agreement; (p) the amendment or reversal of any DIP order; (q) the termination of the Agency Agreement by the counterparty thereto as a result of any default by a Loan Party thereunder; (r) the chapter 11 case is dismissed or converted to chapter 7 cases or a chapter 11 trustee  or an examiner with expanded powers to operate or manage the Debtors is appointed; (s) the failure of the Bankruptcy Court to enter a Final Borrowing Order, in form and substance satisfactory to the Administrative Agent and the Initial Lenders, within 45 days after the Petition Date; (t) an order granting relief from the automatic stay; (u) the filing of any application by any Loan Party without the express prior written consent of the Administrative Agent for the approval of any superpriority claim in these chapter 11 cases which is pari passu with or senior to the priority of the claims of the Administrative Agent, the Lenders and other Credit Parties for the Obligations, or there shall arise any such superpriority claim under the Bankruptcy Code; (v) the payment or other discharge by any Loan Party of any prepetition Indebtedness, except as expressly permitted hereunder, under any DIP Order, or in the Budget or by order in these chapter 11 cases to which order the Administrative Agent has provided its written consent, including payments of Prepetition Indebtedness as permitted under orders granting first day relief; (w) the entry of any order in these chapter 11 cases which provides adequate protection, or the granting by any Loan Party of similar relief in favor of any one or more of a Loan Party's Prepetition creditors contrary to the terms and conditions of any DIP Order or the terms hereof; (x) the failure of any Loan Party to comply with each and all of the terms and conditions of any DIP Order or comply in all material respects with the Cash Management Order, the GOB Sale Order or any other order entered in these chapter 11 cases; (y) the filing of certain motions by any Loan Party; (z) the filing of a motion by any Loan Party seeking approval of a Disclosure Statement and a Bankruptcy Plan, or the entry of an order confirming a Bankruptcy Plan, that does not require repayment in full in cash of all Obligations and Prepetition ABL Liabilities on the Consummation Date of such Bankruptcy Plan; or (aa) the challenge to Prepetition ABL Liabilities. |
| *Local Rule 4001-2(a)(ii)* | *See* DIP Credit Agreement art. VIII. |
| **Release, Waivers or Limitation of Rights** | 506(c) Claims:  As a further condition of the DIP Facility and any obligation of the DIP Lender to make credit extensions pursuant to the DIP Financing Agreements, upon entry of the Final Order, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in these chapter 11 cases or any Successor Case) shall be deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code with respect to the Prepetition Secured Lenders, DIP Lender, the Prepetition Collateral, and the DIP |

| Local Rule Requirement | Description of Provision |
|---|---|
| *Local Rules 4001-2(a)(i)(B),(C)* | Collateral.<br><br>*See* Interim Order ¶39. |
| **Avoidance Actions**<br><br><br><br><br><br><br>*Local Rule 4001-2(a)(1)(D)* | The DIP Collateral includes claims and causes of action arising under section 549 of the Bankruptcy Code that the Debtors may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtors or the estates of the Debtors under chapter 5 of the Bankruptcy Code and any and all recoveries and settlements thereof, but only, subject to entry of the Final Order, to the extent necessary to reimburse the DIP Lender for the amount of the Carve Out, if any, used to finance the pursuit of such recovery or settlement with respect to all other Bankruptcy Recoveries.<br><br>*See* Interim Order ¶6. |

## Jurisdiction

15.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief requested herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2.

## Proposed Adequate Protection and Use of Cash Collateral

16.     In addition to the DIP Financing, the Debtors also require the use of the Prepetition Secured Lenders' Cash Collateral.  The Prepetition Lenders have consented to the use of their cash collateral.  The proceeds of the DIP Facility, coupled with the use of Cash Collateral (consistent with the Budget) will provide the Debtors with the capital necessary to wind-down their business in an orderly manner.

17.     The Debtors submit that the Prepetition Term Loan Lenders and the Prepetition ABL Lender (on an interim basis until the satisfaction of the Roll-Up Obligations)

are entitled to receive adequate protection as set forth in the Interim Order pursuant to sections

361, 363, and 364 of the Bankruptcy Code, for and to the extent of any postpetition diminution in

the value of its interest in the Prepetition Collateral (including Cash Collateral) resulting from the

Debtors' use, sale, or lease of such collateral, the imposition of the automatic stay, and the

subordination to the Carve Out and the DIP Financing (collectively, the "**Diminution in**

**Value**").

       18.     Accordingly, the Debtors have agreed to provide the Prepetition Secured

Lenders with the following adequate protection, in each case to and for the benefits of the

Prepetition ABL Lender only until the satisfaction of the Roll-Up Obligations:

    a)    Subject only to the Carve Out, as adequate protection for the use of the DIP Collateral securing the Prepetition Term Loan before entry of the Interim Order, the Prepetition Secured Lenders shall receive:

       (i)    payment in cash on a monthly basis of interest accruing on the Prepetition Term Loan at the "Default Rate" as provided in the Prepetition Financing Agreements;

       (ii)   payment in cash on a current basis of all reasonable and documented out-of-pocket fees, costs and expenses of the Prepetition Secured Lenders, advisors and attorneys;

       (iii)  all products and proceeds of the Prepetition Collateral and the DIP Collateral regardless of whether such collateral came into existence prior to the Petition Date which shall be applied first, to reduce the Prepetition ABL Debt and second, to reduce the DIP Obligations until paid in full;

       (iv)  subject to a Final Order, payment in full of the remaining Prepetition ABL Debt;

       (v)   replacement liens to the extent of Diminution in Value of the Prepetition Collateral, including replacement liens on all unencumbered assets of the Debtors, which liens will be junior to the Carve Out, the DIP Liens securing the DIP Facility and Permitted Prior Liens; and

       (vi)  superpriority administrative expense claims with respect to all administrative expense claims and unsecured claims against the Debtors and their estates to the extent of Diminution in Value of the Prepetition Collateral, which claims will be junior to the obligations arising under the

(i) DIP Liens, (ii) the DIP Superpriority Claim and (iii) the Carve Out.

19.    The proposed forms of adequate protection described above are needed for the purpose of, among other things, protecting the Prepetition Secured Lenders' claims, obligations, and interest in collateral from potential depreciation during the pendency of these chapter 11 cases, for so long as such claims exist.

**Basis for Relief**

**A.    Entry Into the Proposed DIP Credit Agreement Should Be Authorized**

20.    Absent the relief requested herein, the Debtors' ability to conduct an orderly wind-down of their operations would be jeopardized.  The Debtors will be forced to cease operations immediately if they are unable to procure the funds necessary to pay postpetition wages and salaries and payroll taxes, as well as other expenses required to maintain the Debtors' business through the liquidation.

*1.    Approval Under Section 364(c) of the Bankruptcy Code*

21.    The Debtors propose to obtain the DIP Financing by providing to the DIP Lender security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code.  The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that the Debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).

22.    Section 364(c) financing is appropriate when the trustee or debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. *See In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (denying motion for authorization to enter into postpetition credit facility where debtors could not prove that they were unable to obtain unsecured credit allowable as an administrative expense); *In re Crouse*

*Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of

the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit

cannot be obtained).

        23.     Courts have articulated a three-part test to determine whether a debtor is

entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to

whether:

    a)     the debtor is unable to obtain unsecured credit under section 364(b),
*i.e.*, by allowing a lender only an administrative claim;

    b)     the credit transaction is necessary to preserve the assets of the estate; and

    c)     the terms of the transaction are fair, reasonable and adequate, given the
circumstances of the debtor-borrower and the proposed lender.

*In re L.A. Dodgers LLC*, 457 B.R. at 312; *see also In re Ames Dep't Stores*, 115 B.R. 34, 37-39

(Bankr. S.D.N.Y. 1990); *Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991).  As is fully

set forth below the Debtors have satisfied, each of these conditions.

      *2.*    ***The Debtors Do Not Have an Alternative to the DIP Financing***

        24.     As set forth above, and as the Debtors will show at the Interim Hearing,

financing of the type and in the amount needed in these cases was not obtainable on an

unsecured basis.  There were no potential sources of postpetition financing for the Debtors,

avoidable on an expedited basis and on reasonable terms, because, among other reasons,

third-party financiers would have been required to prime the Prepetition Term Loan Lenders and

the potential lenders approached by PWP did not have an appetite to engage in a non-consensual

priming dispute with the Prepetition Term Loan Lenders.  In these circumstances, "[t]he statute

imposes no duty to seek credit from every possible lender before concluding that such credit is

unavailable."  *Bray v. Shenandoah Fed. Sav. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085,

1088 (4th Cir. 1986); *see In re Phoenix Steel Corp.*, 39 B.R. 218, 222 (D. Del. 1984) (Debtor

satisfied its burden to show an inability to obtain credit on other terms through time and effort);
*see also In re Ames Dep't Stores*, 115 B.R. at 37.

25.     A debtor need only demonstrate "by a good faith effort that credit was not
available without" the protections afforded to potential lenders by sections 364(c) and 364(d) of
the Bankruptcy Code.  *Snowshoe*, 789 F.2d at 1088; *see also In re Antico Mfg. Co.*, 31 B.R. 103,
105 (Bankr. E.D.N.Y. 1983).  Moreover, where there are few lenders likely to be able and
willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to
require [the debtor] to conduct . . . an exhaustive search for financing."  *In re Sky Valley*, *Inc.*,
100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989).  Thus, the
evidence introduced at the Interim Hearing to consider the relief requested in the Interim Order
will satisfy the requirement of section 364(c) of the Bankruptcy Code that alternative credit was
not available on an unsecured basis allowable as an administrative claim under section 503(b)(1)
of the Bankruptcy Code.

     *3.*     ***The DIP Financing is Necessary to Preserve the Assets of the Debtors' Estates***

26.     The Debtors need immediate access to financing.  Access to substantial
credit is necessary to meet the day-to-day costs associated with liquidating the Debtors' business,
including funding for employee wages and other costs necessary to operate the Debtors' business
until such time as the liquidation is complete.  Access to sufficient cash is therefore critical to the
Debtors.  In the absence of immediate liquidity, many of the Debtors' employees may refuse to
continue providing services to the Debtors, rendering the Debtors unable to operate their
business during the wind-down process.  A loss of confidence among employees and other
interested parties in the Debtors' ability to access credit at this crucial time would have a material
adverse impact on the liquidation value of the Debtors' wind-down.

27.     For these reasons, immediate access to the funds available under the DIP Credit Agreement is critical to the Debtors.  The ongoing smooth operations of the business demands that the Debtors not be delayed in receiving the beneficial effects of the DIP Financing; any substantial delay could have the same impact as denial of this Motion.

### 4.     *The Terms of the DIP Credit Agreement Are Fair, Reasonable, and Appropriate*

28.     The DIP Financing reflects the exercise of the Debtors' sound and prudent business judgment.  As described above, the Debtors were not able to obtain alternative financing on an unsecured basis, nor were they able to obtain any financing on terms as favorable to them as the terms negotiated with the DIP Lender.  The Prepetition Term Loan Lenders have consented to the use of cash collateral and priming liens proposed hereunder and will receive adequate protection as outlined above.  Because the Debtors are requesting that the Prepetition ABL Facility be "rolled-up" into the DIP Financing, and the Prepetition ABL Credit Agreement will be terminated upon the granting of such relief in the Final Order, no adequate protection need be provided to the Prepetition ABL Lender from and after the effectuation of the roll-up.  Prior to the roll-up and the Final Order, the Debtors do propose to provide adequate protection to the Prepetition ABL Lender as outlined above.  In the Debtors' business judgment, the DIP Financing is the best option available for the Debtors to obtain much-needed liquidity in the circumstances of these chapter 11 cases.

29.     The DIP Credit Agreement provides that the security interests and administrative expense claims granted to the DIP Lender are subject to the Carve Out.  In *Ames Dep't Stores*, 115 B.R. at 40, the bankruptcy court found that such "carve outs" are not only reasonable, but are necessary to ensure that official committees and debtors' estates will be assured of the assistance of counsel.

30.     The terms and conditions of the DIP Credit Agreement are fair and reasonable and were negotiated by the parties in good faith and at arm's-length.  The interest rate under the DIP Credit Agreement is within the range of market rates and fair and reasonable in light of the credit profile of the Debtors, the nature and extent of the DIP Collateral, and the business risks associated with lending to the Debtors in these chapter 11 cases.  Accordingly, the Debtors submit that the DIP Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code.

**B.      Application of the Business Judgment Standard**

31.     As described above, after appropriate investigation and analysis, and given the exigencies of the circumstances, the Debtors' management has concluded that alternative credit of the type and in the amount required by the Debtors is not available on an unsecured basis.  Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision fails the arbitrary and capricious standard.  *See Trans World Airlines*, *Inc. v. Travelers Int'l AG (In re Trans World Airlines*, *Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility, and asset-based facility "reflect[ed] sound and prudent business judgment . . . [was] reasonable under the circumstances and in the best interest of [the debtor] and its creditors"); *In re After Six*, *Inc.*, 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993) (debtor "is entitled to some free reign in fulfilling its perceived mission of . . . keeping an ongoing business afloat").  Indeed, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtors' estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially."  *Richmond Leasing Co. v. Capital Bank*, *N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

32.     In general, a bankruptcy court defers to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see also After Six*, 154 B.R. at 882-83.  Courts generally will not second guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *Curlew Valley Assocs.*, 14 B.R. at 513-14 (footnote omitted).

33.     The Debtors have exercised sound business judgment in determining that the DIP Financing is not only appropriate, it is necessary.  Furthermore, the Debtors have satisfied the legal prerequisites to borrow under the DIP Credit Agreement.  The terms of the DIP Credit Agreement are fair and reasonable and are in the best interests of the Debtors' estates.  Accordingly, the Debtors should be granted authority to enter into the DIP Credit Agreement, and borrow funds on the secured basis described above, establish that they should be granted the authority to pursuant to section 364(c) of the Bankruptcy Code, and to take the other actions contemplated by the DIP Credit Agreement and as requested herein.

34.     Without the liquidity provided by the DIP Credit Agreement, the Debtors would be unable to pay suppliers, employees, and other constituencies that are essential to the orderly wind-down of the business.  The Debtors' management has exercised its best business judgment in negotiating the DIP Credit Agreement that is presently before the Court.

## C.     Use of the Cash Collateral Should Be Approved

35.     Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).  The Debtors require the use of cash collateral to fund their

operations in accordance with the DIP Financing Agreement.  Indeed, absent such relief, the

Debtors' business will be brought to an immediate halt, with damaging consequences for the

Debtors and their estates and creditors.  The interests of the Prepetition ABL Lender and

Prepetition Term Loan Lenders in the Debtors' cash collateral will be protected by the adequate

protection set forth above.  Moreover, as noted above, the Prepetition Term Loan Lenders have

consented to the use of their cash collateral.  Accordingly, as part of the DIP Financing requested

herein, the Debtors' request to use cash collateral in the operation of their businesses and

administration of these chapter 11 cases should be approved.

**D.      The Proposed Adequate Protection Should Be Authorized**

36.      Section 363(e) of the Bankruptcy Code provides that, "on request of an

entity that has an interest in property used ... or proposed to be used by a debtor in possession,

the court ... shall prohibit or condition such use ... as is necessary to provide adequate protection

of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the forms

of adequate protection, which include periodic cash payments, additional liens, replacement liens

and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided

on a case-by-case basis. *See MNBank Dall., N.A. v. O'Connor (In re O'Connor),* 808 F.2d 1393,

1396-97 (10th Cir. 1987); *Martin v. U.S. (In re Martin),* 761 F.2d 472, 474 (8th Cir. 1985); *In re

Shaw Indus., Inc.,* 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003). The focus of the requirement is to

protect a secured creditor from diminution in the value of its interest in the particular collateral

during the period of use. *See In re Swedeland Dev. Grp., Inc.,* 16 F.3d 552, 564 (3d Cir. 1994)

("The whole purpose of adequate protection for a creditor is to insure that the creditor receives

the value for which he bargained prebankruptcy.") (internal citations omitted).

37.      As noted above, as adequate protection for the interests of the Prepetition ABL

Lender and Prepetition Term Loan Lenders, the Debtors will provide the Prepetition ABL Lender and the

Prepetition Term Loan Lenders with replacement liens, superpriority claims, and adequate protection payments. In consideration for the adequate protection provided to them, the Prepetition Term Loan Lenders have consented to the Debtors' use of their cash collateral. Without access to the proposed DIP Financing and use of cash collateral, the Debtors' liquidity will quickly dry up and the Debtors will be forced to cease operations immediately, destroying the value of these estates to the detriment of all creditors. In contrast, the value of the interest of the Prepetition ABL Lender and the Prepetition Term Loan Lenders in their collateral will be preserved, if not increased, by the DIP Financing because it ensures a more orderly wind-down of the business.

38.    The adequate protection offered to the Prepetition ABL Lender and the Prepetition Term Loan Lenders described above will, taken together, sufficiently protect their interest in any Prepetition Collateral. Accordingly, the adequate protection proposed here is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

## E.    Request for Modification of Automatic Stay

39.    Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The proposed DIP Credit Agreement contemplates a modification of the automatic stay (to the extent applicable), to permit the exercise of all rights and remedies provided for in the DIP Credit Agreement upon the occurrence and during the continuation of any Event of Default, provided that prior to the exercise of any enforcement remedies against the DIP Collateral, the DIP Lender shall be required to give five days' notice to the Debtors, any official unsecured creditors' committee's counsel, and the U.S. Trustee as provided for in paragraph I-D of the proposed Interim Order. Provisions of this kind allowing for a modification of the automatic stay are typically features of postpetition debtor in possession

financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.

**F.      Request for Immediate Interim Relief**

40.      Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion, and to authorize the obtaining and use of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  *See*, *e.g.*, *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985).  After the 14-day period, the request for financing is not limited to those amounts necessary to prevent destruction of the debtor's business.  A debtor is entitled to borrow those amounts that it believes prudent in the operation of its business.  *See*, *e.g.*, *id*. at 449; *Ames Dep't Stores*, 115 B.R. at 36.

41.      Pending the Final Hearing, the Debtors require immediate use of a portion of funds provided for in the DIP Credit Agreement for, among other things, the Debtors' working capital needs.  It is essential that the Debtors immediately have the ability to pay for postpetition liquidation expenses, as well as the prepetition expenses approved in the various first-day orders pending before the Court, to minimize the damage occasioned by their constrained liquidity.

42.      Absent immediate use of a portion of the DIP Financing, the Debtors will be unable to pay ongoing operational expenses and will not be able to continue to make payments to key constituencies, such as employee, that will be integral to the wind-down of the Debtor's business.  Consequently, if interim relief is not obtained, the Debtors' assets will be

jeopardized immediately and irreparably harmed, to the detriment of the Debtors' estates, their creditors, and other parties in interest.

43.     As noted above, the Debtors are unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient to wind-down their operations.  Without the DIP Financing, the Debtors' objective of expeditiously liquidating their inventory and winding-down their operations in an orderly manner may fail.  The terms and conditions of the DIP Credit Agreement are fair and reasonable, and were negotiated by well-represented parties in good faith and at arm's-length.  In these circumstances and, importantly, in light of the risk of possible material irreparable harm to the Debtors' operations, the Debtors respectfully submit the granting of the relief requested by this Motion is warranted.

**G.     The DIP Financing Should Be Accorded the Benefits of Section 364(e)**

44.     Because the DIP Credit Agreement has been negotiated in good faith and at arm's-length and no consideration is being provided to any party for obligations arising under the DIP Credit Agreement, other than as disclosed therein, the Debtors request that the DIP Credit Agreement be accorded the benefits of section 364(e) of the Bankruptcy Code.

<u>**Notice**</u>

45.     Notice of this Motion will be provided to:  (a) the U.S. Trustee; (b)  Riemer & Braunstein LLP, as counsel to Wells Fargo Bank, National Association; (c) Kirkland & Ellis LLP, as counsel to the Prepetition Term Loan Lenders; (d) the 30 largest unsecured creditors of the Debtors, on a consolidated basis; (e)  any other entity asserting recorded liens against any of the Debtors' assets, and their counsel, if known; (f) the Internal Revenue Service; and (g) the Securities and Exchange Commission in compliance with Bankruptcy Rules 4001(b) and (c) and the Local Rules.  As this Motion is seeking "first-day"

relief, within two days of the hearing on this Motion, the Debtors will serve copies of this

Motion and any order entered in respect of this Motion as required by Local Rule 9013-1(m).

The Debtors respectfully submit that, in light of the nature of the relief requested, no other or

further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the Interim

Order, substantially in the form attached hereto as <u>Exhibit A</u>, granting the relief requested in this

Motion on an interim basis and such other and further relief as may be just and proper.

Dated:    Wilmington, Delaware          Respectfully submitted,
          April 11, 2014

                                        SHEARMAN & STERLING LLP
                                        Douglas P. Bartner (Pro Hac Vice Admission Pending)
                                        Jill Frizzley (Pro Hac Vice Admission Pending)
                                        599 Lexington Avenue
                                        New York, New York 10022
                                        Telephone:  (212) 848-4000
                                        Facsimile:   (646) 848-8174

                                                 -and-

                                        YOUNG CONAWAY STARGATT & TAYLOR, LLP

                                        /S/ KENNETH J. ENOS
                                        Pauline K. Morgan (No. 3650)
                                        Kenneth J. Enos (No. 4544)
                                        Rodney Square
                                        1000 North King Street
                                        Wilmington, Delaware 19801
                                        Telephone: (302) 571-6600
                                        Facsimile:  (302) 571-1253

                                        Proposed Counsel to the Debtors and Debtors in Possession