# **EXHIBIT B**

## **DIP Credit Agreement**

**SENIOR SECURED, SUPER-PRIORITY DEBTOR IN POSSESSION
CREDIT AGREEMENT**

Dated as of April 11, 2014

among

COLDWATER CREEK U.S. INC.,

as a Debtor and as Debtor in Possession

and

THE OTHER BORROWERS PARTY HERETO,

each as a Debtor and as Debtor in Possession

and

THE GUARANTORS PARTY HERETO,

each as a Debtor and as Debtor in Possession

and

WELLS FARGO BANK, NATIONAL ASSOCIATION,

as Administrative Agent, Collateral Agent and Swing Line Lender

and

THE LENDERS PARTY HERETO

# TABLE OF CONTENTS

Section                                                                                       Page

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ..................................................1

    1.01   Defined Terms ...................................................................................1
    1.02   Other Interpretive Provisions ........................................................35
    1.03   Accounting Terms ..........................................................................36
    1.04   Rounding ........................................................................................37
    1.05   Times of Day ..................................................................................37
    1.06   Letter of Credit Amounts ...............................................................37
    1.07   Currency Equivalents Generally ....................................................37

ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS ......................................37

    2.01   Committed Loans; Reserves............................................................37
    2.02   Borrowings of Committed Loans. ..................................................38
    2.03   Letters of Credit..............................................................................40
    2.04   Swing Line Loans...........................................................................50
    2.05   Prepayments. ..................................................................................53
    2.06   Termination or Reduction of Commitments ...................................55
    2.07   Repayment of Loans.......................................................................55
    2.08   Interest. ...........................................................................................56
    2.09   Fees.................................................................................................56
    2.10   Computation of Interest and Fees...................................................57
    2.11   Evidence of Debt. ...........................................................................57
    2.12   Payments Generally; Administrative Agent's Clawback. .....................58
    2.13   Sharing of Payments by Lenders ...................................................60
    2.14   Settlement Amongst Lenders .........................................................61

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY; APPOINTMENT
           OF LEAD BORROWER ...............................................................61

    3.01   Taxes. .............................................................................................61
    3.02   [Reserved]. .....................................................................................64
    3.03   [Reserved] ......................................................................................64
    3.04   Increased Costs...............................................................................64
    3.05   [Reserved] ......................................................................................65
    3.06   Mitigation Obligations; Replacement of Lenders. ..........................65
    3.07   Survival .........................................................................................66
    3.08   Designation of Lead Borrower as Borrowers' Agent.......................66

ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS ..............................67

    4.01   Conditions of Initial Credit Extension............................................67
    4.02   Conditions to all Credit Extensions................................................69

ARTICLE V REPRESENTATIONS AND WARRANTIES ..................................................70

    5.01   Existence, Qualification and Power ...............................................70
    5.02   Authorization; No Contravention ...................................................71
    5.03   Governmental Authorization; Other Consents ...............................71

5.04   Binding Effect ......................................................................................71
5.05   No Material Adverse Effect; Budget...............................................71
5.06   [Reserved] ............................................................................................72
5.07   No Default .............................................................................................72
5.08   Ownership of Property; Liens ..........................................................72
5.09   [Reserved] ............................................................................................73
5.10   Insurance ...............................................................................................73
5.11   Taxes ......................................................................................................73
5.12   ERISA Compliance. .............................................................................73
5.13   Subsidiaries; Equity Interests ..........................................................74
5.14   Margin Regulations; Investment Company Act; Public Utility Holding
         Company Act..........................................................................................74
5.15   Disclosure .............................................................................................75
5.16   Compliance with Laws ........................................................................75
5.17   Intellectual Property; Licenses, Etc. ...............................................75
5.18   Labor Matters. ......................................................................................76
5.19   Security Documents. ............................................................................76
5.20   [Reserved]. ...........................................................................................77
5.21   Deposit Accounts; Credit Card Arrangements. ............................77
5.22   Brokers ..................................................................................................77
5.23   Customer and Trade Relations .........................................................77
5.24   [Reserved] ............................................................................................78
5.25   Casualty.................................................................................................78
5.26   Anti-Terrorism Laws. ..........................................................................78

ARTICLE VI AFFIRMATIVE COVENANTS ...........................................................79

6.01   [Reserved ..............................................................................................79
6.02   Certificates; Other Information .......................................................79
6.03   Notices....................................................................................................81
6.04   Payment of Obligations ......................................................................83
6.05   [Reserved] ............................................................................................83
6.06   Maintenance of Properties .................................................................83
6.07   Maintenance of Insurance. .................................................................84
6.08   Compliance with Laws ........................................................................86
6.09   Books and Records; Accountants......................................................86
6.10   Inspection Rights. ................................................................................86
6.11   Use of Proceeds....................................................................................87
6.12   [Reserved] ............................................................................................87
6.13   Cash Management. ...............................................................................87
6.14   Information Regarding the Collateral..............................................89
6.15   Physical Inventories. ...........................................................................90
6.16   Environmental Laws.............................................................................90
6.17   Further Assurances. .............................................................................91
6.18   Compliance with Terms of Leaseholds.............................................92
6.19   Material Contracts ...............................................................................92
6.20   [Reserved]. ...........................................................................................92
6.21   [Reserved]. ...........................................................................................92

6.22   [Reserved]. ...............................................................................................92

6.23   Retention of Consultants; Communication with Accountants and Other Financial Advisors. ...............................................................................92

6.24   Performance Within Budget .........................................................................93

6.25   Permitted Sales Process; Agency Agreement. ............................................94

6.26   Additional Bankruptcy Related Affirmative Covenants & Waivers. ..........94

ARTICLE VII NEGATIVE COVENANTS ............................................................................95

7.01   Liens .............................................................................................................95

7.02   Investments ..................................................................................................95

7.03   Indebtedness; Disqualified Stock ................................................................95

7.04   No Additional Subsidiary ............................................................................95

7.05   Dispositions .................................................................................................95

7.06   Restricted Payments ....................................................................................96

7.07   Prepayments of Indebtedness. ....................................................................96

7.08   Change in Nature of Business. .....................................................................96

7.09   Transactions with Affiliates ........................................................................96

7.10   Burdensome Agreements .............................................................................96

7.11   Use of Proceeds ...........................................................................................97

7.12   Amendment of Material Documents. ...........................................................97

7.13   Fiscal Year. ..................................................................................................98

7.14   Deposit Accounts; Blocked Accounts; Credit Card Processor. ..................98

7.15   Consignments ..............................................................................................98

7.16   Bankruptcy Related Negative Covenants ....................................................98

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES .................................................99

8.01   Events of Default .........................................................................................99

8.02   Remedies Upon Event of Default ..............................................................103

8.03   Application of Funds .................................................................................105

ARTICLE IX AGENTS .........................................................................................................106

9.01   Appointment and Authority .......................................................................106

9.02   Rights as a Lender .....................................................................................106

9.03   Exculpatory Provisions .............................................................................107

9.04   Reliance by Agents ....................................................................................108

9.05   Delegation of Duties ..................................................................................108

9.06   Resignation of Agents ...............................................................................108

9.07   Non-Reliance on Agents and Other Lenders .............................................109

9.08   Administrative Agent May File Proofs of Claim ......................................109

9.09   Collateral and Guaranty Matters ...............................................................110

9.10   Notice of Transfer. ....................................................................................111

9.11   Reports and Financial Statements. ............................................................111

9.12   Agency for Perfection. ...............................................................................112

9.13   Indemnification of Agents .........................................................................112

9.14   Relation among Lenders ............................................................................112

9.15   Defaulting Lender ......................................................................................112

01:15322089.1

(iii)

ARTICLE X MISCELLANEOUS ........................................................................113
    10.01 Amendments, Etc. ..............................................................................113
    10.02 Notices, Financial Statements and Other Documents; Effectiveness;
           Electronic Communications. ...............................................................115
    10.03 No Waiver; Cumulative Remedies......................................................117
    10.04 Expenses; Indemnity; Damage Waiver. .............................................118
    10.05 Payments Set Aside ...........................................................................119
    10.06 Successors and Assigns. ....................................................................119
    10.07 Treatment of Certain Information; Confidentiality ............................124
    10.08 Right of Setoff ..................................................................................125
    10.09 Interest Rate Limitation ....................................................................125
    10.10 Counterparts; Integration; Effectiveness ..........................................126
    10.11 Survival .............................................................................................126
    10.12 Severability........................................................................................126
    10.13 Replacement of Lenders ....................................................................126
    10.14 Governing Law; Jurisdiction; Etc......................................................127
    10.15 Waiver of Jury Trial ..........................................................................128
    10.16 No Advisory or Fiduciary Responsibility ..........................................128
    10.17 USA PATRIOT Act Notice................................................................129
    10.18 Foreign Asset Control Regulations ....................................................129
    10.19 Time of the Essence ...........................................................................130
    10.20 Press Releases....................................................................................130
    10.21 Additional Waivers............................................................................130
    10.22 No Strict Construction. ......................................................................132
    10.23 Attachments.......................................................................................132
    10.24 Intercreditor Agreement. ...................................................................133
    10.25 DIP Orders.........................................................................................133

SIGNATURES…………………………………………………………………………..S-1

01:15322089.1

(iv)

**SCHEDULES**

| | |
|---|---|
| 1.01 | Borrowers |
| 1.02 | Guarantors |
| 1.03 | Budget |
| 2.01 | Commitments and Applicable Percentages |
| 2.03 | Existing Letters of Credit |
| 5.01 | Loan Parties Organizational Information |
| 5.08(b)(1) | Owned Real Estate |
| 5.13 | Subsidiaries; Other Equity Investments; Equity Interests in the Borrower |
| 5.17 | Intellectual Property |
| 5.21(a) | DDAs |
| 5.21(b) | Credit Card Arrangements |
| 7.01 | Existing Liens |
| 7.03 | Existing Indebtedness |
| 10.02 | Administrative Agent's Office; Certain Addresses for Notices |

**EXHIBITS**

*Form of*
| | |
|---|---|
| A | Borrowing Base Certificate |
| B | Interim DIP Order |

### SENIOR SECURED, SUPER-PRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT

This SENIOR SECURED, SUPER-PRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT (as it may be amended or, restated, supplemented or otherwise modified from time to time, this "Agreement") is entered into as of April 11, 2014, among

(i)      COLDWATER CREEK U.S. INC., a Delaware corporation, , as Debtor and Debtor in Possession (the "Lead Borrower"), as agent for the Borrowers now or hereafter party hereto,

(ii)      the BORROWERS now or hereafter party hereto, each as Debtor and Debtor in Possession,

(iii)      the GUARANTORS now or hereafter party hereto, each as Debtor and Debtor in Possession

(iv)      each lender from time to time party hereto (each individually, a "Lender" and collectively, the "Lenders"), and

(v)      WELLS FARGO BANK, NATIONAL ASSOCIATION, as Administrative Agent, Collateral Agent and Swing Line Lender.

On April 11, 2014, the Borrowers and the Guarantors commenced Chapter 11 Case No. 14-10867 (the "Chapter 11 Case") by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  The Borrower continues to operate its business and manage its properties as a debtor and debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

The Borrowers have requested, and the Agents and the Lenders have agreed, upon and subject to the terms and conditions set forth in this Agreement and the DIP Orders, to make available to the Borrowers a senior secured super-priority revolving credit facility in an aggregate principal amount not to exceed $75,000,000 (or such lesser amount as may be made available pursuant to the terms hereof) in order to (a) repay the Pre-Petition ABL Agreement, (b) fund the Chapter 11 Case in accordance with the approved Budget, (c) make certain other payments on the Closing Date as more fully provided in this Agreement, and (d) provide working capital for the Borrowers and the other Loan Parties during the pendency of the Chapter 11 Case, in each case to the extent provided for herein; and

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, the parties hereto hereby agree as follows:

### ARTICLE I
### DEFINITIONS AND ACCOUNTING TERMS

**1.01      Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"ACH" means automated clearing house transfers.

"Accommodation Payment" as defined in Section 0.

"Account" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a policy of insurance issued or to be issued, (d) for a secondary obligation incurred or to be incurred, (e) for energy provided or to be provided, (f) for the use or hire of a vessel under a charter or other contract, (g) arising out of the use of a credit or charge card or information contained on or for use with the card, or (h) as winnings in a lottery or other game of

chance operated or sponsored by a state, governmental unit of a state, or person licensed or authorized to operate the game by a state or governmental unit of a state.  The term "Account" includes health-care-insurance receivables.

"<u>Acquisition</u>" means, with respect to any Person (a) an Investment in, or a purchase of a Controlling interest in, the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit of another Person, (c) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets, or a Controlling interest in the Equity Interests, of any Person, or (d) any acquisition of any Store locations of any other Person, in each case in any transaction or group of transactions which are part of a common plan.

"<u>Act</u>" shall have the meaning provided in <u>Section 10.17</u>.

"<u>Adjusted LIBO Rate</u>" means, for any interest rate calculation with respect to any Base Rate Loan, for any interest rate calculation with respect to any Base Rate Loan, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of one percent) equal to (i) the LIBO Rate for a period  commencing on the date of such calculation and ending on the date that is thirty (30) days thereafter, in each case, <u>multiplied</u> by (ii) the Statutory Reserve Rate. The Adjusted LIBO Rate will be adjusted automatically as of the effective date of any change in the Statutory Reserve Rate.

 "<u>Administrative Agent</u>" means Wells Fargo Bank, in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"<u>Administrative Agent's Office</u>" means the Administrative Agent's address and, as appropriate, account as set forth on <u>Schedule 10.02</u>, or such other address or account as the Administrative Agent may from time to time notify the Lead Borrower and the Lenders.

"<u>Administrative Questionnaire</u>" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"<u>Affiliate</u>" means, with respect to any Person, (i) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, (ii) any director, officer, managing member, partner, trustee, or beneficiary of that Person, (iii) any other Person directly or indirectly holding 10% or more of any class of the Equity Interests of that Person, and (iv) any other Person 10% or more of any class of whose Equity Interests is held directly or indirectly by that Person; <u>provided</u> that, except where the term "Affiliate" is used in <u>Section 7.09</u>, no Credit Party (as defined in the Pre-Petition Term Loan Agreement) under the Pre-Petition Term Loan Agreement shall be deemed to be an Affiliate of the Loan Parties.

"<u>Agency Agreement</u>" means that certain agreement entered into by the Parent (on behalf of itself and its Subsidiaries) and a contractual joint venture comprising Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC, dated April 11, 2014, or any other such agreement that may be approved pursuant to the *Order Authorizing and Approving (I) Assumption of the Agency Agreement or, in the Alternative, Entry into the Overbid Agency Agreement, (II) Store Closing Sales and (III) Other Related Relief* in connection with the GOB Sale.

"<u>Agent(s)</u>" means, individually, the Administrative Agent or the Collateral Agent, and collectively means both of them.

"<u>Aggregate Commitments</u>" means the Commitments of all the Lenders.  The aggregate amount of the Lenders' Commitments as of the Closing Date is $75,000,000.

"<u>Allocable Amount</u>" has the meaning specified in <u>Section 10.21(d)</u>.

"Anti-Terrorism Laws" means the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) and (b) the Uniting and Strengthening America by providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)).

"Applicable Commitment Fee Percentage" means 0.500%.

"Applicable Lenders" means the Required Lenders, all affected Lenders, or all Lenders, as the context may require.

"Applicable Margin" means 2.00%.

"Applicable Percentage" means with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Commitments represented by such Lender's Commitment at such time. If the Commitment of each Lender to make Loans and the obligation of the L/C Issuer to make L/C Credit Extensions have been terminated pursuant to Section 8.02 or if the Aggregate Commitments have expired, then the Applicable Percentage of each Lender shall be determined based on the Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Applicable Rate" means, at any time of calculation, (a) with respect to Commercial Letters of Credit, a per annum rate equal to the Applicable Margin *less* one half of one percent (0.50%), and (b) with respect to Standby Letters of Credit, a per annum rate equal to the Applicable Margin.

"Appraisal Percentage" means 85%.

"Appraised Value" means with respect to the Borrowers' Eligible Inventory, the appraised orderly liquidation value, net of costs and expenses to be incurred in connection with any such liquidation, which value is expressed as a percentage of Cost of the Borrowers' Eligible Inventory as set forth in the Borrowers' inventory stock ledger, which value shall be determined from time to time by the most recent appraisal undertaken by an independent appraiser engaged by the Administrative Agent.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 0), and accepted by the Administrative Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such

Person prepared as of such date in accordance with GAAP if such lease, agreement or instrument were accounted for as a capital lease.

"Audited Financial Statements" means the audited Consolidated balance sheet of the Parent and its Subsidiaries for the Fiscal Year ended January 28, 2012, and the related consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Year of the Parent and its Subsidiaries, including the notes thereto.

"Availability" means, as of any date of determination thereof by the Administrative Agent, the result, if a positive number, of:

> (a)     the Loan Cap,
>
>         minus
>
> (b)     the aggregate Outstanding Amount of all Credit Extensions to, or for the account of, the Borrowers.

In calculating Availability at any time and for any purpose under this Agreement, the Lead Borrower shall certify to the Administrative Agent that all accounts payable and Taxes are being paid on a timely basis and consistent with past practices or practices otherwise permitted hereunder (absent which the Administrative Agent may establish a Reserve therefor).

"Availability Block" means an amount equal to 15% of the Borrowing Base.

"Availability Period" means the period from and including the Closing Date to the Termination Date.

"Availability Reserves" means (a) the Professional Fee Carve Out Reserve, and (b) without duplication of any other Reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves as the Administrative Agent from time to time determines in its discretion as being appropriate (i) to reflect the impediments to the Agents' ability to realize upon the Collateral, (ii) to reflect claims and liabilities that the Administrative Agent determines will need to be satisfied in connection with the realization upon the Collateral, (iii) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, or the assets, business, financial performance or financial condition of any Loan Party, (iv) to reflect that a Default or an Event of Default then exists, or (v) to reflect the amount of any priority or administrative expense claims that, in the ABL Administrative Agent's reasonable determination, require payment during the Chapter 11 Case. Without limiting the generality of the foregoing, Availability Reserves may include (but are not limited to), in the Administrative Agent's discretion, reserves based on: (i) rent; (ii) customs duties and other costs to release Inventory which is included in the Borrowing Base and which is being imported into the United States; (iii) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, and other Taxes which may have priority over the interests of the Collateral Agent in the Collateral; (iv) salaries, wages and benefits due to employees of any Loan Party, (v) Customer Credit Liabilities, (vi) warehousemen's or bailee's charges and other Permitted Encumbrances which may have priority over the interests of the Collateral Agent in the Collateral, (vii) amounts due to vendors on account of consigned goods, (viii) Cash Management Reserves, and (ix) Bank Products Reserves.

"Bank Products" means any services or facilities provided to any Loan Party by a Lender or any of its Affiliates (but excluding Cash Management Services), including, without limitation, on account of (a) credit cards, (b) Swap Contracts, (c) merchant services constituting a line of credit, (d) leasing, and (e) supply chain finance services including, without limitation, trade payable services and supplier accounts receivable purchases.

"Bank Products Reserves" means such reserves as the Administrative Agent from time to time determines in its discretion as being appropriate to reflect the liabilities and obligations of the Loan Parties with respect to Bank Products then provided or outstanding.

"Bankruptcy Code" shall mean Title 11 of the United States Code , as now or hereafter in effect or any successor thereto.

"Bankruptcy Court" has the meaning provided in the recitals to this Agreement.

"Base Rate"  means, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate, as in effect from time to time, plus one-half of one percent (0.50%), (b) the Adjusted LIBO Rate plus one percent (1.00%), or (c) the rate of interest in effect for such day as publicly announced from time to time by Wells Fargo Bank as its "prime rate."  The "prime rate" is a rate set by Wells Fargo Bank based upon various factors including Wells Fargo Bank's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate.  Any change in such rate announced by Wells Fargo Bank shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"Blocked Account" has the meaning provided in Section 6.13(a)(i).

"Blocked Account Agreement" means with respect to a Blocked Account established by a Loan Party, an agreement, in form and substance satisfactory to the Collateral Agent, establishing Control (as defined in the Security Agreement) of such account by the Collateral Agent and whereby the bank maintaining such account agrees to comply with the instructions originated by the Collateral Agent without the further consent of any Loan Party.

"Blocked Account Bank" means each bank with whom deposit accounts are maintained in which any funds of any of the Loan Parties from one or more DDAs are concentrated and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"Borrowers" means, collectively, the Lead Borrower, each Person listed on Schedule 1.01 annexed hereto.

"Borrowing" means a Committed Borrowing or a Swing Line Borrowing, as the context may require.

"Borrowing Base" means, at any time of calculation, an amount equal to:

(a)    the lesser of (i) the Cost of Eligible Inventory (net of Inventory Reserves), multiplied by 75%, or (ii) the product of (x) the Cost of Eligible Inventory (net of Inventory Reserves) and (y) the Appraised Value of Eligible Inventory, multiplied by the Appraisal Percentage;

plus

(b)     the amount of Eligible Credit Card Receivables multiplied by the Credit Card Advance Rate;

minus

(c)    the then amount of all Availability Reserves.

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit A hereto (with such changes therein as may be required by the Administrative Agent to reflect the components of and Reserves against the Borrowing Base as provided for hereunder from time to time), executed and certified as accurate and complete by a Responsible Officer of the Lead Borrower which shall include appropriate exhibits, schedules, supporting documentation, and additional reports as reasonably requested by the Administrative Agent.

01:15322089.1

"Budget" means the financial projections for the Loan Parties covering the thirteen-week period commencing on the Petition Date on a weekly basis, which projections shall include, at a minimum, projected Availability, cash receipts, operating disbursements, payroll disbursements, a reasonably detailed professional fee budget, non-operating disbursements (including, for the avoidance of doubt, professional fees) and inventory for the period covered thereby, substantially in the forms of the initial Budget annexed hereto as Schedule 1.03, and any subsequent projections furnished pursuant to Section 6.02(a) hereof, in each case, in form and substance reasonably satisfactory to the Administrative Agent.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located.

"Capital Leases" shall mean any and all lease obligations that, in accordance with GAAP, are required to be capitalized on the books of a lessee.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Case Professionals" means Persons or firms retained by the Loan Parties or the Creditors' Committee or other statutory committee appointed in the Cases pursuant to §§327 and 1103 of the Bankruptcy Code.

"Cash Collateral Account" means a non-interest bearing account established by one or more of the Loan Parties with Wells Fargo Bank, and in the name of, the Collateral Agent (as the Collateral Agent shall otherwise direct) and under the sole and exclusive dominion and control of the Collateral Agent, in which deposits are required to be made in accordance with Section 0 or 8.02(a)(iii).

"Cash Collateralize" has the meaning specified in Section 0.

"Cash Management Order" means an order entered by the Bankruptcy Court, in form and substance reasonably satisfactory to the Administrative Agent, authorizing the Loan Parties to, among other things, continue their cash management systems, as such order may be amended, modified or supplemented from time to time with the express written consent of the Administrative Agent and with the approval of the Bankruptcy Court.

"Cash Management Order Motion" has the meaning provided for in Section 6.25.

"Cash Management Reserves" means such reserves as the Administrative Agent, from time to time, determines in its discretion as being appropriate to reflect the reasonably anticipated liabilities and obligations of the Loan Parties with respect to Cash Management Services then provided or outstanding.

"Cash Management Services" means any one or more of the following types or services or facilities provided to any Loan Party by the Administrative Agent or any of its Affiliates: (a) ACH transactions, (b) cash management services, including, without limitation, controlled disbursement services, treasury, depository, overdraft, and electronic funds transfer services, (c) foreign exchange facilities, (d) credit or debit cards, and (e) merchant services not constituting a Bank Product.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any Law, rule, regulation or treaty, (b) any change in any Law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.  For purposes hereof, (y) the Dodd-Frank Act and any and all rules, regulations, orders, requests, guidelines and directives adopted, promulgated or implemented in connection therewith and (z) all rules, regulations, orders, requests, guidelines and directives adopted, promulgated or implemented by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, in each case shall be deemed to have been introduced and adopted after the Closing Date.

"Chapter 11 Case" has the meaning provided in the recitals to this Agreement.

"Closing Date" means April 11, 2014.

"Code" means the Internal Revenue Code of 1986, and the regulations promulgated thereunder, as amended and in effect.

"Coldwater Equity Documents" means the Certificate of Designation of Preferences of Convertible Series A Preferred Stock of the Parent, that certain Stock Purchase and Investor Rights Agreement, dated as of July 9, 2012, by and between the Parent and CC Holdings of Delaware, LLC - Series A, and that certain Registration Rights Agreement, dated as of July 9, 2012, by and between the Parent and CC Holdings of Delaware, LLC - Series A.

"Collateral" means any and all "Collateral", "Mortgaged Property", "Intellectual Property", or "DIP Collateral" as defined in any applicable Security Document (including, without limitation, a DIP Order) and all other property that is or is intended under the terms of the Security Documents to be subject to Liens in favor of the Collateral Agent.

"Collateral Access Agreement" means an agreement reasonably satisfactory in form and substance to the Collateral Agent executed by (a) a bailee or other Person in possession of Collateral, and (b) a landlord of Real Estate leased by any Loan Party, pursuant to which such Person (i) acknowledges the Collateral Agent's Lien on the Collateral, (ii) releases or subordinates such Person's Liens in the Collateral held by such Person or located on such Real Estate, (iii) as to any landlord, provides the Collateral Agent with access to the Collateral located in or on such Real Estate and a reasonable time to sell and dispose of the Collateral from such Real Estate, and (iv) makes such other agreements with the Collateral Agent as the Collateral Agent may reasonably require.

"Collateral Agent" means Wells Fargo Bank, acting in such capacity for its own benefit and the ratable benefit of the other Credit Parties, or any successor collateral agent.

"Commercial Letter of Credit" means any Letter of Credit issued for the purpose of providing the primary payment mechanism in connection with the purchase of any materials, goods or services by a Borrower in the ordinary course of business of such Borrower.

"Commitment" means, as to each Lender, its obligation to (a) make Committed Loans to the Borrowers pursuant to Section 2.01, (b) purchase participations in L/C Obligations, and (c) purchase participations in Swing Line Loans, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as

applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Commitment Fee" has the meaning provided in Section 2.09(a).

"Committed Borrowing" means a borrowing consisting of simultaneous Committed Loans made pursuant to Section 2.01.

"Committed Loan" has the meaning specified in Section 2.01.

"Committed Loan Note" means a promissory note made by the Borrowers in favor of a Lender evidencing Committed Loans made by such Lender, substantially in the form of Exhibit C to the Pre-Petition ABL Agreement.

"Committed Loan Notice" means a notice of a Committed Borrowing, which, if in writing, shall be substantially in the form of Exhibit A to the Pre-Petition ABL Agreement.

"Compliance Certificate" means a certificate in form and substance satisfactory to the Administrative Agent certifying compliance with the covenants set forth herein, together with supporting detail.

"Concentration Account" has the meaning provided in Section 6.13(c).

"Confirmation Agreement" means that certain Confirmation and Amendment of Ancillary Loan Documents dated as of May 16, 2011 entered into among the Loan Parties and the Pre-Petition ABL Collateral Agent, as amended and in effect from time to time.

"Consent" means actual consent given by a Lender from whom such consent is sought; or the passage of seven (7) Business Days from receipt of written notice to a Lender from the Administrative Agent of a proposed course of action to be followed by the Administrative Agent without such Lender's giving the Administrative Agent written notice of that Lender's objection to such course of action.

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Consummation Date" means the date of substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later than the effective date) of a Plan of Liquidation confirmed by a Final Order.

"Contractual Obligation" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Cost" means the lower of cost or market value of Inventory, based upon the Borrowers' accounting practices, known to the Administrative Agent, which practices have been in effect since July 9, 2012, as such calculated cost is determined from invoices received by the Borrowers, the Borrowers' purchase journals or the Borrowers' stock ledger. "Cost" does not include inventory capitalization costs, but shall include other non-purchase price charges (such as freight and duty) used in the Borrowers' calculation of cost of goods sold.

"Credit Card Advance Rate" means 85%.

"Credit Card Notifications" has the meaning provided in Section 6.13(a)(ii).

"Credit Card Receivables" means each "Account" (as defined in the UCC) together with all income, payments and proceeds thereof, owed by a major credit or debit card issuer (including,

but not limited to, Visa, Mastercard, Discover and American Express and such other issuers approved by the Administrative Agent) to a Loan Party resulting from charges by a customer of a Loan Party on credit or debit cards issued by such issuer in connection with the sale of goods by a Loan Party, or services performed by a Loan Party, in each case in the ordinary course of its business.

"Credit Extensions" mean each of the following: (a) a Borrowing, (b) an L/C Credit Extension, and (c) a Permitted Overadvance.

"Credit Party" or "Credit Parties" means (a) individually, (i) each Lender and its Affiliates, (ii) each Agent, (iii) each L/C Issuer, (iv) each beneficiary of each indemnification obligation undertaken by any Loan Party under any Loan Document, (v) any other Person to whom Obligations under this Agreement and other Loan Documents are owing, and (vi) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" means, without limitation, (a) all reasonable out-of-pocket expenses incurred by the Agents and their respective Affiliates, in connection with this Agreement and the other Loan Documents, including without limitation (i) the reasonable fees, charges and disbursements of (A) counsel for the Agents, (B) outside consultants for the Agents, (C) appraisers, (D) commercial finance examiners, and (E) all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Obligations and (ii) in connection with (A) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (B) the enforcement or protection of their rights in connection with this Agreement or the Loan Documents or efforts to preserve, protect, collect, or enforce the Collateral or in connection with any proceeding under any Debtor Relief Laws, or (C) any workout, restructuring or negotiations in respect of any Obligations, (b) with respect to the L/C Issuer, and its Affiliates, all reasonable out-of-pocket expenses incurred in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder, (c) all customary fees and charges (as adjusted from time to time) of the Agents with respect to the disbursement of funds (or the receipt of funds) to or for the account of Loan Parties (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith, and (d) all reasonable out-of-pocket expenses incurred by the Credit Parties who are not the Agents, the L/C Issuer or any Affiliate of any of them, after the occurrence and during the continuance of an Event of Default, provided that such Credit Parties shall be entitled to reimbursement for no more than one primary counsel and one local counsel in each applicable jurisdiction representing all such Credit Parties (absent a conflict of interest in which case the Credit Parties may engage and be reimbursed for additional counsel).

"Creditors' Committee" means any official committee of creditors formed, appointed or approved in the Chapter 11 Case pursuant to the Bankruptcy Code.

"Customer Credit Liabilities" means at any time, the aggregate remaining value at such time of (a) outstanding Gift Cards, and (b) outstanding Customer Deposits of the Loan Parties.

"Customer Deposits" means all customer deposits, including, without limitation, all framing deposits.

"DDA" means each checking, savings or other demand deposit account maintained by any of the Loan Parties.  All funds in each DDA shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agents and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

"<u>DDA Notification</u>" has the meaning provided therefor in <u>Section 0(i)</u>.

"<u>Debtor Relief Laws</u>" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"<u>Default</u>" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"<u>Default Rate</u>" means (a) when used with respect to Obligations other than Letter of Credit Fees, an interest rate equal to (i) the Base Rate <u>plus</u> (ii) the Applicable Margin <u>plus</u> (iii) 2% per annum; and (b) when used with respect to Letter of Credit Fees, a rate equal to the Applicable Rate for Standby Letters of Credit or Commercial Letters of Credit, as applicable, plus 2% per annum.

"<u>Defaulting Lender</u>" means any Lender that (a) has failed to fund any portion of the Committed Loans, participations in L/C Obligations or participations in Swing Line Loans required to be funded by it hereunder within one Business Day of the date required to be funded by it hereunder, (b) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within one Business Day of the date when due, unless the subject of a good faith dispute, or (c) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding.

"<u>Deteriorating Lender</u>" means any Defaulting Lender or any Lender as to which (a) the Administrative Agent or L/C Issuer believes in good faith that such Lender has defaulted in fulfilling its obligations under one or more other syndicated credit facilities, or (b) a Person that Controls such Lender has been deemed insolvent by the Administrative Agent or become the subject of any proceeding under any Debtor Relief Law.

"<u>DIP Orders</u>" means the Interim DIP Order and/or the Final DIP Order.

"<u>Disclosure Statement</u>" means the *Disclosure Statement for the Joint Plan of Liquidation of Coldwater Creek Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated April 11, 2014 as amended, supplemented or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, and that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules and any other applicable law.

"<u>Disposition</u>" or "<u>Dispose</u>" means the sale, transfer, license, lease or other disposition (including, without limitation, any sale-leaseback transaction and any sale, transfer, license or other disposition of (whether in one transaction or in a series of transactions) of any property (including, without limitation, any Equity Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"<u>Disqualified Stock</u>" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable for cash, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is 91 days after the Maturity Date; <u>provided</u>, <u>however</u>, that (i) only the portion of such Equity Interests which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock, (ii) with respect to

any Equity Interests issued to any employee or to any plan for the benefit of employees of the Parent or its Subsidiaries or by any such plan to such employees, such Equity Interest shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Parent or one of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, resignation, death or disability and (iii) if any class of Equity Interest of such Person by its terms authorizes such Person to satisfy its obligations thereunder by delivery of an Equity Interest that is not Disqualified Stock, such Equity Interests shall not be deemed to be Disqualified Stock. Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Stock solely because the holders thereof have the right to require a Loan Party to repurchase such Equity Interest upon the occurrence of a change of control or an asset sale shall not constitute Disqualified Stock so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Obligations. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Parent and its Subsidiaries may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

"Dodd-Frank Act" means the Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub.L. 111-203, H.R. 4173) signed into law on July 21, 2010, as amended from time to time.

"Dollars" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of any political subdivision of the United States.

"Effect of Bankruptcy" means, with respect to any obligation, contract or agreement to which a Loan Party is a party, any default or other legal consequences arising on account of the commencement or the filing of the Chapter 11 Case (including the implementation of any stay), or the rejection of any such obligation, contract or agreement with the approval of the Bankruptcy Court if required under applicable law.

"Eligible Assignee" means (a) a Credit Party or any of its Affiliates; (b) a bank, insurance company, or company engaged in the business of making commercial loans, which Person, together with its Affiliates, has a combined capital and surplus in excess of $250,000,000; (c) an Approved Fund; (d) any Person to whom a Credit Party assigns its rights and obligations under this Agreement as part of an assignment and transfer of such Credit Party's rights in and to a material portion of such Credit Party's portfolio of asset based credit facilities; and (e) any other Person (other than a natural person) approved by (x) the Administrative Agent, the L/C Issuer and the Swing Line Lender, and (y) unless an Event of Default has occurred and is continuing, the Lead Borrower (each such approval not to be unreasonably withheld or delayed); provided that notwithstanding the foregoing, "Eligible Assignee" shall not include a Loan Party or any of the Loan Parties' Affiliates or Subsidiaries.

"Eligible Credit Card Receivables" means at the time of any determination thereof, each Credit Card Receivable that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Credit Card Receivable (i) has been earned by performance and represents the bona fide amounts due to a Loan Party from a credit card payment processor and/or credit card issuer, and in each case originated in the ordinary course of business of such Loan Party, and (ii) in each case is acceptable to the Administrative Agent in its discretion, and is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (k) below. Without limiting the foregoing, to qualify as an Eligible

Credit Card Receivable, an Account shall indicate no Person other than a Loan Party as payee or remittance party.  In determining the amount to be so included, the face amount of an Account shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that a Loan Party may be obligated to rebate to a customer, a credit card payment processor, or credit card issuer pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by the Loan Parties to reduce the amount of such Credit Card Receivable.  Any Credit Card Receivables meeting the foregoing criteria shall be deemed Eligible Credit Card Receivables but only as long as such Credit Card Receivable is not included within any of the following categories, in which case such Credit Card Receivable shall not constitute an Eligible Credit Card Receivable:

> (a)    Credit Card Receivable which do not constitute an "Account" (as defined in the UCC);
>
> (b)    Credit Card Receivables that have been outstanding for more than five (5) Business Days from the date of sale;
>
> (c)    Credit Card Receivables with respect to which a Loan Party does not have good, valid and marketable title, free and clear of any Lien (other than Liens granted to the Collateral Agent);
>
> (d)    Credit Card Receivables that are not subject to a first priority security interest in favor of the Collateral Agent (it being the intent that chargebacks in the ordinary course by the credit card processors shall not be deemed violative of this clause);
>
> (e)    Credit Card Receivables which are disputed, are with recourse, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback);
>
> (f)    Credit Card Receivables as to which the credit card processor has the right under certain circumstances to require a Loan Party to repurchase the Accounts from such credit card processor;
>
> (g)    Credit Card Receivables due from an issuer or payment processor of the applicable credit card which is the subject of any bankruptcy or insolvency proceedings;
>
> (h)    Credit Card Receivables which are not a valid, legally enforceable obligation of the applicable issuer with respect thereto;
>
> (i)    Credit Card Receivables which do not conform to all representations, warranties or other provisions in the Loan Documents relating to Credit Card Receivables;
>
> (j)    Credit Card Receivables which are evidenced by "chattel paper" or an "instrument" of any kind unless such "chattel paper" or "instrument" is in the possession of the Collateral Agent, and to the extent necessary or appropriate, endorsed to the Collateral Agent; or
>
> (k)    Credit Card Receivables which the Administrative Agent determines in its discretion to be uncertain of collection.

 "Eligible Inventory" means, as of the date of determination thereof, without duplication, items of Inventory of a Loan Party that are finished goods, merchantable and readily saleable to the public in the ordinary course deemed by the Administrative Agent in its discretion to be eligible for inclusion in the calculation of the Borrowing Base, in each case that, except as otherwise agreed by the Administrative Agent, complies with each of the representations and warranties

respecting Inventory made by the Loan Party in the Loan Documents, and that is not excluded as ineligible by virtue of one or more of the criteria set forth below. Except as otherwise agreed by the Administrative Agent, the following items of Inventory shall not be included in Eligible Inventory:

(a) Inventory that is not solely owned by a Loan Party or a Loan Party does not have good and valid title thereto;

(b) Inventory that is leased by or is on consignment to a Loan Party or which is consigned by a Loan Party to a Person which is not a Loan Party;

(c) Inventory that is not located in the United States of America (excluding territories or possessions of the United States);

(d) Inventory that is not located at a location that is owned or leased by a Loan Party, except (i) Inventory in transit between such owned or leased locations or locations which meet the criteria set forth in clause (ii) below, or (ii) to the extent that the Loan Parties have furnished the Administrative Agent with (A) any UCC financing statements or other documents that the Administrative Agent may determine to be necessary to perfect its security interest in such Inventory at such location, and (B) a Collateral Access Agreement executed by the Person owning any such location on terms reasonably acceptable to the Administrative Agent;

(e) Inventory that is comprised of goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor, (iii) are obsolete or slow moving, or are special order or custom items, work-in-process, raw materials, or that constitute spare parts, promotional, marketing, packaging and shipping materials or supplies used or consumed in a Loan Party's business, (iv) are seasonal in nature and which have been packed away for sale in the subsequent season, (v) not in compliance with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, or (vi) are bill and hold goods;

(f) Inventory that is not subject to a perfected first-priority security interest in favor of the Collateral Agent;

(g) Inventory that consists of samples, labels, bags, packaging, and other similar non-merchandise categories;

(h) Inventory that is not insured in compliance with the provisions of Section 5.10 hereof;

(i) Inventory that has been sold but not yet delivered or as to which a Loan Party has accepted a deposit;

(j) Inventory that is subject to any licensing, patent, royalty, trademark, trade name or copyright agreement with any third party from which any Loan Party or any of its Subsidiaries has received notice of a dispute in respect of any such agreement; or

(k) Inventory which is located in a store that is the subject of an order entered by the Bankruptcy Court authorizing such Store to be closed (other than in connection with a GOB Sale).

"Environmental Indemnity Agreement" means the Amended and Restated Hazardous Materials and Indemnification Agreement dated as of July 9, 2012 between Coldwater Creek Merchandising & Logistics Inc. and the Pre-Petition ABL Administrative Agent.

"Environmental Laws" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the

protection of the environment or the release of any materials into the environment, including, without limitation, those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, interest, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental investigation, assessment, monitoring or remediation, fines, penalties or indemnities), of any Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment, disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or any building or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning provided in the UCC.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on the date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with a Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Borrower or any ERISA Affiliate.

"Event of Default" has the meaning specified in Section 8.01.  An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in Section 10.03 hereof.

"Excess Availability" means, as of any date of determination thereof by the Administrative Agent, the result, if a positive number, of (i) the Borrowing Base at such time, minus (ii) the aggregate Outstanding Amount of all Credit Extensions to, or for the account of, the Borrowers.

"<u>Excluded FATCA Tax</u>" means any tax, assessment or other governmental charge imposed under FATCA that would not have been imposed but for a failure by a Lender (or any financial institution through which any payment is made to such Lender) to comply with the requirements of FATCA.

"<u>Excluded Taxes</u>" means, with respect to the Administrative Agent, any Lender, the L/C Issuer or any other recipient of any payment to be made by or on account of any obligation of the Borrowers hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which any Borrower is located, (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Lead Borrower under <u>Section 10.13</u>), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new Lending Office) or is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with <u>Section 0</u>, except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Borrowers with respect to such withholding tax pursuant to <u>Section 0</u> and (d) Excluded FATCA Tax.

"<u>Executive Order</u>" has the meaning set forth in <u>Section 10.18</u>.

"<u>Existing Letters of Credit</u>" means, collectively, each of the letters of credit issued under the Pre-Petition ABL Agreement and outstanding on the Closing Date, as listed on <u>Schedule 2.03</u>.

"<u>Extraordinary Receipt</u>" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan reversions, indemnity payments and any purchase price adjustments and proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings) and condemnation awards (and payments in lieu thereof).

"<u>Facility Guaranty</u>" means the Amended and Restated Guaranty made by the Guarantors in favor of the Pre-Petition ABL Administrative Agent and the Pre-Petition ABL Collateral Agent, in form and substance reasonably satisfactory to the Administrative Agent.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code as of July 9, 2012 (or any amended or successor version that is substantively comparable), and any current or future regulations or official interpretations thereof.

"<u>Federal Funds Rate</u>" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Wells Fargo Bank on such day on such transactions as determined by the Administrative Agent.

"<u>Final DIP Order</u>" means an order of the Bankruptcy Court which order shall be in form, scope and substance reasonably acceptable to the Administrative Agent, and which, among other

matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guaranty) Obligations, grant Liens under this Agreement, the other Loan Documents, and the DIP Orders, and provides for the super priority of the Agents' and the Lenders' claims, which order is a Final Order.

"Final Order" means an order or judgment of the Bankruptcy Court, as entered on the docket of the Clerk of the Bankruptcy Court, that has not been reversed, stayed, modified or amended and as to which the time to appeal or seek leave to appeal, petition for certiorari, reargue or seek rehearing has expired and no proceeding for certiorari, reargument or rehearing is pending or if an appeal, petition for certiorari, reargument, or rehearing has been sought, the order or judgment of the Bankruptcy Court has been affirmed by the highest court to which the order was appealed, from which the reargument or rehearing was sought, or certiorari has been denied and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

"Fiscal Month" means any fiscal month of any Fiscal Year, which months generally end on the last Saturday of each calendar month in accordance with the fiscal accounting calendar of the Loan Parties.

"Fiscal Year" means the fiscal year of the Lead Borrower and its Subsidiaries ending on the Saturday closest to each January 31st of any calendar year.

"Foreign Asset Control Regulations" has the meaning set forth in Section 10.18.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Lead Borrower is resident for tax purposes.  For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Gift Cards" means all merchandise credits, gift certificates and gift cards of the Borrowers entitling the holder thereof to use all or a portion of the credit, certificate or gift card to pay all or a portion of the purchase price for any Inventory.

"GOB Sale" has the meaning set forth in Section 6.25.

"GOB Sale Order" has the meaning provided in Section 6.25.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, any (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner,

whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or advance or supply funds for the purchase of) any security for the payment of such Indebtedness or obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien), or (c) as an account party in respect of any letter of credit or letter of credit guaranty issued to support such Indebtedness or obligation.  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" means, collectively, the Persons listed on Schedule 1.02 hereto.

"Hazardous Materials" means all toxic, reactive, hazardous, explosive or radioactive substances wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature listed, controlled or regulated pursuant to any Environmental Law.

"Honor Date" has the meaning specified in Section 2.03(c)(i).

"Immaterial Subsidiary" means, on any date of determination, a Domestic Subsidiary of a Loan Party (other than a Loan Party), which neither owns nor has any interest in any assets or other property that is included in the Borrowing Base, and which, at all times, (a) owns or has any interest in any assets or other property with an aggregate book value (as reflected on the financial statements of such Person) of less than $100,000 in the aggregate (when taken together with the aggregate book value of the assets of all other Immaterial Subsidiaries), and (b) has annual revenue of less than $100,000 in the aggregate (when taken together with the annual revenue of all other Immaterial Subsidiaries).

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

    (a)      all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

    (b)      the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

    (c)      net obligations of such Person under any Swap Contract;

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable, whether payable directly or through a financial intermediary, so long as the trade accounts payable were accrued in the ordinary course of business and are not outstanding for more than (i) if payable through a financial intermediary, 45 days and (ii) in all other events, 30 days, past the due date therefor);

(e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     all Attributable Indebtedness of such Person;

(g)     all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person, or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends (including, for the avoidance of doubt, any Disqualified Stock); and

(h)     all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitee" has the meaning specified in Section 10.04(b).

"Independent Consultant" means Alvarez & Marsal (or another independent third party consultant reasonably acceptable to the Administrative Agent).

"Information" has the meaning specified in Section 10.07.

"Intellectual Property" means all present and future:  trade secrets, know-how and other proprietary information; trademarks, trademark applications, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications; (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights, unpatented inventions (whether or not patentable); patents and patent applications; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Intellectual Property Security Agreement" means the Amended and Restated Intellectual Property Security Agreement dated as of July 9, 2012 among the Loan Parties and the Pre-Petition ABL Collateral Agent, granting a Lien in the Intellectual Property and certain other assets of the Loan Parties, as amended and in effect from time to time.

01:15322089.1

"Intercreditor Agreement" means that certain Intercreditor Agreement dated as of July 9, 2012 by and between the Pre-Petition ABL Administrative Agent and the Pre-Petition Term Loan Agent, and acknowledged and agreed to by the Loan Parties, which was entered into in connection with the Pre-Petition ABL Agreement.

"Interest Payment Date" means as to each Loan (including a Swing Line Loan), the first calendar day of each month and the Termination Date.

"Interim DIP Order" means an order entered by the Bankruptcy Court, substantially in the form of, and containing the provisions set forth in, Exhibit B (or such other form and provisions as may be reasonably acceptable to the Administrative Agent), approving, on an interim basis, the Loan Parties' entering into and performing their obligations under this Agreement and the other Loan Documents.

"Inventory" has the meaning given that term in the UCC, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Inventory Reserves" means such reserves as may be established from time to time by the Administrative Agent in the Administrative Agent's discretion with respect to the determination of the saleability, at retail, of the Eligible Inventory or which reflect such other factors as affect the market value of the Eligible Inventory. Without limiting the generality of the foregoing, Inventory Reserves may, in the Administrative Agent's discretion, include (but are not limited to) reserves based on:

    (a)      obsolescence;

    (b)      seasonality;

    (c)      Shrink;

    (d)      imbalance;

    (e)      change in Inventory character;

    (f)      change in Inventory composition;

    (g)      change in Inventory mix;

    (h)      mark-downs (both permanent and point of sale);

    (i)      retail mark-ons and mark-ups inconsistent with prior period practice and performance, industry standards, current business plans or advertising calendar and planned advertising events; and

    (j)      out-of-date and/or expired Inventory.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any Acquisition, or (d) any other investment of money or capital in order to obtain a profitable return. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IRS" means the United States Internal Revenue Service.

"ISP" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance).

"Issuer Documents" means with respect to any Letter of Credit, the Letter Credit Application, and any other document, agreement and instrument entered into by the L/C Issuer and any Borrower (or any Subsidiary thereof) or in favor of the L/C Issuer and relating to any such Letter of Credit.

"Laws" means each international, foreign, Federal, state and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and each applicable administrative order, directed duty, request, license, authorization and permit of, and agreement with, any Governmental Authority, in each case whether or not having the force of law.

"L/C Advance" means, with respect to each Lender, such Lender's funding of its participation in any L/C Borrowing in accordance with its Applicable Percentage.

"L/C Borrowing" means an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when made or refinanced as a Committed Borrowing.

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"L/C Issuer" means (a) Wells Fargo Bank in its capacity as issuer of Letters of Credit hereunder, or any successor issuer of Letters of Credit (including Existing Letters of Credit) hereunder (which successor may only be a Lender selected by the Administrative Agent in its discretion that is reasonably satisfactory to the Lead Borrower), and (b) any other Lender selected by the Administrative Agent in its discretion that is reasonably satisfactory to the Lead Borrower.  The L/C Issuer may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of the L/C Issuer that is reasonably satisfactory to the Lead Borrower, in which case the term "L/C Issuer" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"L/C Obligations" means, as at any date of determination, the aggregate undrawn amount available to be drawn under all outstanding Letters of Credit plus the aggregate of all Unreimbursed Amounts, including all L/C Borrowings.  For purposes of computing the amounts available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.06.  For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any real property for any period of time, with the exception of any overflow storage facilities which do not contain any Collateral of the type included in the Borrowing Base, nor any other Collateral having a value in excess of $250,000 in the aggregate as to all such storage facilities.

"Lender" has the meaning specified in the introductory paragraph hereto and, as the context requires, includes the Swing Line Lender, and collectively means, all such Persons.

01:15322089.1

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Lead Borrower and the Administrative Agent.

"Letter of Credit" means each Standby Letter of Credit and each Commercial Letter of Credit issued in accordance herewith and shall include the Existing Letters of Credit. Without limiting the foregoing, all Existing Letters of Credit shall be deemed to have been issued hereunder and shall for all purposes be deemed to be "Letters of Credit" hereunder.

"Letter of Credit Application" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the L/C Issuer.

"Letter of Credit Expiration Date" means the day that is seven days prior to the Maturity Date then in effect (or, if such day is not a Business Day, the next preceding Business Day).

"Letter of Credit Fee" has the meaning specified in Section 0.

"Letter of Credit Sublimit" means an amount equal to $30,000,000.  The Letter of Credit Sublimit is part of, and not in addition to, the Aggregate Commitments.  A permanent reduction of the Aggregate Commitments shall require a corresponding pro rata reduction in the Letter of Credit Sublimit to an amount equal to (or, at Lead Borrower's option, less than) the Aggregate Commitments.

"LIBO Rate" means for any day, the rate per annum (rounded upward to the nearest whole 1/8th of 1%) for United States dollar deposits determined by the Administrative Agent for the purpose of calculating the Adjusted LIBO Rate, as the Inter-Bank Market Offered Rate in effect from time to time for the 1 month or 3 month delivery of funds in amounts approximately equal to the principal amount of such loans.  The Loan Parties understand and agree that the Administrative Agent may base its determination of the Inter-Bank Market Offered Rate upon such offers or other market indicators of the Inter-Bank Market as the Administrative Agent in its discretion deems appropriate, including but not limited to the rate offered for U.S. dollar deposits on the London Inter-Bank Market.  When interest is determined in relation to such reference rate, each change in the interest rate shall become effective each Business Day that Lender determines that such reference rate has changed.

"Lien" means (a) any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation, Synthetic Lease Obligation or other title retention agreement, any easement, right of way, covenant, restriction or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing  or any agreement to enter into or create any of the foregoing) on or affecting all or any portion of any personal property or real property or any interest therein, or any direct or indirect interest in any Loan Party) and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities; provided, however, "Lien" shall not include (i) any Loan Party's obligation to repurchase or exchange any Inventory sold in the ordinary course of business in accordance with such Loan Party's prevailing return and exchange policies, or (ii) any reserves retained by a Loan Party's credit card issuer or credit card processor in its ordinary course of business.

"Liquidation" means the exercise by the Administrative Agent or Collateral Agent of those rights and remedies accorded to such Agents under the Loan Documents and applicable Law as a creditor of the Loan Parties with respect to the realization on the Collateral, including (after the occurrence and continuation of an Event of Default) the conduct by the Loan Parties acting with

the consent of the Administrative Agent, of any public, private or "going-out-of-business", "store closing" or other similar sale or any other disposition of the Collateral for the purpose of liquidating the Collateral.  Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"Loan" means an extension of credit by a Lender to any Borrower under Article II in the form of a Committed Loan or a Swing Line Loan.

"Loan Account" has the meaning assigned to such term in Section 0.

"Loan Cap" means, at any time of determination, (a) the lesser of (x) the Aggregate Commitments at such time, or (y) the Borrowing Base at such time, minus (b) the Availability Block, minus (c) the aggregate Outstanding Amount (as defined in the Pre-Petition ABL Agreement) of all Pre-Petition ABL Liabilities.

"Loan Documents" means this Agreement, the Ratification Agreement, the Intercreditor Agreement, each Note, each Issuer Document, all Borrowing Base Certificates, the Blocked Account Agreements, the Confirmation Agreement, the DDA Notifications, the Credit Card Notifications, the Security Documents, the Facility Guaranty, all agreements, instruments, documents and certificates identified in Section 4.01 and any other instrument or agreement now or hereafter executed and delivered in connection herewith, or in connection with any transaction arising out of any Cash Management Services and Bank Products provided by the Administrative Agent or any of its Affiliates, each as amended and in effect from time to time.

"Loan Parties" means, collectively, the Borrowers and the Guarantors.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent), condition (financial or otherwise) or prospects of (i) the Borrowers taken as a whole, or (ii) the Loan Parties taken as a whole; (b) a material impairment of the ability of (i) the Borrowers taken as a whole, or (ii) the Loan Parties taken as a whole, to perform their obligations under any Loan Document; (c) a material impairment of the rights and remedies of, or benefit to, the Agent or the Lenders under any Loan Document or a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party; or (d) a material adverse change in, or a material adverse effect upon, the Collateral.  In determining whether any individual event would result in a Material Adverse Effect, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other than existing events occurring on or after the Closing Date would result in a Material Adverse Effect. Notwithstanding anything to the contrary, a "Material Adverse Effect shall not be deemed to exist as a result of the Effect of Bankruptcy or the events leading up to and resulting therefrom.

"Material Contract" means, with respect to any Person, each agreement to which such Person is a party, the termination or breach of which could reasonably be expected to result in a Material Adverse Effect, including, without limitation, the Pre-Petition Term Loan Documents.

"Material Indebtedness" means (a) the Pre-Petition Term Loan Obligations and other Indebtedness owed under the Pre-Petition Term Loan Documents (it being understood that the Pre-Petition Term Loan Obligations and such other Indebtedness under the Pre-Petition Term Loan Documents shall be deemed to be "Material Indebtedness" so long as any Pre-Petition Term Loan Obligations remain outstanding), and (b) any other Indebtedness (other than the Obligations) of the Loan Parties in an aggregate principal amount exceeding $2,500,000.  For purposes of determining the amount of Material Indebtedness at any time, the amount of the

obligations in respect of any Swap Contract at such time shall be calculated at the Swap Termination Value thereof.

"Maturity Date" means the earliest of (i) May 8, 2014, unless a Final DIP Order has been entered on or before that date, (ii)  August 31, 2014; (iii) the third Business Day after the entry of a GOB Sale Order by the Bankruptcy Court authorizing a Permitted Sale of a type described under clause (d) of the definition thereof; (iv) fourteen (14) days following the entry of an order by the Bankruptcy Court confirming a Plan of Liquidation; and (v) the Consummation Date.

"Maximum Rate" has the meaning provided therefor in Section 10.09.

"Mortgage" means each and every mortgage or deed of trust, security agreement and assignment given by a Loan Party owning or holding the leasehold interest in the Real Estate encumbered thereby in favor of the Collateral Agent.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions or otherwise has liability.

"Net Proceeds" means (a) with respect to any Disposition by any Loan Party or any of its Subsidiaries, or any Extraordinary Receipt received or paid to the account of any Loan Party or any of its Subsidiaries, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset by a Lien permitted hereunder which is senior to the Collateral Agent's Lien on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the reasonable and customary out-of-pocket expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Loan Party to third parties (other than Affiliates)) and (C) with respect to the sale or issuance of any Equity Interest by any Loan Party or any of its Subsidiaries, or the incurrence or issuance of any Indebtedness by any Loan Party or any of its Subsidiaries, the excess of (i) the sum of the cash and cash equivalents received in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party or such Subsidiary in connection therewith.

"Non-Consenting Lender" has the meaning provided therefor in Section 10.01.

"Note" means (a) each Committed Loan Note and (b) the Swing Line Loan Note, as each may be amended, supplemented or modified from time to time.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means (a) all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees and expenses that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such

Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, and (b) any Other Liabilities.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity, and (d) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests and all other arrangements relating to the Control or management of such Person.

"Other Liabilities" means any obligation on account of (a) any Cash Management Services furnished to any of the Loan Parties or any of their Subsidiaries and/or (b) any transaction with any Agent, any Lender or any of their respective Affiliates, which arises out of any Bank Products entered into with any Loan Party and any such Person, as each may be amended from time to time.

"Other Taxes" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Outstanding Amount" means (i) with respect to Committed Loans and Swing Line Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Committed Loans and Swing Line Loans, as the case may be, occurring on such date; and (ii) with respect to any L/C Obligations on any date, the amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date, including as a result of any reimbursements by the Borrowers of Unreimbursed Amounts.

"Overadvance" means a Credit Extension to the extent that, immediately after its having been made, Availability is less than zero.

"Owned Real Estate" means any Real Estate owned by a Loan Party.

"Parent" means Coldwater Creek Inc., a Delaware corporation.

"Participant" has the meaning specified in Section 0.

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Borrower or any ERISA Affiliate or to which any Borrower or any ERISA Affiliate contributes or has an obligation to contribute or otherwise has any liability, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Permitted Discretion" means the Administrative Agent's good faith credit judgment based upon any factor or circumstance which it reasonably believes in good faith: (i) will or could

reasonably be expected to adversely affect the value of the Collateral, the enforceability or priority of the Collateral Agent's Liens thereon in favor of the Credit Parties or the amount which the Collateral Agent and the Credit Parties would likely receive (after giving consideration to delays in payment and costs of enforcement) in the liquidation of such Collateral; (ii) suggests that any collateral report or financial information delivered to the Administrative Agent by or on behalf of the Loan Parties is incomplete, inaccurate or misleading in any material respect; (iii) could reasonably be expected to materially increase the likelihood of a bankruptcy, reorganization or other insolvency proceeding involving any Loan Party; or (iv) creates or reasonably could be expected to create a Default or Event of Default.  In exercising such judgment, the Administrative Agent may consider, without limitation, such factors or circumstances already addressed in or tested by the definition of Eligible Inventory or Eligible Credit Card Receivables as well as any of the following: (A) the financial and business climate and prospects of any Loan Party's industry and general macroeconomic conditions; (B) changes in demand for and pricing of Inventory; (C) changes in any concentration of risk with respect to Inventory; (D) any other factors or circumstances that will or could reasonably be expected to have a Material Adverse Effect; (E) audits of books and records by third parties, history of chargebacks or other credit adjustments; and (F) any other factors that change or could reasonably be expected to change the credit risk of lending to the Borrowers on the security of the Collateral.

"Permitted Encumbrances" means:

(a)      Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 6.04;

(b)      carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by applicable Law, arising in the ordinary course of business and securing obligations that are not overdue by more than thirty (30) days or are being contested in compliance with Section 6.04 and, if encumbering any Real Estate, such Liens are discharged or bonded in accordance with the terms of the applicable Mortgage;

(c)      pledges and deposits made (i) in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any Lien imposed by ERISA and (ii) in connection with a Permitted Sale of the type described in clause (d) of the definition thereof, any earnest money deposit or an escrow arrangement approved in an order entered by the Bankruptcy Court approving such sale or disposition;

(d)      deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business and, in the case of surety and performance bonds, customary liens pertaining to the obligations backed by such surety or performance bond;

(e)      Liens in respect of judgments that would not constitute an Event of Default hereunder;

(f)      easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially interfere with the ordinary conduct of business of a Loan Party and such other minor title defects or survey matters that do not materially interfere with the current use of the real property;

(g)      Liens created prior to the Petition Date and existing as of the Closing Date and listed on <u>Schedule 7.01</u> and any renewals or extensions thereof, <u>provided</u> that (i) the property covered thereby is not changed, (ii) the amount secured or benefited thereby was incurred prior to the Petition Date and is not increased, and (iii) the direct or any contingent obligor with respect thereto is not changed;

(h)      Liens in favor of the Collateral Agent;

(i)      Liens securing the Pre-Petition ABL Liabilities;

(j)      Statutory Lien of landlords' and lessors' in respect of rent not in default;

(k)      possessory Liens in favor of brokers and dealers arising in connection with the acquisition or disposition of Investments owned as of the Closing Date and Permitted Investments, <u>provided</u> that such liens (a) attach only to such Investments and (b) secure only obligations incurred in the ordinary course and arising in connection with the acquisition or disposition of such Investments and not any obligation in connection with margin financing;

(l)      Liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(m)      Liens arising from (i) precautionary UCC filings regarding "true" operating leases or, to the extent permitted under the Loan Documents, the consignment of goods to a Loan Party, or (ii) UCC filings which (x) have lapsed or (y) relate to obligations that have been indefeasibly repaid in full and for which no rights to obtain further extensions of credit or other financial accommodations remain outstanding;

(n)      Liens in favor of customs and revenues authorities imposed by applicable Law arising in the ordinary course of business in connection with the importation of goods and securing obligations (i) that are not overdue by more than thirty (30) days, or (ii)(A) that are being contested in good faith by appropriate proceedings, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation;

(o)      Liens on cash collateral securing letters of credit which are permitted under <u>clause (k)</u> of the definition of Permitted Indebtedness;

(p)      with respect to the Real Estate located at One Coldwater Creek Drive, Sandpoint, Idaho 83864 only encumbrances referred to in Schedule B of the most recent Mortgage Policy in respect thereof  received by the Collateral Agent prior to July 9, 2012 insuring the Mortgages; and

(q)      Liens in favor of the Pre-Petition Term Loan Agent under the Pre-Petition Term Loan Documents;

(r)      To the extent arising upon or after the payment of the Initial Guaranty Payment and the issuance of the Letters of Credit, Liens granted in favor of the Agent under the Agency Agreement upon the Merchandise, the Additional Agent Goods, all Proceeds (including, without limitation, credit card Proceeds), the commission regarding the sale or other disposition of Merchant's Consignment Goods under Section 5.4 of the Agency Agreement, the Owned FF&E, the commission regarding the sale or other disposition of Owned FF&E under Section 7 of the Agency Agreement, any Sharing Amount but only up to the amount of the Agent's percentage share of such Sharing Amount under Section

3.2(a) of the Agency Agreement and all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of the foregoing; provided that, until the payment of the full amount of the Initial Guaranty Payment and issuance of the Letters of Credit, such Liens shall remain junior to the Liens described in clauses (h), (i) and (q) above (capitalized terms used in this clause (r) which are not defined elsewhere in this Agreement shall have the meanings assigned to such terms in the Agency Agreement as in effect on the Closing Date).

provided, however,  that, except as provided in any one or more of clauses (a) through (q) above, the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Permitted Indebtedness" means each of the following as long as no Default or Event of Default has occurred and is continuing or would arise from the incurrence thereof:

(a)     Indebtedness incurred prior to the Petition Date which is outstanding on the Closing Date and listed on Schedule 7.03;

(b)     Indebtedness of any Loan Party to any other Loan Party; provided that such Indebtedness shall (i) be evidenced by such documentation as the Administrative Agent may reasonably require, (ii) constitute "Collateral" under this Agreement and the Security Documents, (iii) be on terms (including subordination terms) reasonably acceptable to the Administrative Agent, and (iv) be otherwise permitted pursuant to Section 7.03;

(c)     without duplication of Indebtedness described in clause (f) of this definition, to the extent incurred prior to the Petition Date and outstanding on the Closing Date, purchase money Indebtedness of any Loan Party to finance the acquisition of any fixed or capital assets, including Capital Lease Obligations and Synthetic Lease Obligations, and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof; provided, however, that, if requested by the Collateral Agent, the Loan Parties shall cause the holders of any such Indebtedness to enter into a Collateral Access Agreement on terms reasonably satisfactory to the Collateral Agent;

(d)     to the extent incurred prior to the Petition Date, obligations (contingent or otherwise) of any Loan Party or any Subsidiary thereof existing or arising under any Swap Contract, provided that such obligations are (or were) entered into by such Person in the ordinary course of business for the purpose of directly mitigating risks associated with fluctuations in interest rates or foreign exchange rates, and not for purposes of speculation or taking a "market view;" provided that the aggregate Swap Termination Value thereof shall not exceed $2,500,000 at any time outstanding;

(e)     to the extent incurred prior to the Petition Date, contingent liabilities under surety bonds or similar instruments incurred in the ordinary course of business;

(f)     the Pre-Petition Term Loan Liabilities;

(g)     the Obligations;

(h)     the Pre-Petition ABL Liabilities;

(i)     Guarantees of any Loan Party or other Subsidiary in respect of obligations of another Loan Party that are otherwise permitted to be incurred under this Agreement and the other Loan Documents; and

(j)     Indebtedness permitted by the Cash Management Order.

"Permitted Investments" means each of the following as long as no Default or Event of Default exists or would arise from the making of such Investment:

(a)      Investments made prior to the Petition Date and existing on the Closing Date, and set forth on Schedule 7.02, but not any increase in the amount thereof or any other modification of the terms thereof;

(b)      (i) Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries made prior to the Petition Date and existing on the Closing Date, and (ii) additional Investments by any Loan Party and its Subsidiaries in Loan Parties;

(c)      [reserved];

(d)      Guarantees constituting Permitted Indebtedness;

(e)      to the extent made prior to the Petition Date, Investments by any Loan Party in Swap Contracts permitted hereunder; and

(f)      to the extent made prior to the Petition Date, Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business.

"Permitted Overadvance" means an Overadvance made by the Administrative Agent, in its discretion, which:

(a)      Is made to maintain, protect or preserve the Collateral and/or the Credit Parties' rights under the Loan Documents or which is otherwise for the benefit of the Credit Parties; or

(b)      Is made to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation; and

(c)      Is made to pay any other amount chargeable to any Loan Party hereunder; and

(d)      Together with all other Permitted Overadvances then outstanding, shall not (i) exceed five percent (5%) of the Loan Cap at any time plus an amount equal to two (2) weeks of payroll and expenses at any time, or (ii) unless a Liquidation is occurring, remain outstanding for more than forty-five (45) consecutive Business Days.

provided, however, that the foregoing shall not (i) modify or abrogate any of the provisions of Section 2.03 regarding the Lender's obligations with respect to Letters of Credit or Section 2.05 regarding the Lenders' obligations with respect to Swing Line Loans, or (ii) result in any claim or liability against the Administrative Agent (regardless of the amount of any Overadvance) for Unintentional Overadvances and such Unintentional Overadvances shall not reduce the amount of Permitted Overadvances allowed hereunder, and provided further that in no event shall the Administrative Agent make an Overadvance, if after giving effect thereto, the principal amount of the Credit Extensions would exceed the Aggregate Commitments (as in effect prior to any termination of the Commitments pursuant to Section 2.07 hereof).

"Permitted Sale" means any of the following:

(a)      dispositions of Inventory of any Loan Party in the ordinary course of business;

(b)      dispositions of any furniture, fixture or equipment that is no longer used or useful in the business of the Lead Borrower and its Subsidiaries;

(c)      dispositions of real property which, as of the Closing Date, is " dark" or is no longer utilized by any Loan Party for offices or as a store or distribution center, which disposition shall be on terms reasonably satisfactory to the Agents;

(d)      (i) the disposition of all or substantially all of the Loan Parties' assets as a going concern, in a single transaction or series of related transactions, as approved by the Bankruptcy Court pursuant to the applicable provisions of the Bankruptcy Code, or other applicable law, or (ii) the GOB Sale; provided that, in the case of either (i) or (ii) above, (x) such disposition or other transaction is on terms reasonably satisfactory to the Agents,

and (y) the net cash consideration received therefrom (without giving effect to any such consideration constituting Pre-Petition Term Loan Priority Collateral) is in an amount sufficient to pay in full, and is in fact paid in cash at closing on such disposition, to satisfy the aggregate amount of all outstanding Obligations and all Pre-Petition ABL Liabilities (including all amounts necessary to fund the Pre-Petition Indemnity Account and to Cash Collateralize all Unliquidated Claims);

(e)      dispositions in connection with store closures through the retention by the Loan Parties of one or more independent, nationally recognized, professional retail inventory liquidation firms, reasonably acceptable to the Agents, which transaction shall be on terms reasonably satisfactory to the Agents and approved by the Bankruptcy Court to the extent required by applicable law; or

(f)      disposition of the administrative services building of the Loan Parties located at Sandpoint, Idaho to Litehouse Foods Inc. in form and substance consistent with the Purchase and Sale Agreement previously disclosed to the Administrative Agent and on terms approved by the Bankruptcy Court;

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Petition Date" means April 11, 2014.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established, sponsored, maintained, or contributed to by a Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate, or otherwise with respect to which any Borrower has liability.

"Pledge Agreement" means, collectively, the Amended and Restated Pledge Agreements dated as of the July 9, 2012 among the Loan Parties party thereto and the Pre-Petition ABL Collateral Agent, as amended and in effect from time to time.

"Plan of Liquidation" means a plan filed in the Chapter 11 Case pursuant to Chapter 11 of the Bankruptcy Code.

"Pre-Petition ABL Administrative Agent" means the "Administrative Agent" under (and as defined in) the Pre-Petition ABL Agreement.

"Pre-Petition ABL Agreement" shall mean that certain Amended and Restated Credit Agreement dated as of May 16, 2011 (as amended and in effect, on and prior to the date hereof, including without limitation, pursuant to the First Amendment to Credit Agreement dated as of July 9, 2012 among the Loan Parties, the Agents and the Lenders) among the Borrowers, the Guarantors, the lenders party thereto and Wells Fargo Bank (as successor by merger to Wells Fargo Retail Finance, LLC), in its capacity as Pre-Petition ABL Administrative Agent and Pre-Petition ABL Collateral Agent.

"Pre-Petition ABL Collateral Agent" means the "Collateral Agent" under (and as defined in) the Pre-Petition ABL Agreement.

"Pre-Petition ABL Documents" means the "Loan Documents" as defined in the Pre-Petition ABL Agreement.

"Pre-Petition ABL Liabilities" means (i) the "Obligations" as defined in the Pre-Petition ABL Agreement, (ii) the "Secured Obligations", as defined in the security documents executed and delivered in connection with the Pre-Petition ABL Agreement, and (iii) the "Guaranteed Obligations", as defined in the Facility Guaranty.

"Pre-Petition Indemnity Account" has the meaning provided in a DIP Order.

"<u>Pre-Petition Term Loan Agent</u>" means CC Holdings Agency Corp., as administrative agent and collateral agent under the Pre-Petition Term Loan Documents or any future administrative agent or collateral agent under the Pre-Petition Term Loan Documents.

"<u>Pre-Petition Term Loan Liabilities</u>" means (i) the "Obligations" as defined in the Pre-Petition Term Loan Agreement, (ii) the "Secured Obligations", as defined in the security documents executed and delivered in connection with the Pre-Petition Term Loan Agreement, and (iii) the "Guaranteed Obligations", as defined in the Facility Guaranty (as defined in the Pre-Petition Term Loan Agreement)

"<u>Pre-Petition Term Loan</u>" means the "Loan" (as defined in the Pre-Petition Term Loan Agreement).

"<u>Pre-Petition Term Loan Agreement</u>" means that certain Term Loan Agreement dated as of July 9, 2012, among the Loan Parties, the lenders party thereto, and the Pre-Petition Term Loan Agent, as amended, amended and restated, supplemented or otherwise modified from time to time or refinanced in accordance with the provisions of the Intercreditor Agreement and the DIP Orders.

"<u>Pre-Petition Term Loan Documents</u>" means the "Loan Documents" (as defined in the Pre-Petition Term Loan Agreement as in effect on the date hereof), as may be amended from time to time in accordance with the provisions in the Intercreditor Agreement and the DIP Orders.

"<u>Pre-Petition Term Loan Obligations</u>" means (i) the "Obligations" as defined in the Pre-Petition Term Loan Agreement, (ii) the "Secured Obligations", as defined in the security documents executed and delivered in connection with the Pre-Petition Term Loan Agreement, and (iii) the "Guaranteed Obligations", as defined in the Facility Guaranty (as defined in the Pre-Petition Term Loan Agreement)

"<u>Pre-Petition Term Loan Account</u>" means a segregated deposit account established by the Loan Parties for the benefit of the Prepetition Term Loan Agent and lenders under the Pre-Petition Term Loan Agreement into which the Loan Parties shall immediately deposit any proceeds of Pre-Petition Term Loan Priority Collateral obtained outside the ordinary course of business.

"<u>Pre-Petition Term Loan Priority Collateral</u>" has the meaning set forth in the Intercreditor Agreement.

"<u>Prepayment Event</u>" means:

      (a)     any Disposition (including, without limitation, pursuant to any sale-leaseback transaction or any Permitted Sale) of any property or asset of a Loan Party;

      (b)     any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of a Loan Party, unless the proceeds therefrom are required to be paid to the holder of a Lien on such property or asset having priority over the Lien of the Collateral Agent;

      (c)     the incurrence by a Loan Party of any Indebtedness for borrowed money other than Permitted Indebtedness;

      (d)     the sale or issuance of any Equity Interest by any Loan Party or any of its Subsidiaries; or

      (e)     the receipt by any Loan Party of any Extraordinary Receipts, or of any proceeds from a Permitted Sale.

"<u>Professional Fee Carve Out</u>" means the "Carve Out" as defined in a DIP Order.

"<u>Professional Fee Carve Out Reserve</u>" means a Reserve equal to the maximum possible amount of the Professional Fee Carve Out.

"Professional Fees and Expenses" means, subject to any limitations contained in the DIP Orders, (a) allowed administrative expenses payable pursuant to 28 U.S.C. § 1930(a)(6), and (b) professional fees of, and costs and expenses incurred by, Case Professionals.

"Ratification Agreement" means the Ratification Agreement, dated as of the Closing Date, among the Loan Parties and the Agents.

"Real Estate" means all Leases, and all real property, together with the buildings, structures, parking areas, and other improvements thereon, and all fixtures affixed to such real property, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof, all rents arising therefrom, and all proceeds of any of the foregoing.

"Register" has the meaning specified in Section 0.

"Registered Public Accounting Firm" has the meaning specified by the Securities Laws and shall be independent of the Parent and its Subsidiaries as prescribed by the Securities Laws.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, advisors, attorneys and representatives of such Person and of such Person's Affiliates.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Reports" has the meaning provided in Section 9.11.

"Request for Credit Extension" means (a) with respect to a Committed Borrowing, a Committed Loan Notice, (b) with respect to an L/C Credit Extension, a Letter of Credit Application, and (c) with respect to a Swing Line Loan, a Swing Line Loan Notice.

"Required Lenders" means, as of any date of determination, Lenders holding more than 50% of the Aggregate Commitments; provided, however, if there is more than one (1) Lender, such term would require at least two (2) Lenders or, if the Commitment of each Lender to make Loans and the obligation of the L/C Issuer to make L/C Credit Extensions have been terminated pursuant to Section 8.02, Lenders holding in the aggregate more than 50% of the Total Outstandings (with the aggregate amount of each Lender's risk participation and funded participation in L/C Obligations and Swing Line Loans being deemed "held" by such Lender for purposes of this definition); provided, however, that the Commitment of, and the portion in the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Reserves" means all (if any) Inventory Reserves and Availability Reserves.

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer, assistant treasurer, controller or chief accounting officer of a Loan Party or any of the other individuals designated in writing to the Administrative Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on

account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.  Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person.

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"Security Agreement" means the Amended and Restated Security Agreement dated as of July 9, 2012 among the Loan Parties and the Pre-Petition ABL Collateral Agent, as amended and in effect from time to time, and any other pledge or security agreement entered into by any Loan Party, or any other Person, granting a Lien on any property to secure the obligations and liabilities of any Loan Party under the loan facility contemplated by the Pre-Petition ABL Documents, or this Agreement, as the same may be amended, restated or otherwise modified (including pursuant to any DIP Order) from time to time.

"Security Documents" means (a) the Ratification Agreement, the Security Agreement, the Environmental Indemnity Agreement, the Pledge Agreement, the Intellectual Property Security Agreement, the Blocked Account Agreements, the Mortgages, the DDA Notifications, the Credit Card Notifications, and each other security agreement or other instrument or document executed and delivered to the Collateral Agent pursuant to this Agreement or any other Loan Document granting a Lien to secure any of the Obligations, in each case, as amended by the Ratification Agreement, and (b) the DIP Orders.

"Settlement Date" has the meaning provided in Section 2.15(a).

"Shareholders' Equity" means, as of any date of determination, consolidated shareholders' equity of the Lead Borrower and its Subsidiaries as of that date determined in accordance with GAAP.

"Shrink" means Inventory which has been lost, misplaced, stolen, or is otherwise unaccounted for.

"Standby Letter of Credit" means any Letter of Credit that is not a Commercial Letter of Credit and that (a) is used in lieu or in support of performance guaranties or performance, surety or similar bonds (excluding appeal bonds) arising in the ordinary course of business, (b) is used in lieu or in support of stay or appeal bonds, (c) supports the payment of insurance premiums for reasonably necessary casualty insurance carried by any of the Loan Parties, or (d) supports payment or performance for identified purchases or exchanges of products or services in the ordinary course of business.

"Stated Amount" means at any time the maximum amount for which a Letter of Credit may be honored.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the FRB to which Wells Fargo Bank is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall

include those imposed pursuant to such Regulation D.  Loans made based on the Adjusted LIBO Rate shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Store" means any retail store (which may include any real property, fixtures, Equipment, Inventory and other property related thereto) operated, or to be operated, by any Loan Party.

"Subordinated Indebtedness" means Indebtedness which is expressly subordinated in right of payment to the prior payment in full of the Obligations and which is in form and on terms approved in writing by the Administrative Agent.  For purposes of clarity, Subordinated Indebtedness shall not include any Pre-Petition Term Loan Obligations.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of a Loan Party.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Swing Line" means the revolving credit facility made available by the Swing Line Lender pursuant to Section 2.05.

"Swing Line Borrowing" means a borrowing of a Swing Line Loan pursuant to Section 2.05.

"Swing Line Lender" means Wells Fargo Bank, its capacity as provider of Swing Line Loans, or any successor swing line lender hereunder.

01:15322089.1

"Swing Line Loan" has the meaning specified in Section 0.

"Swing Line Loan Notice" means a notice of a Swing Line Borrowing pursuant to Section 0, which, if in writing, shall be substantially in the form of Exhibit B to the Pre-Petition ABL Agreement.

"Swing Line Loan Note" means the promissory note of the Borrowers substantially in the form of Exhibit C-2 to the Pre-Petition ABL Agreement payable to the order of the Swing Line Lender, evidencing the Swing Line Loans made by the Swing Line Lender.

"Swing Line Sublimit" means an amount equal to the lesser of (a) $10,000,000, and (b) the Aggregate Commitments.  The Swing Line Sublimit is part of, and not in addition to, the Aggregate Commitments.

"Synthetic Lease" shall mean each arrangement, however described, under which the obligor accounts for its interest in the property covered thereby under GAAP as lessee of a lease which is not a Capital Lease and accounts for its interest in the property covered thereby for Federal income tax purposes to the owner.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale-leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earliest to occur of (i) the Maturity Date, (ii) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Commitments are irrevocably terminated (or deemed terminated) in accordance with the provisions of Section 8.02, (iii) the date of termination of the Aggregate Commitments pursuant to Section 2.07, or (iv) the date which is forty five (45) days following the Closing Date, unless a Final DIP Order has been entered on or prior to such date.

"Total Outstandings" means the aggregate Outstanding Amount of all Loans and all L/C Obligations.

"Trading with the Enemy Act" has the meaning set forth in Section 10.18.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"UCP" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600 and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

01:15322089.1

"UFCA" has the meaning specified in Section 10.21(d).

"UFTA" has the meaning specified in Section 10.21(d).

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"Unintentional Overadvance" means an Overadvance which, to the Administrative Agent's knowledge, did not constitute an Overadvance when made but which has become an Overadvance resulting from changed circumstances beyond the control of the Credit Parties, including, without limitation, a reduction in the Appraised Value of property or assets included in the Borrowing Base or misrepresentation by the Loan Parties, or as a result of the incurrence of Credit Party Expenses in accordance with  the terms of this Agreement.

"Unliquidated Claims" means, collectively, all L/C Obligations, and all other Obligations which are contingent or unliquidated including, but not limited to, all indemnification obligations under Section 10.04, and all Obligations due in connection with any Bank Products, Cash Management Services, or similar products.

"United States" and "U.S." mean the United States of America.

"Unreimbursed Amount" has the meaning specified in Section 0.

"Variance Report" means, collectively, (i) a written report prepared by the Lead Borrower's management, in form and substance reasonably satisfactory to the Administrative Agent, setting forth, on a line-item basis, the Loan Parties' actual performance compared to the Budget (1) for the immediately preceding week, (2) on a rolling four (4) week basis ending as of the end of such immediately preceding week, and (3) on a cumulative basis from the Petition Date, in each case together with management's reasonably detailed written explanation of such variances, and (ii) a certificate duly executed by a Financial Officer of the Borrower, in form and substance reasonably satisfactory to the Administrative Agent, setting forth reasonably detailed calculations demonstrating compliance (or, if applicable, non-compliance) with the financial covenants set forth in Section 6.24.

"Wells Fargo Bank" means Wells Fargo Bank, N.A., a national banking association.

      **1.02    Other Interpretive Provisions.**  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

          (a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits

and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    In the case of any component of the calculation of Reserves or Borrowing Base that provides for a determination to be made in the Administrative Agent's discretion, such discretion shall be exercised by the Administrative Agent in its Permitted Discretion.

(e)    Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full (or words of similar effect) of the Obligations shall mean the repayment in Dollars in full in cash or immediately available funds (or, in the case of contingent reimbursement obligations with respect to Letters of Credit and Bank Products (other than Swap Contracts) and any other contingent Obligation, including indemnification obligations, shall mean to Cash Collateralize such Obligations).

**1.03    Accounting Terms**

(a)    _Generally_.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein. Notwithstanding anything to the contrary contained herein, all financial statements delivered hereunder or pursuant to any other Loan Document shall be prepared, and all financial covenants contained herein shall be calculated, without giving effect to any election under the Statement of Financial Accounting Standards No. 159  (or any similar accounting principle) permitting a Person to value its financial liabilities or Indebtedness at the fair value thereof.

(b)    _Changes in GAAP_.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Lead Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Lead Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Lead Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents

required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

      **1.04**    **Rounding.**  Any financial ratios required to be maintained by the Borrowers pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

      **1.05**    **Times of Day.**  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

      **1.06**    **Letter of Credit Amounts.**  Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to be the Stated Amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms or the terms of any Issuer Documents related thereto, provides for one or more automatic increases in the Stated Amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum Stated Amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum Stated Amount is in effect at such time.

      **1.07**    **Currency Equivalents Generally**.  Any amount specified in this Agreement (other than in Articles II, IX and X) or any of the other Loan Documents to be in Dollars shall also include the equivalent of such amount in any currency other than Dollars, such equivalent amount thereof in the applicable currency to be determined by the Administrative Agent at such time on the basis of the Spot Rate (as defined below) for the purchase of such currency with Dollars.  For purposes of this Section 1.07, the "Spot Rate" for a currency means the rate determined by the Administrative Agent to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two Business Days prior to the date of such determination; provided that the Administrative Agent may obtain such spot rate from another financial institution designated by the Administrative Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.

**ARTICLE II**
**THE COMMITMENTS AND CREDIT EXTENSIONS**

      **2.01**    **Committed Loans; Reserves.**  *Subject to the terms and conditions set forth herein, each Lender severally agrees to make loans (each such loan, a "Committed Loan") to the Borrowers from time to time, on any Business Day during the Availability Period, in an aggregate amount not to exceed at any time outstanding the lesser of (x) the amount of such Lender's Commitment, or (y) such Lender's Applicable Percentage of the total Borrowing Base; subject in each case to each of the following limitations:*

**after giving effect to any Committed Borrowing, the Total Outstandings shall not exceed the Loan Cap; and**

**after giving effect to any Committed Borrowing, the aggregate Outstanding Amount of the Committed Loans of any Lender, plus such Lender's Applicable Percentage of the Outstanding Amount of all L/C**

Obligations, **plus** such Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans shall not exceed such Lender's Commitment; and

the Outstanding Amount of all L/C Obligations shall not at any time exceed the Letter of Credit Sublimit; and

after giving effect to all Credit Extensions, no Overadvance shall exist.

Within the limits of each Lender's Commitment, and subject to the other terms and conditions hereof, the Borrowers may borrow under this <u>Section 2.01</u>, prepay under <u>Section 2.06</u>, and reborrow under this <u>Section 2.01</u>.

      **2.02**    **Borrowings of Committed Loans**.

*Committed Loans (including Swing Line Loans) shall be Base Rate Loans subject to and in accordance with this <u>Section 2.02</u>.*

*Each Committed Borrowing shall be made upon the Lead Borrower's irrevocable notice to the Administrative Agent, which may be given by telephone.  Each such notice must be received by the Administrative Agent not later than 11:00 a.m. one Business Day prior to the requested date of any Borrowing.  Each telephonic notice by the Lead Borrower pursuant to this <u>Section 0</u> must be confirmed promptly by delivery to the Administrative Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Lead Borrower.  Except as provided in <u>Sections 0</u> and <u>2.04(c)</u>, each Borrowing of Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof.  Each Committed Loan Notice (whether telephonic or written) shall specify (i) the requested date of the Borrowing (which shall be a Business Day), and (ii) the principal amount of Committed Loans to be borrowed.*

*Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each applicable Lender of the amount of its Applicable Percentage of the applicable Committed Loans.  In the case of a Committed Borrowing, each Lender shall make the amount of its Committed Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Committed Loan Notice.  Upon satisfaction of the applicable conditions set forth in <u>Section 4.02</u> (and, if such Borrowing is the initial Credit Extension on or after the Closing Date, <u>Section 4.01</u>), the Administrative Agent shall use reasonable efforts to make all funds so received available to the Borrowers in like funds by no later than 4:00 p.m. on the day of receipt by the Administrative Agent either by (i) crediting the account of the Lead Borrower on the books of the Administrative Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Lead Borrower; <u>provided</u>,*

*however*, that if, on the date the Committed Loan Notice with respect to such Borrowing is given by the Lead Borrower, there are L/C Borrowings outstanding, then the proceeds of such Borrowing, *first*, shall be applied to the payment in full of any such L/C Borrowings, and *second*, shall be made available to the Borrowers as provided above.

The Administrative Agent, without the request of the Lead Borrower, may advance any interest, fee, expenses, service charge, Credit Party Expenses, or other payment to which any Credit Party is entitled from the Loan Parties pursuant hereto or any other Loan Document, in each case, as and when due and payable, and may charge the same to the Loan Account notwithstanding that an Overadvance may result thereby. The Administrative Agent shall advise the Lead Borrower of any such advance or charge promptly after the making thereof.  Such action on the part of the Administrative Agent shall not constitute a waiver of the Administrative Agent's rights and the Borrowers' obligations under *Section 2.05*.  Any amount which is added to the principal balance of the Loan Account as provided in this *Section 0* shall constitute Committed Loans and shall bear interest at the interest rate then and thereafter applicable to Base Rate Loans.

[Reserved].

At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Lead Borrower and the Lenders of any change in Wells Fargo Bank's prime rate used in determining the Base Rate promptly following the public announcement of such change.

[Reserved].

The Administrative Agent, the Lenders, the Swing Line Lender and the L/C Issuer shall have no obligation to make any Committed Loan or Swing Line Loan, or to cause the issuance of or provide any Letter of Credit, if an Overadvance would result.  The Administrative Agent may, in its discretion, make Permitted Overadvances without the consent of the Lenders, the Swing Line Lender and the L/C Issuer and each Lender shall be bound thereby.  Any Permitted Overadvance may constitute a Swing Line Loan. A Permitted Overadvance is for the account of the Borrowers and shall constitute a Loan and an Obligation and shall be repaid by the Borrowers in accordance with the provisions of *Section 0*.  The making of any such Permitted Overadvance on any one occasion shall not obligate the Administrative Agent or any Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances to remain outstanding. The making by the Administrative Agent of a Permitted Overadvance shall not modify or abrogate any of the provisions of *Section*

***2.03** regarding the Lenders' obligations to purchase participations with respect to Letters of Credit or of **Section 2.04** regarding the Lenders' obligations to purchase participations with respect to Swing Line Loans.  Without limiting the foregoing, the Administrative Agent shall have no liability for, and no Loan Party or Credit Party shall have the right to, or shall, bring any claim of any kind whatsoever against the Administrative Agent with respect to any Unintentional Overadvance regardless of the amount of any such Unintentional Overadvance.*

     **2.03**    **Letters of Credit**.

## *The Letter of Credit Commitment.*

Subject to the terms and conditions set forth herein, (A) the Administrative Agent, in reliance upon the agreements of the Lenders set forth in this Section 2.03, shall cause the L/C Issuer from time to time on any Business Day during the period from the Closing Date until the Letter of Credit Expiration Date, to issue Letters of Credit for the account of the Borrowers, and to amend or extend Letters of Credit previously issued by the L/C Issuer, in accordance with Section 0 below; and (B) the Lenders severally agree to participate in Letters of Credit issued for the account of the Borrowers and any drawings thereunder; provided that after giving effect to any L/C Credit Extension with respect to any Letter of Credit, (x) the Total Outstandings shall not exceed the Loan Cap, (y) the aggregate Outstanding Amount of the Committed Loans of any Lender, plus such Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations, plus such Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans shall not exceed such Lender's Commitment, and (z) the Outstanding Amount of the L/C Obligations shall not exceed the Letter of Credit Sublimit.  Each request by the Lead Borrower for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by the Borrowers that the L/C Credit Extension so requested complies with the conditions set forth in the proviso to the preceding sentence.  Within the foregoing limits, and subject to the terms and conditions hereof, the Borrowers' ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrowers may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.  Any L/C Issuer (other than Wells Fargo Bank or any of its Affiliates) shall notify the Administrative Agent in writing on each Business Day of all Letters of Credit issued on the prior Business Day by such L/C Issuer.  All Existing Letters of Credit shall be deemed to have been issued pursuant hereto, and from and after the Closing Date shall be subject to and governed by the terms and conditions hereof (notwithstanding the fact that the Existing Letters of Credit were issued for the account of the Parent and not the Borrowers).

No Letter of Credit shall be issued if:

*subject to Section 2.04(i), the expiry date of such requested Standby Letter of Credit would occur more than twelve months after the date of issuance or last extension, unless the Required Lenders have approved such expiry date; or*

subject to *Section 2.03(b)(iii)*, the expiry date of such requested Commercial Letter of Credit would occur more than 210 days after the date of issuance or last extension, unless the Required Lenders have approved such expiry date; or

the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless either such Letter of Credit is Cash Collateralized on or prior to the Letter of Credit Expiration Date or all the Lenders have approved such expiry date.

No Letter of Credit shall be issued, without the prior consent of the Administrative Agent, if:

any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the L/C Issuer from issuing such Letter of Credit, or any Law applicable to the L/C Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the L/C Issuer shall prohibit, or request that the L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon the L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement (for which the L/C Issuer is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon the L/C Issuer any unreimbursed loss, cost or expense which was not applicable on the Closing Date and which the L/C Issuer in good faith deems material to it;

the issuance of such Letter of Credit would violate one or more policies of the L/C Issuer applicable to letters of credit generally;

except as otherwise agreed by the Administrative Agent and the L/C Issuer, such Letter of Credit is in an initial Stated Amount less than $50,000, in the case of a Commercial Letter of Credit, or $100,000, in the case of a Standby Letter of Credit;

such Letter of Credit is to be denominated in a currency other than Dollars;

**2.04**    such Letter of Credit contains any provisions for automatic reinstatement of the Stated Amount after any drawing thereunder; or

a default of any Lender's obligations to fund under *Section 0* exists or any Lender is at such time a Defaulting Lender or Deteriorating Lender hereunder, unless the Administrative Agent or the L/C Issuer has entered into satisfactory arrangements with the Borrowers or such Lender to eliminate the L/C Issuer's risk with respect to such Lender.

The Borrowers shall not permit any Letter of Credit to be amended if (A) the L/C Issuer would not be permitted at such time to issue such Letter of Credit in its amended form under the terms hereof or (B) if the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

The L/C Issuer shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and the L/C Issuer shall have all of the benefits and

01:15322089.1

immunities (A) provided to the Administrative Agent in Article IX with respect to any acts taken or omissions suffered by the L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in Article IX included the L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to the L/C Issuer.

## *Procedures for Issuance and Amendment of Letters of Credit.*

Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Lead Borrower delivered to the L/C Issuer (with a copy to the Administrative Agent) in the form of a Letter of Credit Application, appropriately completed and signed by a Responsible Officer of the Lead Borrower.  Any Letter of Credit Application or other document delivered hereunder that is signed by a Responsible Officer shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action, and such Responsible Officer shall be conclusively presumed to have acted on behalf of the Borrowers.  Such Letter of Credit Application must be received by the Administrative Agent and the L/C Issuer not later than 11:00 a.m. at least two Business Days (or such other date and time as the Administrative Agent and the L/C Issuer may agree in a particular instance in their sole discretion) prior to the proposed issuance date or date of amendment, as the case may be.  Promptly after receipt of any Letter of Credit Application, the Administrative Agent will confirm with the L/C Issuer (other than Wells Fargo Bank or any of its Affiliates), by telephone or in writing, that the L/C Issuer has received a copy of such Letter of Credit Application from the Lead Borrower and, if not, the Administrative Agent will provide the L/C Issuer with a copy thereof.  In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the Administrative Agent and the L/C Issuer: (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; and (G) such other matters as the Administrative Agent or the L/C Issuer may require.  In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the Administrative Agent and the L/C Issuer (A) the Letter of Credit to be amended; (B) the proposed date of amendment thereof (which shall be a Business Day); (C) the nature of the proposed amendment; and (D) such other matters as the Administrative Agent or the L/C Issuer may require.  Additionally, the Lead Borrower shall furnish to the L/C Issuer and the Administrative Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any Issuer Documents, as the L/C Issuer or the Administrative Agent may require.

Unless the L/C Issuer has received written notice from any Lender, the Administrative Agent or any Loan Party, at least one Business Day prior to the requested date of issuance or amendment of the applicable Letter of Credit, that one or more applicable conditions contained in Article IV shall not then be satisfied, then, subject to the terms and conditions hereof, the L/C

Issuer shall, on the requested date, issue a Letter of Credit for the account of the applicable Borrower or enter into the applicable amendment, as the case may be, in each case in accordance with the L/C Issuer's usual and customary business practices.  Immediately upon the issuance or amendment of each Letter of Credit, each Lender shall be deemed to (without any further action), and hereby irrevocably and unconditionally agrees to, purchase from the L/C Issuer, without recourse or warranty, a risk participation in such Letter of Credit in an amount equal to the product of such Lender's Applicable Percentage <u>times</u> the amount of such Letter of Credit.  Upon any change in the Commitments under this Agreement, it is hereby agreed that with respect to all L/C Obligations, there shall be an automatic adjustment to the participations hereby created to reflect the new Applicable Percentages of the assigning and assignee Lenders.

(i)        Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the L/C Issuer will also deliver to the Lead Borrower and the Administrative Agent a true and complete copy of such Letter of Credit or amendment.

### ***<u>Drawings and Reimbursements; Funding of Participations.</u>***

Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the Administrative Agent shall notify the Lead Borrower thereof; <u>provided</u>, <u>however</u>, that any failure to give or delay in giving such notice shall not relieve the Borrowers of their obligation to reimburse the L/C Issuer and the Lenders with respect to any such payment. Not later than 11:00 a.m. on the date of any payment by the L/C Issuer under a Letter of Credit (each such date, an "<u>Honor Date</u>"), the Borrowers shall reimburse the L/C Issuer through the Administrative Agent on the same day in an amount equal to the amount of such drawing.  If the Borrowers fail to fully reimburse the L/C Issuer by such time, the Administrative Agent shall promptly notify each Lender of the Honor Date, the amount of the unreimbursed drawing (the "<u>Unreimbursed Amount</u>"), and the amount of such Lender's Applicable Percentage thereof.  In such event, the Borrowers shall be deemed to have requested a Committed Borrowing of Base Rate Loans to be disbursed on the Honor Date in an amount equal to the Unreimbursed Amount, without regard to the minimum and multiples specified in <u>Section 2.02</u> for the principal amount of Base Rate Loans, but subject to the amount of the unutilized portion of the Aggregate Commitments and the conditions set forth in <u>Section 4.02</u> (other than the delivery of a Committed Loan Notice).  Any notice given by the L/C Issuer or the Administrative Agent pursuant to this <u>Section 0</u> may be given by telephone or electronic means.

Each Lender shall upon any notice pursuant to <u>Section 0</u> make funds available to the Administrative Agent for the account of the L/C Issuer at the Administrative Agent's Office in an amount equal to its Applicable Percentage of the Unreimbursed Amount not later than 1:00 p.m. on the Business Day specified in such notice by the Administrative Agent, whereupon, subject to the provisions of <u>Section 0</u>, each Lender that so makes funds available shall be deemed to have made a Base Rate Loan to the Borrowers in such amount.  The Administrative Agent shall remit the funds so received to the L/C Issuer.

With respect to any Unreimbursed Amount that is not fully refinanced by a Committed Borrowing of Base Rate Loans because the conditions set forth in <u>Section 4.02</u> cannot be satisfied or for any other reason, the Borrowers shall be deemed to have incurred from the L/C Issuer an L/C Borrowing in the amount of the Unreimbursed Amount that is not so refinanced, which L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the Default Rate.  In such event, each Lender's payment to the Administrative Agent for the account of the L/C Issuer pursuant to <u>Section 0</u> shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute an L/C Advance from such Lender in satisfaction of its participation obligation under this <u>Section 2.03</u>.

Until each Lender funds its Committed Loan or L/C Advance pursuant to this <u>Section 0</u> to reimburse the L/C Issuer for any amount drawn under any Letter of Credit, interest in respect of such Lender's Applicable Percentage of such amount shall be solely for the account of the L/C Issuer.

Each Lender's obligation to make Committed Loans or L/C Advances to reimburse the L/C Issuer for amounts drawn under Letters of Credit, as contemplated by this <u>Section 0</u>, shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the L/C Issuer, any Borrower or any other Person for any reason whatsoever; (B) the occurrence or continuance of a Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; <u>provided</u>, <u>however</u>, that each Lender's obligation to make Committed Loans pursuant to this <u>Section 0</u> is subject to the conditions set forth in <u>Section 4.02</u> (other than delivery by the Lead Borrower of a Committed Loan Notice).  No such making of an L/C Advance shall relieve or otherwise impair the obligation of the Borrowers to reimburse the L/C Issuer for the amount of any payment made by the L/C Issuer under any Letter of Credit, together with interest as provided herein.

If any Lender fails to make available to the Administrative Agent for the account of the L/C Issuer any amount required to be paid by such Lender pursuant to the foregoing provisions of this <u>Section 0</u> by the time specified in <u>Section 0</u>, the L/C Issuer shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the L/C Issuer at a rate per annum equal to the greater of the Federal Funds Rate and a rate determined by the L/C Issuer in accordance with banking industry rules on interbank compensation plus any administrative, processing or similar fees customarily charged by the L/C Issuer in connection with the foregoing.  If such Lender pays such amount (with interest and fees as aforesaid), the principal amount so paid shall constitute such Lender's Committed Loan included in the relevant Committed Borrowing or L/C Advance in respect of the relevant L/C Borrowing, as the case may be.  A certificate of the L/C Issuer submitted to any Lender (through the Administrative Agent) with respect to any amounts owing under this <u>clause (vi)</u> shall be conclusive absent manifest error.

### *Repayment of Participations.*

At any time after the L/C Issuer has made a payment under any Letter of Credit and has received from any Lender such Lender's L/C Advance in respect of such payment in accordance with Section 0, if the Administrative Agent receives for the account of the L/C Issuer any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the Borrowers or otherwise, including proceeds of Cash Collateral applied thereto by the Administrative Agent), the Administrative Agent will distribute to such Lender its Applicable Percentage thereof (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's L/C Advance was outstanding) in the same funds as those received by the Administrative Agent.

If any payment received by the Administrative Agent for the account of the L/C Issuer pursuant to Section 0 is required to be returned under any of the circumstances described in Section 10.05 (including pursuant to any settlement entered into by the L/C Issuer in its discretion), each Lender shall pay to the Administrative Agent for the account of the L/C Issuer its Applicable Percentage thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned by such Lender, at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Agreement.

***Obligations Absolute.  The obligation of the Borrowers to reimburse the L/C Issuer for each drawing under each Letter of Credit and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:***

any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Loan Document;

the existence of any claim, counterclaim, setoff, defense or other right that the Borrowers or any Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

any payment by the L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in

bankruptcy, debtor in possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Laws;

any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Borrowers or any of their Subsidiaries; or

the fact that any Event of Default shall have occurred and be continuing.

The Lead Borrower shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to it and, in the event of any claim of noncompliance with the Lead Borrower's instructions or other irregularity, the Lead Borrower will immediately notify the Administrative Agent and the L/C Issuer.  The Borrowers shall be conclusively deemed to have waived any such claim against the L/C Issuer and its correspondents unless such notice is given as aforesaid.

**_Role of L/C Issuer._  _Each Lender and the Borrowers agree that, in paying any drawing under a Letter of Credit, the L/C Issuer shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document.  None of the L/C Issuer, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the L/C Issuer shall be liable to any Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Lenders or the Required Lenders, as applicable; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct; (iii) any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit or any error in interpretation of technical terms; or (iv) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document.  The Borrowers hereby assume all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; provided, however, that this assumption is not intended to, and shall not, preclude the Borrowers' pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement.  None of the L/C Issuer, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the L/C Issuer shall be liable or responsible for any of the matters described in clauses (i) through (v) of Section 0 or for any action, neglect or omission under or in connection with any Letter of Credit or Issuer Documents, including, without limitation, the issuance or any amendment of any Letter of Credit, the failure to issue or amend any Letter of Credit, or the honoring or dishonoring of any demand under any Letter of Credit, and such action or neglect or_**

omission will bind the Borrowers; *provided*, *however*, that anything in such clauses to the contrary notwithstanding, the Borrowers may have a claim against the L/C Issuer, and the L/C Issuer may be liable to the Borrowers, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrowers which the Borrowers prove were caused by the L/C Issuer's willful misconduct or gross negligence or the L/C Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit; provided further, however, that any claim against the L/C Issuer by the Borrowers for any loss suffered or incurred by the Borrowers shall be reduced by an amount equal to the sum of (i) the amount (if any) saved by the Borrowers as a result of the breach or other wrongful conduct that allegedly caused such loss, and (ii) the amount (if any) of the loss that would have been avoided had the Borrowers taken all reasonable steps to mitigate such loss, including, without limitation, by enforcing their rights against any beneficiary and, in case of a claim of wrongful dishonor, by specifically and timely authorizing the L/C Issuer to cure such dishonor.  In furtherance and not in limitation of the foregoing, the L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary (or the L/C Issuer may refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit and may disregard any requirement in a Letter of Credit that notice of dishonor be given in a particular manner and any requirement that presentation be made at a particular place or by a particular time of day), and the L/C Issuer shall not be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.  The L/C Issuer shall not be responsible for the wording of any Letter of Credit (including, without limitation, any drawing conditions or any terms or conditions that are ineffective, ambiguous, inconsistent, unduly complicated or reasonably impossible to satisfy), notwithstanding any assistance the L/C Issuer may provide to the Borrowers with drafting or recommending text for any Letter of Credit Application or with the structuring of any transaction related to any Letter of Credit, and the Borrowers hereby acknowledge and agree that any such assistance will not constitute legal or other advice by the L/C Issuer or any representation or warranty by the L/C Issuer that any such wording or such Letter of Credit will be effective.  Without limiting the foregoing, the L/C Issuer may, as it deems appropriate, modify or alter and use in any Letter of Credit the terminology contained on the Letter of Credit Application for such Letter of Credit.

01:15322089.1

*Cash Collateral.  Upon the request of the Administrative Agent, (i) if the L/C Issuer has honored any full or partial drawing request under any Letter of Credit and such drawing has resulted in an L/C Borrowing that remains outstanding, or (ii) if, as of the Letter of Credit Expiration Date, any L/C Obligation for any reason remains outstanding, the Borrowers shall, in each case, immediately Cash Collateralize the then Outstanding Amount of all L/C Obligations.  Sections 2.06 and 8.02(a)(iii) set forth certain additional requirements to deliver Cash Collateral hereunder.  For purposes of this Section 2.03, Section 2.06 and Section 8.02(a)(iii), "Cash Collateralize" means to pledge and deposit with or deliver to the Collateral Agent, for the benefit of the L/C Issuer and the Lenders, as collateral for the L/C Obligations, cash or deposit account balances in an amount equal to 105% of the Outstanding Amount of all L/C Obligations, pursuant to documentation in form and substance satisfactory to the Collateral Agent and the L/C Issuer (which documents are hereby Consented to by the Lenders).  Derivatives of such term have corresponding meanings.  The Borrowers hereby grant to the Collateral Agent a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing.  Cash Collateral shall be maintained in the Cash Collateral Account.  If at any time the Collateral Agent determines that any funds held as Cash Collateral are subject to any right or claim of any Person other than the Collateral Agent or that the total amount of such funds is less than the aggregate Outstanding Amount of all L/C Obligations, the Borrowers will, forthwith upon demand by the Collateral Agent, pay to the Collateral Agent, as additional funds to be deposited as Cash Collateral, an amount equal to the excess of (x) such aggregate Outstanding Amount over (y) the total amount of funds, if any, then held as Cash Collateral that the Collateral Agent determines to be free and clear of any such right and claim.  Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under applicable Laws, to reimburse the L/C Issuer and, to the extent not so applied, shall thereafter be applied to satisfy other Obligations.*

*Applicability of ISP and UCP.  Unless otherwise expressly agreed by the L/C Issuer and the Lead Borrower when a Letter of Credit is issued (including any such agreement applicable to an Existing Letter of Credit), (i) the rules of the ISP shall apply to each Standby Letter of Credit, and (ii) the rules of the UCP, as most recently published by the International Chamber of Commerce at the time of issuance shall apply to each Commercial Letter of Credit.*

*Letter of Credit Fees.  The Borrowers shall pay to the Administrative Agent, for the account of each Lender in accordance with its Applicable Percentage, a Letter of Credit fee (the "Letter of Credit Fee") for each Letter of Credit equal to the Applicable Rate times the daily Stated Amount under each such Letter of Credit (as determined*

pursuant to <u>Section 1.06</u>).  For purposes of computing the daily Stated Amount available to be drawn under any Letter of Credit, the Stated Amount of the Letter of Credit shall be determined in accordance with <u>Section 1.06</u>.   Letter of Credit Fees shall be (i) due and payable on the first calendar day of each month, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand, and (ii) computed on a monthly basis in arrears.  Notwithstanding anything to the contrary contained herein, while any Event of Default has occurred and is continuing, the Administrative Agent may, and upon the request of the Required Lenders shall, notify the Lead Borrower that all Letter of Credit Fees shall accrue at the Default Rate and thereafter such Letter of Credit Fees shall accrue at the Default Rate to the fullest extent permitted by applicable Laws.

<u>Fronting Fee and Documentary and Processing Charges Payable to L/C Issuer</u>.  The Borrowers shall pay to the Administrative Agent, for the account of the L/C Issuer, a fronting fee (i) with respect to each Commercial Letter of Credit, at a rate equal to 0.125 per cent per annum, computed on the amount of such Letter of Credit, and payable upon the issuance thereof, (ii) with respect to any amendment of a Commercial Letter of Credit increasing the amount of such Letter of Credit, at a rate separately agreed between the Lead Borrower and the L/C Issuer, computed on the amount of such increase, and payable upon the effectiveness of such amendment, and (iii) with respect to each Standby Letter of Credit, at a rate equal to 0.125 percent per annum, computed on the daily amount available to be drawn under such Letter of Credit and on a monthly basis in arrears.  Such fronting fees shall be due and payable on the first calendar day of each month, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand.   For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of the Letter of Credit shall be determined in accordance with <u>Section 1.06</u>.  In addition, the Borrowers shall pay to the Administrative Agent, for the account of the L/C Issuer, the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of the L/C Issuer relating to letters of credit as from time to time in effect.  Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

<u>Consignment of Bill of Lading</u>.  The Borrowers shall, upon the request of the Administrative Agent, consign to the L/C Issuer any bill of lading for Inventory which is supported by a Commercial Letter of Credit issued by the L/C Issuer.

*__Conflict with Issuer Documents__.  In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.*

**2.05    Swing Line Loans**.

*__The Swing Line__.  Subject to the terms and conditions set forth herein, the Swing Line Lender agrees, in reliance upon the agreements of the other Lenders set forth in this __Section 2.05__, to make loans (each such loan, a "__Swing Line Loan__") to the Borrowers from time to time on any Business Day during the Availability Period in an aggregate amount not to exceed at any time outstanding the amount of the Swing Line Sublimit, notwithstanding the fact that such Swing Line Loans, when aggregated with the Applicable Percentage of the Outstanding Amount of Committed Loans and L/C Obligations of the Lender acting as Swing Line Lender, may exceed the amount of such Lender's Commitment; __provided__, __however__, that after giving effect to any Swing Line Loan, (i) the Total Outstandings shall not exceed the lesser of (A) the Aggregate Commitments, or (B) the Borrowing Base, and (ii) the aggregate Outstanding Amount of the Committed Loans of any Lender at such time, __plus__ such Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations at such time, __plus__ such Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans at such time shall not exceed such Lender's Commitment, and __provided__, __further__, that the Borrowers shall not use the proceeds of any Swing Line Loan to refinance any outstanding Swing Line Loan.  Within the foregoing limits, and subject to the other terms and conditions hereof, the Borrowers may borrow under this __Section 2.05__, prepay under __Section 2.06__, and reborrow under this __Section 2.05__.  Each Swing Line Loan shall bear interest only at a rate based on the Base Rate.  Immediately upon the making of a Swing Line Loan, each Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Swing Line Lender a risk participation in such Swing Line Loan in an amount equal to the product of such Lender's Applicable Percentage __times__ the amount of such Swing Line Loan.*

*__Borrowing Procedures__.  Each Swing Line Borrowing shall be made upon the Lead Borrower's irrevocable notice to the Swing Line Lender and the Administrative Agent, which may be given by telephone. Each such notice must be received by the Swing Line Lender and the Administrative Agent not later than 1:00 p.m. on the requested borrowing date, and shall specify (i) the amount to be borrowed, which shall be a minimum of $100,000, and (ii) the requested borrowing date, which shall be a Business Day.  Each such telephonic notice must be confirmed promptly by delivery to the Swing Line Lender and the Administrative Agent of a written Swing Line Loan Notice, appropriately completed and signed by a Responsible Officer of the Lead Borrower. Promptly after receipt by the Swing Line Lender of any telephonic Swing Line Loan Notice, the Swing Line Lender will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has also received such Swing*

*Line Loan Notice and, if not, the Swing Line Lender will notify the Administrative Agent (by telephone or in writing) of the contents thereof.  Unless the Swing Line Lender has received notice (by telephone or in writing) from the Administrative Agent at the request of the Required Lenders prior to 2:00 p.m. on the date of the proposed Swing Line Borrowing (A) directing the Swing Line Lender not to make such Swing Line Loan as a result of the limitations set forth in the proviso to the first sentence of Section 0, or (B) that one or more of the applicable conditions specified in Article IV is not then satisfied, then, subject to the terms and conditions hereof, the Swing Line Lender may, not later than 3:00 p.m. on the borrowing date specified in such Swing Line Loan Notice, make the amount of its Swing Line Loan available to the Borrowers at its office by crediting the account of the Lead Borrower on the books of the Swing Line Lender in immediately available funds.*

### Refinancing of Swing Line Loans.

The Swing Line Lender at any time in its sole and absolute discretion may request, on behalf of the Borrowers (which hereby irrevocably authorize the Swing Line Lender to so request on their behalf), that each Lender make a Base Rate Loan in an amount equal to such Lender's Applicable Percentage of the amount of Swing Line Loans then outstanding.  Such request shall be made in writing (which written request shall be deemed to be a Committed Loan Notice for purposes hereof) and in accordance with the requirements of Section 2.02, without regard to the minimum and multiples specified therein for the principal amount of Base Rate Loans, but subject to the unutilized portion of the Aggregate Commitments and the conditions set forth in Section 4.02.  The Swing Line Lender shall furnish the Lead Borrower with a copy of the applicable Committed Loan Notice promptly after delivering such notice to the Administrative Agent.  Each Lender shall make an amount equal to its Applicable Percentage of the amount specified in such Committed Loan Notice available to the Administrative Agent in immediately available funds for the account of the Swing Line Lender at the Administrative Agent's Office not later than 1:00 p.m. on the day specified in such Committed Loan Notice, whereupon, subject to Section 0, each Lender that so makes funds available shall be deemed to have made a Base Rate Loan to the Borrowers in such amount.  The Administrative Agent shall remit the funds so received to the Swing Line Lender.

If for any reason any Swing Line Loan cannot be refinanced by such a Committed Borrowing in accordance with Section 0, the request for Base Rate Loans submitted by the Swing Line Lender as set forth herein shall be deemed to be a request by the Swing Line Lender that each of the Lenders fund its risk participation in the relevant Swing Line Loan and each Lender's payment to the Administrative Agent for the account of the Swing Line Lender pursuant to Section 0 shall be deemed payment in respect of such participation.

If any Lender fails to make available to the Administrative Agent for the account of the Swing Line Lender any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 0 by the time specified in Section 0, the Swing Line Lender shall be

entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Swing Line Lender at a rate per annum equal to the greater of the Federal Funds Rate and a rate determined by the Swing Line Lender in accordance with banking industry rules on interbank compensation plus any administrative, processing or similar fees customarily charged by the Swing Line Lender in connection with the foregoing.  If such Lender pays such amount (with interest and fees as aforesaid), the principal amount so paid shall constitute such Lender's Committed Loan included in the relevant Committed Borrowing or funded participation in the relevant Swing Line Loan, as the case may be.   A certificate of the Swing Line Lender submitted to any Lender (through the Administrative Agent) with respect to any amounts owing under this <u>clause (iii)</u> shall be conclusive absent manifest error.

Each Lender's obligation to make Committed Loans or to purchase and fund risk participations in Swing Line Loans pursuant to this <u>Section 0</u> shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the Swing Line Lender, the Borrowers or any other Person for any reason whatsoever, (B) the occurrence or continuance of a Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; <u>provided</u>, <u>however</u>, that each Lender's obligation to make Committed Loans pursuant to this <u>Section 0</u> is subject to the conditions set forth in <u>Section 4.02</u>.  No such funding of risk participations shall relieve or otherwise impair the obligation of the Borrowers to repay Swing Line Loans, together with interest as provided herein.

### *Repayment of Participations.*

At any time after any Lender has purchased and funded a risk participation in a Swing Line Loan, if the Swing Line Lender receives any payment on account of such Swing Line Loan, the Swing Line Lender will distribute to such Lender its Applicable Percentage of such payment (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's risk participation was funded) in the same funds as those received by the Swing Line Lender.

If any payment received by the Swing Line Lender in respect of principal or interest on any Swing Line Loan is required to be returned by the Swing Line Lender under any of the circumstances described in <u>Section 10.05</u> (including pursuant to any settlement entered into by the Swing Line Lender in its discretion), each Lender shall pay to the Swing Line Lender its Applicable Percentage thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned, at a rate per annum equal to the Federal Funds Rate.  The Administrative Agent will make such demand upon the request of the Swing Line Lender.  The obligations of the Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Agreement.

01:15322089.1

***Interest for Account of Swing Line Lender***.  **The Swing Line Lender shall be responsible for invoicing the Borrowers for interest on the Swing Line Loans.  Until each Lender funds its Base Rate Loan or risk participation pursuant to this _Section 2.05_ to refinance such Lender's Applicable Percentage of any Swing Line Loan, interest in respect of such Applicable Percentage shall be solely for the account of the Swing Line Lender.**

***Payments Directly to Swing Line Lender***.  **The Borrowers shall make all payments of principal and interest in respect of the Swing Line Loans directly to the Swing Line Lender.**

**2.06    Prepayments**.

**The Borrowers may, upon irrevocable notice (unless the notice is conditioned on a refinancing, a "change of control" or asset sale transaction or other transaction of a similar nature, in which case such notice may be revoked on or prior to such date, in the event such transaction is not consummated on or prior to such date) from the Lead Borrower to the Administrative Agent, at any time or from time to time voluntarily prepay Committed Loans in whole or in part without premium or penalty; _provided_ that (i) such notice must be received by the Administrative Agent not later than 11:00 a.m. on the date of such prepayment; and (ii) such prepayment shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment of Committed Loans to be prepaid. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment. If such notice is given by the Lead Borrower, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein (unless the notice is conditioned on a refinancing, a "change of control" or asset sale transaction or other transaction of a similar nature, in which case such notice may be revoked on or prior to such date, in the event such transaction is not consummated on or prior to such date).  Each such prepayment shall be applied to the Committed Loans of the Lenders in accordance with their respective Applicable Percentages.**

**The Borrowers may, upon irrevocable notice (unless the notice is conditioned on a refinancing, a "change of control" or asset sale transaction or other transaction of a similar nature, in which case such notice may be revoked on or prior to such date, in the event such transaction is not consummated on or prior to such date) from the Lead Borrower to the Swing Line Lender (with a copy to the Administrative Agent), at any time or from time to time, voluntarily prepay Swing Line Loans in whole or in part without premium or penalty; _provided_ that (i) such notice must be received by the Swing Line Lender and the Administrative Agent not later than 1:00 p.m. on the date**

*of the prepayment, and (ii) any such prepayment shall be in a minimum principal amount of $100,000.  Each such notice shall specify the date and amount of such prepayment.  If such notice is given by the Lead Borrower, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein(unless the notice is conditioned on a refinancing, a "change of control" or asset sale transaction or other transaction of a similar nature, in which case such notice may be revoked on or prior to such date, in the event such transaction is not consummated on or prior to such date).*

*[intentionally omitted].*

*If for any reason the Total Outstandings at any time exceed the Loan Cap, the Borrowers shall immediately prepay Committed Loans, Swing Line Loans and L/C Borrowings and/or Cash Collateralize the L/C Obligations (other than L/C Borrowings) in an aggregate amount equal to such excess.*

*The Borrowers shall prepay the Loans with any proceeds deposited to the Concentration Account in accordance with the provisions of <u>Section 6.13</u>, including, without limitation, any Net Proceeds received by a Loan Party upon the occurrence of a Prepayment Event (other than a Permitted Sale), shall be transferred to the Concentration Account in accordance with <u>Section 6.13</u> and shall, (i) if deposited in the Concentration Account not later than 2:00 p.m. in immediately available funds, be utilized to prepay the Committed Loans on the date such funds were deposited into the in the Concentration Account, or (ii) if deposited in the Concentration Account after 2:00 p.m. in immediately available funds, be utilized to prepay the Committed Loans on the next Business Day following the date such funds were deposited into the in the Concentration Account, in either case in the order of priority set forth in  Section 0. The application of all such proceeds to the Loans shall not reduce the Commitments.*

*All proceeds from a Permitted Sale shall be paid upon the closing of any such Disposition shall be remitted to the Administrative Agent for application to the Obligations and the Pre-Petition ABL Liabilities in accordance with <u>Section 8.03</u>, <u>provided that</u>, to the extent permitted by the DIP Orders, any such proceeds which constitute Pre-Petition Term Loan Priority Collateral shall be immediately deposited into the Pre-Petition Term Loan Account.*

*Prepayments made pursuant to either Section 0, or Section 0 above <u>first</u>, shall be applied to the Outstanding Amount (as defined in the Pre-Petition ABL Agreement) of all Pre-Petition ABL Liabilities in accordance with Section 2.05(d) of the Pre-Petition ABL Agreement until such Outstanding Amount has been reduced to zero; <u>second</u>, shall be applied ratably to the L/C Borrowings and the Swing Line Loans; <u>third</u>, shall be*

*applied ratably to the outstanding Committed Loans, in the case of payments other than pursuant to __Section 0__ when no Event of Default exists; __fourth,__ shall be used to Cash Collateralize the remaining L/C Obligations in accordance with __Section 0__; and __fifth,__ the amount remaining, if any, after the prepayment in full of all L/C Borrowings, Swing Line Loans and Committed Loans outstanding at such time and the Cash Collateralization of the remaining L/C Obligations in full may be retained by the Borrowers for use in the ordinary course of its business, provided that, in each case, to the extent permitted by the DIP Orders, any such proceeds which constitute Pre-Petition Term Loan Priority Collateral shall be immediately deposited into the Pre-Petition Term Loan Account.  Upon the drawing of any Letter of Credit that has been Cash Collateralized, the funds held as Cash Collateral shall be applied (without any further action by or notice to or from the Borrowers or any other Loan Party) to reimburse the L/C Issuer or the Lenders, as applicable.*

   **2.07**   **Termination or Reduction of Commitments**.  The Borrowers may, upon irrevocable notice from the Lead Borrower to the Administrative Agent, terminate the Aggregate Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit or from time to time permanently reduce the Aggregate Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit; <u>provided</u> that (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. five Business Days prior to the date of any such termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $10,000,000 or any whole multiple of $1,000,000 in excess thereof, (iii) the Borrowers shall not terminate or reduce (A) the Aggregate Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Outstandings would exceed the Aggregate Commitments, (B) the Letter of Credit Sublimit if, after giving effect thereto, the Outstanding Amount of L/C Obligations not fully Cash Collateralized hereunder would exceed the Letter of Credit Sublimit, and (C) the Swing Line Sublimit if, after giving effect thereto, and to any concurrent payments hereunder, the Outstanding Amount of Swing Line Loans hereunder would exceed the Swing Line Sublimit.

   (b)   If, after giving effect to any reduction of the Aggregate Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit exceeds the amount of the Aggregate Commitments, such Letter of Credit Sublimit or Swing Line Sublimit shall be automatically reduced by the amount of such excess.

   (c)   The Administrative Agent will promptly notify the Lenders of any termination or reduction of the Letter of Credit Sublimit, Swing Line Sublimit or the Aggregate Commitments under this Section 2.07.  Upon any reduction of the Aggregate Commitments, the Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount.  All fees (including, without limitation, Commitment Fees, and Letter of Credit Fees) and interest in respect of the Aggregate Commitments accrued until the effective date of any termination of the Aggregate Commitments shall be paid on the effective date of such termination.

   **2.08**   **Repayment of Loans**.

*The Borrowers shall repay to the Lenders on the Termination Date the aggregate principal amount of Committed Loans outstanding on such date.*

*To the extent not previously paid, the Borrowers shall repay the outstanding balance of the Swing Line Loans on the Termination Date.*

      **2.09**    **Interest**.

*Subject to the provisions of <u>Section 2.09(i)</u> below, each Committed Loan and each Swing Line Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate <u>plus</u> the Applicable Margin.*

*[intentionally omitted].*

*(i)*     *If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.*

If any other Event of Default has occurred and is continuing, then the Administrative Agent may, and upon the request of the Required Lenders shall, notify the Lead Borrower that all outstanding Obligations shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate and thereafter, until such Event of Default has been duly waived as provided in <u>Section 10.01</u> hereof, such Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable Laws.

Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

*Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Laws.*

      **2.10**    **Fees.**  In addition to certain fees described in <u>subsections 0</u> and <u>0</u> of <u>Section 2.03</u>:

<u>**Commitment Fee.**</u>  **The Borrowers shall pay to the Administrative Agent, for the account of each Lender, in accordance with its Applicable Percentage, a commitment fee (the "<u>Commitment Fee</u>") equal to the Applicable Commitment Fee Percentage <u>times</u> the average daily amount by which the Aggregate Commitments exceed the sum of (i) the Outstanding Amount of Loans and (ii) the Outstanding Amount of L/C Obligations.  The Commitment Fee shall accrue at all times during the Availability Period, including at any time during which one or more of the conditions in <u>Article IV</u> is not met, and shall be calculated and be due and payable monthly in arrears on the**

*first calendar day of each month, commencing with the first such date to occur after the Closing Date, and on the last day of the Availability Period.*

*[intentionally omitted].*

*[intentionally omitted].*

*<u>Closing Fee</u>.  On the Closing Date, the Borrowers shall pay to the Administrative Agent, for the account of the Lenders, a closing fee in the amount of $750,000.  Such closing fee shall be paid in immediately available funds, shall be fully earned when paid, and shall not be refundable for any reason whatsoever.*

       **2.11**    **Computation of Interest and Fees**.  All computations of interest and fees shall be made on the basis of a 360-day year and actual days elapsed.  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, <u>provided</u> that any Loan that is repaid on the same day on which it is made shall, subject to <u>Section 2.12</u>, bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

       **2.12**    **Evidence of Debt**.

*The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by the Administrative Agent (the "<u>Loan Account</u>") in the ordinary course of business.  In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Loan from such Lender, each payment and prepayment of principal of any such Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to such Lender.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrowers shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.  Upon receipt of an affidavit of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the Borrowers will issue, in lieu thereof, a*

*replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.*

*In addition to the accounts and records referred to in <u>Section 0</u>, each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records evidencing the purchases and sales by such Lender of participations in Letters of Credit and Swing Line Loans.  In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.*

*The Administrative Agent shall render monthly statements regarding the Loan Account to the Lead Borrower including principal, interest, fees, and including an itemization of all charges and expenses constituting Credit Party Expenses owing, and such statements, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and the Credit Parties unless, within thirty (30) days after receipt thereof by the Lead Borrower, the Lead Borrower shall deliver to the Administrative Agent written objection thereto describing the error or errors contained in any such statements.*

**2.13    Payments Generally; Administrative Agent's Clawback**.

<u>*General*</u>*.  All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.*

*(i)    <u>Funding by Lenders; Presumption by Administrative Agent</u>.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Committed Borrowing, prior to 12:00 noon on the date of such Borrowing) that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has*

*made such share available in accordance with and at the time required by __Section 2.02__ and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Committed Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation plus any administrative processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrowers, the interest rate applicable to Committed Loans.  If the Borrowers and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period.  If such Lender pays its share of the applicable Committed Borrowing to the Administrative Agent, then the principal amount so paid shall constitute such Lender's Committed Loan included in such Committed Borrowing.  Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Lender that shall have failed to make such payment to the Administrative Agent.*

Payments by Borrowers; Presumptions by Administrative Agent.  Unless the Administrative Agent shall have received notice from the Lead Borrower prior to the time at which any payment is due to the Administrative Agent for the account of the Lenders or the L/C Issuer hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the L/C Issuer, as the case may be, the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Lenders or the L/C Issuer, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or the L/C Issuer, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

A notice of the Administrative Agent to any Lender or the Lead Borrower with respect to any amount owing under this subsection (i) shall be conclusive, absent manifest error.

***Failure to Satisfy Conditions Precedent.  If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this __Article II__, and such funds are not made available to the***

***Borrowers by the Administrative Agent because the conditions to the applicable Credit Extension set forth in <u>Article IV</u> are not satisfied or waived in accordance with the terms hereof (subject to the provisions of the last paragraph of <u>Section 4.02</u> hereof), the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.***

***<u>Obligations of Lenders Several</u>.  The obligations of the Lenders hereunder to make Committed Loans, to fund participations in Letters of Credit and Swing Line Loans and to make payments pursuant to <u>Section 10.04(c)</u>, are several and not joint.  The failure of any Lender to make any Committed Loan, to fund any such participation or to make any payment under <u>Section 10.04(c)</u> on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Committed Loan, to purchase its participation or to make its payment under <u>Section 10.04(c)</u>.***

***<u>Funding Source</u>.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.***

2.14     **Sharing of Payments by Lenders**.  If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest on, or other amounts with respect to, any of the Obligations resulting in such Lender's receiving payment of a proportion of the aggregate amount of such Obligations greater than its <u>pro rata</u> share thereof as provided herein (including as in contravention of the priorities of payment set forth in <u>Section 8.03</u>), then the Credit Party receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Obligations of the other Credit Parties, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in <u>Section 8.03</u>, <u>provided</u> that:

if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

the provisions of this Section shall not be construed to apply to (x) any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Committed Loans or subparticipations in L/C Obligations or Swing Line Loans to any assignee or participant, other than to the Borrowers or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with

respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

    **2.15**   **Settlement Amongst Lenders**

    (a)   The amount of each Lender's Applicable Percentage of outstanding Committed Loans and outstanding Swing Line Loans shall be computed weekly (or more frequently in the Administrative Agent's discretion) and shall be adjusted upward or downward based on all Loans (including Swing Line Loans) and repayments of Committed Loans and Swing Line Loans received by the Administrative Agent as of 3:00 p.m. on the first Business Day (such date, the "<u>Settlement Date</u>") following the end of the period specified by the Administrative Agent.

    (b)   The Administrative Agent shall deliver to each of the Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Committed Loans for the period and the amount of repayments received for the period.  As reflected on the summary statement, (i) the Administrative Agent shall transfer to each Lender its Applicable Percentage of repayments, and (ii) each Lender shall transfer to the Administrative Agent (as provided below) or the Administrative Agent shall transfer to each Lender, such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Committed Loans made by each Lender shall be equal to such Lender's Applicable Percentage of all Committed Loans outstanding as of such Settlement Date.  If the summary statement requires transfers to be made to the Administrative Agent by the Required Lenders and is received prior to 1:00 p.m. on a Business Day, such transfers shall be made in immediately available funds no later than 3:00 p.m. that day; and, if received after 1:00 p.m., then no later than 3:00 p.m. on the next Business Day. The obligation of each Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Administrative Agent.  If and to the extent any Lender shall not have so made its transfer to the Administrative Agent, such Lender agrees to pay to the Administrative Agent, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Administrative Agent, equal to the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Administrative Agent in connection with the foregoing.

**ARTICLE III**
**TAXES, YIELD PROTECTION AND ILLEGALITY;**
**APPOINTMENT OF LEAD BORROWER**

    **3.01**   **Taxes**.

***<u>Payments Free of Taxes</u>.  Any and all payments by or on account of any obligation of the Borrowers hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, <u>provided</u> that if the Borrowers shall be required by applicable Laws to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent, Lender or L/C Issuer, as the case may be, receives***

*an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrowers shall make such deductions and (iii) the Borrowers shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Laws.*

*<u>Payment of Other Taxes by the Borrowers</u>.  Without limiting the provisions of <u>subsection 0</u> above, the Borrowers shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Laws.*

*<u>Indemnification by the Loan Parties</u>.  The Loan Parties shall indemnify the Administrative Agent, each Lender and the L/C Issuer, within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by the Administrative Agent, such Lender or the L/C Issuer, as the case may be, and any penalties, interest, fees, and reasonable costs and expenses, arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Lead Borrower by a Lender or the L/C Issuer (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender or the L/C Issuer, shall be conclusive absent manifest error.*

*<u>Evidence of Payments</u>.  If requested by the Administrative Agent, the Lead Borrower shall deliver to the Administrative Agent, as soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrowers to a Governmental Authority, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.*

*<u>Status of Lenders</u>.  Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which any Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Lead Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by the Lead Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if requested by the Lead Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Lead Borrower or the Administrative Agent as will enable the Lead Borrower or the*

01:15322089.1

***Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.***

Without limiting the generality of the foregoing, in the event that any Borrower is resident for tax purposes in the United States, any Foreign Lender shall deliver to the Lead Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Lead Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

**duly completed copies of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party,**

**duly completed copies of Internal Revenue Service Form W-8ECI,**

**in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrowers within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN, or**

**any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Lead Borrower to determine the withholding or deduction required to be made.**

***<u>Treatment of Certain Refunds</u>.  If the Administrative Agent, any Lender or the L/C Issuer determines that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrowers or with respect to which the Borrowers have paid additional amounts pursuant to this Section, it shall pay to the Borrowers an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrowers under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent, such Lender or the L/C Issuer, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), <u>provided</u> that the Borrowers, upon the request of the Administrative Agent, such Lender or the L/C Issuer, agree to repay the amount paid over to the Borrowers (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent, such Lender or the L/C Issuer in the event the Administrative Agent, such Lender or the L/C Issuer is required to repay such refund to such Governmental Authority.  This subsection shall not be construed to require the Administrative Agent, any Lender or the L/C Issuer to make***

*available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrowers or any other Person.*

*__FATCA__.  Without limitation of __Section 3.01(e)__, if a payment made to a Lender or a Participant under any Loan Document would be subject to United States federal withholding tax imposed by FATCA if such Lender or Participant were to fail to comply with the applicable reporting and document provision requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent , at the time or times prescribed by law and at such time or times reasonably requested by either, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower and/or the Agent as may be necessary for the Borrower and the Administrative Agent to comply with its obligations under FATCA, to determine that such Lender or Participant has or has not complied with such Lender or Participant's obligations under FATCA and, as necessary, to determine the amount to deduct and withhold from such payment.*

    3.02    **[Reserved].**
    3.03    **[Reserved].**
    3.04    **Increased Costs**.

*__Increased Costs Generally__.  If any Change in Law shall:*

**impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender or the L/C Issuer;**

**subject any Lender or the L/C Issuer to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any participation in a Letter of Credit, or change the basis of taxation of payments to such Lender or the L/C Issuer in respect thereof (except for Indemnified Taxes or Other Taxes covered by __Section 3.01__ and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender or the L/C Issuer); or**

**impose on any Lender or the L/C Issuer any other condition, cost or expense affecting this Agreement or any Letter of Credit or participation therein;**

and the result of any of the foregoing shall be to increase the cost to such Lender, or to increase the cost to such Lender or the L/C Issuer of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or the L/C Issuer hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or the L/C Issuer, the Borrowers will pay to such Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered.

01:15322089.1

***Capital Requirements.*** **If any Lender or the L/C Issuer determines that any Change in Law affecting such Lender or the L/C Issuer or any Lending Office of such Lender or such Lender's or the L/C Issuer's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or the L/C Issuer's capital or on the capital of such Lender's or the L/C Issuer's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the L/C Issuer, to a level below that which such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the L/C Issuer's policies and the policies of such Lender's or the L/C Issuer's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company for any such reduction suffered.**

***Certificates for Reimbursement.*** **A certificate of a Lender or the L/C Issuer setting forth the amount or amounts necessary to compensate such Lender or the L/C Issuer or its holding company, as the case may be, as specified in <u>subsection 0</u> or <u>0</u> of this Section, as well as the basis for determining such amount or amounts, and delivered to the Lead Borrower shall be conclusive absent manifest error. The Borrowers shall pay such Lender or the L/C Issuer, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.**

***Delay in Requests.*** **Failure or delay on the part of any Lender or the L/C Issuer to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's or the L/C Issuer's right to demand such compensation, <u>provided</u> that the Borrowers shall not be required to compensate a Lender or the L/C Issuer pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender or the L/C Issuer, as the case may be, notifies the Lead Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).**

***[Reserved].***

    3.05    **[Reserved].**

    3.06    **Mitigation Obligations; Replacement of Lenders**.

***Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender as reasonably determined by such Lender.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.***

***Replacement of Lenders.  Notwithstanding subsection (a) above, if any Lender requests compensation under Section 3.04, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 the Borrowers may replace such Lender in accordance with Section 10.13.***

***If the L/C Issuer may not issue Letters of Credit as a result of the limitations set forth in Section 2.03(a)(iii)(A), then Borrowers may, if no Default or Event of Default exists and with the prior written consent of Administrative Agent (which consent shall not be unreasonably withheld or delayed):  (i) request a Lender (with such Lender's consent) to issue Letters of Credit; or (ii) designate a supplemental bank or financial institution, which is an Eligible Assignee and otherwise satisfactory to Administrative Agent, to issue Letters of Credit and become an additional "L/C Issuer" hereunder.***

     **3.07****Survival.**  All of the Borrowers' obligations under this Article III shall survive termination of the Aggregate Commitments and repayment of all Obligations hereunder.

     **3.08****Designation of Lead Borrower as Borrowers' Agent.**

***Each Borrower hereby irrevocably designates and appoints the Lead Borrower as such Borrower's agent to obtain Credit Extensions, the proceeds of which shall be available to each Borrower for such uses as are permitted under this Agreement.  As the disclosed principal for its agent, each Borrower shall be obligated to each Credit Party on account of Credit Extensions so made as if made directly by the applicable Credit Party to such Borrower, notwithstanding the manner by which such Credit Extensions are recorded on the books and records of the Lead Borrower and of any other Borrower.  In addition, each Loan Party other than the Borrowers hereby irrevocably designates and appoints the Lead Borrower as such Loan Party's agent to represent such Loan Party in all respects under this Agreement and the other Loan Documents.***

*Each Borrower recognizes that credit available to it hereunder is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers.  Consequently, each Borrower hereby assumes and agrees to discharge all Obligations of each of the other Borrowers.*

*The Lead Borrower shall act as a conduit for each Borrower (including itself, as a "Borrower") on whose behalf the Lead Borrower has requested a Credit Extension.  Neither the Administrative Agent nor any other Credit Party shall have any obligation to see to the application of such proceeds therefrom.*

## ARTICLE IV
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

**4.01    Conditions of Initial Credit Extension.**  The obligation of the L/C Issuer and each Lender to make its initial Credit Extension hereunder is subject to satisfaction (or waiver in accordance with <u>Section 10.01</u>) of the following conditions precedent:

(a)    The Administrative Agent's receipt of the following, each of which shall be originals, telecopies or other electronic image scan transmission (e.g., "pdf" or "tif " via e-mail) (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Administrative Agent:

(i)    executed counterparts of this Agreement sufficient in number for distribution to the Administrative Agent, each Lender and the Lead Borrower;

(ii)    (A) a Committed Loan Note executed by the Borrowers in favor of each Lender requesting a Committed Loan Note and (B) a Swing Line Loan Note executed by the Borrowers in favor of Wells Fargo Bank;

(iii)    such certificates of resolutions or other action or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may require evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party;

(iv)    copies of each Loan Party's Organization Documents and such other documents and certifications as the Administrative Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, and in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect;

(v)    [reserved];

(vi)    [reserved];

(vii)    evidence that all insurance required to be maintained pursuant to the Loan Documents and all endorsements in favor of the Agents required under the Loan Documents have been obtained and are in effect;

(viii)    the Ratification Agreement, duly executed by the applicable Loan Parties;

(ix)    all other Loan Documents (to the extent not executed and delivered in connection with the Pre-Petition ABL Agreement), each duly executed by the applicable Loan Parties;

(x)    evidence that all other actions that the Agents may deem necessary or desirable in order to create valid first and subsisting Liens on the property described in the Mortgages has been taken;

(xi)    results of searches or other evidence reasonably satisfactory to the Collateral Agent (in each case dated as of a date reasonably satisfactory to the Collateral Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Encumbrances;

(xii)    all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Collateral Agent to be filed, registered or recorded to create or perfect the first priority Liens intended to be created under the Loan Documents and all such documents and instruments shall have been so filed, registered or recorded to the satisfaction of the Collateral Agent; and

(xiii)    such other assurances, certificates, documents, consents or opinions as the Agents reasonably may require.

(b)    After giving effect to (i) the first funding under the Loans, (ii) any charges to the Loan Account made in connection with the establishment of the credit facility contemplated hereby and (iii) all Letters of Credit to be issued at, or immediately subsequent to such establishment, Availability shall be not less than $0.

(c)    The Administrative Agent shall have received a Borrowing Base Certificate dated the Closing Date, relating to the week ended on April 11, 2014, and executed by a Responsible Officer of the Lead Borrower.

(d)    Each of the Interim DIP Order and the Cash Management Order, and all motions related to any of the foregoing or otherwise relating to this Agreement, shall be in form and substance reasonably satisfactory to the Administrative Agent.  Each of the Interim DIP Order and the Cash Management Order shall have been entered, shall be in full force and effect, and shall not have been reversed, vacated or stayed, or modified without the prior written consent of the Administrative Agent and any other Person, to the extent provided for in the Interim DIP Order.  All other necessary consents and approvals to the transactions contemplated hereby shall have been obtained and shall be reasonably satisfactory to the Administrative Agent.

(e)    [reserved].

(f)    The Administrative Agent shall have received and be satisfied (as determined in its discretion) with (i) an initial Budget of the Lead Borrower and its Subsidiaries, (ii) such other information (financial or otherwise) reasonably requested by the Administrative Agent.

(g)    Other than as an Effect of Bankruptcy, there shall not have occurred any default of any Material Contract of any Loan Party which could reasonably be expected to have a Material Adverse Effect.

(h)    (i) There shall not have been (x) any order granted by the Bankruptcy Court sustaining any objection by any Person, nor (y) any pleading filed by any Loan Party, challenging, in either case, the validity, priority, perfection, or enforceability of the Pre-Petition ABL Documents, the Pre-Petition ABL Liabilities, or any Lien granted pursuant to the Pre-Petition ABL Documents, and (ii) no Lien granted pursuant to the Pre-Petition ABL Documents shall have been determined to be null and void, invalid or unenforceable by the Bankruptcy Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Chapter 11 Case, including, without limitation, the Creditors' Committee.

(i)    The consummation of the transactions contemplated hereby shall not violate any applicable Law or any Organization Document.

(j)    All fees and expenses required to be paid to the Agents on or before the Closing Date shall have been paid in full, and all fees required to be paid to the Lenders on or before the Closing Date shall have been paid in full.

(k)    The Borrowers shall have paid all fees, charges and disbursements of counsel to the Administrative Agent to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute the Administrative Agents reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrowers and the Administrative Agent).

(l)    The Administrative Agent and the Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act, and shall be satisfied that the Loan Parties are in compliance with all Laws.

(m)    No material changes in governmental regulations or policies affecting any Loan Party or any Credit Party shall have occurred prior to the Closing Date.

Without limiting the generality of the provisions of <u>Section 9.04</u>, for purposes of determining compliance with the conditions specified in this <u>Section 4.01</u>, each Lender that has signed this Agreement shall be deemed to have Consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be Consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**4.02    Conditions to all Credit Extensions.**  The obligation of each Lender to honor any Request for Credit Extension is subject to the following conditions precedent:

(a)    The representations and warranties of each other Loan Party contained in <u>Article V</u> or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Credit Extension, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, and (ii) in the case of

any representation and warranty qualified by materiality, they shall be true and correct in all respects.

(b)     No Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof.

(c)     The Administrative Agent and, if applicable, the L/C Issuer or the Swing Line Lender shall have received a Request for Credit Extension in accordance with the requirements hereof.

(d)     The Administrative Agent shall have received an updated Borrowing Base Certificate reflecting the outstanding Credit Extensions after giving effect to such request (it being agreed that except for Borrowing Base Certificates furnished pursuant to Section 6.02(c), the values for eligible assets will not be required to be updated).

(e)     No injunction, writ, restraining order, or other order of any nature prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against any Borrower, any Agent, any Lender or any of their Affiliate.

(f)      The aggregate amount of all requested Loans and/or Letters of Credit shall not exceed Availability at such time.

(g)     The requested Credit Extension complies with, and is for a purpose permitted by, the Budget and, after giving effect to the making of such Credit Extension, the DIP Orders remain in full force and effect.

Each Request for Credit Extension submitted by the Borrower shall be deemed to be a representation and warranty by the Borrowers that the conditions specified in this Section 4.02 have been satisfied on and as of the date of the applicable Credit Extension.  The conditions set forth in this Section 4.02 are for the sole benefit of the Credit Parties but until the Required Lenders otherwise direct the Administrative Agent to cease making Committed Loans, the Lenders will fund their Applicable Percentage of all Committed Loans and L/C Advances and participate in all Swing Line Loans and Letters of Credit whenever made or issued, which are requested by the Lead Borrower and which, notwithstanding the failure of the Loan Parties  to comply with the provisions of this Article IV, are agreed to by the Administrative Agent, provided, however, the making of any such Loans or the issuance of any Letters of Credit shall not be deemed a modification or waiver by any Credit Party of the provisions of this Article IV on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce the Credit Parties to enter into this Agreement and to make Loans and to issue Letters of Credit hereunder, each Loan Party represents and warrants to the Administrative Agent and the other Credit Parties that:

**5.01    Existence, Qualification and Power.**  Each Loan Party and each Subsidiary thereof (a) is a corporation, limited liability company, partnership or limited partnership, duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation, organization or formation, (b) upon the entry of the DIP Orders, has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business as currently conducted, and (ii) execute, deliver and perform its obligations under

the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.  Schedule 5.01 annexed hereto sets forth, as of the Closing Date, each Loan Party's name as it appears in official filings in its state of incorporation or organization and the name under which each Loan Party currently conducts its business (if different), its state of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization, its federal employer identification number, and the address of its chief executive office and principal place of business.

    **5.02    Authorization; No Contravention.**  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party, upon the entry of the DIP Orders, has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require any payment to be made under (i) any Material Contract or any Material Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries, (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject  or (iii) any governmental licenses, permits, authorizations, consents and approvals; (c) result in or require the creation of any Lien upon any asset of any Loan Party (other than Liens in favor of the Collateral Agent under the Security Documents); or (d) violate any Law.

    **5.03    Governmental Authorization; Other Consents.**  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (a) the perfection or maintenance of the Liens created under the Security Documents (including the first priority nature thereof), or as otherwise expressly contemplated hereby in respect of the protection and enforcement of such Liens or, (b) such as have been obtained or made and are in full force and effect or (c) filings with the SEC in connection with the entry into a material agreement.

    **5.04    Binding Effect.**  This Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party that is party thereto. This Agreement constitutes, and each other Loan Document when so delivered will, upon the entry of the DIP Orders, constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms and the DIP Orders.

    **5.05    No Material Adverse Effect; Budget**.

    ***[Reserved].***

    ***[Reserved].***

***Other than the filing of the Chapter 11 Case on the Petition Date, since such date there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.***

***[Reserved].***

***The initial Budget delivered to the Administrative Agent was prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such forecasts, and represented, at the time of delivery, the Loan Parties' best estimate of future financial performance.***

     **5.06**    **[Reserved]**.

     **5.07**    **No Default**.    Other than as an Effect of Bankruptcy, (a) no Loan Party or any Subsidiary is in default under or with respect to any Material Indebtedness which could reasonably be expected to have a Material Adverse Effect and (b) no Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

     **5.08**    **Ownership of Property; Liens.**

        (a)    ***Each of the Loan Parties thereof has good record and marketable title in fee simple to or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business, including, without limitation, the Real Estate, in each case free and clear of all Liens, other than Permitted Encumbrances. Each of the Loan Parties has good and marketable title to, valid leasehold interests in, or valid licenses to use all personal property (including Intellectual Property) and assets material to the ordinary conduct of its business as currently conducted, free and clear of all Liens, other than Permitted Encumbrances.***

***<u>Schedule 5.08(b)(1)</u> sets forth the address (including street address, county and state) of all Owned Real Estate, together with a list of the holders of any mortgage or other Lien thereon as of the Closing Date. Each Loan Party has good, marketable and insurable fee simple title to such Loan Party's or such Subsidiary's Owned Real Estate, free and clear of all Liens, other than Permitted Encumbrances.***

***The property of each Loan Party and each of its Subsidiaries is subject to no Liens, other than Permitted Encumbrances.***

***<u>Schedule 7.02</u> sets forth a complete and accurate list of all Investments other than Equity Interests disclosed pursuant to <u>Schedule 5.13</u> held by any Loan Party or any Subsidiary of a Loan Party on the Closing Date, showing as of the Closing Date, the amount, obligor or issuer and maturity, if any, thereof.***

01:15322089.1

***Schedule 7.03** **sets forth a complete and accurate list of all Indebtedness of each Loan Party and any Subsidiary of each Loan Party as of the Closing Date, showing as of the Closing Date the amount, obligor or issuer and maturity thereof.***

**5.09    [Reserved].**

**5.10    Insurance.**  The properties of the Loan Parties and their Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties or the applicable Subsidiary operates.

**5.11    Taxes.**  The Loan Parties have filed all Federal, state and other material tax returns and reports required to be filed, and have paid all Federal, state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings being diligently conducted, for which adequate reserves have been provided in accordance with GAAP, as to which Taxes no Lien has been filed and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation.  There is no proposed tax assessment against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect.  No Loan Party or any Subsidiary thereof is a party to any tax sharing agreement.

**5.12    ERISA Compliance**.

***Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws.  Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the knowledge of the Loan Parties, nothing has occurred which would prevent, or cause the loss of, such qualification.  The Loan Parties and each ERISA Affiliate have made all required contributions to each Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan.  No Lien imposed under the Code or ERISA exists or would reasonably be expected to arise on account of any Plan.***

***There are no pending or, to the knowledge of the Loan Parties, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.***

***(i)    No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither any Loan Party nor any ERISA***

***Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA.***

5.13    **Subsidiaries; Equity Interests.**  As of the Closing Date, the Loan Parties have no Subsidiaries other than those specifically disclosed in Part (a) of <u>Schedule 5.13</u>, which Schedule sets forth the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary, listed by class, and setting forth the number and percentage of the outstanding Equity Interests of each such class owned directly or indirectly by the applicable Loan Party.  All of the outstanding Equity Interests in the Loan Parties and such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party (or a Subsidiary of a Loan Party) in the amounts specified on Part (a) of <u>Schedule 5.13</u>, free and clear of all Liens except for those created under the Security Documents and those in favor of the Pre-Petition Term Loan Agent pursuant to the Pre-Petition Term Loan Documents.  Except as specifically disclosed in <u>Schedule 5.13</u>, no Loan Party or any of its respective Subsidiaries is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of any Loan Party's Subsidiaries' Equity Interests or any security convertible into or exchangeable for any such Equity Interests.  As of the Closing Date, the Loan Parties have no equity investments in any other corporation or entity other than those specifically disclosed in Part (b) of <u>Schedule 5.13</u>.  Part (c) of <u>Schedule 5.13</u> is a complete and accurate description of the authorized Equity Interests of each Loan Party as of the Closing Date, by class, and a description of the number of shares of each such class that are issued and outstanding.  All of the outstanding Equity Interests in the Loan Parties have been validly issued, and are fully paid and non-assessable and, other than with respect to the Parent, are owned in the amounts specified on Part (c) of <u>Schedule 5.13</u>, free and clear of all Liens except for those created under the Security Documents.  Except as set forth in <u>Schedule 5.13</u>, there are no subscriptions, options, warrants, or calls relating to any shares of any Loan Party's Equity Interests, including any right of conversion or exchange under any outstanding security or other instrument.  The copies of the Organization Documents of each Loan Party and each amendment thereto provided pursuant to <u>Section 4.01</u> are true and correct copies of each such document, each of which is valid and in full force and effect, subject to the Effect of Bankruptcy.

5.14    **Margin Regulations; Investment Company Act; Public Utility Holding Company Act**.

***No Loan Party is engaged or will be engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.  None of the proceeds of the Credit Extensions shall be used directly or indirectly for the purpose of purchasing or carrying any margin stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to***

***purchase or carry any margin stock or for any other purpose that might cause any of the Credit Extensions to be considered a "purpose credit" within the meaning of Regulations T, U, or X issued by the FRB.***

***None of the Loan Parties, any Person Controlling any Loan Party, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940. None of the Loan Parties, any Person Controlling any Loan Party, or any Subsidiary is a "holding company" or an "affiliate" of a "holding company" or a "subsidiary company" of a "holding company", as each term is defined and used in the Public Utility Holding Company Act of 2005.***

    **5.15    Disclosure**. Each Loan Party has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No report, financial statement, certificate or other information (including, without limitation, the Budget) furnished (whether in writing or orally) by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading as of the time when made or delivered; <u>provided</u> that, with respect to projected financial information and the Budget, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

    **5.16    Compliance with Laws.** Except as an Effect of Bankruptcy, each of the Loan Parties and each Subsidiary is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

    **5.17    Intellectual Property; Licenses, Etc.** Each Loan Party owns, or holds licenses in, all Intellectual Property, trade names, patent rights and other authorizations that are necessary to the conduct of its business as currently conducted and as proposed to be conducted, and attached hereto as Schedule 5.17 is a true, correct, and complete listing as of the Closing Date of all patents, patent applications, trademark registrations, trademark applications, material copyright applications and material copyright registrations as to which a Loan Party is the owner or is an exclusive licensee. There is no action, proceeding, claim or complaint pending or, threatened in writing to be brought against any Loan Party which might jeopardize any of such Person's interest in any of the foregoing licenses or Intellectual Property used in the operation of the business of any Loan Party or any of its Subsidiaries as currently conducted and as proposed to be conducted, except those which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, and no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be

employed, by any Loan Party or any Subsidiary infringes, misappropriates, deletes or otherwise relates upon any Intellectual Property or other rights held by any other Person.

**5.18    Labor Matters**.

There are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of the Loan Parties comply in all material respects with the Fair Labor Standards Act and any other applicable federal, state, local or foreign Law dealing with such matters. No Loan Party or any of its Subsidiaries has incurred any material liability or obligation under the Worker Adjustment and Retraining Act or similar state Law. Subject to the Effect of Bankruptcy, all payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party, except as could not reasonably be expected to have a Material Adverse Effect.  As of the Closing Date, there are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition in any case, and at all times after the Closing Date, there are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition in any case which, either  individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries, in any case which, either  individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  Other than the Effect of Bankruptcy, the consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound.  Each Loan Party and its Subsidiaries are in material compliance with all requirements pursuant to employment standards, labor relations, health and safety, workers compensation and human rights laws, immigration laws and other applicable employment legislation, except as could not reasonably be expected to have a Material Adverse Effect.  To the knowledge of the Loan Parties, no officer or director of any Loan Party who is party to an employment agreement with such Loan Party is in violation of any term of any employment contract or proprietary information agreement with such Loan Party, which could reasonably be expected to have a Material Adverse Effect; and to the knowledge of the Loan Parties, the execution of the employment agreements and the continued employment by the Loan Parties of the such persons, will not result in any such violation, which could reasonably be expected to have a Material Adverse Effect.

**5.19    Security Documents**.

(a)    Upon the entry of the DIP Orders, each of the Security Documents creates in favor of the Collateral Agent, for the benefit of the secured parties referred to therein, a legal, valid, unavoidable, continuing and enforceable security interest in the Collateral,

and the Collateral Agent shall have a fully perfected first priority Lien on, and security interest in, to and under all right, title and interest of each Loan Party thereunder in such Collateral, and such security interest is in each case prior and superior in right and interest to any other Person; <u>provided</u> that, (i) in no event shall the DIP Liens prime any valid, enforceable, non-avoidable liens which were existing on the Petition Date and (as of such date) have priority over the security interest in the Collateral securing the amounts outstanding under the Pre-Petition ABL Agreement; and (ii) notwithstanding the first priority nature of the security interest and Lien of the Collateral Agent in the Collateral, the Collateral (including the application of all proceeds thereof) are, and shall be subject to, the terms and conditions of the Intercreditor Agreement (except as to priority) and the DIP Orders.

(b)      No further recording, filing or other action of any kind will be required in connection with the creation, perfection or enforcement of such security interests and Liens in favor of the Collateral Agent.  No other claims having a priority superior or <u>pari passu</u> to that granted to or on behalf of the Agents or the Lenders shall be granted or approved while any of the Obligations or the Commitments remain outstanding.

**5.20**    **[Reserved].**

**5.21**    **Deposit Accounts; Credit Card Arrangements**.

*Annexed hereto as <u>Schedule 5.21(a)</u> is a list of all DDAs maintained by the Loan Parties as of the Closing Date, which Schedule includes, with respect to each DDA (i) the name and address of the depository; (ii) the account number(s) maintained with such depository; (iii) a contact person at such depository, and (iv) the identification of each Blocked Account Bank.*

*Annexed hereto as <u>Schedule 5.21(b)</u> is a list describing all arrangements as of the Closing Date to which any Loan Party is a party with respect to the processing and/or payment to such Loan Party of the proceeds of any credit card charges and debit card charges for sales made by such Loan Party.*

**5.22**    **Brokers**.  No broker or finder brought about the obtaining, making or closing of the Loans or transactions contemplated by the Loan Documents, and no Loan  Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.  Each Loan Party hereby jointly and severally indemnifies each Credit Party against, and agrees that such Person will hold each such Credit Party harmless from, any claim, demand or liability, including reasonable attorneys' fees, for any broker's, finder's or placement fee or commission incurred by such indemnifying party or the Lead Borrower or its Affiliates or a representative of such Person.

**5.23**    **Customer and Trade Relations**.  Except as a result of an Effect of Bankruptcy, there exists no actual termination or cancellation of, or any material adverse modification or change in, the business relationship of any Loan Party with any supplier material to its operations, unless the Administrative Agent has received evidence, in form and substance reasonably satisfactory to it, that the applicable Loan Party has replaced (or is replacing) any such supplier, and the terms governing such business relationship are either (i) not be less favorable to such Loan Party, in any material respect than those which governed the business relationship with the replaced supplier prior to its threatened termination or cancellation, or

modification or change, as the case may be, or (ii) reasonably acceptable to the Administrative Agent.

5.24    **[Reserved]**.

5.25    **Casualty**.  Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.26    **Anti-Terrorism Laws.**

***General*.  To the knowledge of the Loan Parties, after reasonable inquiry, none of the Loan Parties nor any direct or indirect investor in any Loan Party (other than the Lenders or any direct or indirect investors in the Lenders), is in violation of any Anti-Terrorism Law or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.**

***Executive Order No. 13224*.  To the knowledge of the Loan Parties, after reasonable inquiry, none of the Loan Parties nor any direct or indirect investor in any Loan Party (other than the Lenders or any direct or indirect investors in the Lenders), or their respective agents acting or benefiting in any capacity in connection with the transactions hereunder, is any of the following (each a "*Blocked Person*"):**

(i)    a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

(ii)    a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

(iii)    a Person or entity with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)    a Person or entity that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order No. 13224;

(v)    a Person or entity that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list; or

(vi)    a Person or entity who is affiliated or associated with a person or entity listed above.

**To the best knowledge of the Loan Parties, after reasonable inquiry, none of the Loan Parties nor, to the knowledge of the Loan Parties, any of its or their agents acting in any capacity in connection with the transactions hereunder (A) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (B) deals in, or otherwise engages in any**

*transaction relating to, any property or interests in property blocked pursuant to the Executive Order No. 13224.*

**ARTICLE VI**
**AFFIRMATIVE COVENANTS**

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which no claim has been asserted), or any Letter of Credit shall remain outstanding, the Loan Parties shall, and shall (except in the case of the covenants set forth in Sections 6.02 and 6.03) cause each Subsidiary to:

**6.01    [Reserved].**

**6.02    Certificates; Other Information.**  Deliver to the Administrative Agent, in form and detail reasonably satisfactory to the Administrative Agent:

(a)    at least seven days prior to the hearing for the entry of a Final DIP Order, a final Budget and business plan updating the initial Budget and business plan delivered prior to the Closing Date;

(b)    on Wednesday of each week (or, if Wednesday is not a Business Day, on the next succeeding Business Day), as of the close of business on the immediately preceding Saturday, in each case in form and substance reasonably satisfactory to the Administrative Agent, a duly completed Compliance Certificate signed by a Responsible Officer of the Lead Borrower, which shall include (i) a certification as to the amount, if any, of any obligations and liabilities with respect to Taxes, that have not been timely paid, (ii) a certification as to the receipt of notice, if any, as to any material obligations or liabilities with respect to utilities that have not been timely paid, (iii) a certification as to the receipt of notice, if any, as to any obligations or liabilities with respect to insurance premiums that have not been timely paid, (iv) a certification as to the acquisition, if any, of any patents, patent applications, trademark registrations, trademark applications, material copyright registrations and material copyright applications or other material Intellectual Property acquired since the date of the last similar certification, and (v) a report of any new Store openings or closings of any Store since the date of the last similar certification.  In the event of any change in generally accepted accounting principles used in the preparation of such financial statements, the Lead Borrower shall also provide a statement of reconciliation conforming such financial statements to GAAP;

(c)    on Wednesday of each week (or, if Wednesday is not a Business Day, on the next succeeding Business Day), as of the close of business on the immediately preceding Saturday, in each case in form and substance reasonably satisfactory to the Administrative Agent, (i) a Borrowing Base Certificate (together with supporting source documents), an updated Borrowing Base Certificate, certified as complete and correct by a Responsible Officer of the Lead Borrower, (ii) a rent report reflecting the date and amount of each payment on account of base rent, additional rent and common area maintenance expenses made on account of the Loan Parties' Leases, together with such supporting documentation or other information as the Administrative Agent may reasonably request, (iii) a statement of all Reported Fee Accruals (as defined in a DIP Order), (iv) a thirteen (13) week cash flow projections for the Loan Parties, reflecting on a line-item basis, among other things, anticipated sales, cash receipts, inventory levels and expenditures, and (v) a Variance Report and an updated Budget to reflect the

01:15322089.1

removal of the then-first week and the addition of a new thirteenth week, each of which items described in this clause (v) shall be acceptable to the Administrative Agent and the Lenders in their sole discretion;

(d)     upon the request of the Administrative Agent or its auditors, appraisers, accountants, consultants or other representatives, copies of each Loan Party's federal income tax returns, and any amendments thereto;

(e)     promptly following the submission to the board of directors (but in no event later than five (5) Business Days thereafter), copies of any audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by its Registered Public Accounting Firm in connection with the accounts or books of the Loan Parties or any Subsidiary, or any audit of any of them;

(f)     promptly after the same are available, and in no event later than ten (10) Business Days after they are sent, made available, or publicly filed, notice of (and, at the request of the Administrative Agent, copies of) annual report, proxy or financial statement or other documents, report or communication sent to the stockholders of the Loan Parties, and copies of all annual, regular, periodic and special reports and registration statements which any Loan Party may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934 or with any national securities exchange, and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(g)     as soon as is reasonably possible prior to the furnishing or filing thereof, copies of any statement, report or pleading proposed to be furnished to or filed with the Bankruptcy Court or the Creditors' Committee in connection with the Chapter 11 Case;

(h)     promptly and in no event later than five (5) Business Days after they are sent, notice of (and copies of) any notice of default or other material notice, statement, report or other communication (other than periodic information and reports in the ordinary course) furnished to any holder of debt securities of any Loan Party or any Subsidiary thereof pursuant to the terms of any indenture, loan or credit or similar agreement, in each case not otherwise required to be furnished to the Lenders pursuant to any other clause of this Section 6.02;

(i)     as soon as available, but in any event within thirty (30) days after the end of each Fiscal Year of any Loan Party (or upon the request of the Administrative Agent or its auditors, appraisers, accountants, consultants or other representatives), (i) a certificate executed by an authorized officer of the Lead Borrower certifying the existence and adequacy of the property and casualty insurance program carried by the Loan Parties and their Subsidiaries, and (ii) a written summary of said program identifying the name of each insurer, the number of each policy and expiration date of each policy, the amounts and types of each coverage, and a list of exclusions and deductibles for each policy, and containing such additional information as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably specify;

(j)     promptly, and in any event within three (3) Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each notice or other correspondence received from any Governmental Authority (including, without limitation, the SEC (or comparable agency in any applicable non-U.S. jurisdiction))

concerning any proceeding with, or investigation or possible investigation or other inquiry (other than routine and periodic inquiries received in the ordinary course) by such Governmental Authority regarding financial or other operational results of any Loan Party or any Subsidiary thereof or any other matter which, in either case, could reasonably be expected to have a Material Adverse Effect;

(k)    promptly, and in any event within three (3) Business Days after receipt thereof, copies of all financial and other reports and information delivered to the Pre-Petition Term Loan Agent, whether pursuant to the DIP Orders, or otherwise, as and when such materials are delivered to the Pre-Petition Term Loan Agent; and

(l)    promptly, such additional information regarding the business affairs, financial condition or operations of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender may from time to time reasonably request, including, without limitation, the income level for each individual Store.

Financial statements and other documents required to be delivered pursuant to Section 6.02 shall be delivered in accordance with Section 10.02(a).  The Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Loan Parties with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Loan Parties hereby acknowledge that the Administrative Agent will make available to the Lenders and the L/C Issuer materials and/or information provided by or on behalf of the Loan Parties hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Loan Parties or their securities) (each, a "Public Lender").  The Loan Parties and their Subsidiaries hereby agree that, if requested by the Administrative Agent, they will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Loan Parties shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Loan Parties or their securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.07); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

6.03    **Notices.**  Promptly notify the Administrative Agent:

(a)    any officer of a Loan Party or any of its Subsidiaries becomes aware of the occurrence of any Default or Event of Default;

(b)      any officer of a Loan Party or any of its Subsidiaries becomes aware of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)      any officer of a Loan Party or any of its Subsidiaries becomes aware of any breach or non-performance of, any default under, or termination of, a Material Contract or with respect to Material Indebtedness of any Loan Party or any Subsidiary thereof; (including, but not limited to, notice of any "Default" or "Event of Default" under (and as defined in) the Pre-Petition Term Loan Documents);

(d)      any officer of a Loan Party or any of its Subsidiaries becomes aware of any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority;

(e)      any officer of a Loan Party or any of its Subsidiaries becomes aware of the commencement of, or any material development in, any litigation or any administrative or arbitration proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws;

(f)      any officer of a Loan Party or any of its Subsidiaries becomes aware of any undischarged or unpaid judgments or decrees;

(g)      of the occurrence of any ERISA Event;

(h)      of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof;

(i)      of any change in any Loan Party's chief executive officer, chief financial officer or chairman of the board of directors;

(j)      of the discharge by any Loan Party of its present Registered Public Accounting Firm or any withdrawal or resignation by such Registered Public Accounting Firm;

(k)      of any collective bargaining agreement or other labor contract to which a Loan Party becomes a party, or the application for the certification of a collective bargaining agent, or any strike, lockout, slowdown or other material labor dispute against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened;

(l)      any officer of a Loan Party or any of its Subsidiaries becomes aware of the filing of any Lien for unpaid Taxes against any Loan Party;

(m)      any officer of a Loan Party or any of its Subsidiaries becomes aware of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed;

(n)      (i) notice of any amendment, supplement, modification, waiver or consent to the Pre-Petition Term Loan Documents, (ii) notice of any intended disposition of Pre-Petition Term Loan Priority Collateral and any receipt of proceeds therefrom and (iii) any notice or writing with similar effect that relates to non-compliance or potential non-compliance of any obligation thereunder, in each case, received from or delivered to any party to the Pre-Petition Term Loan Documents and copies thereof;

(o)      of any failure by any Loan Party to pay rent at any one or more of such Loan Party's locations, as and when such rent first became due following the Petition

Date, unless such non-payment was permitted under the Bankruptcy Code or pursuant to an order of the Bankruptcy Court;

(p)     of any breach (or alleged breach) under the Agency Agreement, by any party thereto; and

(q)     of the discharge or resignation (or attempted resignation) of the Independent Consultant; and

(r)     of any Subsidiary that was an Immaterial Subsidiary ceasing to be an Immaterial Subsidiary.

Each notice pursuant to this Section 6.03 shall be accompanied by a statement of a Responsible Officer of the Lead Borrower setting forth details of the occurrence referred to therein and stating what action the Lead Borrower has taken and proposes to take with respect thereto.  Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

**6.04    Payment of Obligations**.  To the extent required by the Bankruptcy Code, pay and discharge in full as the same shall become due and payable (subject to any applicable grace period, and ordinary and customary trade terms), all its obligations and liabilities incurred after the Petition Date, including (a) all Federal, state and other material tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, and (b) all lawful claims (including, without limitation, claims for labor, materials, supplies and claims of landlords, warehousemen, customs brokers, and carriers) which, if unpaid, would by law become a Lien upon its property, except, in each case, where (i) the validity or amount thereof (other than payroll taxes or taxes that are the subject of a United States federal tax lien) is being contested in good faith by appropriate proceedings diligently conducted, (ii) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (iii) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (iv) no Lien has been filed with respect thereto (other than any Lien being contested in good faith with respect to labor, materials or supplies associated with any Real Estate of the Loan Parties ), and (v) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.  The Lead Borrower will, upon request, furnish the Collateral Agent with proof satisfactory to the Collateral Agent indicating that the Loan Parties and their Subsidiaries have made the payments described in clause (a) above.  Each Loan Party shall, and shall cause each of its Subsidiaries to, pay in full as the same shall become due and payable (subject to any applicable grace period, and ordinary and customary trade terms) all undisputed material accounts payable incident to the operations of such Person not referred to in this Section 6.04, above.  Nothing contained herein shall be deemed to limit the rights of the Agents with respect to determining Reserves pursuant to this Agreement.

**6.05    [Reserved]**.

**6.06    Maintenance of Properties**.

*Keep its properties, including, without limitation, the Real Estate, in such repair, working order and condition and substantially in the condition as of the Closing Date (ordinary wear and tear and casualty events excepted except where failure to maintain such properties has not resulted, and which, in the aggregate, could not reasonably be expected to have a Material Adverse Effect.*

*No Loan Party nor any of its Subsidiaries shall take any action, or fail to take any action, that could reasonably be expected to knowingly infringe, misappropriate, dilute or otherwise violate any Intellectual Property or other rights of other Persons.*

*Do all things reasonably necessary in order to comply with all Environmental Laws at any real property or otherwise in connection with their operations except where the noncompliance with which could not reasonably be expected to cause a Material Adverse Effect, and obtain all permits and other governmental authorizations for their operations under applicable Environmental Laws other than such permits and other authorizations the failure of which to obtain could not, individually or in the aggregate, reasonably be expected to cause a Material Adverse Effect.*

**6.07    Maintenance of Insurance.**

*Maintain with financially sound and reputable insurance companies reasonably acceptable to the Administrative Agent and not Affiliates of the Loan Parties, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by applicable Law, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and as are reasonably acceptable to the Administrative Agent.*

*Fire and extended coverage policies maintained with respect to any Collateral shall be endorsed or otherwise amended to include (i) a non-contributing mortgage clause (regarding improvements to real property) and lenders' loss payable clause (regarding personal property), in form and substance satisfactory to the Collateral Agent, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Collateral Agent, (ii) a provision to the effect that none of the Loan Parties, Credit Parties or any other Person shall be a co-insurer and (iii) such other provisions as the Collateral Agent may reasonably require from time to time to protect the interests of the Credit Parties. Commercial general liability policies shall be endorsed to name the Collateral Agent as an additional insured. Business interruption policies shall name the Collateral Agent as a loss payee and shall be endorsed or amended to include (i) a provision that, from and after the Closing Date, the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Collateral Agent, and (ii) such other provisions as the Collateral Agent may reasonably require from time to time to protect the interests of the Credit Parties. Each such policy referred to in this <u>Section 6.07(b)</u> shall also provide that it shall not be canceled or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Collateral Agent (giving the Collateral Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not*

*less than thirty (30) days' prior written notice thereof by the insurer to the Collateral Agent. The Lead Borrower shall deliver to the Collateral Agent, prior to the cancellation, or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Collateral Agent, including an insurance binder) together with evidence satisfactory to the Collateral Agent of payment of the premium therefor.*

*None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this __Section 6.07.__  Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees.  If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by law, to waive their right of recovery, if any, against the Credit Parties and their agents and employees.  The designation of any form, type or amount of insurance coverage by the any Credit Party under this __Section 6.07__ shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.*

*Maintain for themselves and their Subsidiaries, a Directors and Officers insurance policy, and a "Blanket Crime" policy including employee dishonesty, forgery or alteration, theft, disappearance and destruction, robbery and safe burglary, and computer fraud coverage with responsible companies in such amounts as are customarily carried by business entities engaged in similar businesses similarly situated, and will upon request by the Administrative Agent furnish the Administrative Agent certificates evidencing renewal of each such policy.*

*Permit any representatives that are designated by the Collateral Agent to inspect the insurance policies maintained by or on behalf of the Loan Parties and to inspect books and records related thereto and any properties covered thereby.  The Loan Parties shall pay the reasonable fees and expenses of any representatives retained by the Collateral Agent to conduct any such inspection.*

*If at any time the area in which any Real Estate is located is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such total amount as is reasonable and customary for companies engaged in businesses similar to that of the Borrowers, and otherwise comply with the National Flood Insurance*

***Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time.***

**6.08     Compliance with Laws.**  Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted, such contest effectively suspends enforcement of the contested Laws, and adequate reserves have been set aside and maintained by the Loan Parties in connection therewith and in accordance with GAAP, and (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

**6.09     Books and Records; Accountants**

(a)     (i) Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or such Subsidiary, as the case may be; and (ii) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties or such Subsidiary, as the case may be.

(b)     At all times retain a Registered Public Accounting Firm which is reasonably satisfactory to the Administrative Agent and shall instruct such Registered Public Accounting Firm to cooperate with, and be available to, the Administrative Agent or its representatives to discuss the Loan Parties' financial performance, financial condition, operating results, controls, and such other matters, within the scope of the retention of such Registered Public Accounting Firm, as may be raised by the Administrative Agent.  The Lead Borrower hereby irrevocably authorizes and directs all auditors, accountants, or other third parties to deliver to the Administrative Agent, at the Borrowers' expense, copies of the Borrowers' financial statements, papers related thereto, and other accounting records of any nature in their possession, and to disclose to the Administrative Agent any information they may have regarding the Collateral or the financial condition of the Borrowers.  The Required Lenders hereby approve Deloitte & Touche as a satisfactory Registered Public Accounting Firm.

**6.10     Inspection Rights.**  (a) Permit representatives and independent contractors of either any Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and Registered Public Accounting Firm, all at the expense of the Loan Parties (such expenses to be reasonable) and at such reasonable times during normal business hours and as often as may be reasonably desired, at the expense of the Loan Parties at any time during normal business hours and without advance notice.  At any time following the Petition Date, permit the Agents or their professionals (including investment bankers, consultants, accountants, and lawyers) retained by them to conduct evaluations of the Loan Parties' business plan, Budget, forecasts and cash flows.

(b)     Upon the request of the Administrative Agent, permit the Administrative Agent or professionals (including investment bankers, consultants, accountants, lawyers and appraisers) retained by the Administrative Agent to conduct appraisals, commercial finance examinations and other evaluations, including, without limitation, of (i) the Lead Borrower's practices in the computation of the Borrowing Base and (ii) the assets included in the Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves.  The Loan Parties (x) shall pay the reasonable fees and reasonable

expenses of the Administrative Agent or such professionals with respect to such evaluations and appraisals and (y) hereby irrevocably authorize and consent to the Administrative Agent's delivery (subject to such non-reliance and indemnity agreements in favor of the Administrative Agent and its professionals as the Administrative Agent may reasonably require) of such evaluations and appraisals to the Pre-Petition Term Loan Agent.

        (c)      [Intentionally Omitted].

        (d)      Permit the Administrative Agent, from time to time, to engage a geohydrologist, an independent engineer or other qualified consultant or expert, reasonably acceptable to the Administrative Agent, at the expense of the Loan Parties, to undertake Phase I environmental site assessments during the term of this Agreement of the material owned Real Estate, provided that such assessments may only be undertaken if a Loan Party receives any notice or obtains knowledge of (A) any potential or known release of any Hazardous Materials at or from any material owned Real Estate, notification of which must be given to any Governmental Authority under any Environmental Law, or notification of which has, in fact, been given to any Governmental Authority, or (B) any complaint, order, citation or notice with regard to air emissions, water discharges, or any other environmental health or safety matter affecting any Loan Party or any material owned Real Estate from any Person (including, without limitation, the Environmental Protection Agency). Environmental assessments may include detailed visual inspections of the material owned Real Estate, including, without limitation, any and all storage areas, storage tanks, drains, dry wells and leaching areas, and the taking of soil samples, surface water samples and ground water samples, as well as such other investigations or analyses as are reasonably necessary for a determination of the compliance of the material owned Real Estate and the use and operation thereof with all applicable Environmental Laws. The Borrowers will, and will cause each of their Subsidiaries to, cooperate in all respects with the Administrative Agent and such third parties to enable such assessment and evaluation to be timely completed in a manner reasonably satisfactory to the Administrative Agent.

        **6.11**     **Use of Proceeds**.  Use the proceeds of the Credit Extensions to (a) upon the entry of the Final DIP Order, to repay the Pre-Petition ABL Liabilities in full (to the extent not previously paid in full) and to fund the Pre-Petition Indemnity Account, and (b) to the extent expressly permitted under the DIP Orders, and solely in strict compliance with the Budget and this Agreement, for general corporate purposes of the Loan Parties, in each case to the extent expressly permitted under applicable Law and the Loan Documents.

        **6.12**     **[Reserved].**

        **6.13**     **Cash Management.**

***Upon the request of the Administrative Agent at any time following the Closing Date (which request shall be deemed to have been made as of the Closing Date):***

**deliver written notice (together with a copy of the Interim DIP Order) to (x) each depository where any DDA is maintained and (y) each Blocked Account Bank where any DDA is maintained (each, a "Blocked Account"), setting forth the Credit Parties' rights in, and each such institution's obligations with respect to, each related DDA and Blocked Account, as applicable (each, a "DDA Notification"); and**

**deliver written notice (together with a copy of the Interim DIP Order and the Cash Management Order) to each credit card clearinghouses and processors listed on Schedule 5.21(b) to the Pre-Petition**

ABL Agreement, setting forth the Credit Parties' rights in, and each such institution's obligations with respect to, all credit card proceeds (each, a "Credit Card Notification").

*(i) Each Credit Card Notification and DDA Notification shall require, and the Loan Parties shall cause, the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to a Blocked Account of all payments due from credit card processors, and (ii) the Borrowers shall cause each depository institution listed on Schedule 5.21(a) to the Pre-Petition ABL Agreement to cause the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to a Blocked Account of all amounts on deposit in each DDA in excess of the minimum balance permitted in accordance with Section 6.13(c).*

*Each Blocked Account Agreement shall require, and the Loan Parties shall cause, the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to the concentration account maintained by the Collateral Agent at Wells Fargo Bank (the "Concentration Account"), of all cash receipts and collections, including, without limitation, the following:*

all available cash receipts from the sale of Inventory and other assets (other than proceeds of Pre-Petition Term Loan Priority Collateral which, to the extent permitted by the DIP Orders, shall be immediately deposited into the Pre-Petition Term Loan Account);

all proceeds of collections of Accounts;

all Net Proceeds, and all other cash payments received by a Loan Party from any Person or from any source or on account of any sale or other transaction or event, including, without limitation, any Prepayment Event (other than proceeds of Pre-Petition Term Loan Priority Collateral which, to the extent permitted by the DIP Orders, shall be immediately deposited into the Pre-Petition Term Loan Account);

the then contents of each DDA (net of any minimum balance, not to exceed $2,500.00, as may be required to be kept in the subject DDA by the depository institution at which such DDA is maintained);

the then entire ledger balance of each Blocked Account (net of any minimum balance, not to exceed $2,500.00, as may be required to be kept in the subject Blocked Account by the Blocked Account Bank); and

the proceeds of all credit card charges.

*The Concentration Account shall at all times be under the sole dominion and control of the Collateral Agent. The Loan Parties hereby acknowledge and agree that (i) without limiting the provisions of Section 0, the Loan Parties have no right of withdrawal from*

*the Concentration Account, (ii) the funds on deposit in the Concentration Account shall at all times be collateral security for all of the Obligations and (iii) the funds on deposit in the Concentration Account shall be applied as provided in <u>Section 0</u>.  In the event that, notwithstanding the provisions of this <u>Section 6.13</u>, any Loan Party receives or otherwise has dominion and control of any such proceeds or collections, such proceeds and collections shall be held in trust by such Loan Party for the Collateral Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Concentration Account or dealt with in such other fashion as such Loan Party may be instructed by the Collateral Agent.*

*Upon the request of the Administrative Agent, the Loan Parties shall cause bank statements and/or other reports to be delivered to the Administrative Agent not less often than monthly, accurately setting forth all amounts deposited in each Blocked Account to ensure the proper transfer of funds as set forth above.*

    **6.14    Information Regarding the Collateral**.

*Furnish to the Administrative Agent at least thirty (30) days prior written notice of any change in: (i) any Loan Party's name as it appears in official filings in the state of incorporation or other organization; (ii) the location of any Loan Party's chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or distribution center at which Collateral owned by it is located (including the establishment of any such new office or distribution center); (iii) any Loan Party's type of entity or jurisdiction of incorporation or formation; or (iv) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization. The Loan Parties agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest in all the Collateral for its own benefit and the benefit of the other Credit Parties.*

 *From time to time as may be reasonably requested by any Agent, the Lead Borrower shall supplement each Schedule to this Agreement and the other Loan Documents, or any representation herein or in any other Loan Document, with respect to any matter arising after the Closing Date that, if existing or occurring on the Closing Date, would have been required to be set forth or described in such Schedule or as an exception to such representation or that is necessary to correct any information in such Schedule or representation which has been rendered inaccurate thereby (and, in the case of any supplements to any Schedule, such Schedule shall be appropriately marked to show the changes made therein).  Notwithstanding the foregoing, no supplement or revision*

01:15322089.1

*to any Schedule or representation shall be deemed the Credit Parties' consent to the matters reflected in such updated Schedules or revised representations nor permit the Loan Parties to undertake any actions otherwise prohibited hereunder or fail to undertake any action required hereunder from the restrictions and requirements in existence prior to the delivery of such updated Schedules or such revision of a representation; nor shall any such supplement or revision to any Schedule or representation be deemed the Credit Parties' waiver of any Default resulting from the matters disclosed therein.*

**6.15    Physical Inventories**.

*Upon the request of the Collateral Agent from time to time, cause a physical inventory to be undertaken at all Stores and distribution centers or warehouses, in each case at the expense of the Loan Parties and consistent with past practices and following such methodology as is consistent with the methodology used in the immediately preceding inventory <u>provided</u>, <u>however</u>, if the Agent should have a good faith belief that the accuracy or completeness of the inventory or cycle count practices or methodology is unreliable, all such inventory and cycle count shall be subsequently conducted by such inventory takers and in accordance with such practices and methodology, as are reasonably satisfactory to the Collateral Agent, in each case at the expense of the Loan Parties. The Collateral Agent, at the expense of the Loan Parties, may participate in and/or observe each scheduled physical count of Inventory which is undertaken on behalf of any Loan Party.  The Lead Borrower, within ten (10) days following the completion of each such inventory, shall provide the Collateral Agent with a reconciliation of the results of such inventory (as well as of any other physical inventory or cycle counts undertaken by a Loan Party) and shall post such results to the Loan Parties' stock ledgers and general ledgers, as applicable.*

*[intentionally omitted].*

**6.16    Environmental Laws**.

*Except as could not reasonably be expected to have a Material Adverse Effect (a) conduct its operations and keep and maintain its Real Estate in compliance with all Environmental Laws; (b) obtain and renew all environmental permits appropriate or necessary for its operations and properties; and (c) implement any and all investigation, assessment, monitoring, remediation, removal and other response actions that are (i) necessary to maintain the value and marketability of the Real Estate, or (ii)  necessary to otherwise comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, <u>provided</u>, <u>however</u>, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the*

*extent that its obligation to do so is being contested in good faith and by proper proceedings diligently prosecuted and reserves acceptable to the Collateral Agent in its Permitted Discretion have been reserved and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP. In the event any response actions are conducted at any Real Estate to address any release or threatened release of Hazardous Materials, the Loan Party or any of its Subsidiaries shall not permit the recording of any activity and use limitation or similar instruments restricting or prohibiting the use of any Real Estate or limiting the exposure of occupants on the Real Estate to any Hazardous Materials at such Real Estate without the prior written consent of the Collateral Agent, which may be granted, conditioned, delayed, or withheld in its Permitted Discretion. Notwithstanding the foregoing, no consent of the Collateral Agent shall be required to restrict any Real Estate from a future residential use that is not permissible under the zoning in effect at the time such restriction is proposed or from restricting the use of groundwater at any Real Estate where groundwater is not used at the time any such restriction is proposed for such restricted use.*

      **6.17    Further Assurances.**

*Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any applicable Law, or which any Agent may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties. The Loan Parties also agree to provide to the Agents, from time to time upon request, evidence satisfactory to the Agents as to the perfection and priority of the Liens created or intended to be created by the Security Documents.*

*If any material personal property assets are acquired by any Loan Party after the Closing Date (other than assets constituting Collateral under the Security Documents that become subject to the Lien of the Security Documents upon acquisition thereof), notify the Agents thereof, and the Loan Parties will cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be necessary or shall be requested by any Agent to grant and perfect such Liens, including actions described in paragraph (a) of this <u>Section 6.17</u>, all at the expense of the Loan Parties. In no event shall compliance with this <u>Section 6.17(b)</u> waive or be deemed a waiver or consent to any transaction giving rise to the need to comply with this <u>Section 6.17(b)</u> if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute consent to the inclusion of any acquired assets in the computation of the Borrowing Base.*

*[Intentionally Omitted].*

*[Intentionally Omitted].*

***(i) Upon the request of the Collateral Agent, made in its Permitted Discretion, the Loan Parties shall use commercially reasonable efforts to cause the landlord of any such leased property to deliver a Collateral Access Agreement to the Collateral Agent in such form as the Collateral Agent may reasonably require in respect of such leased property; and (ii) shall, simultaneously with the delivery to the Pre-Petition Term Loan Agent, deliver to the Collateral Agent a Collateral Access Agreement for any location or Store for which a Collateral Access Agreement has been provided to the Pre-Petition Term Loan Agent.***

     **6.18**    **Compliance with Terms of Leaseholds.**
Except as otherwise expressly permitted hereunder (including, without limitation, in connection with Permitted Sales), and to the extent required under the Bankruptcy Code, make all payments and otherwise perform all obligations becoming due following the Petition Date in respect of all Leases of real property to which any Loan Party is a party, keep such Leases in full force and effect and not allow such Leases to lapse or be terminated or any rights to renew such Leases to be forfeited or cancelled, notify the Administrative Agent of any default by any party with respect to such Leases and cooperate with the Administrative Agent in all respects to cure any such default, and cause each of its Subsidiaries to do so, except, in any case, where the failure to do so, either individually or in the aggregate, could not be reasonably likely to have a Material Adverse Effect.  In the event that the Borrowers become delinquent in their rent payments, the Administrative Agent may establish additional Reserves against the Borrowing Base for the amount of any landlord liens arising from such delinquency.

     **6.19**    **Material Contracts**.  Perform and observe all of the terms and provisions of each Material Contract (other than with respect to the Pre-Petition Term Loan Documents (it being understood that the Pre-Petition Term Loan Documents shall be subject to the provisions of Section 8.01(g))) to be performed or observed by any Loan Party or any of its Subsidiaries (except as may be occasioned as an Effect of Bankruptcy), take all such action required on the part of any Loan Party or any of its Subsidiaries to maintain each such Material Contract in full force and effect, enforce each such Material Contract in accordance with its terms, take all such action to such end as may be from time to time requested by the Administrative Agent and, upon request of the Administrative Agent, make to each other party to each such Material Contract such demands and requests for information and reports or for action as any Loan Party or any of its Subsidiaries is entitled to make under such Material Contract, and cause each of its Subsidiaries to do so, except, in any case, where the failure to do so, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

     **6.20**    **[Reserved].**
     **6.21**    **[Reserved].**
     **6.22**    **[Reserved].**
     **6.23**    **Retention of Consultants; Communication with Accountants and Other Financial Advisors.**

01:15322089.1

*Continue to retain the Independent Consultant, the scope and terms of such engagement to be reasonably satisfactory to the Administrative Agent (subject to Bankruptcy Court approval, to be obtained by May 12, 2014).  Until such time as all Pre-Petition ABL Liabilities and all Obligations have been repaid in full (or cash collateralized in accordance with the terms hereof) and all Commitments have been terminated, the Lead Borrower shall continue to retain the Independent Consultant to assist the Loan Parties with a Permitted Sale and with the preparation of the Budget and the other financial and Collateral reporting required to be delivered to the Administrative Agent pursuant to this Agreement.*

*The Lead Borrower authorizes the Administrative Agent to communicate directly with its independent certified public accountants, appraisers, financial advisors, investment bankers and consultants (including the Independent Consultant), which have been engaged from time to time by the Borrower, and authorizes and shall instruct those accountants, appraisers, financial advisors, investment bankers and consultants to communicate to the Administrative Agent information relating to each Loan Party with respect to the business, results of operations, prospects and financial condition of such Loan Party.*

*Each Loan Party acknowledges that the Administrative Agent shall be permitted to engage such outside consultants and advisors (each, a "Lender Group Consultant"), for the sole benefit of the Administrative Agent and other Credit Parties, as the Administrative Agent may determine to be necessary or appropriate in its sole discretion.  Each Loan Party and agrees that (i) such Loan Party shall provide its complete cooperation during business hours with any Lender Group Consultant (including, without limitation, providing reasonable access to such Loan Party's business, books and records; and (ii) all reasonable costs and expenses of any such Lender Group Consultant shall be Credit Party Expenses; and (iii) all reports, determinations and other written and verbal information provided by any Lender Group Consultant shall be confidential (except that each Loan Party hereby irrevocably authorizes the Administrative Agents and other Credit Parties to share all such reports, determinations and other written and verbal information with the Pre-Petition Term Loan Agent) and no Loan Party shall be entitled to have access to same.*

     **6.24**    **Performance Within Budget**.  At all times following the Closing Date, strictly perform in accordance with the Budget subject to the following:

*the Debtors' actual expenses and cash expenditures shall not be greater than the lesser of (x) 115% of the projected amounts set forth in the Budget, and (y) 100% of the projected amounts set forth in the Budget plus $8,000,000, on a cumulative basis, and*

*the Borrowers' actual Excess Availability shall not be less than 90% of the projected amounts set forth on the Budget at any time.*

Each of the forgoing clauses (a) through (b) to be reported on Wednesday of each week and tested as of the end of the immediately preceding week on a cumulative basis, commencing with the third week after the Petition Date, pursuant to the Variance Report delivered for such period; provided that, the Loan Parties shall provide reporting for such covenants commencing with the first week following the Petition Date.

      **6.25**     **Permitted Sales Process; Agency Agreement.**

      (a)     *On the Petition Date, the Loan Parties shall have filed a motion or series of motions in the Chapter 11 Case with the Bankruptcy Court, requesting approval for a Permitted Sale of all of the inventory in their Stores through a chain-wide going out of business sale (the "GOB Sale").  In connection therewith:*

      (i)     **On or before May 8, 2014, the Bankruptcy Court shall have entered an order (the "GOB Sale Order") approving the immediate commencement and consummation of the GOB Sale, which GOB Sale Order shall be in form and substance acceptable to the Administrative Agent; and**

      (ii)     **On or before May 9, 2014, the Loan Parties shall have completed and closed on the Agency Agreement pursuant to the GOB Sale Order.**

*After the Petition Date, to the extent not previously authorized under the GOB Sale Order, the Loan Parties shall file one or more motions in the Chapter 11 Cases with the Bankruptcy Court, requesting approval for a Permitted Sale(s) to Liquidate any of their remaining assets.*

      **6.26**     **Additional Bankruptcy Related Affirmative Covenants & Waivers.**

*Within 119 days of the Petition Date, obtain an order of the Bankruptcy Court extending the time period of the Borrowers to assume or reject Leases to not less than 210 days from the Petition Date.*

*Provide the Administrative Agent with a status report and such other updated information relating to a Permitted Sale as may be reasonably requested by the Administrative Agent, in form and substance acceptable to the Administrative Agent.*

*Upon the Closing Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, the Loan Parties hereby irrevocably waive any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations other than as expressly set forth in a DIP Order.*

01:15322089.1

*Promptly, punctually, and faithfully perform all of the terms and conditions of the DIP Orders.*

*On or before May 8, 2014, the Bankruptcy Court shall have entered a Final DIP Order acceptable to the Administrative Agent in its sole and exclusive discretion.*

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which no claim has been asserted), or any Letter of Credit shall remain outstanding, no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

**7.01    Liens.**  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired or sign or file or suffer to exist under the UCC or any similar Law or statute of any jurisdiction a financing statement that names any Loan Party or any Subsidiary thereof as debtor; sign or suffer to exist any security agreement authorizing any Person thereunder to file such financing statement; sell any of its property or assets subject to an understanding or agreement (contingent or otherwise) to repurchase such property or assets with recourse to it or any of its Subsidiaries; or assign or otherwise transfer any accounts or other rights to receive income, other than, as to all of the above, Permitted Encumbrances.

**7.02    Investments.**  Have outstanding, make, acquire or hold any Investment (or become contractually committed to do so), directly or indirectly, or incur any liabilities (including contingent obligations) for or in connection with any Investment, except Permitted Investments (but only to the extent consistent with the Budget).

**7.03    Indebtedness; Disqualified Stock.**  Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness (except Permitted Indebtedness, but only to the extent consistent with the Budget) or issue Disqualified Stock or (ii) increase the principal amount of the Pre-Petition Term Loan Obligations, except by the accrual of any Prepayment Premium (as defined in the Pre-Petition Term Loan Agreement) but, in any case, limited to the extent expressly permitted by the Intercreditor Agreement, the DIP Orders and each other order of the Bankruptcy Court (including, without limitation, any intercreditor provisions set forth in any such DIP Orders or other orders), other than as a result of the accrual of PIK Interest (as defined in the Pre-Petition Term Loan Agreement).

**7.04    No Additional Subsidiary.**  (a) Merge or consolidate with or into another Person, reorganize, enter into a Plan of Liquidation, recapitalization or reclassify its Equity Interests (or agree to do any of the foregoing), except in connection with a Permitted Sale; or (b) create, form, or organize any Subsidiary from and after the Closing Date.

**7.05    Dispositions**.  Make any Disposition or enter into any agreement to make any Disposition other than Permitted Sales; provided that, to the extent entered into prior to the Petition Date, the following shall continue to be Dispositions which are permitted under this Section 7.05: (x) leases of one or both of the two smallest (by square footage) buildings (as determined on the Closing Date) located at One Coldwater Creek Drive, Sandpoint, Idaho 3864, which shall in no event be more than ten percent (10%) of the total square footage of all of the buildings on the Owned Real Estate located at One Coldwater Creek Drive, Sandpoint, Idaho 83864, and (y) subleases, assignments or other disposition of interests in any leased Stores or in

the Real Estate located at 745 and/or 751 West Hanley Avenue, Coeur d'Alene, Idaho 83815; provided that, in each case, (i) no Default or Event of Default exists at the time of entering into such lease, sublease, assignment or other agreement and (ii) such lease or sublease is made on an arm's length basis and the lessor receives fair market value for such lease; provided, further, for the avoidance of doubt, that any subleasing, assigning or disposing of any entire Store shall be treated as the closure of such Store for all purposes hereunder.

 **7.06** **Restricted Payments**.  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests.

 **7.07** **Prepayments of Indebtedness**.  Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness, or make any payment in violation of any subordination terms of any Subordinated Indebtedness, except (a) to the extent permitted hereunder, regularly scheduled or mandatory repayments, repurchases, redemptions or defeasances of Permitted Indebtedness (but excluding on account of any Subordinated Indebtedness) incurred Post-Petition, (b) payments on account of the Obligations, (c) payments required to be made under the Pre-Petition Term Loan, any other payments (including adequate protection payments) made in reduction of the Pre-Petition Term Loan which are, in each case, expressly provided for in the DIP Orders or any of the orders granting "first day" relief in the Chapter 11 Case and, in all events, to the extent permitted under the Intercreditor Agreement and (e) payments (including through the application of funds in accordance with <u>Section 0</u> and <u>Section 8.03</u>) as and when due in respect of the Pre-Petition ABL Liabilities in accordance with the terms of this Agreement and the DIP Orders (including all adequate protection payments on account of the Pre-Petition ABL Liabilities).

 **7.08** **Change in Nature of Business.**

  Engage in any line of business different from the business conducted by the Loan Parties and their Subsidiaries on the Closing Date or any business substantially related or incidental thereto.

 **7.09** **Transactions with Affiliates.**  Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than on fair and reasonable terms that are fully disclosed to the Administrative Agent, and that are no less favorable to the Loan Parties or such Subsidiary than would be obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, <u>provided</u> that the foregoing restriction shall not apply to (i) a transaction between or among the Loan Parties, (ii) transactions between or among any Subsidiaries that are not Loan Parties, (iii) Permitted Investments of the type described in clause (l) of the definition thereof, (iv) Restricted Payments permitted pursuant to <u>Section 7.06</u>, (v) the payment of director and officer compensation (including bonuses) and other benefits (including retirement, health, stock option and other benefit plans) and indemnification arrangements, in each case under this <u>clause (v)</u>, made in the ordinary course of business and consistent with industry practice, (vi) Permitted Investments of the type described in <u>clause (g)</u> of the definition thereof, (vii) the transactions pursuant to the Coldwater Equity Documents, (viii) the transactions pursuant to the Pre-Petition Term Loan Documents and (ix) the loan transactions set forth on <u>Schedule 7.02</u>.

 **7.10** **Burdensome Agreements.**  **E**nter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document, the Pre-Petition ABL

Agreement or the Pre-Petition Term Loan Documents) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments or other distributions to any Loan Party or to otherwise transfer property to or invest in a Loan Party, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Loan Party, or (iv) of the Loan Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Collateral Agent; provided, however, that this clause (iv) shall not prohibit (I) any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under clause (c) of the definition of Permitted Indebtedness solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; or (II) the existence of or entry into of licenses, leases or other contracts entered into in the ordinary course of business containing customary restrictions on the assignment of such license, lease or contract; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

      **7.11    Use of Proceeds.**  Except as expressly provided in the DIP Orders, or any of the orders granting "first day" relief in the Chapter 11 Case, use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately: (i) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of the Credit Parties or their rights and remedies under this Agreement and the other Loan Documents, including, without limitation, for the payment of any services rendered by the professionals retained by the Borrowers or the Creditors' Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief (x) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations or the Liens securing same, (y) for monetary, injunctive or other affirmative relief against any Credit Party or the Collateral, or (z) preventing, hindering or otherwise delaying the exercise by any Credit Party of any rights and remedies under the Loan Documents or applicable Law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the court or otherwise) by any or all of the Credit Parties upon any of the Collateral; (ii) to make any distribution under a Bankruptcy Plan in the Chapter 11 Case; (iii) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the Administrative Agent; (iv) to pay any fees or similar amounts to any Person who has proposed or may propose to purchase interests in any Borrower without the prior written consent of the Administrative Agent; and (v) to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose, or for any other purpose that entails a violation of any of the regulations of the Board, including Regulations U and X.

      **7.12    Amendment of Material Documents**.
Amend, modify or waive any of a Loan Party's rights under (a) its Organization Documents, or (b) any Material Contract or Material Indebtedness (other than on account of any refinancing thereof otherwise permitted hereunder) other than the Pre-Petition Term Loan Documents in accordance with the Intercreditor Agreement, in each case to the extent that such amendment, modification or waiver would be reasonably likely to have a Material Adverse Effect.  Except as permitted by the Intercreditor Agreement, the Loan Parties shall not amend, modify or waive any of a Loan Party's or its Subsidiaries' rights under the Pre-Petition Term Loan Documents or any

documents executed in connection therewith, without the consent of the Required Lenders hereunder.

**7.13    Fiscal Year**.

Change the Fiscal Year of any Loan Party, or the accounting policies or reporting practices of the Loan Parties, except as required by GAAP.

**7.14    Deposit Accounts; Blocked Accounts; Credit Card Processor**.

(a)    Open, or permit any funds to be deposited to, any new DDAs or Blocked Accounts unless permitted by the Cash Management Order and after compliance with the provisions of Section 6.13.

(b)    Enter into new agreements with credit card processors other than the ones expressly contemplated herein or in Section 6.13.

**7.15    Consignments**.  Consign any Inventory or sell any Inventory on bill and hold, sale or return, sale on approval, or other conditional terms of sale (it being understood that customer return and exchange policies relating to the sale of Inventory in the ordinary course of business shall not be prohibited by this Section 7.15).

**7.16    Bankruptcy Related Negative Covenants.** *Seek, consent to, or permit to exist any of the following:*

*Any order which authorizes the rejection or assumption of any Leases (other than the "dark stores") of any Loan Party without the Administrative Agent's prior consent, whose consent shall not be unreasonably withheld;*

*Any modification, stay, vacation or amendment to the DIP Orders to which the Agents have not consented in writing;*

*A priority claim or administrative expense or unsecured claim against any Loan Party (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agents and the Lenders in respect of the Obligations and the Pre-Petition ABL Liabilities, except with respect to the Professional Fee Carve Out;*

*Any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, except with respect to the Professional Fee Carve Out;*

*Any order which authorizes the return of any of the Loan Parties' property pursuant to Section 546(h) of the Bankruptcy Code;*

*Any order which authorizes the payment of any Indebtedness (other than the Pre-Petition ABL Liabilities, Pre-Petition Term Loan Liabilities, Indebtedness reflected in the approved Budget, and other Indebtedness approved by the Agents) incurred prior to the Petition Date other than orders of the Bankruptcy Court granting "first day" relief*

*or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness (other than Pre-Petition Term Loan Liabilities) which is secured by a Lien; or*

*Any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.*

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**8.01    Events of Default.**  Any of the following shall constitute an Event of Default:

(a)    <u>Non-Payment</u>.  The Borrowers or any other Loan Party fails to pay when and as required to be paid herein, (i) any amount of principal of any Loan or any L/C Obligation, or deposit any funds as Cash Collateral in respect of L/C Obligations, or (ii) any interest on any Loan or on any L/C Obligation, or any fee due hereunder, or (iii) any other amount payable hereunder or under any other Loan Document; or

(b)    <u>Specific Covenants</u>.  (i) Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of <u>Sections 6.02(b)</u>, <u>6.02(c)</u>, <u>6.03</u>, <u>6.07</u> (other than in connection with the last sentence of clause (b) thereof), <u>6.10</u>, <u>6.11</u>, <u>6.13</u>, <u>6.23</u>, <u>6.24</u>, <u>6.25</u>, <u>6.26</u> or <u>Article VII</u> of this Agreement; or (ii) any of the Loan Parties fails to perform or observe any term, covenant or agreement contained in <u>Sections 4.04</u>, <u>4.10(a)</u> and <u>5.01</u> of the Security Agreement to which it is a party; or

(c)    <u>Additional Covenants</u>.  Any Loan Party fails to perform or observe any term, covenant or agreement contained in <u>Sections 6.02</u> (not specified in <u>subsection (b)</u> above) contained in this Agreement and such failure continues for five (5) days; or

(d)    <u>Other Defaults</u>.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in <u>subsection (a)</u>, <u>(b)</u> or <u>(c)</u> above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days; or

(e)    <u>Material Impairment</u>.  Any material impairment of the priority of the Credit Parties' security interests in the Collateral; or

(f)    <u>Representations and Warranties</u>.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith (including, without limitation, any Borrowing Base Certificate) shall be incorrect or misleading in any material respect when made or deemed made (or, with respect to any representation, warranty, certification, or statement of fact qualified by materiality, incorrect or misleading in any respect); or

(g)    <u>Cross-Default</u>.  Except as a result of the commencement of the Chapter 11 Case or unless payment is stayed by the Bankruptcy Court, (i) any (i) Any Loan Party or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any (x) Material Indebtedness (including, but not limited to, the Pre-Petition Term Loan

Obligations), or (y) other Indebtedness, to the extent that such failure could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect (other than Indebtedness hereunder and the Pre-Petition ABL Liabilities), including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement, or (B) fails to observe or perform any other agreement or condition relating to any such Material Indebtedness (other than Indebtedness hereunder and Indebtedness under Swap Contracts) (including, but not limited to, the Pre-Petition Term Loan Documents) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Material Indebtedness or the beneficiary or beneficiaries of any Guarantee thereof (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which a Loan Party or any Subsidiary thereof is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which a Loan Party or any Subsidiary thereof is an Affected Party (as so defined); or

(h)     <u>Judgments</u>.  There is entered against any Loan Party or any Subsidiary thereof, after the Petition Date (i) one or more judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $3,000,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, is not in effect; or

(i)     <u>ERISA</u>.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $500,000 or which would reasonably likely result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $100,000 or which would reasonably likely result in a Material Adverse Effect; or

(j)     <u>Invalidity of Loan Documents</u>.  (i)  Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or under the DIP Orders or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party contests in any

manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document (including, without limitation, any DIP Order); or (ii) any Lien purported to be created under any Security Document (including, without limitation, any DIP Order) shall cease to be, or shall be asserted by any Loan Party or any other Person not to be, a valid and perfected Lien on any Collateral to the extent required by the applicable Security Document (including, without limitation, any DIP Order), with the priority required by such applicable Security Document; or

(k)      [Reserved]

(l)      Loss of Collateral.  There occurs any uninsured loss to any material portion of the Collateral; or

(m)      Breach of Contractual Obligation.  Any Loan Party or any Subsidiary thereof fails (except as an Effect of Bankruptcy) to make any undisputed payment when due  in respect of any Material Contract or fails to observe or perform any other material agreement or condition relating to any such Material Contract or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause the counterparty to such Material Contract to terminate such Material Contract in accordance with its terms; or

(n)      Indictment.  The indictment or institution of any legal process or proceeding against, any Loan Party or any Subsidiary thereof, under any federal, state or municipal criminal statute, rule, regulation, order, or other requirement having the force of law for a felony;

(o)      Guaranty.  The termination or attempted termination of any Facility Guaranty other than in accordance with the terms of the Loan Documents; or

(p)      Subordination.  (i)  The subordination provisions of the documents evidencing or governing any Subordinated Indebtedness shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness; (ii) any Borrower or any other Loan Party shall, directly or indirectly, (A) make any payment on account of any Subordinated Indebtedness that has been contractually subordinated in right of payment to the payment of the Obligations, except to the extent that such payment is permitted by the terms of such subordinated provisions applicable to such Subordinated Indebtedness or (B) disavow or contest in any manner (x) the effectiveness, validity or enforceability of any such subordination provisions, (y) that such subordination provisions and any intercreditor provisions contained therein exist for the benefit of the Credit Parties, or (z) that all payments of principal of or premium and interest on the applicable Subordinated Indebtedness, or realized from the liquidation of any property of any Loan Party, shall be subject to any of such subordination provisions or the intercreditor provisions, as applicable; or (iii) any intercreditor provision set forth in the Intercreditor Agreement shall, in whole or in part, terminate or otherwise fail or cease to be valid and binding on, or enforceable against, any Loan Party, the Pre-Petition Term Loan Agent or any holder of the Pre-Petition Term Loan Obligations (or any Loan Party, the Pre-Petition Term Loan Agent or any such holder shall so state in writing); or

(q)    <u>Invalidity of the Intercreditor Agreement</u>.  Any provision of the Intercreditor Agreement shall, at any time after the delivery of such Intercreditor Agreement, fail to be valid and binding, or enforceable; or

(r)    <u>Amendment or Reversal of DIP Orders</u>.  The entry of an order in the Chapter 11 Case which stays, modifies (in any manner adverse to the Administrative Agent and the Lenders and other Credit Parties) or reverses any DIP Order or which otherwise materially adversely affects, as determined by the Administrative Agent in its reasonable discretion, the effectiveness of any DIP Order without the express written consent of the Administrative Agent; or

(s)    <u>Breach of Agency Agreement</u>.  The occurrence of any default by a Loan Party under the Agency Agreement; or

(t)    <u>Appointment of Trustee or Examiner; Conversion</u>.  Either (i) the appointment in the Chapter 11 Case of a trustee or of any examiner having expanded powers to operate all or any part of any Loan Party's business, or (ii) the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; or

(u)    <u>Final DIP Order</u>.  The failure of the Bankruptcy Court to enter a Final DIP Order, in form and substance satisfactory to the Administrative Agent and the Initial Lenders, within forty-five (45) days after the Petition Date; or

(v)    <u>Relief From Automatic Stay</u>.  The entry of any order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code which permits any creditor to (i) realize upon, or to exercise any right or remedy with respect to (x) any portion of the Collateral included in (or eligible for inclusion in) the Borrowing Base or (y) any other Collateral, to the extent such realization or exercise of rights or remedies would be reasonably likely to have a Material Adverse Effect, or (ii) to terminate any license, franchise, or similar agreement, where such termination would reasonably be likely to have a Material Adverse Effect; or

(w)    <u>Super-Priority Claims</u>.  The filing of any application by any Loan Party without the express prior written consent of the Administrative Agent for the approval of any super-priority claim in the Chapter 11 Case which is pari passu with or senior to the priority of the claims of the Administrative Agent, the Lenders and other Credit Parties for the Obligations, or there shall arise any such super-priority claim under the Bankruptcy Code; or

(x)    <u>Payment of Pre-Petition Indebtedness</u>.  The payment or other discharge by any Loan Party of any pre-petition Indebtedness, except as expressly permitted hereunder, under any DIP Order, or in the Budget or by order in the Chapter 11 Case to which order the Administrative Agent has provided its written consent, including payments of Pre-Petition Indebtedness as permitted under orders granting first day relief; or

(y)    <u>Adequate Protection</u>.  The entry of any order in the Chapter 11 Case which provides adequate protection, or the granting by any Loan Party of similar relief in favor of any one or more of a Loan Party's Pre-Petition creditors, contrary to the terms and conditions of any DIP Order or the terms hereof; or

(z)    <u>Compliance with Orders</u>.  The failure of any Loan Party to (i) comply with each and all of the terms and conditions of any DIP Order or (ii) comply in all material respects with the Cash Management Order, the GOB Sale Order or any other order entered in the Chapter 11 Case;

(aa)    [reserved].

(bb)    <u>Certain Motions</u>.  The filing of any motion by any Loan Party seeking, or the entry of any order in the Chapter 11 Case: (i) (A) permitting working capital or other financing (other than ordinary course trade credit, unsecured debt) for any Loan Party from any Person other than the Administrative Agent (unless (a) such refinancing lender is bound by the terms of the Intercreditor Agreement and (b) the proceeds of such financing are used to pay all Pre-Petition ABL Liabilities in full, to fully fund the Pre-Petition Indemnity Account, to pay all Obligations in full, to Cash Collateralize all Unliquidated Claims, (B) granting a Lien on, or security interest in (other than a Permitted Encumbrance) any of the Collateral, other than with respect to this Agreement (unless such Liens are granted in connection with a financing, the proceeds of which are applied to the payment in full of all Obligations and the Cash Collateralization of all Unliquidated Claims), (C) except as permitted by this Agreement and the DIP Orders, permitting the use of any of the Collateral pursuant to Section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent, (D) permitting recovery from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (E) dismissing the Chapter 11 Case or (ii) the filing of any motion by any party in interest or any Creditors' Committee appointed in the Chapter 11 Case) (x) seeking any of the matters specified in the foregoing clause (i) that is not dismissed or denied within thirty (30) days of the date of the filing of such motion (or such later date agreed to in writing by the Administrative Agent) or (y) seeking the reconsideration of any DIP Order; or

(cc)    <u>Filing of Disclosure Statement or Bankruptcy Plan</u>.  The filing of a motion by any Loan Party seeking approval of a Disclosure Statement and a Bankruptcy Plan, or the entry of an order confirming a Bankruptcy Plan, that does not require repayment in full in cash of all Obligations and Pre-Petition ABL Liabilities on the Consummation Date of such Bankruptcy Plan; or

(dd)    <u>Challenge to Pre-Petition ABL Liabilities</u>.   (i) the filing of any pleading by any Loan Party or the granting of any order or other relief requested by any other party in interest (including but not limited to, any Creditors' Committee), in either case, challenging the validity, priority, perfection, or enforceability of the Pre-Petition ABL Documents, the Pre-Petition ABL Liabilities, or any Lien granted pursuant to the Pre-Petition ABL Documents, or (ii) the validity, priority, perfection, or enforceability of the Pre-Petition ABL Documents, the Pre-Petition ABL Liabilities, or any Lien granted pursuant to the Pre-Petition ABL Documents is determined to be null and void, invalid or unenforceable by the Bankruptcy Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Chapter 11 Case, including, without limitation, the Creditors' Committee.

**8.02    Remedies Upon Event of Default.**  If any Event of Default occurs and is continuing subject to the terms of the DIP Orders:

(a)    The Administrative Agent may, or, at the request of the Required Lenders shall, take any or all of the following actions:

(i)    declare the Commitments of each Lender to make Loans and any obligation of the L/C Issuer to make L/C Credit Extensions to be terminated, whereupon such Commitments and obligation shall be terminated;

(ii)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;

(iii)    require that the Loan Parties Cash Collateralize all Unliquidated Claims; and

(iv)    whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, the DIP Orders, any of the other Loan Documents or applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties;

(b)    In addition to the exercise by the Administrative Agent and the Collateral Agent of any or all of their rights and remedies after the occurrence and during the continuance of an Event of Default, the Collateral Agent may require, and upon request by the Collateral Agent the Borrowers shall, undertake to Liquidate the Collateral on behalf of the Collateral Agent in such manner as the Collateral Agent may require. Such liquidation may be effected through a partial or chain-wide store closing sale in a manner consistent with the foregoing enumeration of the Agent's rights and remedies, and as otherwise permitted by the Bankruptcy Court. The Agents and the Borrowers shall endeavor to implement such a Liquidation on mutually acceptable terms and conditions. However, the Collateral Agent may by written notice to the Lead Borrower require the Borrowers to:

(i)    File a motion seeking to retain one or more nationally recognized professional retail inventory liquidation agents reasonably acceptable to the Collateral Agent to sell, lease, or otherwise dispose of the Collateral on terms acceptable to the Agents.

(ii)    File a motion or motions seeking to sell or otherwise dispose of any or all of the Real Estate pursuant to Section 363 of the Bankruptcy Code, on terms acceptable to the Agents.

(iii)    File a motion or motions seeking to sell, assume, assign, or otherwise dispose of any or all of the Leases pursuant to Sections 363 and 365 of the Bankruptcy Code, on terms acceptable to the Agents and the Pre-Petition Term Loan Agent and subject to the Intercreditor Agreement.

The Borrowers shall file such motion(s) within five (5) Business Days of the Administrative Agent's request and shall diligently prosecute such motion(s). If the Borrowers fail to so file or diligently prosecute the motion(s), the Administrative Agent may file and prosecute such motion(s) in the name of the Borrowers.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

01:15322089.1

**8.03    Application of Funds.** Subject to the Intercreditor Agreement and the DIP Orders, any amounts either (a) constituting proceeds from a Permitted Sale or (b) received after the exercise of remedies provided for in <u>Section 8.02</u>, on account of the Obligations, shall in each case, be applied by the Administrative Agent in the following order, regardless of whether such Obligations are allowed or allowable in any bankruptcy or insolvency proceeding or under any Debtor Relief Law:

<u>First</u>, to pay accrued and unpaid Professional Fees and Expenses up to an aggregate amount not to exceed the Professional Fee Carve Out;

<u>Second</u>, to payment in full of the Pre-Petition ABL Liabilities (to be applied in accordance with Section 8.03 of the Pre-Petition ABL Agreement) and to fund the Pre-Petition Indemnity Account (to the extent not previously funded in full);

<u>Third</u>, to payment of that portion of the Obligations (excluding the Other Liabilities) constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and the Collateral Agent and amounts payable under <u>Article III</u>) due and payable to the Administrative Agent and the Collateral Agent, each in its capacity as such;

<u>Fourth</u>, to payment of that portion of the Obligations (excluding the Other Liabilities) constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Lenders and the L/C Issuer (including fees, charges and disbursements of counsel to the respective Lenders and the L/C Issuer and amounts payable under <u>Article III</u>), ratably among them in proportion to the amounts described in this clause <u>Fourth</u> payable to them;

<u>Fifth</u>, to the extent not previously reimbursed by the Lenders, to payment to the Lenders of that portion of the Obligations constituting principal and accrued and unpaid interest on any Permitted Overadvances and Unintentional Overadvances, ratably among the Lenders in proportion to the amounts described in this clause <u>Fifth</u> payable to them;

<u>Sixth</u>, to the extent that Swing Line Loans have not been refinanced by a Committed Loan, payment to the Swing Line Lender of that portion of the Obligations constituting accrued and unpaid interest on the Swing Line Loans;

<u>Seventh</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Committed Loans, L/C Borrowings and other Obligations, and fees (including Letter of Credit Fees), ratably among the Lenders and the L/C Issuer in proportion to the respective amounts described in this clause <u>Seventh</u> payable to them;

<u>Eighth</u>, to the extent that Swing Line Loans have not been refinanced by a Committed Loan, to payment to the Swing Line Lender of that portion of the Obligations constituting unpaid principal of the Swing Line Loans;

<u>Ninth</u>, to payment of that portion of the Obligations constituting unpaid principal of the Committed Loans and L/C Borrowings, ratably among the Lenders and the L/C Issuer in proportion to the respective amounts described in this clause <u>Ninth</u> held by them until paid in full;

<u>Tenth</u>, to the Administrative Agent for the account of the L/C Issuer, to Cash Collateralize that portion of L/C Obligations comprised of the aggregate undrawn amount of Letters of Credit;

<u>Eleventh</u>, to payment of all other Obligations (including without limitation, to Cash Collateralize all Unliquidated Claims, but excluding any Other Liabilities), ratably among

the Credit Parties in proportion to the respective amounts described in this clause Eleventh held by them;

Twelfth, to payment of all other Obligations arising from Bank Products, ratably among the Credit Parties in proportion to the respective amounts described in this clause Twelfth held by them; and

Thirteenth, to payment of all other Obligations; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law or the DIP Orders.

Subject to Section 0, amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Eighth above shall be applied to satisfy drawings under such Letters of Credit as they occur.  If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

Provided that, notwithstanding anything in this Section 8.03 to the contrary, but subject in all events to the DIP Orders, any amounts received which constitute Pre-Petition Term Loan Priority Collateral, shall be immediately deposited into the Pre-Petition Term Loan Account.

## ARTICLE IX
## AGENTS

**9.01    Appointment and Authority**.

(a)    Each of the Lenders and the L/C Issuer hereby irrevocably appoints Wells Fargo Bank to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  Except as provided in Section 9.06, the provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders and the L/C Issuer, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.

(b)    Each of the Lenders (in its capacities as a Lender), Swing Line Lender and the L/C Issuer hereby irrevocably appoints Wells Fargo Bank as Collateral Agent and authorizes the Collateral Agent to act as the agent of such Lender and the L/C Issuer for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Collateral Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Collateral Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights and remedies thereunder at the direction of the Collateral Agent), shall be entitled to the benefits of all provisions of this Article IX and Article X (including Section 10.04(c)), as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents, as if set forth in full herein with respect thereto.

**9.02    Rights as a Lender.**  The Persons serving as the Agents hereunder shall have the same rights and powers in their capacity as a Lender as any other Lender and may exercise the same as though they were not the Administrative Agent or the Collateral Agent and the terms "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context

otherwise requires, include the Person serving as the Administrative Agent or the Collateral Agent, as applicable, hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Loan Parties or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent or the Collateral Agent, as applicable, hereunder and without any duty to account therefor to the Lenders.

      **9.03    Exculpatory Provisions.**  The Agents shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agents:

        (a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

        (b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent or the Collateral Agent, as applicable, is required to exercise as directed in writing by the Applicable Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), underlined provided that the Agents shall not be required to take any action that, in its respective opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable Law; and

        (c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent, the Collateral Agent or any of its Affiliates in any capacity.

The Agents shall not be liable for any action taken or not taken by it (i) with the Consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

The Agents shall not be deemed to have knowledge of any Default unless and until notice describing such Default is given to such Agent by the Loan Parties, a Lender or the L/C Issuer. In the event that the Agents obtains such actual knowledge or receives such a notice, the Agents shall give prompt notice thereof to each of the other Credit Parties.  Upon the occurrence and during the continuance of an Event of Default, the Agents shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Applicable Lenders. Unless and until the Agents shall have received such direction, the Agents may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Credit Parties.  In no event shall the Agents be required to comply with any such directions to the extent that any Agent believes that its compliance with such directions would be unlawful.

The Agents shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder

or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in <u>Article IV</u> or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agents.

       **9.04**    **Reliance by Agents**.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the L/C Issuer, the Administrative Agent may presume that such condition is satisfactory to such Lender or the L/C Issuer unless the Administrative Agent shall have received written notice to the contrary from such Lender or the L/C Issuer prior to the making of such Loan or the issuance of such Letter of Credit.  Each Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

       **9.05**    **Delegation of Duties.**  Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by such Agent.  Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agents and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as such Agent.

       **9.06**    **Resignation of Agents.**  Either Agent may at any time give written notice of its resignation to the Lenders, the L/C Issuer and the Lead Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, without the consent of the Loan Parties, to appoint a successor Administrative Agent or Collateral Agent, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, in consultation with the Lead Borrower (absent the existence of a Default or an Event of Default), on behalf of the Lenders and the L/C Issuer, appoint a successor Administrative Agent or Collateral Agent, as applicable, meeting the qualifications set forth above; <u>provided</u> that if the Administrative Agent or Collateral Agent, as applicable, shall notify the Lead Borrower and the Lenders that no qualifying Person has accepted such appointment, then the resigning Agent may apply to a court of competent jurisdiction for the appointment of a new Administrative Agent or Collateral Agent, as applicable, <u>provided</u>, <u>further</u>, that such resignation shall not become effective until such time as a

successor Administrative Agent or the Collateral Agent, as applicable, is appointed and has accepted such appointment.  Upon the acceptance of a successor's appointment as Administrative Agent or the Collateral Agent, as applicable, hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Lead Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Administrative Agent or the Collateral Agent hereunder.

Any resignation by Wells Fargo Bank as Administrative Agent pursuant to this Section shall also constitute the resignation of Wells Fargo Bank as Swing Line Lender and the resignation of Wells Fargo Bank as L/C Issuer.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer and Swing Line Lender, (b) the retiring L/C Issuer and Swing Line Lender shall be discharged from all of their respective duties and obligations hereunder or under the other Loan Documents, and (c) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring L/C Issuer to effectively assume the obligations of the retiring L/C Issuer with respect to such Letters of Credit.

**9.07    Non-Reliance on Agents and Other Lenders.**  Each Lender and the L/C Issuer acknowledges that it has, independently and without reliance upon the Agents or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender and the L/C Issuer also acknowledges that it will, independently and without reliance upon the Agents or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.  Except as provided in Section 9.12, the Agents shall not have any duty or responsibility to provide any Credit Party with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Agents .

**9.08    Administrative Agent May File Proofs of Claim.**  In case of the pendency of any proceeding under any Debtor Relief Laws or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Loan Parties) shall be entitled and empowered, by intervention in such proceeding or otherwise

> (a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the L/C Issuer, the Administrative Agent and

the other Credit Parties (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the L/C Issuer, the Administrative Agent, such Credit Parties and their respective agents and counsel and all other amounts due the Lenders, the L/C Issuer the Administrative Agent and such Credit Parties under <u>Sections 0, 0, 2.10</u> and 10.04) allowed in such judicial proceeding; and

       (b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the L/C Issuer to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders and the L/C Issuer, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under <u>Sections 2.10</u> and 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or the L/C Issuer any Plan of Liquidation, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or the L/C Issuer or to authorize the Administrative Agent to vote in respect of the claim of any Lender or the L/C Issuer in any such proceeding.

     **9.09**     **Collateral and Guaranty Matters.**  The Credit Parties irrevocably authorize the Agents, at their option and in their discretion,

       (a)     to release any Lien on any property granted to or held by the Collateral Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted) and the expiration or termination of all Letters of Credit (or upon the Cash Collateralization of all Letters of Credit in the manner set forth in <u>Section 0</u>), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing by the Applicable Lenders in accordance with <u>Section 10.01</u>  or (iv) as otherwise required pursuant to the Intercreditor Agreement;

       (b)     to subordinate any Lien on any property granted to or held by the Collateral Agent under any Loan Document to the holder of any Lien, or to release any Lien, on such property that is permitted by the definition of Permitted Encumbrances; and

       (c)     to release any Guarantor from its obligations under the Facility Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by any Agent at any time, the Applicable Lenders will confirm in writing such Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Facility Guaranty pursuant to this <u>Section 9.09</u>.  Notwithstanding the foregoing, in each case as specified above in <u>clauses (a)-(c)</u> of this <u>Section 9.09</u>, the Agents will without further confirmation from the Required Lenders, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Facility

Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.09.

Anything contained in any of the Loan Documents to the contrary notwithstanding, Loan Parties, Administrative Agent, Collateral Agent and each Lender hereby agree that (1) no Lender shall have any right individually to realize upon any of the Collateral under any Security Document or to enforce the Facility Guaranty, it being understood and agreed that all powers, rights and remedies under the Security Documents and the Facility Guaranty may be exercised solely by Administrative Agent and/or Collateral Agent acting as agent for and representative of Lenders in accordance with the terms thereof, and (2) in the event of a foreclosure by Administrative Agent and/or Collateral Agent on any of the Collateral pursuant to a public or private sale or a sale under §363 of the Bankruptcy Code, Administrative Agent, Collateral Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and Administrative Agent, as agent for and representative of Lenders (but not any Lender or Lenders in its or their respective individual capacities unless Required Lenders shall otherwise agree in writing) shall be entitled (at the direction of the Required Lenders), for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by Administrative Agent and/or Collateral Agent at such sale.

**9.10    Notice of Transfer**.

The Agents may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Acceptance shall have become effective as set forth in Section 10.06.

**9.11    Reports and Financial Statements**.

By signing this Agreement, each Lender:

(a)    agrees to furnish the Administrative Agent on the first day of each month with a summary of all Other Liabilities due or to become due to such Lender. In connection with any distributions to be made hereunder, the Administrative Agent shall be entitled to assume that no amounts are due to any Lender on account of Other Liabilities unless the Administrative Agent has received written notice thereof from such Lender;

(b)    is deemed to have requested that the Administrative Agent furnish such Lender, promptly after they become available, copies of all financial statements required to be delivered by the Lead Borrower hereunder and all commercial finance examinations and appraisals of the Collateral received by the Agents (collectively, the "Reports");

(c)    expressly agrees and acknowledges that the Administrative Agent makes no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(d)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agents or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(e)    agrees to keep all Reports confidential in accordance with the provisions of Section 10.07 hereof; and

(f)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agents and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Credit Extensions that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Loan or Loans; and (ii) to pay and protect, and indemnify, defend, and hold the Agents and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agents and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

**9.12    Agency for Perfection**. Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agents and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable Law of the United States can be perfected only by possession. Should any Lender (other than the Agents) obtain possession of any such Collateral, such Lender shall notify the Agents thereof, and, promptly upon the Collateral Agent's request therefor shall deliver such Collateral to the Collateral Agent or otherwise deal with such Collateral in accordance with the Collateral Agent's instructions.

**9.13    Indemnification of Agents**. Without limiting the obligations of the Loan Parties hereunder, the Lenders hereby agree to indemnify the Agents, the L/C Issuer and any Related Party, as the case may be, ratably according to their Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against any Agent, the L/C Issuer and their Related Parties in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by any Agent, the L/C Issuer and their Related Parties in connection therewith; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's, the L/C Issuer's and their Related Parties' gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction.

**9.14    Relation among Lenders**. The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agents) authorized to act for, any other Lender.

**9.15    Defaulting Lender.**

(a)    If for any reason any Lender shall become a Defaulting Lender or shall fail or refuse to abide by its obligations under this Agreement, including without limitation its obligation to make available to Administrative Agent its Applicable Percentage of any Loans, expenses or setoff or purchase its Applicable Percentage of a participation interest in the Swing Line Loans or L/C Borrowings and such failure is not cured within two (2) days of receipt from the Administrative Agent of written notice thereof, then, in addition to the rights and remedies that may be available to the other Credit Parties, the Loan Parties or any other party at law or in equity, and not at limitation thereof, (i) such Defaulting Lender's right to participate in the administration of, or decision-making rights related to, the Obligations, this Agreement or the other

Loan Documents shall be suspended during the pendency of such failure or refusal, (ii) a Defaulting Lender shall be deemed to have assigned any and all payments due to it from the Loan Parties, whether on account of outstanding Loans, interest, fees or otherwise, to the remaining non-Defaulting Lenders for application to, and reduction of, their proportionate shares of all outstanding Obligations until, as a result of application of such assigned payments the Lenders' respective Applicable Percentages of all outstanding Obligations shall have returned to those in effect immediately prior to such delinquency and without giving effect to the nonpayment causing such delinquency, and (iii) at the option of the Administrative Agent, any amount payable to such Defaulting Lender hereunder (whether on account of principal, interest, fees or otherwise) shall, in lieu of being distributed to such Defaulting Lender, be retained by the Administrative Agent as cash collateral for future funding obligations of the Defaulting Lender in respect of any Loan or existing or future participating interest in any Swing Line Loan or Letter of Credit.  The Defaulting Lender's decision-making and participation rights and rights to payments as set forth in clauses (i), (ii) and (iii) hereinabove shall be restored only upon the payment by the Defaulting Lender of its Applicable Percentage of any Obligations, any participation obligation, or expenses as to which it is delinquent, together with interest thereon at the Default Rate.

(b)      The non-Defaulting Lenders shall also have the right, but not the obligation, in their respective, sole and absolute discretion, to cause the termination and assignment, without any further action by the Defaulting Lender for no cash consideration (pro rata, based on the respective Commitments of those Lenders electing to exercise such right), of the Defaulting Lender's Commitment to fund future Loans. Upon any such purchase of the Applicable Percentage of any Defaulting Lender, the Defaulting Lender's share in future Credit Extensions and its rights under the Loan Documents with respect thereto shall terminate on the date of purchase, and the Defaulting Lender shall promptly execute all documents reasonably requested to surrender and transfer such interest, including, if so requested, an Assignment and Acceptance.

(c)      Each Defaulting Lender shall indemnify the Administrative Agent and each non-Defaulting Lender from and against any and all loss, damage or expenses, including but not limited to reasonable attorneys' fees and funds advanced by the Administrative Agent or by any non-Defaulting Lender, on account of a Defaulting Lender's failure to timely fund its Applicable Percentage of a Loan or to otherwise perform its obligations under the Loan Documents.

## ARTICLE X
## MISCELLANEOUS

**10.01    Amendments, Etc.**  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no Consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Administrative Agent, with the Consent of the Required Lenders, and the Lead Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent, and each such waiver or Consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or Consent shall:

(a)      extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02), without the written Consent of such Lender;

(b)      as to any Lender, postpone any date fixed by this Agreement or any other Loan Document for (i) any scheduled payment or mandatory prepayment of principal, interest, fees or other amounts due to such Lender hereunder or under any of the other Loan Documents without the written Consent of such Lender entitled to such payment, or (ii) any scheduled or mandatory reduction or termination of the Aggregate Commitments hereunder or under any other Loan Document without the written Consent of such Lender;

(c)      as to any Lender, reduce the principal of, or the rate of interest specified herein on, any Loan or L/C Borrowing held by such Lender, or (subject to clause (iv) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document to or for the account of such Lender, without the written Consent of each Lender entitled to such amount; provided, however, that (i) only the Consent of the Required Lenders shall be necessary to amend any financial covenant hereunder (or any defined term used therein), (ii) only the Consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest on the Committed Loans and the Swing Line Loans or Letter of Credit Fees at the Default Rate;

(d)      as to any Lender, change Section 2.14 or Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby without the written Consent of such Lender;

(e)      change any provision of this Section or the definition of "Applicable Lenders", or "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written Consent of each Lender included in any such definition;

(f)      except as expressly permitted hereunder or under any other Loan Document, release, or limit the liability of, any Loan Party without the written Consent of each Lender;

(g)      except as provided in Section 9.09(a)(i), (ii) or (iv), release all or substantially all of the Collateral from the Liens of the Security Documents without the written Consent of each Lender;

(h)      without the written Consent of each Lender, increase the Aggregate Commitments;

(i)      change the definition of the term "Borrowing Base" or any component definition thereof if as a result thereof the amounts available to be borrowed by the Borrowers would be increased without the written Consent of each Lender, provided that the foregoing shall not limit the discretion of the Administrative Agent to change, establish or eliminate any Reserves, so long as the methodology used in determining or changing any such Reserves is consistent with the methodology used by the Administrative Agent on the Closing Date;

(j)      modify the definitions of "Permitted Overadvance" or "Unintentional Overadvance" so as to increase the amount thereof or, except as provided in the

definition of "Permitted Overadvance", the time period for which a Permitted Overadvance may remain outstanding without the written Consent of each Lender;

(k)   except as expressly permitted herein or in any other Loan Document, subordinate the Obligations hereunder or the Liens granted hereunder or under the other Loan Documents, to any other Indebtedness or Lien, as the case may be without the written Consent of each Lender;

and, provided further, that (i) no amendment, waiver or Consent shall, unless in writing and signed by the L/C Issuer in addition to the Lenders required above, affect the rights or duties of the L/C Issuer under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it; (ii) no amendment, waiver or Consent shall, unless in writing and signed by the Swing Line Lender in addition to the Lenders required above, affect the rights or duties of the Swing Line Lender under this Agreement; (iii) no amendment, waiver or Consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document; (iv) no amendment, waiver or Consent shall, unless in writing and signed by the Collateral Agent in addition to the Lenders required above, affect the rights or duties of the Collateral Agent under this Agreement or any other Loan Document; (v) no amendment, waiver or Consent to the extent the terms thereof would violate the terms of the Intercreditor Agreement (but only to such extent) shall be effective unless consented to in writing and signed by the Pre-Petition Term Loan Agent; and (vi) except to the extent provided in the Intercreditor Agreement, the Intercreditor Agreement may be amended, or rights or privileges thereunder waived, in a writing executed only by the Administrative Agent and the Pre-Petition Term Loan Agent.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or Consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender.

Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no provider or holder of any Bank Products or Cash Management Services shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider or holder of such agreements or products or the Obligations owing thereunder, nor shall the consent of any such provider or holder be required (other than in their capacities as Lenders, to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of Collateral or any Loan Party.

If any Lender does not Consent (a "Non-Consenting Lender") to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the Consent of each Lender and that has been approved by the Required Lenders, the Lead Borrower may replace such Non-Consenting Lender in accordance with Section 10.13; provided that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Lead Borrower to be made pursuant to this paragraph).

**10.02   Notices, Financial Statements and Other Documents; Effectiveness; Electronic Communications**.

(a)   *Notices, Financial Statements and Other Documents Generally.*  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices, financial statements and other documents and communications provided for herein shall be in

writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

**if to the Loan Parties, the Agents, the L/C Issuer or the Swing Line Lender, to the address, telecopier number, electronic mail address or telephone number specified for such Person on <u>Schedule 10.02</u>; and**

**if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.**

Notices, financial statements and other documents sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices, financial statements and other documents sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices, financial statements and other documents delivered through electronic communications to the extent provided in <u>subsection (b)</u> below, shall be effective as provided in such <u>subsection (b)</u>.

(b)    <u>Electronic Communications</u>.  Notices, financial statements and other documents  and communications to the Lenders and the L/C Issuer hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, <u>provided</u> that the foregoing shall not apply to notices to any Lender or the L/C Issuer pursuant to <u>Article II</u> if such Lender or the L/C Issuer, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Lead Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, <u>provided</u> that approval of such procedures may be limited to particular notices or communications.  Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing <u>clause (i)</u> of notification that such notice or communication is available and identifying the website address therefor.

(c)    <u>Change of Address, Etc</u>.  Each of the Loan Parties, the Agents, the L/C Issuer and the Swing Line Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Lead Borrower, the Agents, the L/C Issuer and the Swing Line Lender.  In addition, each Lender agrees to

notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(d)    Reliance by Agents, L/C Issuer and Lenders.  The Agents, the L/C Issuer and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices and Swing Line Loan Notices) purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Loan Parties shall indemnify the Agents, the L/C Issuer, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties.  All telephonic notices to and other telephonic communications with the Agents may be recorded by the Agents, and each of the parties hereto hereby consents to such recording.

(e)    The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall an Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to any Loan Party, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Loan Parties' or any Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to any Loan Party, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

**10.03   No Waiver; Cumulative Remedies.**  No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of

whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

      **10.04**   **Expenses; Indemnity; Damage Waiver**.

      (a)   <u>Costs and Expenses</u>.  The Borrowers shall pay all Credit Party Expenses.

      (b)   <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall indemnify the Agents (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the reasonable fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agents (and any sub-agents thereof) and their Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit, any bank advising or confirming a Letter of Credit or any other nominated person with respect to a Letter of Credit seeking to be reimbursed or indemnified or compensated, and any third party seeking to enforce the rights of a Borrower, beneficiary, nominated person, transferee, assignee of Letter of Credit proceeds, or holder of an instrument or document related to any Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to, a Blocked Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

      (c)   <u>Reimbursement by Lenders</u>.  Without limiting their obligations under <u>Section 9.13</u> hereof, to the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under <u>subsection (a)</u> or <u>(b)</u> of this Section to be paid by it, each Lender severally agrees to pay to the Agents (or any such sub-agent), the L/C Issuer or such Related Party, as the case may be, such Lender's Applicable Percentage

(determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agents (or any such sub-agent) or the L/C Issuer in its capacity as such, or against any Related Party of any of the foregoing acting for the Agents (or any such sub-agent) or L/C Issuer in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 0.

(d)    Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable Law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)    Payments.  All amounts due under this Section shall be payable on demand therefor.

(f)    Survival.  The agreements in this Section shall survive the resignation of any Agent and the L/C Issuer, the assignment of any Commitment or Loan by any Lender, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

**10.05    Payments Set Aside.**  To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Laws or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be automatically revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender and the L/C Issuer severally agrees to pay to the Agents upon demand its Applicable Percentage (without duplication) of any amount so recovered from or repaid by the Agents, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders and the L/C Issuer under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.06    Successors and Assigns**.

**_Successors and Assigns Generally_.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written Consent of the Administrative Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of _Section 10.06(b)_, (ii) by way of participation in accordance with the provisions of _Section 0_, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of _Section 0_ (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in _subsection 0_ of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.**

**_Assignments by Lenders_.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans (including for purposes of this _Section 0_, participations in L/C Obligations and in Swing Line Loans) at the time owing to it); _provided_ that any such assignment shall be subject to the following conditions:**

**Minimum Amounts.**

in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

in any case not described in _subsection 000_of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if the "Effective Date" is specified in the Assignment and Assumption, as of the "Effective Date", shall not be less than $10,000,000, unless the Administrative Agent otherwise consents (such consent not to be unreasonably withheld or delayed); _provided_, _however_, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

01:15322089.1

**Proportionate Amounts.** Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned, except that this <u>clause (ii)</u> shall not apply to the Swing Line Lender's rights and obligations in respect of Swing Line Loans;

**Required Consents.** No consent shall be required for any assignment except to the extent required by <u>subsection 000</u> of this Section and, in addition:

*[reserved];*

*the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Commitment if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender; and*

*the consent of the L/C Issuer (such consent not to be unreasonably withheld or delayed) shall be required for any assignment that increases the obligation of the assignee to participate in exposure under one or more Letters of Credit (whether or not then outstanding); and*

*the consent of the Swing Line Lender (such consent not to be unreasonably withheld or delayed) shall be required for any assignment in respect of the assignment of any Commitment.*

**Assignment and Assumption.** The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, <u>provided</u>, <u>however</u>, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to <u>subsection 0</u> of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of <u>Sections 3.01</u>, 3.04 and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Upon request, the Borrowers (at their expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with <u>Section 10.06(d)</u>.

***Register.*  The Administrative Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the**

*names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans and L/C Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>").  The entries in the Register shall be conclusive, absent manifest error, and the Loan Parties, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Lead Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.*

*<u>Participations</u>.  Any Lender may at any time, without the consent of, or notice to, the Loan Parties or the Administrative Agent, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries) (each, a "<u>Participant</u>") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans (including such Lender's participations in L/C Obligations and/or Swing Line Loans) owing to it); <u>provided</u> that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Agents, the Lenders and the L/C Issuer shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any Participant shall agree in writing to comply with all confidentiality obligations set forth in <u>Section 10.07</u> as if such Participant was a Lender hereunder.*

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any  provision of this Agreement and the other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to <u>Section 10.01</u> that affects such Participant.  Subject to <u>subsection 0</u> of this <u>Section</u>, the Loan Parties agree that each Participant shall be entitled to the benefits of <u>Sections 3.01</u> and <u>3.04</u> to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to <u>Section 0</u>.  To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 10.08</u> as though it were a Lender, provided such Participant agrees to be subject to <u>Section 2.13</u>  as though it were a Lender.  Each Lender, acting for this purpose as an agent of the Loan Parties, shall maintain at its offices a record of each agreement or instrument effecting any participation and a register for the recordation of the names and addresses of its Participants and their rights with respect to principal amounts and other Obligations from time to time (each a "<u>Participation Register</u>"). The entries in each Participation Register shall be conclusive absent manifest error and the Loan Parties, the Administrative Agent, the L/C Issuer and the Lenders may treat each Person whose name is recorded in a Participant Register as a Participant for all purposes of this Agreement (including, for the avoidance of doubt, for purposes of entitlement to benefits under Sections <u>3.01</u> and <u>3.04</u> and <u>Section 10.08</u>). The Participation Register shall be available for inspection by the Lead

01:15322089.1

Borrower, the L/C Issuer and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

***Limitations upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Lead Borrower's prior written consent.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 3.01 unless the Lead Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Loan Parties, to comply with Section 3.01(e) as though it were a Lender.***

***<u>Certain Pledges</u>.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; <u>provided</u> that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.***

***<u>Electronic Execution of Assignments</u>.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.***

***<u>Resignation as L/C Issuer or Swing Line Lender after Assignment</u>.  Notwithstanding anything to the contrary contained herein, if at any time Wells Fargo Bank assigns all of its Commitment and Loans pursuant to <u>subsection 0</u> above, (i) Wells Fargo Bank may upon 30 days' notice to the Lead Borrower and the Lenders, resign as L/C Issuer (provided that such resignation shall not be effective until a successor L/C Issuer has been appointed, which absent the occurrence and continuation of an Event of Default, shall be reasonably acceptable to the Lead Borrower), and/or (ii) Wells Fargo Bank upon 30 days' notice to the Lead Borrower, resign as Swing Line Lender.  In the event of any such resignation as L/C Issuer or Swing Line Lender, the Lead Borrower shall be entitled to appoint from among the Lenders a successor L/C Issuer or Swing Line Lender hereunder; <u>provided</u>, <u>however</u>, that no failure by the Lead Borrower to appoint***

01:15322089.1

*any such successor shall affect the resignation of Wells Fargo Bank as L/C Issuer or Wells Fargo Bank as Swing Line Lender, as the case may be. If Wells Fargo Bank resigns as L/C Issuer, it shall retain all the rights, powers, privileges and duties of the L/C Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as L/C Issuer and all L/C Obligations with respect thereto (including the right to require the Lenders to make Base Rate Loans or fund risk participations in Unreimbursed Amounts pursuant to Section 0). If Wells Fargo Bank resigns as Swing Line Lender, it shall retain all the rights of the Swing Line Lender provided for hereunder with respect to Swing Line Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Lenders to make Base Rate Loans or fund risk participations in outstanding Swing Line Loans pursuant to Section 0. Upon the appointment of a successor L/C Issuer and/or Swing Line Lender, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer or Swing Line Lender, as the case may be, and (b) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to Wells Fargo Bank to effectively assume the obligations of Wells Fargo Bank with respect to such Letters of Credit.*

      **10.07  Treatment of Certain Information; Confidentiality.**  Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, funding sources, attorneys, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential on the same terms as provided herein), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Loan Party and its obligations, (g) with the consent of the Lead Borrower or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Loan Parties; provided, however, that in the case of any disclosure pursuant to clause (c) above, the applicable Credit Party which is required to disclose confidential Information agrees to give the Lead Borrower, to the extent practicable and not otherwise prohibited by any such Law, regulation, subpoena, order or decree of a court or similar legal process , prior notice of such disclosure (provided, however, no Credit Party shall incur any liability to any Loan Party or other Person for failing to provide the Lead Borrower with any such prior notice); provided, further, however, that the Administrative Agent and such

Lender shall disclose only that portion of the confidential Information as is required to be disclosed, in its sole judgment, pursuant to any such Law, regulation, subpoena, order or decree of a court or similar legal process.  Any such required disclosure shall not, in and of itself, change the status of the disclosed information as Information under the terms of this Agreement.  For purposes of this Section, "Information" means all information received from the Loan Parties or any Subsidiary thereof relating to the Loan Parties or any Subsidiary thereof or their respective businesses, other than any such information that is available to any Credit Party on a non-confidential basis prior to disclosure by the Loan Parties or any Subsidiary thereof.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Credit Parties acknowledges that (a) the Information may include material non-public information concerning the Loan Parties or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

     **10.08    Right of Setoff.**  If an Event of Default shall have occurred and be continuing or if any Lender shall have been served with a trustee process or similar attachment relating to property of a Loan Party, each Lender, the L/C Issuer and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent or the Required Lenders, to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender, the L/C Issuer or any such Affiliate to or for the credit or the account of the Borrowers or any other Loan Party against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to such Lender or the L/C Issuer, regardless of the adequacy of the Collateral, and irrespective of whether or not such Lender or the L/C Issuer shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrowers or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender or the L/C Issuer different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender, the L/C Issuer and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, the L/C Issuer or their respective Affiliates may have.  Each Lender and the L/C Issuer (through the Administrative Agent) agrees to notify the Lead Borrower and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

     **10.09    Interest Rate Limitation.**  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize

01:15322089.1

any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**10.10    Counterparts; Integration; Effectiveness.**  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be as effective as delivery of a manually executed counterpart of this Agreement.

**10.11    Survival.**  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding. Further, the provisions of Sections 3.01, 3.04, 3.05 and 10.04 and Article IX shall survive and remain in full force and effect regardless of the repayment of the Obligations, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof.  In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agents may require such indemnities and collateral security as they shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, (y) any obligations that may thereafter arise with respect to the Other Liabilities and (z) any Obligations that may thereafter arise under Section 10.04.

**10.12    Severability.**  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**10.13    Replacement of Lenders.**  If any Lender requests compensation under Section 3.04, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such

Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 10.06</u>), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), <u>provided</u> that:

(a)      the Borrowers shall have paid to the Administrative Agent the assignment fee specified in <u>Section 0</u>;

(b)      such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and L/C Advances, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(c)      in the case of any such assignment resulting from a claim for compensation under <u>Section 3.04</u> or payments required to be made pursuant to <u>Section 3.01</u>, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)      such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

     **10.14    Governing Law; Jurisdiction; Etc**.

<u>**GOVERNING LAW**</u>**.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE BANKRUPTCY CODE AND THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

<u>**SUBMISSION TO JURISDICTION**</u>**.  EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE LOAN PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH COURTS. EACH OF THE LOAN PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN**

*DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.*

*WAIVER OF VENUE.  EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE LOAN PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.*

*SERVICE OF PROCESS.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.*

*ACTIONS COMMENCED BY LOAN PARTIES. EACH LOAN PARTY AGREES THAT ANY ACTION COMMENCED BY ANY LOAN PARTY ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT SOLELY IN THE BANKRUPTCY COURT, OR A COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR ANY FEDERAL COURT SITTING THEREIN AS THE ADMINISTRATIVE AGENT MAY ELECT IN ITS SOLE DISCRETION AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION.*

     **10.15    Waiver of Jury Trial.**  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

     **10.16    No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or

of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

**10.17   USA PATRIOT Act Notice.**  Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the Act. Each Loan Party is in compliance, in all material respects, with the Patriot Act.  No part of the proceeds of the Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**10.18   Foreign Asset Control Regulations.**  Neither of the advance of the Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting

01:15322089.1

Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)).  Furthermore, none of the Borrowers or their Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

    **10.19    Time of the Essence.**  Time is of the essence of the Loan Documents.

    **10.20    Press Releases**.

        (a)     Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of Administrative Agent or its Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to Administrative Agent and without the prior written consent of Administrative Agent unless (and only to the extent that) such Credit Party or Affiliate is required to do so under applicable Law and then, in any event, such Credit Party or Affiliate will consult with Administrative Agent before issuing such press release or other public disclosure.

        (b)     Each Loan Party consents to the publication by the Administrative Agent or any Lender of advertising material, including any "tombstone" or comparable advertising, on its website or in other marketing materials of Administrative Agent, relating to the financing transactions contemplated by this Agreement using any Loan Party's name, product photographs, logo, trademark or other insignia. The Administrative Agent or such Lender shall provide a draft reasonably in advance of any advertising material to the Lead Borrower for review and comment prior to the publication thereof. The Administrative Agent reserves the right to provide to industry trade organizations and loan syndication and pricing reporting services information necessary and customary for inclusion in league table measurements.

    **10.21    Additional Waivers**.

*The Obligations are the joint and several obligation of each Loan Party. To the fullest extent permitted by applicable Law, the obligations of each Loan Party shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Collateral Agent or any other Credit Party.*

*The obligations of each Loan Party  shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Obligations after the termination of the Commitments), including any claim of waiver, release, surrender, alteration or compromise of any of the*

*Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of any Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations after the termination of the Commitments).*

*To the fullest extent permitted by applicable Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the indefeasible payment in full in cash of all the Obligations and the termination of the Commitments. The Collateral Agent and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations have been indefeasibly paid in full in cash and the Commitments have been terminated. Each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.*

*Each Borrower is obligated to repay the Obligations as joint and several obligors under this Agreement. Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all the Obligations and the termination of the Commitments. In addition, any indebtedness of any Loan Party now or hereafter held by any other Loan Party is hereby subordinated in right of payment to the prior indefeasible*

01:15322089.1

*payment in full of the Obligations and no Loan Party will demand, sue for or otherwise attempt to collect any such indebtedness.  If any amount shall erroneously be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to the Administrative Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents. Subject to the foregoing, to the extent that a Loan Party shall, under this Agreement as a joint and several obligor, repay any of the Obligations constituting Loans made to the Borrowers hereunder or other Obligations incurred directly and primarily by any Loan Party (an "Accommodation Payment"), then the Loan Party making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, the Borrower in an amount, for each of such other Loan Party, equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Loan Party's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Loan Parties. As of any date of determination, the "Allocable Amount" of each Loan Party shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Loan Party hereunder without (a) rendering such Loan Party "insolvent" within the meaning of Section 101 (31) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Loan Party with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Loan Party unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.*

*Without limiting the generality of the foregoing, or of any other waiver or other provision set forth in this Agreement, each Loan Party hereby absolutely, knowingly, unconditionally, and expressly waives any and all claim, defense or benefit arising directly or indirectly under any one or more of Sections 2787 to 2855 inclusive of the California Civil Code or any similar law of California.*

### 10.22    No Strict Construction.

The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

### 10.23    Attachments.

The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of

any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

**10.24   Intercreditor Agreement.**

The Loan Parties, the Agents and the Lenders acknowledge that the exercise of certain of the Agents' and Lenders' rights and remedies hereunder may be subject to, and restricted by, the provisions of the Intercreditor Agreement. Except as specified herein, nothing contained in the Intercreditor Agreement shall be deemed to modify any requirement or shall be deemed to modify any of the provisions of this Agreement and the other Loan Documents, which, among the Loan Parties, the Agent and the Lenders shall remain in full force and effect. In the event of any conflict between the terms of this Agreement and the Intercreditor Agreement, the terms of the Intercreditor Agreement shall govern and control except with respect to any terms not consented to by the Lead Borrower that, pursuant to Section 8.7 of the Intercreditor Agreement, require the consent of the Lead Borrower.  Notwithstanding anything in this Agreement to the contrary, but to the extent permitted by the DIP Orders, any amounts received by the Agent or the Lenders, at any time, which constitute Pre-Petition Term Loan Priority Collateral or proceeds of Pre-Petition Term Loan Priority Collateral, shall be immediately deposited into the Pre-Petition Term Loan Account.

**10.25   DIP Orders.**

In the event of any inconsistency between the terms of the DIP Orders and the Loan Documents, the terms of the DIP Orders shall control.

*[Remainder of page intentionally left blank]*

01:15322089.1

-133-

*IN WITNESS WHEREOF,* the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

<u>Borrowers</u>:

**COLDWATER CREEK U.S. INC., as Debtor and Debtor in Possession**, as Lead Borrower and a Borrower

By:_____

Name:

Title:

**COLDWATER CREEK THE SPA INC. , as Debtor and Debtor in Possession**, as a Borrower

By:_____

Name:

Title:

**COLDWATER CREEK MERCHANDISING & LOGISTICS INC. , as Debtor and Debtor in Possession**, as a Borrower

By:_____

Name:

Title:

Guarantors:

**COLDWATER CREEK INC., as Debtor and Debtor in Possession**, as a Guarantor


By:_____
Name:
Title:

**ASPENWOOD ADVERTISING, INC. , as Debtor and Debtor in Possession**, as a Guarantor


By:_____
Name:
Title:

**COLDWATER CREEK SOURCING INC. , as Debtor and Debtor in Possession**, as a Guarantor


By:_____
Name:
Title:

**CWC SOURCING LLC, as Debtor and Debtor in possession**, as a Guarantor


By:_____
Name:
Title:

**CWC REWARDS INC. , as Debtor and Debtor in Possession**, as a Guarantor


By:_____
Name:
Title:

01:15322089.1

<u>Agents</u>:

**WELLS FARGO BANK, NATIONAL ASSOCIATION** (as successor by merger to Wells Fargo Retail Finance, LLC),
as Administrative Agent and Collateral Agent

By: _____
Name:
Title:

01:15322089.1

-Signature Page-

<u>Lenders</u>:

**WELLS FARGO BANK, NATIONAL ASSOCIATION**,
as a Lender and as Swing Line Lender

By: _____
Name:
Title:

01:15322089.1