# **EXHIBIT C**

**Tang Declaration**

NYDOCS03/984993.13

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------x
                                                       :
                                                       :
                                                       :
In re:                                                 :    Chapter 11
                                                       :
COLDWATER CREEK INC., et al.,[1]                       :    Case No. 14–10867 (____)
                                                       :
                    Debtors.                           :    (Joint Administration Requested)
                                                       :
-------------------------------------------------------x
```

**DECLARATION OF AGNES K. TANG IN SUPPORT OF DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POSTPETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE PRIORITY, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS, (V) MODIFYING THE AUTOMATIC STAY AND (VI) SCHEDULING A FINAL HEARING**

I, Agnes K. Tang, declare under penalty of perjury that:

1. I am a Managing Director with Perella Weinberg Partners LP ("**PWP**"), residing in PWP's New York City office at 767 Fifth Avenue, New York, New York 10153. I am authorized to execute this declaration (this "**Declaration**") on behalf of PWP and submit this Declaration in support of the *Debtors' Motion for Interim and Final Orders (I) Authorizing Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Priority, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection to Prepetition Secured Lenders, (V) Modifying the Automatic Stay and (VI) Scheduling a Final Hearing* (the "**DIP Motion**") filed by Coldwater Creek Inc., on behalf of itself and its affiliated

---

[1] The Debtors in these proceedings (including the last four digits of their respective taxpayer identification numbers) are: Coldwater Creek Inc. (9266), Coldwater Creek U.S. Inc. (8831), Aspenwood Advertising, Inc. (7427), Coldwater Creek The Spa Inc. (7592), Coldwater Rewards Inc. (5382), Coldwater Creek Merchandising & Logistics Inc. (3904), and Coldwater Creek Sourcing Inc. (8530). Debtor Coldwater Sourcing LLC has the following Idaho organizational identification number: W38677. The Debtors' corporate headquarters is located at One Coldwater Creek Drive, Sandpoint, Idaho 83864.

debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**"), on the date hereof (the "**Petition Date**").  Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein.[2]

## Background and Qualifications

2.  I am a Managing Director at PWP, and in such capacity, I have advised numerous clients in a variety of different types of distressed transactions since 2008.  Prior to my employment with PWP, from July 2002 through October 2008, I held a number of positions in the Financial Restructuring Group at Houlihan Lokey Capital, Inc.  In addition, from July 1998 through December 2000, I was an investment professional at Marsh and McLennan Capital, a private investment fund of Marsh and McLennan, Inc.  Finally, from July 1996 through July 1998, I worked as a strategy consultant at Mercer Management Consulting, now known as Oliver Wyman.

3.  I received a Bachelor of Arts in Economics and in Mathematics from Northwestern University and a Masters of Business Administration from The Harvard Business School.  I hold Series 7, Series 63 and Series 79 securities licenses.

4.  The nature of my work for PWP and Houlihan Lokey over the past 12 years has been primarily focused on bankruptcy and restructuring situations, representing debtors, creditors, and investors in distressed companies.  Among other things, I advise companies with respect to corporate restructurings, recapitalizations, sale transactions, obtaining and amending credit facilities, refinancings and negotiations with interested purchasers, credit providers and creditors, among other constituents.  I have worked on a number of restructuring transactions, representing companies, creditors and investors in both "out-of-court" transactions

---

[2]   Certain disclosures herein relate to matters within the personal knowledge of other professionals at PWP and are based on information provided by them.

and chapter 11 cases, including Hawker Beechcraft Inc., James River Coal, RJ O'Brien, Contech Constructions Products, Inc., Houghton Mifflin Harcourt, Inc., Education Media Publishing Group, QCE Holdings, LLC, Aurora Foods, Inc., Winn-Dixie, Inc., Galey & Lord, Inc., Salton, Inc., Danka Business Systems, PLC and Protection One, Inc., among others.

5. In connection with the above-referenced restructuring engagements, I have advised distressed companies in connection with obtaining financing, including assisting such companies in determining financing needs, identifying potential sources of financing and negotiating the terms of such financing.

6. As a finance and restructuring professional, I closely follow developments in the financial markets and, in particular, the credit markets, and keep abreast of the terms of current financing transactions in distressed and bankruptcy situations.

## PWP's Qualifications

7. PWP is an investment banking and financial advisory firm with offices in London, England; New York, New York; San Francisco, California; Denver, Colorado; Abu Dhabi, United Arab Emirates; and Dubai, United Arab Emirates. PWP provides owners, chief executives, senior management and boards of directors of public and private companies with strategic and financial advice that often results in a financial transaction.

8. PWP professionals have expertise in the reorganization and restructuring of troubled companies, both out-of-court and in chapter 11 cases. PWP's professionals have advised debtors, creditors, equity constituencies and government agencies in many complex financial reorganizations and restructurings. In particular, PWP has provided services to debtors and other constituents in a number of chapter 11 cases, including among others, *In re Hawker Beechcraft, Inc.,* Case No. 12-11873 (Bankr. S.D.N.Y. May 3, 2012); *In re AMR Corp.,* Case No.

11-15463 (SHL) (Bankr. S.D.N.Y. Mar. 26, 2012); *In re Hostess Brands, Inc.,* Case No. 12-22052 (RDD) (Bankr. S.D.N.Y. Jan. 27, 2012); *In re Catalyst Paper Corp.,* Case No. 12-10221 (PJW) (Bankr. D. Del. Jan. 17, 2012); *In re Loehmann's Holdings, Inc.,* Case No. 10-16077 (REG) (Bankr. S.D.N.Y. Dec. 15, 2010); *In re Boston Generating, LLC,* Case No. 10-14419 (SCC) (Bankr. S.D.N.Y. Oct. 20, 2010); *In re Panolam Holdings Co.,* Case No. 09-13889 (MFW) (Bankr. D. Del. Dec. 9, 2009); *In re Accuride Corp.,* Case No. 09-13449 (BLS) (Bankr. D. Del. Nov 2, 2009); *In re Masonite Corp.,* Case No. 09-10844 (PJW) (Bankr. D. Del. April 14, 2009).

## The Debtors' Need for Postpetition Financing

9.  It is critical that the Debtors have access to the funds available under the superpriority postpetition debtor in possession financing described in the DIP Motion (the "**DIP Financing**") so they can effectuate an orderly wind-down of their business and maximize the value of their estates.  Absent access to the liquidity provided by the DIP Financing, I believe that the Debtors do not have sufficient liquidity to sustain their operations through an orderly wind-down and will likely have to commence an immediate shut down.

10.  Without access to the DIP Financing, the Debtors will likely have to terminate their business operations on an immediate basis to the material detriment of their creditors, customers, employees and other parties-in-interest.  In light of the foregoing, I believe that the Debtors require postpetition financing.  As reflected in the DIP Motion, the Debtors have an immediate need during the interim period to access a portion of the DIP Financing.  Upon entry of the final order, the Debtors will need the balance of the DIP Financing for the remainder of these chapter 11 cases.  Based on the Debtors' liquidity needs as described in the DIP Budget (as defined in the DIP Motion), I believe the proposed DIP Financing will provide the Debtors with sufficient funds during these chapter 11 cases to meet their obligations to employees and

customers and to satisfy their working capital and their operational needs, all of which will preserve the value of the Debtors' estates.

### The Debtors' Efforts to Obtain Postpetition Financing

11. On May 16, 2013, the Debtors first engaged PWP to provide general financial advisory services to explore strategic alternatives. The PWP team, consisting of Partners, Managing Directors and other employees working under their supervision and direction, was tasked with primary responsibility to manage the process of launching a sale process for substantially all of the Debtors' assets.

12. With the assistance of PWP, from May 2013 through March 2014, the Debtors explored multiple strategic and financing alternatives, including amendments of the Debtors' credit facilities, the sale of all or specific portions of the Debtors' operations (including the sale of certain business segments that were already being considered), new debt and/or new equity infusions, a debt for equity exchange, and a comprehensive restructuring of the Debtors' balance sheet. The results of the strategic alternatives process were disappointing, as it became apparent that no party was willing to acquire the Debtors as a going concern largely due to the uncertainty of the viability of the Debtors' retail operation.

13. Accordingly, prior to the Petition Date, PWP contacted the Debtors' existing secured lenders, the Prepetition ABL Lender (as defined in the Motion) and the Prepetition Term Loan Lenders (as defined in the Motion) as well as 11 third-party lenders, including six traditional financial institutions and five alternative lenders, seeking proposals for postpetition financing for the Debtors. Although the Debtors and PWP sought postpetition financing from approximately 13 parties, ultimately, we did not receive any other proposals from potential sources of postpetition financing other than the Prepetition ABL Lender. A primary reason, among others, cited by the financing parties contacted was that third-party financing

sources would have been required to prime the Prepetition Term Loan Lenders and the potential lenders approached by PWP were not interested in pursuing non-consensual priming ahead of the Prepetition Term Loan Lenders.

14. Furthermore, immediately prior to the filing of these chapter 11 cases, when it became evident that the Debtors may pursue a chapter 11 liquidation, PWP had discussions with the Prepetition Term Loan Lenders and its advisors and confirmed that the Prepetition Term Loan Lenders would not agree to a priming DIP from a third-party lender. Based on prior conversations with potential financing sources, PWP did not believe seeking additional financing proposals in connection with the liquidation scenario would result in additional interest from third-party financing sources without the support and consent of the Prepetition Term Loan Lenders.

15. To facilitate an orderly wind-down of the Debtors' operations in a way that will maximize value for the estates, the Prepetition ABL Lender has agreed to provide the Debtors with DIP Financing in the amount of $75 million, including a roll-up of the prepetition obligations under the Prepetition ABL Credit Agreement (as defined in the Motion), subject to Court approval. Based on the extensive process PWP conducted to solicit funding from third parties and the results thereof, I believe that the DIP Financing represents the best terms for debtor in possession financing the Debtors are able to arrange following arm's-length negotiations and a thorough marketing process to third-party financiers. The liquidity provided by the DIP Financing will allow the Debtors to continue to operate their business until such time as the liquidation can be completed.

16. I believe that the DIP Financing, coupled with cash flow from operations, will permit the Debtors to fund their operations through a controlled and orderly chapter 11

liquidation.  Without the DIP Financing, the Debtors will likely experience an immediate liquidity shortfall and will be deprived of the capital necessary to effectuate an orderly wind-down.

17. I believe that the terms of the DIP Financing constitute the most cost-effective and advantageous proposal available to the Debtors.

18. Based on my experience and discussions with various lenders and financing providers, I do not believe the Debtors could have obtained any viable postpetition financing facilities of the type and magnitude required in these chapter 11 cases on an unsecured basis or on any other basis than the terms of the DIP Financing.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
April 11, 2014                                /s/ Agnes K. Tang
                                              Agnes K. Tang

01:15322084.1