# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x

|  |  |
|---|---|
| | **Chapter 11** |
| **In re:** | **Case No. 14 –10867 (____)** |
| | **(Joint Administration Requested)** |
| **COLDWATER CREEK INC., _et al._,**[1] | |
| **Debtors.** | *Requested* Auction Procedures Obj. Deadline: April 22, 2014 at 12:00 NOON (ET) |
| | *Requested* Auction Procedures Approval Hearing:  April 23, 2014 |
| | |
| | *Requested* Sale Objection Deadline: April 28, 2014 at 4:00 p.m. (ET) |
| | *Requested* Sale Approval Hearing: May 6, 2014 |

---------------------------------------------------------------x

## DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING ENTRY INTO AGENCY AGREEMENT, (B) AUTHORIZING BIDDING PROTECTIONS, (C) AUTHORIZING BIDDING PROCEDURES AND AUCTION AND (D) SCHEDULING SALE HEARING AND APPROVING NOTICE THEREOF, (II) AUTHORIZING (A) SALE OF ASSETS AND (B) STORE CLOSING SALES AND (III) GRANTING RELATED RELIEF

Coldwater Creek Inc., on behalf of itself and its affiliated debtors and debtors in

possession in the above-captioned cases (collectively, the "**Debtors**"), hereby submits this

motion (this "**Motion**") for entry of orders (I)(A) authorizing the entry into that certain Agency

Agreement, dated as of April 11, 2014 (the "**Agency Agreement**"), attached hereto as <u>Exhibit A</u>

(which is inclusive of the Sale Guidelines (the "**Sale Guidelines**"), attached hereto as <u>Exhibit B</u>),

with the joint venture comprised of Hilco Merchant Resources, LLC and Gordon Brothers Retail

Partners, LLC (together, the "**Stalking Horse**"), (B) authorizing bidding protections for the

---

[1]     The Debtors in these proceedings (including the last four digits of their respective taxpayer identification numbers) are:  Coldwater Creek Inc. (9266), Coldwater Creek U.S. Inc. (8831), Aspenwood Advertising, Inc. (7427), Coldwater Creek The Spa Inc. (7592), CWC Rewards Inc. (5382), Coldwater Creek Merchandising & Logistics Inc. (3904), and Coldwater Creek Sourcing Inc. (8530).  Debtor CWC Sourcing LLC has the following Idaho organizational identification number:  W38677.  The Debtors' corporate headquarters is located at One Coldwater Creek Drive, Sandpoint, Idaho  83864.

Stalking Horse, (C) authorizing the bidding procedures and related auction and (D) scheduling a

sale hearing and approving notice thereof (the "**Bidding Procedures Order**") and

(II) authorizing (A)  sale of Assets (defined below) and (B) store closing sales and (III) granting

related relief (the "**Approval Order**").  In support of this Motion, the Debtors respectfully

represent as follows:

<u>**Background**</u>

1.    On the date hereof (the "**Petition Date**"), each of the Debtors filed a

voluntary petition with the Court for relief under chapter 11 of title 11 of the United States Code,

11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**").  The Debtors continue to operate their

business and manage their properties as debtors in possession pursuant to sections 1107 and 1108

of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

As of the date hereof, no creditors' committee has been appointed.

2.    The Debtors and their non-debtor affiliate (collectively, "**Coldwater**")

have operated as a specialty retailer of women's apparel, jewelry and accessories.  Coldwater has

been a multi-channel retailer that offers its merchandise through retail stores across the country,

its catalog and its e-commerce website, www.coldwatercreek.com.  Originally founded in

Sandpoint, Idaho in 1984 as a direct, catalog-based marketer, Coldwater evolved into a multi-

channel specialty retailer operating 334 premium retail stores, 31 factory outlet stores and seven

day spa locations throughout the United States.  As of the Petition Date, the Debtors employ 339

full and part-time employees in their corporate headquarters and 5,571 full and part-time

employees in other locations, including their retail stores, spas, design center, call center and

distribution center.

3.    The Debtors have filed these chapter 11 cases because they have

concluded that they are unable to reorganize on a stand-alone basis.  After months of declining

sales and failed out-of-court sales and refinancing processes, the Debtors have determined that the best way to maximize value for the benefit of all interested parties is a prompt and orderly wind-down of their business.  As more fully discussed in the *Declaration of James A. Bell in Support of Voluntary Petitions, First Day Motions and Applications* (the "**First Day Declaration**"), which was filed contemporaneously with this Motion, the conclusion to liquidate was reached following a lengthy process in which the Debtors considered and explored all reasonable strategic alternatives.  Additional factual background relating to the Debtors' business, capital structure and the commencement of these chapter 11 cases is set forth in detail in the First Day Declaration and is incorporated herein by reference.

4.      In order to liquidate their business as expeditiously as possible, the Debtors have filed this Motion seeking authority to conduct chain-wide store closing sales (the "**Store Closing Sales**") and liquidate their (i) inventory, (ii) furniture, fixtures and equipment, (iii) intellectual property, (iv) accounts receivable and cash on hand in the stores or other closing locations, (v) real property leases and (vi) customer lists (each, an "**Asset Class**" and collectively, the "**Assets**").  The Debtors believe that commencing store closing sales prior to the Mother's Day weekend, which historically is a peak sales time for the Debtors, will maximize value for the Debtors' estates while minimizing the administrative expenses incurred in these chapter 11 cases.

5.      Additionally, on the date hereof the Debtors filed the *Debtors' Joint Plan of Liquidation of Coldwater Creek Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Plan**") and a related Disclosure Statement.  The Plan provides for the orderly resolution of the Debtors' remaining Assets following completion of the Sale and is supported by Wells Fargo Bank, National Association, as administrative agent and collateral

01:15322085.1

agent under that certain Amended and Restated Senior Secured Credit Agreement dated as of May 16, 2011, as amended by that certain First Amendment to the Amended and Restated Credit Agreement dated as of July 9, 2012 with the Debtors and CC Holdings Agency Corporation, as administrative agent and collateral agent under that certain Term Loan Agreement dated as of July 9, 2012 with the Debtors (collectively, the "**Secured Lenders**").

### Facts Specific to the Relief Requested

6.       Prior to the Petition Date, the Debtors, in consultation with their legal and financial advisors, investigated a broad range of strategic alternatives.  The Debtors concluded that the only means of maximizing the value of their Assets was to conduct the Store Closing Sales at all of the Debtors' retail locations through the retention of a professional liquidator. Additional factual background relating to the Debtors' decision to file this Motion is contained in the *Declaration of Andrew Bednar in Support of the Debtors' Motion for Orders (I)(A) Authorizing Entry into Agency Agreement, (B) Authorizing Bidding Protections, (C) Authorizing Bidding Procedures and Auction and (D) Scheduling Sale Hearing and Approving Notice Thereof, (II) Authorizing (A) Sale of Assets and (B) Store Closing Sales and (III) Granting Related Relief* attached hereto as Exhibit C (the "**Bednar Declaration**").  The Secured Lenders support the pursuit of these Store Closing Sales, including the entry by the Debtors into the Agency Agreement with the Stalking Horse or other successful bidder after an auction and all of the relief requested herein.

7.       As mentioned above, the Debtors believe that it is crucial that they commence the Store Closing Sales on their proposed timeline (which historically represents a time of high traffic and sales for the Debtors) to maximize value for the Debtors' estates and all stakeholders while minimizing administrative expenses.  Further, pursuant to their postpetition financing agreement and the plan support agreement, the Debtors have agreed to commence the

Store Closing Sales no later than May 8, 2014.  The Agency Agreement (defined below) also provides that the Store Closing Sales must commence on or prior to May 8, 2014 (the "**Sale Commencement Date**").  The Debtors propose to commence the Store Closing Sales immediately following the Sale Hearing and thereby stem the losses resulting from the continued operation of the retail stores, the distribution center and the call center that the Debtors will be shutting down (the "**Closing Locations**").  In an effort to streamline and expedite the liquidation process, the Debtors, in consultation with their Secured Lenders, solicited bids from seven liquidators.  The Debtors and their advisors then ran a process to identify the highest and best bid that would also be willing to serve as the stalking horse  bidder, subject to a subsequent auction process.  The details of the process of soliciting bids from and pursuing retention of a nationally-recognized liquidator are described in detail in the *Declaration of Scott Brubaker in Support of the Debtors' Motion for Orders (I)(A) Authorizing Entry into Agency Agreement, (B) Authorizing Bidding Protections, (C) Authorizing Bidding Procedures and Auction and (D) Scheduling Sale Hearing and Approving Notice Thereof, (II) Authorizing (A) Sale of Assets and (B) Store Closing Sales and (III) Granting Related Relief* attached hereto as <u>Exhibit D</u> (the "**Brubaker Declaration**").

        8.      As a result of this process, the Debtors, in consultation with their Secured Lenders, determined that the Stalking Horse bid represented the highest and best offer as of the date hereof, and thus that it was in the best interests of the Debtors, their estates, creditors and other parties-in-interest to enter into the Agency Agreement.  As part of the consideration for entry into the Agency Agreement, the Debtors request authority to pay the Stalking Horse a break up fee and provide for an expense reimbursement that will be payable to the Stalking

01:15322085.1

Horse in certain circumstances where the Stalking Horse is not the successful bidder after an auction.

9.      Pursuant to the Agency Agreement, the Stalking Horse will serve as the Debtors' exclusive agent to (a) sell all of the merchandise (the "**Merchandise**") located at (or to be shipped from the distribution center to) all of the Debtors' retail locations and, if requested by the Stalking Horse, through catalog and e-commerce platforms (the "**Sale**") and (b) dispose of any owned fixtures, furnishings and equipment (the "**Owned FF&E**") in the Debtors' retail locations, distribution center, call center and corporate offices (together with the Sale, the "**Transaction**").

10.      The significant terms of the Agency Agreement are as follows:[2]

| Provision | Description of Provision |
|---|---|
| Sale | The Stalking Horse shall be retained as the Debtors' exclusive agent to liquidate the Merchandise from all of the Debtors' retail store locations and, if requested by the Stalking Horse, through catalog and e-commerce platforms free and clear of all claims, liens or encumbrances of any kind (collectively, "**Liens**") pursuant to a "going out of business," "store closing," "sale on everything," "total liquidation," "everything must go," or similarly themed sale (which shall comply with the Sale Guidelines).  The Merchandise includes (a) all new, finished, first-quality saleable goods in the ordinary course of business (i) located at the Debtors' retail store locations, (ii) located at the Debtors' warehouse / distribution center and received at the stores within 14 days of the Sale Commencement Date and (iii) on-order or in-transit and received at the stores within 14 days of the Sale Commencement Date and (b) defective merchandise not new, finished, first-quality or saleable in the |

[2]      This summary is provided in accordance with Rule 6004-1(b)(iv) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") and is qualified in its entirety by reference to the provisions of the Agency Agreement and the Sale Guidelines. Each capitalized term used and not otherwise defined herein shall have the meaning assigned thereto in the Agency Agreement and the Sale Guidelines.  To the extent there exists any inconsistency between this summary and the provisions of the Agency Agreement and the Sale Guidelines, the provisions of the Agency Agreement and the Sale Guidelines, as applicable, shall control.

01:15322085.1

| Provision | Description of Provision |
|---|---|
| *Local Rule 6004-1(b)(iv)* | normal course.<br><br>*See* Agency Agreement Section 1. |
| Guaranteed Amount<br><br><br><br><br><br>*Local Rule 6004-1(b)(iv)* | As a guaranty of the Stalking Horse's performance under the Agency Agreement, the Stalking Horse will guarantee the Debtors' receipt of 97% (subject to certain potential adjustments) of the Cost Value of the Merchandise included in the Sale (the "**Guaranteed Amount**").  The Cost Value of such Merchandise is estimated to be between $90 million and $100 million.<br><br>*See* Agency Agreement Sections 3.1(a), 3.1(b), 3.1(c). |
| Sharing Amount<br><br><br><br><br><br>*Local Rule 6004-1(b)(iv)* | To the extent that Proceeds from the Store Closing Sales exceed the sum of the Guaranteed Amount and expenses of the Sale, all remaining Proceeds shall be paid first to pay the Agency Fee (defined below) and next will be shared with 50% going to the Debtors and 50% going to the Stalking Horse.<br><br>*See* Agency Agreement Section 3.2(a). |
| Transfer of Remaining Merchandise<br><br><br><br><br><br><br>*Local Rule 6004-1(b)(iv)* | To the extent that there is Merchandise remaining upon completion of the Sale at each store (the "**Remaining Merchandise**"), such Remaining Merchandise  will be deemed transferred to the Stalking Horse free and clear of all Liens.  The Stalking Horse shall use commercially reasonable efforts to dispose of such Remaining Merchandise by means of bulk sale/wholesale or otherwise.<br><br>*See* Agency Agreement Section 3.2(b) |
| Agency Fee<br><br><br>*Local Rule 6004-1(b)(iv)* | The Stalking Horse shall receive as a fee 8.5% of the aggregate Cost Value of the Merchandise (the "**Agency Fee**").<br><br>*See* Agency Agreement Section 3.2(a). |
| Payment Date | On the second business day following entry of the Approval Order, the Stalking Horse will pay to the Debtors 80% of the estimated Guaranteed Amount with respect to Merchandise other than On-Order Merchandise.  The balance of the Guaranteed Amount shall be paid by the Stalking Horse on the second business day following the issuance of the final |

| Provision | Description of Provision |
|---|---|
| *Local Rule 6004-1(b)(iv)* | report of the aggregate Cost Value of the Merchandise included in the Sale by the Inventory Taking Service verified by the Debtors and the Stalking Horse.  To secure payment of the balance, the Stalking Horse will furnish the Debtors with an irrevocable stand-by letter of credit for the remaining 20% of the estimated Guaranteed Amount plus an agreed amount equal to three weeks of estimated expenses, naming the Debtors and Secured Lenders as co-beneficiaries.<br><br>*See* Agency Agreement Sections 3.3(b) and 3.4. |
| Additional Stalking Horse Merchandise<br><br>*Local Rule 6004-1(b)(iv)* | The Stalking Horse is entitled, at its expense, to include in the Store Closing sales additional merchandise procured by the Stalking Horse which is of like kind, and no lesser quality to, the Merchandise.  The Stalking Horse will pay the Debtors an amount equal to 7.5% of the gross proceeds of the sale of any Additional Stalking Horse Merchandise.<br><br>*See* Agency Agreement Section 8.10. |
| Sale of Owned FF&E<br><br>*Local Rule 6004-1(b)(iv)* | The Stalking Horse will sell the Debtors' Owned FF&E located at the stores, the distribution center, the call center and corporate offices, free and clear of all Liens on (a) a commission basis or (b) a guaranteed fee basis, at the Debtors' option.  The commission option entitles the Debtors to receive a commission equal to 20% of the gross proceeds from the sale of such Owned FF&E but obligates the Debtors to pay expenses incurred in connection with such disposition in accordance with a mutually agreed budget.  The guaranteed fee option entitles the Stalking Horse to pay a lump sum to the Debtors to be agreed upon in consultation with the Secured Lenders, but requires that all costs associated with disposition will be paid by the Stalking Horse in return for realization of all proceeds from the sale of the Owned FF&E.  The Debtors' option is exercisable in writing within 10 days after the Sale Commencement Date.<br><br>*See* Agency Agreement Section 7. |
| Cost Value of Merchandise | The Stalking Horse's proposal is subject to the aggregate Cost Value of the Merchandise, as calculated in accordance with the Agency Agreement, being not less than $90,000,000 nor more than $100,000,000 subject to certain adjustments and conditions set forth in the Agency Agreement. |

01:15322085.1

| Provision | Description of Provision |
|---|---|
| *Local Rule 6004-1(b)(iv)* | *See* Agency Agreement Section 3.1(b). |
| Store Closing Sales Expenses<br><br>*Local Rule 6004-1(b)(iv)* | The Stalking Horse will pay all Expenses of the Sale.  The actual costs and expenses of the operations of the distribution center and transfer and delivery of Merchandise and Additional Stalking Horse Goods to and from the distribution center shall remain the sole obligation of the Debtors.  In addition, as described above, the Debtors may be liable for the expenses incurred in connection with the Sale of FF&E, in the event that they elect to execute the FF&E Commission option.<br><br>*See* Agency Agreement Section 4. |
| Releases<br><br>*Local Rule 6004-1(b)(iv)(C)* | In connection with the Final Reconciliation of amounts owing to and from the Debtors pursuant to the terms of the Agency Agreement, the Debtors and the Stalking Horse are required to execute a settlement letter, including an appropriate mutual release.<br><br>*See* Agency Agreement Section 8.7. |
| Record Retention<br><br>*Local Rule 6004-1(b)(iv)(J)* | The Agency Agreement does not contemplate the transfer of the Debtors' books and records to the Stalking Horse. |
| Relief from Bankruptcy Rule 6004(h)<br><br>*Local Rule 6004-1(b)(iv)(O)* | As set forth herein, the Debtors seek relief from the stay requirements of Bankruptcy Rule 6004(h). |
| Sale Period | The Stalking Horse will commence the Store Closing Sales on or prior to May 8, 2014 and expects to end the Store Closing Sales on or about August 31, 2014; *provided, however,* the Stalking Horse would have the right to terminate the Sale at any store or the distribution center on seven days' notice.  Expenses will be paid until the applicable vacate date for a Closing Location; *provided, however,* that the Stalking Horse shall remain obligated to pay occupancy expenses until the fifteenth of a calendar month for any Closing Location for which the Stalking Horse did not provide a notice of vacate prior to the eighth day of |

01:15322085.1

| Provision | Description of Provision |
|---|---|
| *Local Rule 6004-1(b)(iv)* | such month.  The Stalking Horse will operate no more than 100 stores after July 31, 2014.<br><br>*See* Agency Agreement Section 6. |
| Bidding Protections<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>*Local Rule 6004-1(b)(iv)(D), 6004-1(b)(iv)(G) and 6004-1(c)(1)(C)(2)* | If (a) the Court approves an alternative transaction, or a motion or other request to approve an alternative transaction is filed by or on behalf of the Debtors (subject to the terms of the Agency Agreement) or (b) the Stalking Horse is not approved as the successful bidder at the Auction contemplated by the Bidding Procedures Order then the Stalking Horse shall be entitled to receive: (i) a Break Up Fee of 1.5% of the Guaranteed Amount (the "**Break Up Fee**"), (ii) an expense reimbursement equal to the reasonable and documented third party costs, fees, and expenses incurred by the Stalking Horse incurred in acquiring signage and other advertising and promotional material in connection with the Sale (excluding any cost of capital incurred in connection therewith) or such third party will purchase the signage and other advertising and promotional material in connection with the Sale, in either case in an amount not to exceed $800,000) (the "**Signage Costs**") and (iii) reimbursement for all written commitments existing as of the start of the Auction by the Stalking Horse to purchase Additional Stalking Horse Goods (the "**Purchase Orders**", and together with the Signage Costs, the "**Expense Reimbursement**", and together with the Break Up Fee, the "**Bidding Protections**").  Neither the Break Up Fee nor the Expense Reimbursement shall be eligible to be "credit bid" by the Stalking Horse.<br><br>*See* Agency Agreement Section 16. |
| Merchandise Returns / Gift Certificates / Membership Program | Sales of all items of Merchandise sold during the Sale Period will be "final sales."  The Stalking Horse will accept returns sold prior to the Sale Commencement Date pursuant to the Debtors return policy if directed by the Debtors.  During the Sale Period, the Stalking Horse shall accept the Debtors' gift certificates and gift cards and the Debtors shall reimburse the Stalking Horse in cash for such amounts during the weekly sale reconciliation.  After the Sale Period, the Stalking Horse will have no obligation to accept the Debtors' gift certificates and gift cards and, if the Stalking Horse does accept such gift certificates and gift cards, it will not be entitled to any reimbursement from the Debtors.  The Stalking Horse will |

| Provision | Description of Provision |
|---|---|
| *Local Rule 6004-1(b)(iv)* | not honor customer discounts.  To the extent afforded to employees during the Sale Period, the Stalking Horse will honor (i) employee discounts afforded by the Debtors or (ii) the then-prevailing Sale discounts being offered by the Stalking Horse but not both on a cumulative basis.<br><br>*See* Agency Agreement Sections 8.2, 8.5 and 8.6. |
| Superpriority Claims and Liens<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>*Local Rule 6004-1(b)(iv)* | Subject to the Stalking Horse having satisfied its obligation to pay the Initial Guaranty Payment and issuance of the letter of credit, the Debtors grant Liens upon (i) the Merchandise, (ii) Additional Agent Goods; (iii) all proceeds, (iv) the commission regarding the sale of the Debtors' Consignment Goods, (v) the Owned FF&E, (vi) the commission regarding sale of the Owned FF&E, (vii) any Sharing Amount owed to the Stalking Horse and (viii) all proceeds to secure the full payment and performance of the obligations of the Debtors.<br><br>Subject to the Stalking Horse having satisfied its payment obligations under the Agency Agreement, any amounts owed by Debtors to the Stalking Horse under the Agency Agreement shall be granted the status of superpriority claims in these chapter 11 cases pursuant to section 364(c) of the Bankruptcy Code senior to all other superpriority claims, including (without limitation) to the superpriority claims of the Secured Lenders. |

A       **The Proposed Bidding Procedures and Auction**

11.       Although the Debtors have entered into the Agency Agreement with the Stalking Horse, given the desire to wind-down the Debtors' business expeditiously and minimize administrative expenses, on the one hand, and their desire to ensure a fair and transparent opportunity for all potentially interested parties to participate in the Sale process, on the other hand, the Debtors and their advisors will seek to hold an auction at **10:00 a.m. prevailing Eastern Time on May 1, 2014** (the "**Auction**"), pursuant to the Bidding Procedures attached to the Bidding Procedures Order as Exhibit 1 ("**Bidding Procedures**").

12.     Accordingly, the Debtors have proposed the following timeline:[3]

| Action | Deadline |
|---|---|
| Bid Procedures Hearing | April 23, 2014 |
| Submission Deadline for Materials to Become Qualified Bidder | April 28, 2014 |
| Submission Deadline for Qualified Bids | April 28, 2014 |
| Auction | May 1, 2014 |
| Store Closing Approval Hearing | May 6, 2014 |
| Consummation of Sale | May 6, 2014 |

13.     The significant terms of the Bidding Procedures are as follows: [4]

| Provision | Description of Provision |
|---|---|
| **Delivery of Financial Information and Confidentiality of Debtor Information** | The Bidding Procedures contemplate that each entity who wishes to participate in the bidding process (a "**Potential Bidder**") must deliver:<br><br>(a) adequate assurance information, including (i) adequate information (in the Debtors' reasonable business judgment) about the financial condition of the Potential Bidder, such as federal tax returns for the previous two years, a current financial statement, and/or current bank account statements; and (ii) information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capacity to consummate the proposed transaction;<br><br>(b) an executed confidentiality agreement in form and substance satisfactory to the Debtors, which will inure to the benefit of any purchaser of the Assets or certain Asset |

---

[3]     The Debtors, in the exercise of their business judgment, reserve the right to change these sale-related dates in order to maximize the value of the Transaction.

[4]     This summary is provided in accordance with Rule 6004-1(c)(i) of the Local Rules and is qualified in its entirety by reference to the provisions of the Bidding Procedures.  Each capitalized term used and not otherwise defined herein shall have the meaning assigned thereto in the Bidding Procedures.  To the extent there exists any inconsistency between this summary and the provisions of the Bidding Procedures, the provisions of the Bidding Procedures shall control.

| Provision | Description of Provision |
|---|---|
| *Local Rule 6004-1(c)(i)(A)(1), 6004-1(c)(i)(A)(2), and 6004-1(c)(i)(A)(3)* | Classes; and<br><br>(c) a firm, irrevocable commitment for financing or other evidence of ability to consummate the proposed Transaction that will allow the Debtors to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the Transaction. |
| **Non-Binding Indication of Interest**<br><br><br>*Local Rule 6004-1(c)(i)(A)(4)* | Qualified Bidders must include a signed writing that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder and the back-up bidder (the "**Back-Up Bidder**"); *provided that* if such Qualified Bidder is selected as the Successful Bidder or Back-Up Bidder, its offer will remain irrevocable until the date that is three business days after the commencement of the Sale. |
| **Qualified Bids Deadline**<br><br><br>*Local Rule 6004-1(c)(i)(B)(1)* | Qualified Bidders must submit their bid by 4:00 p.m. prevailing Eastern time on April 28, 2014.  The Debtors will notify all Qualified Bidders two business days after the Bid Deadline as to whether or not any bids constitute Qualified Bids and whether such Qualified Bidder's bid constitutes a Qualified Bid with respect to any Asset Class. |
| **Qualified Bids Form**<br><br><br>*Local Rule 6004-1(c)(i)(B)(2)* | Qualified Bidders must include a duly authorized and executed copy of the Stalking Horse Agency Agreement (as modified to reflect such Qualified Bidder's proposed transaction including all exhibits and schedules thereto, an "**Alternative Transaction Agreement**"), together with copies marked to show any amendments and modifications to (a) the Stalking Horse Agency Agreement and (b) the proposed Approval Order. |
| **Good Faith Deposit**<br><br><br>*Local Rule 6004-1(c)(i)(B)(3)* | All Qualified Bids must be accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, in an amount equal to ten percent of the value of such Qualified Bidder's Qualified Bid.  A Successful Bidder that breaches any of its obligations under the Successful Bidder Agreement shall forfeit its Deposit. The forfeiture of the Deposit shall be in addition to any other rights, claims and remedies that the Debtors and their estates may have against such Successful Bidder. |

| Provision | Description of Provision |
|---|---|
| **Qualified Bids and Qualified Bidders** | In addition to the provisions required of each Qualified Bid above, each Qualified Bid must:<br><br>(a) state with specificity the Asset Classes such Qualified Bidder offers to purchase, in cash, (which shall consist of at least the Asset Classes described in the non-binding letter of intent submitted by such Qualified Bidder) and the liabilities and obligations to be assumed by the Qualified Bidder upon the terms and conditions set forth in the Alternative Transaction Agreement;<br><br>(b) disclose any connection or agreements with the Debtors, the Stalking Horse, any other known Potential Bidder and/or any officer, director or equity security holder of Coldwater Creek Inc.;<br><br>(c) contain written confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement, including, but not limited to, any additional due diligence, inventory evaluation or financing conditions, and that all necessary approvals have been obtained prior to the date of submission of the bid;<br><br>(d) include evidence, in form and substance reasonably satisfactory to the Debtors, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Stalking Horse Agency Agreement or Alternative Transaction Agreement;<br><br>(e) include an acknowledgement and representation that the Qualified Bidder:  (i) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, regarding the Assets or the completeness of any information provided except as expressly stated in the Agency Agreement or Alternative Transaction Agreement; and (iv) is not entitled to any expense reimbursement, break up fee or similar type of payment in connection with its bid; *provided that* this subsection (iv) does not apply to the |

| Provision | Description of Provision |
|---|---|
| *Local Rule 6004-1(c)(i)(B)(4)* | Stalking Horse; and<br><br>(f) is accompanied by a letter (i) stating with specificity the Assets or Asset Classes such Qualified Bidder wishes to bid on and the liabilities and obligations to be assumed by such Qualified Bidder, (ii) specifying all material terms of the bid that are substantially the same as or better than those of the Stalking Horse bid, to the extent the bid is on the same Asset Class as the Stalking Horse bid, (iii) stating that its offer is a *bona fide* offer that it intends to consummate if it is selected as the Successful Bidder and (iv) stating that such Qualified Bidder has not engaged in any collusion with respect to the bidding process. |
| **No-Shop or No Solicitation**<br><br>*Local Rule 6004-1(c)(i)(C)(1)* | Neither the Agency Agreement nor the Bidding Procedures limit the Debtors' ability to solicit higher or otherwise better bids. |
| **Break Up Fee and Expense Reimbursement**<br><br>*Local Rule 6004-1(c)(i)(C)(2)* | If the Court approves a Successful Bidder, other than the Stalking Horse, to ultimately consummate the Transaction, the Stalking Horse will be entitled to a Break Up Fee and Expense Reimbursement. |
| **Bidding Increments** | Bidding at the Auction for the Asset Classes of inventory and FF&E will begin at an amount equal to a Guaranty Percentage of not less than 99% *plus* the aggregate amount of the Break Up Fee and Expense Reimbursement and will continue in guaranty percentage increments of at least 0.10% above the prior bid for inventory and FF&E.  After conclusion of the auction, the highest or otherwise best bid with respect to inventory will be deemed the Winning Asset Class Bid for inventory and FF&E.<br><br>Bidding at the Auction for Asset Classes other than inventory and FF&E will begin with the Highest or Best Asset Class Bid for such Asset Class and will continue in increments of at least $50,000 above the prior bid for such Asset Class.  After conclusion of the auction, the highest or otherwise best bid with respect to each Asset Class will be deemed the Winning Asset Class Bid for such Asset Class.<br><br>After determination of each Winning Asset Class Bid, bidding at the auction will proceed with the Highest or Best Asset Bid (meaning the aggregate consideration for the |

01:15322085.1

| Provision | Description of Provision |
|---|---|
| *Local Rule 6004-1(c)(i)(C)(3)* | Winning Asset Class Bids or a Qualified Bidder for the Assets), *plus* $100,000 and will continue in increments of at least $100,000. |
| **Break Up Fee and Expense Reimbursement at Auction**<br><br>*Local Rule 6004-1(c)(i)(C)(4)* | The Stalking Horse will not receive a "credit" equal to the Break Up Fee or Expense Reimbursement at the Auction, but the Debtors reserve the right, in their business judgment, to take such amounts into account in determining which bid is the highest and best bid for the Transaction. |
| **Modification of the Bidding Procedures**<br><br>*Local Rule 6004-1(c)(i)(D)* | The Bid Deadline may be extended by the Debtors with the consent of the Stalking Horse and each of the Notice Parties (which consent shall not be unreasonably withheld).  The Debtors retain the right, with the consent of the Secured Lenders, to waive or modify the terms of the Bidding Procedures when determining which Bids (other than the Agency Agreement, which shall constitute a Qualified Bid) may be deemed Qualified Bids. |
| **Closing with Alternative Backup Bidders**<br><br>*Local Rule 6004-1(c)(i)(E)* | If an Auction is conducted, the Qualified Bidder with the second highest or otherwise best Qualified Bid at the Auction for the Assets or for any Asset Class, as determined by the Debtors in the exercise of their business judgment and with the consent of the Secured Parties, will be required to serve as a back-up bidder (a "**Back-Up Bidder**") and keep such bid open and irrevocable until the day that is three business days after the commencement of the Sale. Following the Sale Hearing, if the Successful Bidder fails to consummate the Sale because of a breach or failure to perform on the part of such Successful Bidder, the applicable Back-Up Bidder will be deemed to be the new Successful Bidder for the Assets or applicable Asset Class, and the Debtors will be authorized, but not required, to consummate the Sale with such Back-Up Bidder without further order of the Bankruptcy Court. |

14.    The Debtors believe that conducting the Auction is critical to the integrity of their search process for a liquidator.  Accordingly, within three days of entry of the Bidding Procedures Order, the Debtors will serve a notice (the "**Auction Notice**"), attached as <u>Exhibit 2</u>

to the Bidding Procedures Order, by first class mail upon:  (a) the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"); (b) counsel to the Secured Lenders; (c) all parties who are known to assert a security interest, lien, or claim in any of the Merchandise; (d) all the Debtors' landlords; (e) all applicable federal, state, and local taxing authorities; (f) all applicable county and state consumer protection agencies; (g) all applicable state attorneys general; (h) all other government agencies required to receive notice under the Bankruptcy Rules; (i) the 30 largest unsecured creditors of the Debtors; (j) any other party the files a notice of opposition in the case and (k) any other party appearing on the Debtors' creditor matrix (collectively, the "**Notice Parties**").

15.    Any bidder that desires to make a bid will deliver written copies of its bid to (a) the lead Debtor, Coldwater Creek Inc., One Coldwater Creek Drive, Sandpoint, Idaho 83864, Attn.:  John E. Hayes III; (b) proposed co-counsel to the Debtors, Shearman & Sterling LLP, 599 Lexington Avenue, New York, New York  10022, Attn.:  Douglas P. Bartner, Jill K. Frizzley and Steve L. Camahort; (c) proposed co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware  19801, Attn.:  Pauline K. Morgan and Kenneth J. Enos; (d) counsel to the prepetition term loan lenders, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York  10022, Attn.:  Joshua A. Sussberg; (e) co-counsel to the prepetition term loan lenders, Klehr Harrison Harvey Branzburg LLP*,* 919 N. Market Street, Wilmington, Delaware 19801, Attn:  Domenic E. Pacitti; (f) counsel to Wells Fargo Bank, National Association as Administrative Agent for the debtor in possession credit agreement, c/o Riemer & Braunstein LLP, Three Center Plaza, 6th Floor, Boston, Massachusetts  02108,  Attn.:  Donald E. Rothman; (g) counsel for any committee appointed in these chapter 11 cases; (h) the U.S. Trustee, 855 King Street, Suite 2207, Lockbox 35,

Wilmington, Delaware 19801, Attn.: Benjamin Hackman; (i) Hilco Merchant Resources, LLC,

5 Revere Drive, Suite 206, Northbrook, IL 60062, Attn: Ian S. Fredericks; (j) Gordon Brothers

Group, LLC, 800 Boylston Street, 27th Floor, Boston, MA 02199, Attn: Michael D. Chartock and

(k) counsel to the Stalking Horse, Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue,

New York, New York 10178, Attn: Steven J. Reisman (collectively, the "**Bid and Objection**

**Notice Parties**"), so as to be received not later than 4:00 p.m. prevailing Eastern time on April

28, 2014 (the "**Bid Deadline**").

16.     Objections to the Motion must be in writing, conform to the Bankruptcy

Rules and the Local Rules of the Bankruptcy Court, and be filed with the Bankruptcy Court and

served upon the Bid and Objection Notice Parties.

## Jurisdiction

17.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334 and the *Amended Standing Order of Reference* from the United States District Court

for the District of Delaware dated as of February 29, 2012. Venue is proper pursuant to 28

U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). The

statutory predicates for the relief requested herein are sections 105(a), 363, 364, 365, 503, 507

and 554 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**").

## Relief Requested

18.     By this Motion, the Debtors seek the entry of two orders:

(a)     the Bidding Procedures Order substantially in the form attached hereto as
Exhibit E, pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy
Rule 6004, (a) authorizing entry into Agency Agreement, (b) authorizing Bidding
Protections, (c) authorizing Bidding Procedures and setting the time, date and place of the
Auction and (d) approving the form of Auction Notice and (ii) setting a hearing (the
"**Sale Hearing**"), to be held on May 6, 2014, to consider the entry of the Approval Order;
and

(b)        following the Sale Hearing, the Debtors request the entry of the Approval Order substantially in the form attached hereto as Exhibit F, pursuant to Sections 105(a) and 363(b), (f), and (m) of the Bankruptcy Code and Bankruptcy Rule 6004, approving (i) the Agency Agreement and any Agency Transaction Agreement with the parties submitting the highest or otherwise best bid at the Auction (each a "**Successful Bidder**") and (ii) the Transaction in relation to the Store Closing Sales and waiving the Debtors' compliance with state and local laws, statutes, rules, ordinances and/or lease provisions restricting the Store Closing Sales.

A        **Authorizing Entry into Agency Agreement, Bidding Protection and Bidding Procedures and Auction**

19.        Section 363(b)(1) of the Bankruptcy Code provides in relevant part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Further, pursuant to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

20.        Under applicable case law, in this and other circuits, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use should be approved.  *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (finding that the sale of substantially all of the Debtor's assets satisfied the sound business reason test).  *See also Myers v. Martin (In re martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)) (noting that the Court defers to the trustee's judgment so long as there is a legitimate business justification); *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a §363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where

the debtor articulates a reasonable basis for its business decisions (as distinct from a decision

made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's

conduct.").  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in

question should be approved under section 363(b)(1).  Indeed, when applying the "business

judgment" standard, courts show great deference to a debtor's business decisions.  *See Pitt v.

First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, No. 89 C 593, 1989

WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . .

must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or

in gross abuse of the bankrupt's retained discretion.").

21.    Disposition of a debtor's inventory by a liquidator acting as a debtor's

agent pursuant to store closing and liquidation procedures like those proposed herein is an

accepted method for the sale of assets in chapter 11 cases involving retail debtors.  *See, e.g. In re*

*Borders Grp., Inc.*, No. 11-10614 (MG) (Bankr. S.D.N.Y. July 21, 2011) (authorizing debtors'

entry into agency agreement to conduct full-scale liquidation of stores); *In re Borders Grp., Inc.*,

No. 11-10614 (MG) (Bankr. S.D.N.Y. Feb. 18, 2011) (authorizing debtors' entry into agency

agreement to conduct store closing sales on first day); *In re Goody's LLC*, No. 09-10124 (Bankr.

D. Del. Jan. 21, 2009) (authorizing debtors' assumption of prepetition agency agreement and to

conduct full-scale liquidation through store closing sales at the outset of the case); *In re Circuit*

*City Stores Inc.*, No. 08-35653 (KRH) (Bankr. E.D. Va. Nov. 10, 2008); *In re Whitehall Jewelers*

*Holdings, Inc.*, No. 08-11261 (KG) (Bankr D. Del. Aug. 8, 2008) (authorizing debtors' entry into

an agency agreement to conduct store closing sales); *In re Goody's Family Clothing, Inc.*, No.

08-11133 (CSS) ( Bankr D. Del. June 13, 2008) (same); *In re Linens Holding Co.*, No. 08-10832

(CSS) (Bankr. D. Del. May 30, 2008) (same); *In re Sharper Image Corp.*, No. 08-10322 (KG)

(Bankr. D. Del. May 30, 2008) (authorizing debtor's entry into an agency agreement to conduct store closing sales).

### 1.    *The Bidding Protections Requested are Reasonable and Justified*

22.    If the Stalking Horse is not the Successful Bidder, the Debtors propose to provide the Stalking Horse with the following Bidding Protections:  (a) the Break Up Fee; (b) the signage costs; and (c) reimbursements for all Purchase Orders.  The Bidding Protections are in consideration for the Stalking Horse conducting its due diligence, entering into the Agency Agreement and agreeing to subject its bid to the Auction.  The Bidding Protections were negotiated at arm's-length and in good faith and are necessary to secure the Stalking Horse's participation in the Debtors' sale process.  Further, based on discussions with the Stalking Horse, the Debtors believe that the Stalking Horse would not enter into the Agency Agreement without the Bidding Protections.

23.    The Debtors have determined that the Store Closing Sales are critical to preserving the value of their estates and submit that providing the Bidding Protections to the Stalking Horse is an actual, necessary cost of going forward with the Store Closing Sales. Therefore, the Debtors hereby respectfully request that the Court approve the Bidding Protections.

24.    In the Third Circuit, bid protections, including traditional break up fees and expense reimbursement provisions, will be approved where they are necessary for the preservation of the debtor's estate.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999).  Accordingly, bid protections may be awarded where they induce the stalking horse bidder to make an initial bid or adhere to its bid after the court orders an auction and where they promote more competitive bidding.  *In re O'Brien*, 181 F.3d at 537.

01:15322085.1

25.     The Bidding Protections should be approved and accorded administrative expense status under sections 503(b)(1)(A) and 507 of the Bankruptcy Code, because they provide a clear benefit to the Debtors' estates and the Stalking Horse expressly conditioned its willingness to enter into the Agency Agreement upon the Debtors' agreement to, and Court approval of, the Bidding Protections.  The Bidding Protections will enable the Debtors to secure an adequate consideration floor for the Merchandise and, thus, ensure that competing bids will be materially higher or better than that contained in the Agency Agreement.  Accordingly, the Debtors' ability to offer the Bidding Protections enables them to ensure the sale of the Merchandise to a contractually-committed bidder at a price they believe to be fair while, at the same time, providing them with the potential of even greater benefit to their estates.

26.     The Debtors submit that the amount of the Break Up Fee (1.5% of $90,000,000-$100,000,000) and Expense Reimbursement are reasonable in light of the efforts and expenses that the Stalking Horse has undertaken in its due diligence review, negotiating the terms of the Agency Agreement and preparing for the commencement of the Store Closing Sales.

27.     In addition, payment of the Bidding Protections will not diminish the Debtors' estates.  The Debtors do not intend to terminate the Agency Agreement if to do so would incur an obligation to pay the Bidding Protections, unless they are accepting an alternative bid, which bid must exceed the consideration offered by the Stalking Horse by an amount sufficient to pay the Bidding Protections.

28.     The Court has approved protections similar to the Break Up Fee as reasonable and consistent with the type and range of bidding protection typically approved.  *See, e.g., In re Vertis Holdings, Inc.*, No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012) [Docket No. 206] (approving break up fee of 3.0% in connection with a $258 million sale of assets and a

$2.5 million expense reimbursement); *In re Solyndra LLC*, Case No. 11-12799 (MFW) (Docket No. 1113) (Bankr. D. Del. Sept. 29, 2012) (approving break up fee of 2.6% in connection with $90 million sale of assets); *In re Northstar Aerospace (USA) Inc.*, Case No. 12-11817 (MFW) (Bankr. D. Del. June 27, 2012) [Docket No. 119] (approving break up fee of 3.5% in connection with $70 million sale of assets); *In re Anchor Blue Retail Grp., Inc.*, No. 09-11770 (PJW) (Bankr. D. Del. June 12, 2009) (authorizing stalking horse expense reimbursement up to $1,000,000.00).

> **2.      Entry into the Agency Agreement is a Sound Exercise of the Debtors' Business Judgment**

29.      Entry into the Agency Agreement is a sound exercise of the Debtors' business judgment, utilizing a professional liquidating agent with substantial experience and expertise in conducting orderly simultaneous Store Closing Sales will maximize sales for the Debtors in a short amount of time.  In particular, the terms of the Agency Agreement provide for a guaranteed return (with an additional increased potential shared recovery) to the estates, which minimizes the Debtors' risks while at the same time motivating the Stalking Horse (or other Successful Bidder) to maximize proceeds from the Store Closing Sales.

30.      Additionally, it is more cost effective for the Debtors to allow the Stalking Horse or other Successful Bidder to conduct the Store Closing Sales than for the Debtors to conduct such sales on their own because, among other reasons, the Stalking Horse or other Successful Bidder will reimburse the Debtors for expenses of the Store Closing Sales.  These significant cost savings increase the overall recovery for creditors of the Debtors' estates.  Moreover, the Stalking Horse or other Successful Bidder the Debtors select has, or will have, extensive knowledge, expertise and experience in conducting store closing sales.

01:15322085.1

31.     No matter the outcome of the Auction, the salient terms of the Agency Agreement will remain the same, other than possible economic improvements favorable to the Debtors and their estates.  Therefore, inasmuch as adequate notice of the material terms of the Agency Agreement is given by this Motion and has been provided to the Debtors' major constituents the Debtors submit that no further hearing or notice should be necessary with respect to approval of either the Agency Agreement or any other, materially similar agreement based on the form of Stalking Horse Agency Agreement, as modified to reflect such Successful Bidder's proposed transaction (an "**Alternative Transaction Agreement**") with the Successful Bidder.

32.     As set forth in the Brubaker Declaration and the Bednar Declaration, it is essential that the Debtors commence their going out of business sales in time to take advantage of existing seasonal inventory and historically high sales periods.  Any delays in entering into an agreement with a liquidator will lead to unnecessary expense that could, in turn, disrupt the Debtors' orderly wind-down of their estates.  Further, as mentioned above, conducting Store Closing Sales near the outset of these chapter 11 cases will maximize value for the Debtors' estates and minimize the administrative expenses incurred in the cases.

33.     The Debtors submit, and will demonstrate at the Sale Hearing, that the Agency Agreement is, and that any Alternative Transaction Agreement will be, the result of good faith arms'-length negotiations and the good faith extension of credit by the Stalking Horse and/or any other Successful Bidder, as well as the other financial accommodations, as set forth in the Agency Agreement, constitute the extension of credit in good faith under section 364(e) of the Bankruptcy Code and, as such, the reversal or modification on appeal of the Court's authorization to consummate the transactions contemplated by the Agency Agreement or any

01:15322085.1

Alternative Transaction Agreement, and the security interest granted thereunder, should not affect the validity of such transactions unless such authorization has been stayed pending appeal.

34.    The Debtors submit that the consideration provided by the Successful Bidder pursuant to the Agency Agreement is fair and constitutes reasonably equivalent value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and other applicable Federal and State laws of the United States, any territory or possession, and the District of Columbia.

35.    Based upon the foregoing, the Bednar Declaration and the Brubaker Declaration, the Debtors believe that the terms of the Agency Agreement are typical, customary and reasonable under the circumstances in the exercise of their prudent business judgment. Accordingly, the Debtors respectfully request that the Court approve the Agency Agreement with the Stalking Horse, or authorize the Debtors to enter into a substantially similar agreement with the Successful Bidder.

### 3.    *Bidding Procedures*

36.    The Debtors believe that the solicitation of bids to act as the Debtors' agent in connection with the Store Closing Sales is the best way to maximize the value of the Debtors' Merchandise and Owned FF&E, and an Auction for all Asset Classes as described herein with the Stalking Horse leading the bidding for Merchandise and Owned FF&E will result in the most beneficial arrangement for the Debtors and their estates.  Based on the Auction results, the Debtors will consummate the Agency Agreement and/or enter into an Alternative Transaction Agreement with the Successful Bidder.  Accordingly, the Debtors respectfully request that the Court approve the Bidding Procedures, as set forth in Exhibit 1 to the Bidding Procedures Order.

37.     The use of the Agency Agreement, upon which the initial bids, as well as bids at the Auction will be based, will enable the Debtors and other parties-in-interest to easily compare and contrast any differing terms of the Bids made by the Qualified Bidders (defined in the Bidding Procedures) at the Auction.  The Debtors reserve the right to amend or otherwise change the terms of the Agency Agreement in such manner as the Debtors deem to be in their best interests after consultation with the Consultation Parties (defined in the Bidding Procedures) and agreement of the Stalking Horse.

38.     Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify their creditors of the Auction and the Sale, including a disclosure of the date, time, and place of the Auction, the terms and conditions of the Store Closing Sales, the date, time, and place of the Sale Hearing, and the deadline for filing any objections to the relief requested herein.  Within three days of entry of the Bidding Procedures Order, the Debtors will serve the Auction Notice by first class mail upon the Notice Parties.

39.     The Debtors submit that the form of Auction Notice, substantially in the form attached as Exhibit 2 to the Bidding Procedures Order, is reasonably calculated to provide timely and adequate notice of the proposed Store Closing Sales, the Bidding Procedures, the Auction and the Sale Hearing to the Debtors' creditors and all other parties-in-interest that are entitled to notice, as well as those parties that have expressed a bona fide interest in being the liquidating agent or acquiring the Debtors' Assets.  Accordingly, the Debtors request that the Court approve the notice procedures set forth in this Motion, including the form and manner of service of the Auction Notice, and that no other or further notice of the Store Closing Sales, the Bidding Procedures or the Auction is required.

40.     The Debtors submit that the foregoing procedures are fair, transparent and will derive the highest and best bids for the Assets.

**B       Scheduling Sale Hearing and Notice Thereof**

41.     The Debtors request that the Court hold the Sale Hearing on May 6, 2014. The Debtors have also requested that the Court establish May 1, 2014 at 4:00 p.m. (Eastern) as the deadline for objections to the Motion and the Approval Order.

42.     As mentioned above, the Debtors propose to commence the Store Closing Sales immediately following the Sale Hearing and thereby stem the losses resulting from the continued operation of the Closing Locations.  The Debtors believe that going forward on an expedited basis will in no way impair recoveries because (a) all nationally-recognized potential liquidators (the other parties that can effectuate a transaction of this magnitude) have been involved in the process the Debtors engaged in prepetition to select the Stalking Horse, (b) those parties were provided all necessary diligence and have expertise in quickly formulating and executing such bids, (c) the solicitation process run by the Debtors' advisors was routine for such situations and the form of agency agreement used is customary and (d) the Debtors' Secured Lenders have had direct input in the process.

43.     Further, the Debtors believe that it is crucial that they commence the Store Closing Sales on their proposed timeline to maximize value for the Debtors' estates while minimizing administrative expenses and, pursuant to the Agency Agreement, their postpetition financing agreement and the plan support agreement, they are obligated to do so no later than May 8, 2014.  Thus, the Debtors respectfully request that the Court hold the Sale Hearing on May 6, 2014.

**C**     **The Store Closing Sales**

*1.*     ***Approval of Store Closing Sales Under Section 363 of the Bankruptcy Code is Warranted***

44.     The Debtors, exercising their business judgment and in consultation with their advisors and key constituents, have determined that it is in the best interests of the Debtors, their estates, creditors, and other parties-in-interest to conduct Store Closing Sales at the Closing Locations.  Based on applicable precedent, the Court should authorize the Debtors to do so as set forth herein to stem the losses resulting from continued operations at the Closing Locations and to enable the estates to recover as much as possible from the liquidation.

45.     The Closing Locations are operating at a significant loss and represent a drain on the Debtors' liquidity.  Thus, the sooner the Debtors can liquidate the Assets at the Closing Locations and reject the corresponding leases, the sooner and better the Debtors can mitigate the strain on their liquidity.  Moreover, delays in the liquidation process could cause portions of the Closing Locations' inventory to become less valuable, not only due to lack of replenishment, but also due to changes in the quality of the inventory mix due to ongoing sales and lack of seasonally appropriate merchandise.  The realization of fair value for the Assets as promptly as possible will inure to the benefit of all parties' in interest. Thus, time is of the essence to preserve and maximize the value of the Debtors' Assets before the Merchandise declines in value and to reduce ongoing administrative expenses.

46.     Store closing or liquidation sales are a routine occurrence in chapter 11 cases involving retail debtors.  *See In re Ames Dep't Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (holding that "going-out-of-business" sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets"); *see also In re Ames Dep't Stores, Inc. (Ames II)*, Ch 11 Case No. 01-42217 (REG) (Bankr. S.D.N.Y. Aug. 20, 2001) (approving

store closing sales and agency agreement on first day).  Courts in this and other Districts have

approved similar requests by debtors to conduct store closing sales, finding the debtors'

requested relief consistent with applicable provisions of the Bankruptcy Code.  *See, e.g.*, *In re*

*Namco, LLC*, No. 13-10610 (PJW) (Bankr. D. Del. Apr. 12, 2013) [Docket No. 124] (authorizing

store closing sales); *In re Orchard Supply Hardware Stores Corp.*, No. 13-11565 (Bankr. D. Del.

June 28, 2013) [Docket No. 113] (same); *In re Samsonite Co. Stores, LLC*, No 09-13102 (PJW)

(Bankr. D. Del. Sept. 10, 2009) [Docket No.  81] (same); *In re Tweeter Home Entm't Grp., Inc*.,

No. 07-10787 (PJW) (Bankr. D. Del. July 13, 2007) [Docket No. 452] (same); *In re Three A's*

*Holdings, L.L.C.*, No. 06-10886 (BLS) (Bankr. D. Del. Sept. 25, 2006) [Docket No. 278] (same).

### 2.    *Sale of Assets Should Be Free and Clear of Liens, Claims and Encumbrances*

47.    Section 363 of the Bankruptcy Code provides in relevant part that a debtor

"after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate."  Where a debtor has shown some "articulated business justification," the

sale of assets under section 363 should be approved.  *See Ames Dep't Stores*, 136 B.R. at 359

(holding that going-out-of-business sales are governed by §363(b)); *In re Del. and Hudson Ry.*

*Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (noting that the Third Circuit has adopted the "sound

business judgment" test for section 363 asset sales); *Myers v. Martin (In re Martin)*, 91 F.3d 389,

395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th

Cir. 1991)); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d. Cir. 1986) (applying business

judgment rule)*; In re Lionel Corp.*, 722 F.2d at 1070-71 (same).

48.    As set forth in the First Day Declaration and the Bednar Declaration,

ample business reasons exist for conducting the Store Closing Sales.  As previously described to

the Court, the Debtors and their advisors have analyzed exhaustively the Debtors' business and

various strategic alternatives and determined that an immediate liquidation of the Debtors' retail

01:15322085.1

locations is the most likely path to maximize recoveries for the Debtors' estates, their creditors

and other parties-in-interest in the wind-down of the Debtors' business.  The Brubaker

Declaration describes how the Assets will be monetized most efficiently and expeditiously

through an orderly process conducted by an experienced liquidation firm.

49.     Moreover, immediate Store Closing Sales in accordance with the terms of

the Agency Agreement will minimize the administrative expenses of the estates by reallocating a

significant portion of the risks and costs of the Store Closing Sales from the Debtors to the

Successful Bidder.  If the Debtors are not allowed to commence the Store Closing Sales, the

estates would suffer significant detriment from the resulting delay, added postpetition expenses,

depreciation in the value of the Assets and further time and efforts the Debtors would be required

to expend to reformulate a different liquidation strategy.

50.     To facilitate the sale of Merchandise, the Debtors request authority to sell

Assets on a final "as is" basis, free and clear of all Liens in accordance with section 363(f) of the

Bankruptcy Code, with any such Liens on the Assets attaching to the Guaranteed Amount and

any other consideration received pursuant to Alternative Transaction Agreements in the same

order or priority and with the same force, validity and effect as such Liens had with respect to

such Assets prior to the Transaction.

51.     Section 363(f) of the Bankruptcy Code allows a debtor to sell property

"free and clear of any interest in such property of an entity other than the estate" if one of the

following conditions is met:

(a)     applicable nonbankruptcy law permits the sale of such property free and
clear of such interest;

(b)     the party asserting the lien, claim or interest consents to the sale;

(c)     the interest is a lien and the purchase price for the property is greater than
the aggregate amount of all liens on the property;

(d)    the interest is the subject of a bona fide dispute; or

(e)    such entity could be compelled to accept a money satisfaction of such claim.

11 U.S.C. § 363(f); *see also In re Elliott*, 94 B.R. 343, 345 (E.D. Pa 1988) (noting that section 363(f) is written in the disjunctive, thereby allowing sales "free and clear" if any one of the subsections is met).

52.    As noted above, the Secured Lenders not only have consented to the Store Closing Sales, they have required that the Debtors conduct them in accordance with milestones contained in the Debtors' agreement with them, thereby satisfying section 363(f)(2) of the Bankruptcy Code.  Furthermore, to the extent there are any entities with an interest in any of the Merchandise that have not already consented to the Store Closing Sales, such entity could be compelled to accept a money satisfaction of such interest.  Specifically, the Debtors propose that any Liens asserted against the Merchandise attach to any proceeds realized from the sale of such Merchandise, in the same order of priority and subject to the rights, claims, defenses and objections, if any, of all parties with respect thereto.

### 3.    *Restrictive Provisions Impeding Store Closing Sales are Unenforceable*

53.    The Debtors lease all of their retail store locations and thus, the Store Closing Sales may be inconsistent with certain provisions of the governing leases or other documents to which the Debtors are a party, whether or not filed of record, with respect to any of the leased Closing Locations, including, for example, reciprocal easements, "go dark" provisions, landlord recapture rights, and other covenants that purport to restrict or prohibit the Debtors from conducting store closing or similar themed sales.  Such restrictive provisions are unenforceable in bankruptcy as they constitute an impermissible restraint on a debtor's ability to effectively administer its estate and maximize the value of its assets under the Bankruptcy Code.

*See In re Ames Dep't Stores*, 136 B.R. at 359 (holding that enforcement of lease restrictions would "contravene overriding federal policy requiring Debtors to maximize estate assets*"); In re R.H. Macy and Co., Inc.*, 170 B.R. 69, 73-74 (Bankr. S.D.N.Y. 1994) (finding that landlord could not recover for breach of covenant to stay open because debtor had a duty to maximize value to the estate by conducting a store closing sale and closing the store); *In re Tobago Bay Trading Co.,* 112 B.R. 463, 467-68 (Bankr. N.D. Ga., 1990) (concluding that a debtor's reorganization would be significantly impaired if lease provisions prohibiting inventory liquidation were enforced); *In re Libson Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct GOB sale).

54.     Similarly, to the extent there are restrictive provisions in any of the governing leases dictating the manner, method, dimensions relating to or otherwise prohibiting the use of advertising materials or signage to be used relating to the conduct of the Store Closing Sales, the Debtors request that such restrictive provisions be invalidated as improper interference with the Debtors' ability to effectively conduct the Store Closing Sales and maximize the liquidation value of the Assets.  Courts in this and other Districts have routinely granted similar relief and held that restrictive lease provisions affecting store closing sales in chapter 11 cases are unenforceable.  *See*, *e.g.*, *In re Namco LLC*, No. 13-10610 (PJW) (Bankr. D. Del. Apr. 12, 2013) [Docket No. 124] (authorizing store closing sales without the necessity of compliance with any lease provision); *In re Orchard Supply Hardware Stores Corp.*, No. 13-11565 (CSS) (Bankr. D. Del. June 28, 2013) [Docket No. 113] (same); *In re Samsonite Co. Stores, LLC*, No 09-13102 (PJW) (Bankr. D. Del. Sept. 10, 2009) [Docket No.  81] (same); *In re Tweeter Home Entm't Grp., Inc*., No. 07-10787 (PJW) (Bankr. D. Del. July 13, 2007) [Docket No. 452] (same); *In re*

*Three A's Holdings, L.L.C.*, No. 06-10886 (BLS) (Bankr. D. Del. Sept. 25, 2006) [Docket

No. 278] (same).

55.     Accordingly, to the extent that any provisions or restrictions exist in any

of the leases governing the Closing Locations, the Debtors respectfully request that the Court

invalidate such provisions and authorize the Debtors and/or the Successful Bidder to conduct the

Store Closing Sales in accordance with the Sale Guidelines without interference by any landlords

or other persons affected in any way, directly or indirectly, by the Store Closing Sales.

**4.      *Store Closing Sales Should be Exempt from Federal, State, and Local Laws,
Statutes, Rules and Ordinances Relating to Liquidations***

56.     The Debtors operate their retail locations across numerous states that may

have cumbersome state and local laws, statutes, regulations, rules and ordinances governing store

closing, liquidation, or similar themed sales, that require long waiting periods, special licenses

and permits, or restrictions against bulk sales and augmentation (collectively, the "**Liquidation

Laws**").  However, some state statutes provide that where a liquidation or bankruptcy sale is

court authorized, then a company need not comply with such Liquidation Laws.  *See e.g.,* Tex.

Bus. & Com. Code § 17.91 (2004).  Moreover, the Bankruptcy Code preempts state and local

laws that conflict with its underlying policies, and the Court has the authority, under section

105(a) of the Bankruptcy Code, to permit the Store Closing Sales notwithstanding contrary

Liquidation Laws.  *See generally Belculfine v. Aloe (In re Shenango Grp., Inc.)*, 186 B.R. 623,

628 (Bankr. W.D. Pa. 1995) (noting that debtors have unique fiduciary and legal obligations

pursuant to the Bankruptcy Code and that state statutes "cannot place burdens on them where the

result would contradict the priorities established by the federal bankruptcy code.").

57.     Here, the Debtors' ability to use and sell the Merchandise pursuant to

section 363 of the Bankruptcy Code, in order to maximize recovery for their estates and

creditors, would be severely undermined if the Court does not provide for a waiver of the

Liquidation Laws.  Courts in this and other Districts have routinely granted comparable relief.

*See*, *e.g.*, *In re Namco, LLC*, No. 13-10610 (PJW) (Bankr. D. Del. Apr. 12, 2013) [Docket No.

124] (authorizing store closing sales with waiver of federal and state "going out of business"

laws); *In re Orchard Supply Hardware Stores Corp.*, No. 13-11565 (Bankr. D. Del. June 28,

2013) [Docket No. 113] (same); *In re Samsonite Co. Stores, LLC*, No 09-13102 (PJW) (Bankr.

D. Del. Sept. 10, 2009) [Docket No.  81] (same); *In re Tweeter Home Entm't Grp., Inc.*,

No. 07-10787 (PJW) (Bankr. D. Del. July 13, 2007) [Docket No. 452] (same); *In re Three A's

Holdings, L.L.C.*, No. 06-10886 (BLS) (Bankr. D. Del. Sept. 25, 2006) [Docket No. 278] (same).

      58.    Requiring the Debtors to comply with each state's applicable local

Liquidation Laws would be extremely burdensome and adjudication of disputes with local

authorities over the application and interpretation of local laws would be tremendously expensive

for the estates.  Moreover, in the context of a bankruptcy proceeding, waiving compliance with

Liquidations Laws is entirely appropriate as the Debtors and their Assets are subject to the

Court's exclusive jurisdiction and the Court would be able to supervise and ensure proper

conduct of the Store Closing Sales.  Additionally, governmental units and parties-in-interest will

receive notice of this Motion and the opportunity to be heard on any objections.  Thus, the

Debtors respectfully request that the Court expressly approve the Sale Guidelines and authorize

the Debtors and/or the Successful Bidder to conduct the Store Closing Sales without the added

costs and delay of complying with applicable local Liquidation Laws.[5]

---

[5]    The requested waiver is narrowly tailored to facilitate the successful conduct of the Store Closing Sales. The Debtors are not seeking a general waiver of all state and local laws, but only those specifically governing liquidation or similarly themed sales.  The Debtors fully intend to comply with applicable state and local environmental, tax, employment, public health and safety laws, and consumer protection laws (regulating deceptive practices).

59.     The requested waiver is narrowly tailored to facilitate the successful conduct of the Sale.  The Debtors are not seeking a general waiver of all state and local laws, but only those specifically governing liquidation or similarly themed sales.  The Debtors fully intend to comply with applicable state and local environmental, tax, employment, public health and safety laws, and consumer protection laws (regulating deceptive practices), except as explicitly set forth in this Motion.

### 5.     Sale is Exempt from "Fast Pay" Laws and Regulations

60.     Many states in which the Debtors operate also have laws and regulations that require the Debtors to pay an employee substantially contemporaneously with his or her termination (the "**Fast Pay Laws**").  In many cases, these laws require the payment to occur either immediately or within a period of only a few days from the date such employee is terminated.  The sweeping nature of the Sale contemplated by this Motion will result in a substantial numbers of employees being terminated.  The Debtors' payroll systems will simply be unable to process the payroll information associated with these terminations in a manner that will be compliant with these state laws and regulations.

61.     As set forth above, the Bankruptcy Code preempts state and local laws that conflict with its underlying policies.  Preemption is appropriate where, as here, the only state laws involved concern economic regulation rather than the protection of public health and safety.

62.     It will be necessary to have the Debtors' payroll department calculate individual termination payments, prepare each termination payment check, obtain authorization for each such check and then prepare each such check for mailing. With employee terminations on the scale necessitated by the Sale at the Closing Locations, this process could easily take several days.

01:15322085.1

63.     To be clear, the Debtors intend to pay their terminated employees as expeditiously as possible and under normal payment procedures.  However, the requirements imposed by these state laws and regulations are unworkable in these extraordinary circumstances.  If the Debtors were required to comply with these state laws and regulations, their efforts to wind-down their operations and stem unnecessary payroll costs will be hampered tremendously.  Indeed, if forced to comply, the Debtors will face the choice of (a) having to incur the costs of keeping employees "employed" after the conclusion of the Sale while payroll is prepared or (b) staging terminations to the detriment of the Debtors' estates.  Both of these choices will provide no benefit to the Debtors' estates and will only increase the administrative costs of conducting the Sale.

64.     Accordingly, the Debtors respectfully submit that in this instance, Fast Pay Laws are at odds with the underlying policies of the Bankruptcy Code and as such, the Debtors should be granted relief from their requirements.  *See, e.g. Loehmann's Holdings Inc.*, Case No. 13-14050 (MG) (waiving "fast pay" laws and regulations in connection with approval of store closing sales) [Docket No. 200] (Bankr. S.D.N.Y. Dec. 13, 2013); *Filene's Basement, LLC,* Case No. 11-13511(KJC) (same) [Docket No. 189] (Bankr. D. Del. Nov. 2, 2011).

**D      Other Related Relief**

***1.      The Debtors Should be Authorized to Abandon Certain Property at the Closing Locations Following the Conclusion of the Store Closing Sales***

65.     After notice and a hearing, a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. §554(a); s*ee also Hanover Ins. Co. v. Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974) (stating that a trustee "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim").

66.    Pursuant to the Agency Agreement, the Successful Bidder is authorized to sell FF&E remaining in the Closing Locations following the conclusion of the Store Closing Sales.  However, the Debtors (or the Successful Bidder)  may determine that the costs associated with holding and/or selling certain property and/or FF&E exceeds the proceeds that will be realized upon its sale, or that such property is not sellable at all.  In such event, the property is of inconsequential value and benefit to the estates and/or may be burdensome to retain.

67.    To maximize the value of the Debtors' Assets and to minimize the costs to the estates, the Debtors respectfully request authority for themselves and/or the Successful Bidder (in coordination) to abandon any of their remaining FF&E or other property located at the Closing Locations without incurring liability to any person or entity.  The Debtors further request that the landlords of each Closing Store with any abandoned FF&E or other property be authorized to dispose of such property without liability to any third parties.

**2.    *Sale of the Assets Does Not Require the Appointment of a Consumer Privacy Ombudsman***

68.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or release personally identifiable information about individuals unless such sale or lease is consistent with its policies or upon appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code.

69.    Pursuant to the Agency Agreement, the Successful Bidder will be permitted only to use the Debtors' customer lists when acting as the Debtors' agent and in connection with the Sale.  The Successful Bidder will be subject to reasonable restrictions by the Debtors in order to comply with the Debtors' privacy policy[6] and applicable laws governing the

---

[6]    Among other things, the Debtors' privacy policy provides that the Debtors never sell, rent or trade customers' email addresses and that encryption technology is used for sales through their website in order

use and dissemination of confidential consumer personal data.  The Debtors will not sell or lease any personally identifiable information to the Successful Bidder.  Therefore, appointment of a consumer privacy ombudsman is unnecessary.

### Further Relief

70.     The Debtors request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above and in the Brubaker Declaration, time is of the essence and it is imperative that the Debtors be able to assume the Agency Agreement or, in the alternative, enter into the Alternative Transaction Agreement, and commence the Store Closing Sales on the timeline proposed.  In order to maximize the value of the Assets and minimize the estates' unnecessary administrative expenses, the Debtors believe a waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that they apply, is in the best interest of the Debtors' estates and stakeholders.

### Notice

71.     Notice of this Motion will be provided to:  (a) the U.S. Trustee; (b) Kirkland & Ellis LLP, as counsel to the prepetition term loan lenders; (c) Riemer & Braunstein LLP, as counsel to Wells Fargo Bank, National Association; (d) the 30 largest unsecured creditors of the Debtors, on a consolidated basis; (e) the Stalking Horse; (f)  Curtis, Mallet-Prevost, Colt & Mosle LLP, as counsel to the Stalking Horse; (g) all landlords of the Closing Locations; (h) all applicable state and consumer protection agencies; (i) all applicable state attorneys general and (j) parties entitled to notice pursuant to Bankruptcy Rule 2002.  The

---

to ensure the secure transmission of personal information.  A complete copy of the Debtors' privacy policy can be found on their website at www.coldwatercreek.com/customerservice/PrivacyPolicy.

Debtors respectfully submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the forms attached hereto as Exhibits E and F, granting the relief requested in this Motion and such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
       April 11, 2014

Respectfully submitted,

SHEARMAN & STERLING LLP
Douglas P. Bartner
Jill Frizzley
599 Lexington Avenue
New York, New York  10022
Telephone:  (212) 848-4000
Facsimile:   (646) 848-8174

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP


/S/ KENNETH J. ENOS
Pauline K. Morgan (No. 3650)
Kenneth J. Enos (No. 4544)
Rodney Square
1000 North King Street
Wilmington, Delaware  19801
Telephone:  (302) 571-6600
Facsimile:   (302) 571-1253

Proposed Counsel to the Debtors and Debtors in Possession

01:15322085.1