1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2

3   IN RE:                          )  Case No. 14-10867 (BLS)
                                    )  Chapter 11
4   COLDWATER CREEK INC., *et al.*,  )
                                    )  Courtroom No. 1
5              Debtors.             )  824 Market Street
                                    )  Wilmington, DE 19801
6                                   )
                                    )
7                                   )  May 6, 2014
                                    )  9:30 A.M.
8
                        TRANSCRIPT OF HEARING
9            BEFORE HONORABLE BRENDAN L. SHANNON
                UNITED STATES BANKRUPTCY JUDGE
10
    APPEARANCES:
11
    For the Debtors:        Shearman & Sterling LLP
12                          By:  JILL FRIZZLEY, ESQUIRE
                                 STACEY CORR-IRVINE, ESQUIRE
13                               DOUGLAS BARTNER, ESQUIRE
                            599 Lexington Avenue
14                          New York, New York 10022

15  For the Creditors       Cozen & O'Connor P.C.
    Committee:              By:  MARK FELGER, ESQUIRE
16                          1201 N. Market Street, Suite 1001
                            Wilmington, Delaware 19801
17
                            Lowenstein Sandler LLP
18                          By:  NORMAN KINEL, ESQUIRE
                            1251 Avenue of the Americas
19                          New York, New York 10020

20  ECRO:                   DANA MOORE

21  Transcription Service:  Reliable
                            1007 N. Orange Street
22                          Wilmington, Delaware 19801
                            Telephone:  (302) 654-8080
23                          E-Mail:  gmatthews@reliable-co.com

24  Proceedings recorded by electronic sound recording:
    transcript produced by transcription service.
25

```
 1   For Hilco:              Skadden Arps Slate Meagher Flom
                             By:  IAN FREDERICKS, ESQUIRE
 2                           One Rodney Square
                             Wilmington, Delaware 19899
 3
     For U.S. Trustee:       United States Department of Justice
 4                           By:  BENJAMIN HACKMAN, ESQUIRE
                             Office of the United States Trustee
 5                           844 King Street, Suite 2207
                             Lockbox 35
 6                           Wilmington, Delaware 19801

 7   For CC Holdings:        Kirkland & Ellis LLP
                             By:  JOSHUA SUSSBERG, ESQUIRE
 8                           601 Lexington Avenue
                             New York, New York 10022
 9
     For Bayer Retail:       Monzack Mersky McLaughlin and
10   PAOG & McEwen           Browder, P.A.
     NP/I&G Eastchase        By:  RACHEL MERSKY, ESQUIRE
11   Webb Gin                1201 N. Orange Street, Suite 400
     IMI Huntsville          Wilmington, Delaware 19801
12   G&I VII Retail Operating
     IMI Mount Pleasant
13   G&I VI Promenade

14   For Todman Landlords:   By:  ANDREW CONWAY, ESQUIRE
                             200 East Long Lake Road
15                           Bloomfield Hills, Michigan 48304

16   For WCDA:               Womble Carlyle
                             By:  FRANK MONACO, ESQUIRE
17                           222 Delaware Avenue
                             Wilmington, Delaware 19801
18
     For Tiger Capital:      Morris Nichols Arsht & Tunnell
19                           By:  WILLIAM ALLEMAN, ESQUIRE
                             1201 North Market Street, 16th Floor
20                           Wilmington, Delaware 19899

21   For Consumer Privacy    Blank Rome
     Ombudsman:              By:  BONNIE GLANTZ-FATEL, ESQUIRE
22                           1201 Market Street, Suite 800
                             Wilmington, Delaware 19899
23

24

25
```

1                           INDEX

2                                                    Page

NOTICE OF AGENDA MATTERS:
3   For the Debtors, by Ms. Frizzley              4,44,50
    For Hilco, by Mr. Fredericks                       14
4   For Todman Landlords, by Mr. Conway               19
    For Multiple Landlords, by Ms. Mersky             22
5   For the Creditors Committee, by Mr. Kinel      22,40
    For the U.S. Trustee, by Mr. Hackman           35,42
6   For, by Mr. Alleman                               30
    For CC Holdings, by Mr. Sussberg                  32
7   For, by Ms. Glantz-Fatel                          50
    For, by Ms. Corr-Irvine                           54

8
                                               Further
9   WITNESS FOR THE      Direct Cross Redirect Recross Redirect
    DEBTOR:
10  Scott Brubaker              24

11                                       Marked    Received
    EXHIBITS:
12  D1 - Declaration of Scott Brubaker               11

13

14

15

16

17

18

19

20

21

22

23

24

25

1   THE CLERK:  All rise.

2   THE COURT:  Please be seated. Ms. Frizzley.

3   MS. FRIZZLEY:  Good morning, Your Honor.

4   THE COURT:  Good morning.

5   MS. FRIZZLEY:  Jill Frizzley of Shearman & Sterling

6   LLP, co-counsel to the Debtors.  As Your Honor is aware, the

7   agenda for today's hearing has been substantially reduced as

8   a result of the Debtors' decision to adjourn three matters in

9   response or, I guess, in reaction to the CNOs that were filed

10  for 10 orders for which the Court --

11  THE COURT:  Right.  I believe those orders have been

12  signed.  If they haven't, then get in touch with Chambers,

13  because I think I signed them all.

14  MS. FRIZZLEY:  We have seen those orders

15  THE COURT:  Oh great.

16  MS. FRIZZLEY:  Thank you, Your Honor. So that leaves

17  three matters on which we'll be going forward this morning.

18  With Your Honor's permission, I'd like to deviate from the

19  order in the agenda, however, and start with item 15 so I can

20  present the sale motion and the results of our auction to

21  you.  And then turn it to my colleagues Stacey Corr-Irvine

22  for the remaining two items this morning.

23  THE COURT:  Very good.

24  MS. FRIZZLEY:  Thank you.  I should start by

25  informing the Court that the auction conducted by the Debtors

1   for the asset classes of inventory FF&E, intellectual

2   property, and customer list was a resounding success.  The

3   Debtors, their secured lenders and the Committee of Unsecured

4   Creditors spent 32 consecutive hours at the offices of

5   Shearman & Sterling to achieve a result for these estates

6   that I can safely say exceeded the expectations of all

7   parties.

8          THE COURT:  You know I've noted before to take this

9   position I took a pay cut normally on a scale normally only

10  associated with prolonged incarceration.  But a 32 hour

11  auction reminds me why I'm here.

12         MS. FRIZZLEY:  Well it's noteworthy that during the

13  course of the auction, the Debtors, the Committee, and the

14  secured lenders were in agreement each step of the way, and I

15  will spare you much of the detail of those 32 hours.  But I

16  would like to disclose a few elements of the process for the

17  record.

18         THE COURT:  Okay.

19         MS. FRIZZLEY:  After the bid deadline on April 28th,

20  the Debtors went into the auction with two bids on their

21  inventory class of assets for inventory and FF&E, five bids

22  for the intellectual property and customer list asset

23  classes, and one bid for all of the asset classes that were

24  offered for sale.  After consultation with the secured

25  lenders and the Committee, as required under our bidding

1   procedures, the determination was collectively made that it

2   would maximize recoveries on the asset classes to request

3   additional bids only on a combined basis.

4        Accordingly, we permitted the IP bidders that were

5   present to join in conversations with the bidder on the

6   inventory and FF&E class.  Because we had the Hilco Gordon

7   Brothers joint venture bidding for all the asset classes --

8        THE COURT:  All assets --

9        MS. FRIZZLEY:  And then we had another inventory and

10  FF&E bidder who we'll talk more about later who then entered

11  into discussions with the IP bidders.

12       As Your Honor will require at our adjourned bidding

13  procedures hearing on April 29th as one of the concessions

14  that the Debtors and the secured lenders made to the

15  Committee to be able to go forward with that hearing on a

16  consensual basis, we allowed for a potential for a second

17  auction on the IP assets if the Debtors, the secured lenders

18  and the Committee were not all satisfied that the bids

19  received at the May 1 auction represented the highest and

20  best bids for that asset class.  And actually that would be

21  the asset classes both of intellectual property and the

22  customer list.

23       I have no doubt that Mr. Kinel will speak for the

24  Committee himself, but I'm pleased to report that as part of

25  the determination to conduct the bidding on a combined asset

1 basis, the Committee agreed to permit the sale of IP assets

2 to go forward today and is no longer requiring that the

3 Debtors continue to entertain bids for additional time.  So

4 with those dynamics, we had several rounds and many hours of

5 active bidding between the two groups of bidders for the

6 combined asset classes.  I pause here to note for the Court

7 that the Debtors obtained agreement on the record from both

8 of the combined bidding groups that neither would object at

9 the hearing to the auction process or the results thereof if

10 they did not prevail.

11        At various junctures over the course of the 32 hours

12 in an effort to submit a higher and better bid, bidders

13 offered changes to the contractual terms of the agency

14 agreement that were favorable to the Debtors.  All of those

15 changes are indicated in the blackline to the agency

16 agreement that was filed last night.

17        THE COURT:  I have it, and I appreciate getting

18 that.

19        MS. FRIZZLEY:  And if you'd like me to go through

20 those later when we present the sale order, I'm happy to go

21 through the material changes to the agency agreement.  But if

22 not, right now I would go to the economics of the successful

23 bid.

24        THE COURT:  Please.

25        MS. FRIZZLEY:  So ultimately as I mentioned, the

1  Hilco Gordon Brothers joint venture that was the stalking

2  horse approved at the April 29th hearing submitted the winning

3  bid in what we referred to as a $161 million aggregate

4  amount.  And the economics that we build up to the $161 by

5  getting 128% of the cost value of the inventory class of

6  assets, $27 million on account of the intellectual property

7  assets; so that's the IPM, the customer list; $2 million for

8  FF&E asset class, and attribution of value of $2 million for

9  allowing 35 days for the Debtors to complete the flow of

10 merchandise from their distribution center into the stores

11 without imposing an adjustment to the cost value of that

12 inventory.  Previously, the Debtors had had only 14 days in

13 order to achieve that and so the Debtors ascribed a value of

14 $2 million to this contractual modification.

15      Lastly, there's a $2 million dollar component that

16 came from a minimum guarantee on the amount payable to the

17 Debtors on account of augmented goods.  Previously, it had

18 just been a 7.5% sharing arrangement, but there's now a

19 guarantee --

20      THE COURT:  There's now a floor --

21      MS. FRIZZLEY:  -- of a floor of $2 million.

22 Exactly, Your Honor.

23      Also as part of the Hilco Gordon Brothers' bid the

24 IP assets were treated with by the identification of a

25 designee.  So the Hilco Gordon Brothers' joint venture

1   identified on the record that an affiliate of Sycamore would

2   be the designee for the IP assets.  And then the backup bid

3   the value on the aggregate that we attribute to that bid is

4   $156 million.  That was submitted by a joint venture of Tiger

5   Capital, FB Capital and Great American for the inventory and

6   FF&E classes.  And a joint venture of Blue Star & Galaxy for

7   the IP assets.  When I refer to those IP assets, Blue Star,

8   Galaxy JV were only bidding on the true intellectual property

9   class and not the customer list.

10          THE COURT:  Right.

11          MS. FRIZZLEY:  As part of getting to the results of

12   the auction at one point the Debtors, the Committee, and

13   secured lenders consulted and agreed to offer to what we call

14   the Tiger JV subject to Court approval a backup breakup fee

15   in the amount of $2.25 million dollars.  The rationale was

16   that it conferred real and substantial benefit on the

17   estates.  And in a moment, I am going to proffer some

18   testimony of Scott Brubaker of Alvarez & Marsal in support of

19   the decision of the parties to offer that breakup fee.

20          THE COURT:  Okay.

21          MS. FRIZZLEY:  Next, though, I'll turn to the

22   consumer privacy ombudsman.  At the hearing on April 25th,

23   this Court ordered the appointment of a CPO and the report of

24   the consumer privacy ombudsman is on file at the docket at

25   339.

1       THE COURT:  I received it early this morning.  I

2  appreciate getting it.

3       MS. FRIZZLEY:  I'm pleased to report that the

4  Debtors worked closely throughout this process with the CPO

5  to provide all the diligence requested and to address

6  concerns relating to the sale of the customer list.  Both the

7  amended and restated agency agreement and the revised form of

8  approval order which we will go through I think later in the

9  hearing were all consistent with the recommendations of the

10  CPO and contain provisions addressing the recommendations

11  that she made.

12       Now with all of that background, the Debtors seek

13  entry of an order first approving the amended and restated

14  agency agreement with the joint venture between Hilco and

15  Gordon Brothers; second, approving the commencement of store

16  closing sales on May 8th and waiving compliance with state and

17  local laws, statutes, rules, ordinances and lease provisions

18  that restrict such sales; third, authorizing the successful

19  bidder to sell the inventory and FF&E in accordance with the

20  agency agreement; fourth, authorizing the sale of the

21  intellectual property and the customer list to the identified

22  designee of the successful bidder and then; fifth,

23  authorizing the backup bid.  The entry into backup,

24  agreements with the backup bidder should the successful

25  bidder not consummate the transaction and the payment of the

1  backup breakup fee.

2          In support of the motion, I would move into evidence

3  the previously filed declaration of Scott Brubaker of Alvarez

4  & Marsal which is attached as Exhibit D to the sale motion at

5  Docket Number 13.

6          THE COURT:  All right does anyone object to

7  introduce of Mr. Brubaker's affidavit as part of the Debtors'

8  case in chief in connection with its request for approval of

9  the agency agreement and sale process?  Very well, it's

10 admitted.

11    [Declaration of Scott Brubaker received into evidence]

12          MS. FRIZZLEY:  Thank you.  We would also proffer

13 some additional testimony from Mr. Brubaker regarding

14 paragraph 45 of this approval order which contains the

15 breakup fee.

16          THE COURT:  The backup breakup.

17          MS. FRIZZLEY:  The backup breakup fee.

18          THE COURT:  You may proceed.

19          MS. FRIZZLEY:  If called testify, Mr. Brubaker would

20 state that he participated in the auction and the decisions

21 and negotiations by the bidders and with the bidders at the

22 auction.  He would also testify that during the course of the

23 auction the backup bidder was willing to make a bid

24 substantially in excess of the bidding increments which prior

25 to that moment in time at the auction had consisted of

1  increments of $1 to $2 million dollars.  And he did so only

2  on the condition that it would be, the bidder agreed to

3  increase the bidding increment only on the condition that it

4  would be awarded a breakup fee if it was not the successful

5  bidder.

6         Mr. Brubaker would further testify that the Debtors

7  consulted with their term loan lenders and the Unsecured

8  Creditors Committee and that all parties determined that

9  offering this breakup fee, subject to this Court's approval,

10  would provide a benefit to the Debtors' estate and creditors.

11  Finally, he would testify that as a result of offering the

12  breakup fee, the backup bidder increased its next bid by $15

13  million dollars or a value equal to $15 million dollars.  And

14  that that increase in value is far in excess of the value of

15  the breakup fee.

16         Despite the success of the auction --

17         THE COURT:  Hang on; is that the conclusion of the

18  proffer?

19         MS. FRIZZLEY:  It is; I'm sorry.

20         THE COURT:  Does anyone wish to cross examine Mr.

21  Brubaker regarding the contents of the proffer?

22         MR. HACKMAN:  Yes, Your Honor.

23         THE COURT:  Okay I'll tell you what and, Mr.

24  Hackman, if you'll indulge me a little.  I'd ask that we hold

25  off for a moment on Mr. Brubaker's testimony.  I think I'd

1  like to know exactly where we are with what's happened over

2  the last few days and then we'll turn to testimony, if that's

3  all right with you.  And if you need to recap the proffer at

4  the conclusion or when we get to it, I'd be happy to require

5  that.  It is a little bit irregular to break it up this way,

6  but I want to make sure that I understand where we are.  But,

7  of course, I'll give you the opportunity to cross.  Mr.

8  Brubaker, thanks for your patience.

9          MS. FRIZZLEY:  Thank you, Your Honor, so I was about

10  to say although that we take the position the auction was

11  very successful.  You've seen approximately 35 formal

12  objections to the sale motion filed on the docket; most of

13  which related to the sale guidelines and were made by

14  landlords.  And I'm pleased to report that I believe only one

15  objection is outstanding.  And after I read something into

16  the record to resolve one objection, I would if the Court

17  would permit turn it over to Ian Fredericks from Hilco who

18  has been dealing with the objections and who would like to

19  make a couple statements on the record and give you a finer

20  sense of where we are with resolving them.

21          THE COURT:  That sounds fine.

22          MS. FRIZZLEY:  To resolve the objection of Wood

23  County which is Item S on the agenda in Docket Number 254,

24  I'd like to clarify on the record that the equipment that the

25  landlord refers to some equipment, the ownership of which is

1  disputed between the landlord and the Debtor.  And I will

2  commit on the record that the Debtors will not attempt to

3  sell that equipment absent agreement with Wood County or a

4  further order of this Court after notice and a hearing.

5          THE COURT:  Okay.

6          MS. FRIZZLEY:  So with that, I would turn it over to

7  Mr. Fredericks to give you more of a sense of the status of

8  the [indiscernible] of the motion to the objection.

9          THE COURT:  Very good; Mr. Fredericks, good morning,

10 it's good to see.

11         MR. FREDERICKS:  Good morning, Your Honor, Ian

12 Fredericks from Hilco on behalf of the Gordon Brothers joint

13 venture.  I also have with me local counsel Ms. Quirk from

14 Cole Schotz and Mr. Reisman from Curtis who I'm sure is less

15 than pleased that I'm here stealing his thunder, but I guess

16 that's --

17         THE COURT:  It's never a good idea to let the client

18 get to the podium.

19         MR. FREDERICKS:  Exactly, but good morning and thank

20 you for giving me an opportunity to be heard.  I'm pleased to

21 report that I believe we have resolved, and I'm sure the

22 landlord attorneys will correct me if I'm wrong, every

23 objection and I believe one objection remains unresolved

24 because there's an open issue that I think at this moment

25 we're still trying to work through.

1      THE COURT:  Okay.

2      MR. FREDERICKS:  I have for every side letter where

3  we private hearing we received an executed version from the

4  landlord, I executed those this morning.  And I believe

5  they're being scanned and PDF back to the respective

6  landlords during the hearing.

7      THE COURT:  Okay.

8      MR. FREDERICKS:  With respect to side letters where

9  we had reached an agreement but had not received the

10  landlord's signature other than the ones we just reached here

11  at the hearing, I signed those and those should also be

12  scanned and sent back to the landlords.  And I assume they're

13  listening on the phone so I'm trying to give them the benefit

14  of things they may not know.

15      There are two landlords.  One of them was counsel to

16  Matrix and one of them was counsel to, and that's Mr. Branch.

17  And I believe the other one was counsel to Stanbery.  The

18  location in Stanbery; I think it's Stanbery, Connecticut and

19  that's Ms. Conlan [*phonetic*].  There are two issues -- we

20  have entered into side letters with both of them or have

21  agreed upon the terms.  We have reserved rights on an issue

22  with respect to each one of them.  That issue happens to be

23  different.  And the goal is to try to work with them after

24  the sale commences to reach a resolution.

25      I have agreed and I advised Mr. Branch yesterday

1  that I would put on the record that neither entry into the

2  side letter nor their failure to object formally at the sale

3  hearing on those reserved issues will not prejudice them;

4  similarly will not be prejudiced in the unlikely event we're

5  unable to reach a resolution and have to come back before

6  Your Honor.

7           THE COURT:  I understand.

8           MR. FREDERICKS:  I'm optimistic we'll be able to

9  reach a resolution on both, Your Honor.

10          THE COURT:  Okay.

11          MR. FREDERICKS:  There are a couple of other points

12  relative to the agency agreement approval of the sale.  In

13  the agency agreement, it contemplates it was within the

14  Debtors' discretion as to whether or not we would accept

15  returns during the sale and upon the terms upon which we

16  would accept the returns.  We received, I would say, an

17  informal inquiry from the National Association of Attorney

18  Generals regarding this issue and a couple of other issues.

19  And I understand based on discussions with the Debtors, and

20  they can confirm that, the Debtors are directing us to accept

21  returns.  And they're going to tell us exactly the terms upon

22  which we're supposed to accept those returns.  And we'll

23  obviously comply with the Debtors' request, but that's one

24  point that has been exercised, I guess, under the agency

25  agreement.

1          THE COURT:  Okay.

2          MR. FREDERICKS:  There is a, the agency agreement

3   currently contemplates that the sale would end on 7/31 or

4   such later date as the parties agree in writing.  We've

5   agreed with the Debtors and there is a letter agreement in

6   place whereby the sale, and was the material part of our

7   bidding at the auction.  The sale has been extended to August

8   31st.

9          THE COURT:  Okay.

10          MR. FREDERICKS:  The final points are late yesterday

11  a minor dispute arose over whether or not certain FF&E was or

12  was not included with the, furniture, fixtures and equipment

13  was included within the FF&E that was a component of our bid.

14  This primarily related to a wine bar and a --

15          THE COURT:  In one of the spas?

16          MR. FREDERICKS:  Not one of the spas; separate, but

17  still a wine bar I think near a spa relative to one of the

18  stores.  And then there was an APA that I believe the Debtors

19  have filed a motion to approve for what they call the

20  lighthouse property which is a part of their corporate --

21  it's one parcel within their corporate headquarters.

22          THE COURT:  Okay.

23          MR. FREDERICKS:  The Debtors took the position the

24  wine bar was excluded.  Obviously, we took a contrary

25  position and then on the FF&E --

1        THE COURT:  What about contents?

2        MR. FREDERICKS:  We wanted the contents too.  We

3   took the position that might be inventory, but they --

4        THE COURT:  Not for long.

5        MR. FREDERICKS:  Exactly.  That would be a wasting

6   asset.  So on the lighthouse FF&E there is an APA and it says

7   that all of the personal property within this I believe it's

8   one building on this parcel is being sold with that APA.  It

9   contemplates a schedule, I believe it's Schedule 1.2, but the

10  schedule has not been completed.

11       I guess what we would ask is we obviously agreed to

12  carve out the FF&E and there's been a minor adjustment to the

13  value we're going to pay.  But we want to make sure the FF&E

14  doesn't sort of move from one building into that building.

15  And we also want to make sure that the Debtors as they're

16  filling out that schedule that they work with us so that we

17  can confirm that yes the items on that schedule they're

18  actually in that building.  They're not located somewhere

19  else and moving into that building.

20       So, you know, I have no doubt we worked through

21  every other issue, I have no doubt we can do it.  I just

22  wanted to put those statements on the record.

23       THE COURT:  Okay I understand.  I appreciate the

24  clarifications.

25       MR. FREDERICKS:  Thank you, Your Honor.

1       THE COURT:  All right let me ask before I turn the

2  podium over to the office of the United States Trustee for

3  purposes of cross examination, I would ask if anyone else

4  wishes to be heard?  I recognize that the comments

5  particularly by Mr. Fredericks, but also by Ms. Frizzley

6  reflect what is, I think, fairly described as an ongoing

7  dynamic, and I appreciate the amount of effort that goes into

8  addressing and resolving many of these issues.

9       I understand, again, that some of these issues may

10  have just been resolved this morning or being memorialized

11  and I think Mr. Fredericks noted that I believe you said,

12  sir, you signed each of the side letters that you've received

13  and they're presumably going on their way back.  But I would

14  hear from anyone that wishes to be heard with respect to the

15  matters that have been described so far on the record and

16  then we'll turn the podium over to the U.S. Trustee.  Mr.

17  Monaco; counsel?

18       MR. CONWAY:  Good morning, Your Honor, Andrew Conway

19  on behalf of the Todman landlords.  We did file an objection

20  which was withdrawn yesterday.  I just wanted to bring to the

21  attention of the Court that we do have an agreement with the

22  Debtor regarding FF&E and all of the locations that my client

23  leases to the Debtor.  And I expect that that will be upheld.

24  I have no reason to believe it won't, but just in case I just

25  wanted to create the record.  So we'll work to finish that up

1  with the Debtor and hopefully we won't be back in front of

2  you on that issue.

3          THE COURT:  Okay I'll be here, but I agree with you

4  I hope that the issue is resolved as a business matter.  Mr.

5  Monaco.

6          MR. MONACO:  Good morning, Your Honor, for the

7  record Frank Monaco on behalf of Woods County Development

8  Authority.  Your Honor, I represent the landlord of the

9  distribution center located in Parkersburg, West Virginia.  I

10 believe it's a facility that's over 600,000 square feet.  It

11 may be the largest building in West Virginia.

12         And I think where we are is and I appreciate

13 counsel's representation, but if I could just give the Court

14 just a little bit of background.  The dispute that we're

15 having and it's relatively a narrow one is over three pieces

16 of equipment that are located at the facility, attached to

17 the facility, and are integral to the operation.  It's a

18 reserve rack, an active rack and a conveyor belt.  We've

19 attached documentation to our objection which describes this

20 equipment, where it's located, and our ownership rights to

21 it.

22         And we filed the objection merely as a protective --

23         THE COURT:  Sure, I saw the objection.

24         MR. MONACO:  Right.  So I think where we're at, Your

25 Honor, is that counsel did make representation on the record

1  about their not going to sell absent an agreement or order of

2  the Court and I appreciate that.  But I think what we would

3  like to have that actually embodied in the order itself.  We

4  didn't receive a response, but we had some email, phone call

5  exchanges with them yesterday, and I think that's really

6  where we're at.

7        We think it's important for to put, you know, the

8  world on notice of our interest.  If they're talking about,

9  you know, a paragraph I don't think it's that difficult to

10  do.  And it's just may be we're being a bit overly cautious,

11  but I think it's not that difficult to do.  I did talk to Mr.

12  Fredericks about this.  He's really agnostic about putting it

13  in the order.  So I think we're at the point where we just

14  need Your Honor to decide it should go in the order or the

15  statement of the record is sufficient.

16        THE COURT:  Ms. Frizzley?

17        MS. FRIZZLEY:  I have no objection to putting it in

18  the order, Your Honor.

19        THE COURT:  Okay we'll put it in the order.

20        MR. MONACO:  Thank you, Your Honor.

21        THE COURT:  That's fine.  Ms. Mersky.

22        MS. MERSKY:  Your Honor, Rachel Mersky on behalf of

23  Glimcher [indiscernible] and eight or nine other landlords.

24  And I rise only to say thank you because by giving us

25  additional time, by working with counsel for the Committee,

1  counsel for the Debtors and counsel for the Hilco joint

2  venture everything at issue has been resolved.  It's been

3  resolved individually, professionally and as a result of a

4  lot of work by all parties and it's really appreciated.

5  Thank you, Your Honor.

6          THE COURT:  Very good, thank you.  Okay.  Mr. Kinel.

7          MR. KINEL:  Good morning, Your Honor.  The Committee

8  has some comments largely to do with the order and a discreet

9  dispute and we're happy to reserve those until later if, I

10  just don't want to leave the impression that we're fully

11  resolved in everything.

12          THE COURT:  I understand.  And I assume the secured

13  lenders in the same place.  Again, I don't want to belabor

14  the point.  Ms. Mersky, I think hit the nail on the head.  It

15  is not lost on me the amount of effort that goes into an

16  auction process and then the resolutions that have been

17  individually negotiated and achieved with the various

18  landlords.  I mean those are collectively hundreds of hours

19  and many, many, many phone calls.  And Ms. Mersky said it and

20  I'm going to repeat it that I certainly appreciate the

21  productive and professional attitude that everybody has had

22  on a collaborative approach.  The auction clearly was a

23  success and, again, the result of a tremendous amount of

24  effort.

25          I'm also aware where we're are in the process and

1  that many people are getting emails or documents sent to them

2  that said all right we're all good.  And the expectation is

3  that those processes will play out satisfactorily and again I

4  have no doubt that they will.  If there is need for resort to

5  the Court to deal with some of these issues, I'll be here.

6  But most of these are business issues, and again I think

7  people have dealt with it in a way that is particularly

8  commendable.

9         So I'm aware that the process is ongoing.  The

10  documents and the ancillary documents are probably still in

11  process.  And we'll let that exercise play out.  But I

12  appreciate the comments and, of course, you know we'll let

13  that move forward.  All right.

14         MR. KINEL:  Thank you, Your Honor.

15         THE COURT:  Thank you.  Mr. Hackman, you wish to

16  cross.  All right we'll bring up Mr. Brubaker.  We'll swear

17  the witness please.

18             SCOTT BRUBAKER, DEBTORS' WITNESS, SWORN

19         THE CLERK:  Please state and spell your name for the

20  record.

21         MR. BRUBAKER:  Scott, S-c-o-t-t; Brubaker, B-r-u-b-

22  a-k-e-r.

23         THE COURT:  Thank you, you may be seated.  Mr.

24  Hackman, before we begin again I'd express my appreciation

25  for your patience to allow us to bifurcate or truncate the

1   process a little bit.  What we have in the record before us

2   today is the admitted declaration of Mr. Brubaker that goes

3   broadly to the sale process.  And then we have specific

4   proffer from Ms. Frizzley regarding Mr. Brubaker's proposed

5   testimony on the backup breakup fee.  Just so that I know

6   where you're going is the U.S. Trustee's examination to the

7   general issues that were raised in the affidavit or on the

8   specifics of the backup breakup fee or both?

9          MR. HACKMAN:  It's on the specifics of the backup

10  breakup fee.

11         THE COURT:  Very good; I figured as much.  I just

12  wanted to confirm.  You may proceed.

13         MR. HACKMAN:  Thank you, Your Honor.

14                      CROSS EXAMINATION

15  BY MR. HACKMAN:

16  Q.  Good morning, Mr. Brubaker, my name is Ben Hackman.  I'm

17  an attorney for the U.S. Trustee.  I have a few questions for

18  you about your testimony that was proffered earlier this

19  morning.  I believe Ms. Frizzley indicated earlier that your

20  testimony is that you participated in the auction that was

21  held in this case, is that correct?

22  A.  That's correct.

23  Q.  Are you familiar with the bids that were submitted in

24  connection with that auction?

25  A.  I am.

1  Q.  How many bids were submitted?

2  A.  There were two bids submitted for inventory and FF&E and

3  five bids submitted for intellectual property.  There was one

4  bid submitted for a combination of all of those asset

5  classes.

6  Q.  And who is the bidder that submitted the bid for the

7  combination of all of those asset classes?

8  A.  That bidder we refer to as the GB Hilco joint venture.

9  Q.  Did joint venture that involved Tiger Capital and other

10 entities make a bid on those asset classes?

11 A.  Tiger did make a bid on those asset classes.

12        MR. HACKMAN:  Going forward I'll just refer to that

13 entity as the Tiger Capital JV if that's okay.

14        THE COURT:  It's the JV.  Is this Tiger

15 Schottenstein Bernstein Great American?  They were all there.

16 BY MR. HACKMAN:

17 Q.  So the Tiger Capital entity just to make sure, I want to

18 make sure I understand this correctly.  The Tiger Capital JV

19 made a bid for all of those asset classes that you had

20 referenced before, is that correct?

21 A.  They did.

22 Q.  And when did they make that bid?

23 A.  They made a bid several hours into the auction in

24 response to our request for that bid.

25 Q.  That is the first time they had made a bid for those

1  assets?

2  A.   At that auction, yes.

3  Q.   Did they submit a bid before the auction?

4  A.   Well they submitted a proposal to us when we were in the

5  process of selecting a stalking horse prepetition.

6  Q.   Did the Debtors take the position that the proposal Tiger

7  Capital made prepetition was a qualified bid?

8  A.   They withdrew that bid, so it was not a qualified bid.

9  Q.   When did they withdraw that bid?

10  A.   Shortly prepetition when they, was when they withdrew

11  their bid.

12  Q.   So before the petitions were filed?

13  A.   Correct.

14  Q.   And when the Tiger Capital JV made the bid for those

15  asset classes a few hours into the auction what were the

16  terms and conditions of that bid?

17  A.   I don't have my note with me from the, what their initial

18  bid was, but it was on the same similar terms to the Gordon

19  Brothers Hilco bid.

20  Q.   Was it a bid that was above the stalking horse bid?

21  A.   My recollection is it was above by an increment that we

22  had requested.

23  Q.   How much above the Gordon Brothers Hilco stalking horse

24  bid was the Tiger Capital JV bid?

25  A.   My recollection was it was in approximately $1 million

1   dollars.

2   Q.  When the Tiger Capital JV made its first bid did it

3   require a breakup fee as a condition to making its bid?

4   A.  Not to my knowledge, no.

5   Q.  So they participated in the auction and made a bid before

6   requiring a breakup fee as a condition to making overbids

7   that were in excess of their initial bid?

8   A.  That's my recollection, yes.

9   Q.  So after Tiger Capital made its initial bid, is it

10  correct then to -- did the Gordon Brothers Hilco JV then make

11  a bid that was above the Tiger Capital bid?

12  A.  Yes, they did.

13  Q.  And did Tiger Capital then -- how many rounds of bidding

14  occurred then between those two bidders?

15  A.  My recollection is that the Tiger Capital joint venture

16  in the 15th round ceded the auction to the Gordon Brothers

17  Hilco joint venture.

18  Q.  So 15 rounds.  In which of those rounds did the Tiger

19  Capital entity require as a condition to its bid that it be

20  paid a breakup fee?

21  A.  My recollection is it was the third round.

22  Q.  And can you please describe what the request was to Tiger

23  Capital, what they specifically requested?

24  A.  The request was that Tiger Capital was willing to

25  increase their bid substantially 15 times the minimum bid

1  increment in exchange for protection should they not win the

2  auction with that additional bid.

3  Q.  Have you been involved in other auctions for asset sales

4  on bankruptcy cases?

5  A.  I have.

6  Q.  How many?

7         THE COURT:  Hang on; can I ask you a question.  Did

8  I understand your testimony that at some point during a

9  series of rounds you were approached by Tiger who offered to

10 make basically not a routine minimum overbid, but rather a

11 honking big bid if you would and if they didn't win that the

12 estate would provide for them a breakup fee?

13        THE WITNESS:  My recollection is that they asked us

14 if they made an outsized bid that they would be covered in

15 the event that happened.  My understanding though is that

16 that would not come from the estate; that that would come

17 from a third party, the term lenders.

18        THE COURT:  Okay, I understand.

19 BY MR. HACKMAN:

20 Q.  So Mr. Brubaker, you have been involved in asset sales

21 and auctions for assets sales in bankruptcy cases before?

22 A.  Yes, I have.

23 Q.  Approximately how many would you say you've been involved

24 in?

25 A.  I've been involved in five auctions specific to Specialty

1  Retailers.

2  Q.  Have you been involved in an auction for the sale of

3  assets in a bankruptcy case where a non-stalking horse bidder

4  requested a breakup fee other than this case?

5  A.  I have not.

6  Q.  And I believe your response to the Court a few minutes

7  ago was that your understanding is that this breakup fee

8  payable to Tiger Capital would not come out of the Debtors'

9  bankruptcy estates, is that correct?

10 A.  Correct.

11 Q.  And who would pay for that fee?

12 A.  That would somehow be provided by the term lender.

13 Q.  When Tiger Capital made its initial bid at that point is

14 it your understanding that they were committed to serving as

15 a backup bidder in the event that they were not the winning

16 bidder?

17 A.  I recall at some point during the evening morning we did

18 seek clarification about that and did confirm that they if

19 they were not the winning bidder would be a backup bidder.  I

20 just don't recall the series of events, whether they

21 confirmed that before they made the overbid or not; the

22 substantial overbid or not.

23 Q.  You're not sure if it was before or after that?

24 A.  I just don't recall.

25          MR. HACKMAN:  I have no other questions, Your Honor.

1          THE COURT:  Okay.

2          MR. HACKMAN:  Thank you, Mr. Brubaker.

3          THE COURT:  Any redirect?

4          MR. ALLEMAN:  Good morning, Your Honor, Bill Alleman

5    Morris Nichols Arsht & Tunnel on behalf of Tiger Capital JV.

6    Your Honor, at the start of this hearing we were unaware of

7    any objections to the backup breakup fee.  I think we might

8    benefit --

9          THE COURT:  I haven't an objection.  I heard that

10   the U.S. Trustee asked to expand the record with respect to

11   the request.  I'll probably hear an objection in a moment.

12         MR. HACKMAN:  Yes, Your Honor, we are objecting to

13   that.

14         THE COURT:  Sorry for the interruption.

15         MR. ALLEMAN:  Your Honor, we think we might benefit

16   from a brief recess if Your Honor is willing to indulge us,

17   we can speak with the U.S. Trustee regarding this.

18         THE COURT:  That would be fine.  Let me make an

19   observation.  We had a colloquy at the last hearing about the

20   possibility of my preapproving a breakup fee.  I think what I

21   told Mr. Bartner, was it.  I wasn't sure which of you was at

22   the podium at the time, but my comment was that I think

23   consistent with the position taken by the U.S. Trustee and my

24   colleagues that I was not able to preemptively approve a

25   breakup fee.  And what I suggested at the time was a mechanic

1  I think precisely what the Debtors used at the auction which

2  is to essentially make that offer and that counsel and,

3  again, your clients have hired able counsel, that they would

4  have a measure of confidence about proceeding forward.  This

5  is, I think, Mr. Hackman has correctly noted an unusual

6  circumstance, but, at least, in my experience not unheard of.

7  And I'm aware that flexibility is one of the hallmarks of an

8  auction process.

9       And I think that the U.S. Trustee is right to

10  carefully scrutinize this sort of proposal or transaction.

11  But I will also share that I take a great deal of comfort,

12  frankly, from the process and, frankly, the end result.  And

13  the consensus between primary economic stakeholders in making

14  that decision is a bid and the ask.  It's a transaction.  And

15  so I think the U.S. Trustee again this is not a typical

16  scenario, but it is the sort of thing that we see.  Things

17  get squirrely 30 hours into an auction.  And from my point of

18  view that can be a very good thing.  But these are entitled

19  to scrutiny but not particularly troubling given the context

20  of it.

21       I will, of course, hear presentations and argument

22  if people wish to be heard.  But if you want a couple of

23  minutes, we'll break for five minutes and we'll reconvene.

24  We stand in recess.  You're not to discuss your testimony.

25  You remain under oath, okay.

1      [Recess 10:25:48 to 10:33:16]

2           THE CLERK:  All rise.

3           THE COURT:  Please be seated.  Mr. Brubaker, thank

4  you.  I remind you, sir, you remain under oath.  Mr.

5  Sussberg?

6           MR. SUSSBERG:  I don't have any questions for Mr.

7  Brubaker, but.

8           THE COURT:  Does anyone have cross or redirect for

9  Mr. Brubaker?  Very well, sir, you may step down.  Thank you.

10 Mr. Sussberg?

11          MR. SUSSBERG:  Good morning, Your Honor.

12          THE COURT:  Good morning.

13          MR. SUSSBERG:  Joshua Sussberg from Kirkland Ellis

14 on behalf of the term loan lenders.  Just to give you a

15 little bit of context on the backup breakup fee and then a

16 bit of argument in response to the questions and likely the

17 argument that will be made.

18          In the context of the auction I think Your Honor is

19 aware now that there was a break away bid possibility where

20 an auction was proceeding a million dollar increments and

21 there was clear indication that we were going nowhere other

22 than million dollar increments.  The parties in this room,

23 the Committee, the Debtors, term loan lenders got together

24 and discussed this.  This wasn't Tiger coming up with some

25 theory and proposing it and saying you must do this or else.

1  This was us strategizing to try to drive a recovery.  And, in

2  fact, Your Honor, I think you're aware this was a phenomenal

3  result and a large part of that is due in fact to what

4  happened with this $15 million break away bid.

5         In the context of those discussions, and Mr. Kinel

6  will speak to this as well, we had significant back and forth

7  not only with the parties in this room, but with the Tiger

8  group.  And the discussion was and it went something like we

9  as the term loan lenders are sponsoring a plan that's on file

10 before Your Honor.  And in that plan there's an

11 administrative claims cap.  And when we talked to the Debtors

12 and to the Committee there was a discussion in the context of

13 agreeing to this backup breakup fee that we would agree as

14 the term loan lenders to increase the administrative claims

15 cap to cover that fee.

16         THE COURT:  By the dealt of the --

17         MR. SUSSBERG:  $2.25 --

18         THE COURT:  Of the proposed breakup fee?

19         MR. SUSSBERG:  Correct, Your Honor.  And we had that

20 discussion and Tiger group in response said we think it's

21 great that you'll pay as an administrative claim as part of

22 the plan, but what if that plan never comes to fruition.

23 What if that plan is not confirmed?  In that context we said

24 to the extent there's a distribution on account of the term

25 loan claims, we as the term loan lenders would agree that

1  there's a charge against our collateral for that fee.  We are

2  in a potential high class problem scenario where if there is

3  a distribution 100 cents on account of our claims, it becomes

4  a question as to whose responsible for that claim.  Is it the

5  estate on an administrative basis or is it the term loan

6  lenders out of their collateral?

7        And after talking to Mr. Kinel and Mr. Bartner and

8  Ms. Frizzley, we don't need to decide that today, Your Honor,

9  because again that's a high class problem.  What we do want

10 to put in the order is a proviso that says in a world where

11 there's a phenomenal result and the term loan lenders are

12 paid in full and cash and there's money left for the

13 Committee, we'll all reserve our rights and come back and

14 agree there's a dispute.  And to the extent Your Honor is

15 available as you always are, we'll present that to Your

16 Honor.  But, Your Honor, that's the important context for

17 this dispute.

18        And, again, the reason why we don't want to argue a

19 high class problem today and if we do and we are able to

20 resolve our disputes as we have the last several weeks, we'll

21 present it to Your Honor.  But I would say, Your Honor, with

22 that in mind I really do think that everything that's

23 transpired over the course of the last week and a half and

24 special thanks to the folks at Shearman & Sterling and Young

25 Conaway for stewarding this case to where it's been, it's

1  been a model for building consensus.  And I think it's again

2  I said this last week a prelude of things to come.  We'll

3  resolve this dispute.  We'll resolve everything else.  These

4  cases will end in the right place.

5          But, again, bringing it back to home this piece of

6  the auction and a break away bid of $15 million was critical

7  for us to even have this problem in the first place.  And I

8  think with that, Your Honor, and Ms. Frizzley will speak to

9  this, I'm sure Mr. Kinel will as well, this is something that

10 without question we think is appropriate, submitted in

11 accordance with the guidelines we discussed with Your Honor

12 last week.  We think it was appropriate, and we think it's

13 important to confirming and solidifying what is a phenomenal

14 result.

15         THE COURT:  Let me hear from the U.S. Trustee.

16         MR. HACKMAN:  Good morning, Your Honor.

17         THE COURT:  Good morning.

18         MR. HACKMAN:  The paragraph of the sale order that

19 we're objecting to is paragraph 45.

20         THE COURT:  Can I have the latest and greatest of

21 the sale order?  I think I got the APA, but I don't know if I

22 have the --

23         MS. FRIZZLEY:  May I approach?

24         THE COURT:  Yes, sure.  Thank you.  Paragraph 45.

25 Okay I'm there.

1      MR. HACKMAN:  It provides that in consideration of

2  its participation of the auction, the Debtors, Committee,

3  term loan lenders will give the backup bidder a $2.25 million

4  dollar breakup fee to the extent it's not the winning bidder.

5  And it further provides that this backup breakup fee is

6  commensurate with -- it constitutes an actual and necessary

7  cost and expense incurred by the Debtors in preserving and

8  enhancing the value of these estates within the meaning of

9  503(b) and that the backup fee shall be deemed an

10  administrative claim under the Debtors' plan.

11      There are three main problems that I see with this,

12  Your Honor.  The first is using the term breakup fee.  I

13  don't think this is properly characterizable as a breakup

14  fee.

15      THE COURT:  Call it a topping fee?

16      MR. HACKMAN:  Perhaps.  I mean I view a breakup fee

17  as a fee that is there to compensate a stalking horse bidder

18  for the time and expense it occurs in doing due diligence and

19  creating an asset purchase agreement that may later be used

20  by another bidder to submit a winning bid.  You know, the

21  idea there is that the stalking horse doesn't need to incur

22  that cost without incurring the intended benefit of

23  ultimately acquiring the assets.  So I don't think it's

24  properly characterizable as a breakup fee.

25      THE COURT:  Well I agree with you in terms of

1  nomenclature.  But I've often believed that there's a broader

2  practical understructure to breakup fees and bidding

3  protections.  They represent in the -- I agree with you for

4  starters.  This is not a typical scenario.  And so I want to

5  be clear that the objection or the concerns that are being

6  articulated by the U.S. Trustee and the request for

7  elaboration and substantiation in the record are both

8  warranted and necessary.

9         But to me the issue in a typical scenario is

10 precisely as you described.  It is to incentivize or

11 compensate somebody for being the first person to step out

12 onto the sixth grade dance floor.  Nobody wants to do that,

13 right.  But there is an upside.  Maybe somebody else will

14 come out.  And that happens.  There is also a broader range

15 of considerations that are maybe less predictable and less

16 specific to the average case.

17        But I found or observed that breakup fees, I think

18 as a practical matter, serve to render confidence in a

19 marketplace that often has, as in this case, an expedited

20 sale process with a limited opportunity for due diligence.

21 And often when we have situations and we take these guys, all

22 right.  You know, we take the liquidator community which is

23 nearly represented in its entirety today.  These guys know

24 each other.  And in the same way that if Coke is bidding on a

25 plastic supplier, Pepsi is going to show up too.  And even if

1  they don't have time to do due diligence, they know that the

2  guys from Coke know what they're doing.  And they'll consider

3  that bid.  And so you get a benefit there.

4         And then the final element is often the process of a

5  colloquy between someone like Mr. Brubaker and the stalking

6  horse on a pre-bankruptcy basis that says I need you to step

7  up.  What I want is a better bid.  You want to be the one.

8  You'll get these protections.  And you're right you get

9  compensated for lost opportunity costs, commitment of

10  capital, that kind of stuff.

11        But also someone again like the Debtor or Mr.

12  Brubaker gets to say look I realize that you want to pay as

13  little as possible, but if you want this position, I can get

14  you that protection, but you need to move from $10 million to

15  $13.5 and we're done.  And I'll stop talking to these other

16  guys.  That to me is part of the dynamic that in a different

17  format occurred as its described to me here at the auction.

18         So I guess I would observe that this is either a

19  topping fee.  Breakup fee is not the right word, you're

20  right, because of the way that we use it.  But I think it's a

21  topping fee.  And it is a compensation to somebody to make

22  that bid.  And it doesn't have all the typical trappings

23  that's associated with what you offer to a stalking horse.

24  But it is as a practical matter a topping fee from somebody

25  who has a reason to expect that their next bid is going to

1 win.  And the Debtor wants to bring that bid in.  But I

2 understand the point.  I think had two other issues with it.

3         MR. HACKMAN:  Your Honor, I would only add that my

4 understanding is on the one hand the term loan lender would

5 ultimately be the one funding this payment.

6         THE COURT:  May.

7         MR. HACKMAN:  Right.  However, the proposed sale

8 order specifically says that this is an administrative

9 expense claim under 503(b) and that it will receive

10 administrative expense status under the plan.  I'm not sure

11 that the administrative expense status of this payment needs

12 to be decided today.

13         THE COURT:  Well you know I just had, it's funny

14 that you mention this because I just had this discussion with

15 Ms. Sarkeesian about 19 hours ago.  And the issue was and so

16 I think I'd like a little bit of clarity either from whoever

17 wants to give it to me on the mechanics of this.  Because the

18 issue that Ms. Sarkeesian raised which is distinct from this

19 is that there was a, it was a breakup fee.  It was a bid

20 protections, bid procedures motion.  And the U.S. Trustee's

21 concerns had been resolved with one exception and that was

22 that the breakup fee or the bids procedures order provided

23 that there would be superpriority administrative expense

24 status according to the breakup fee.

25         And the point was and I think a well-founded point

1  that that's actually not a remedy or a right available

2  outside of an adequate protection context for a lender.  And

3  we had this discussion and we agreed that we would strike it.

4  But my point was more specific and that is that regardless of

5  what you call it as a general proposition in our body of case

6  law and I think assiduously enforced by your office is that a

7  breakup fee is payable from the proceeds of a closed superior

8  transaction.  It's usually paid at closing, right.

9         And so my point is whatever you call it breakup fees

10 get paid because they should get paid.  I'm not clear on how

11 this one gets paid because this transaction will close and

12 normally we don't think about the claims sitting until plan

13 confirmation.  That raises some issues between these guys

14 about whose paying for it, but my question would be does the

15 amount get paid promptly and then we'll figure out on whose

16 tab it's being run.  Mr. Kinel?  And don't go far, Mr.

17 Hackman.

18        MR. KINEL:  Thank you, Your Honor, Norm Kinel,

19 Lowenstein Sandler on behalf of the Committee.  Your Honor,

20 there is, in fact, a dispute between the Committee and the

21 term loan lenders.  I think Your Honor heard the testimony of

22 Mr. Brubaker earlier that the term loan lenders were going to

23 pay the breakup fee.  The Committee's understanding is that

24 that was unconditionally in any scenario not just increasing

25 an administrative claims number in a budget, but whether

1  they're paid in full, whether they're not paid in full.  If

2  they're paid a million dollars less or it doesn't matter.  In

3  any scenario, it comes from the term loan lenders.

4         And the record of the auction, we believe, although

5  apparently the Debtors have advised me they don't have the

6  record would show that that was put on the record.  And,

7  regardless, Your Honor's heard the testimony, the Debtors'

8  witness as to what was agreed to.  However, the Committee

9  supports this transaction.  The Committee agrees with

10  everything that's been said.  It is a wonderful result.  We

11  give credit to all our colleagues who were involved in it.

12         And so Mr. Sussberg and I discussed this morning

13  rather than having to have what would amount to an

14  evidentiary hearing probably on this issue that we would try

15  to kick the can down the road on this issue.

16         THE COURT:  And that's fine as to, you know, out of

17  whose pocket it comes.  I understand and I understand the

18  wisdom of kicking that can down the line.  The specific

19  question I had is how and when does this get paid.  If I am

20  to approve this and presumably this sale will close since

21  you're going to start selling tomorrow or this transaction

22  will close today, the money gets paid and then we'll figure

23  out who's responsible for it.

24         MR. KINEL:  My understanding is that it gets paid at

25  closing.

1          MR. SUSSBERG:  Your Honor, paragraph 45 of the order

2    is a bit convoluted.  And rather than walk --

3          THE COURT:  Mr. Hackman has accurately pointed that

4    out.

5          MR. SUSSBERG:  The way that it works, Your Honor,

6    subject to resolving this dispute is the breakup topping,

7    however the nomenclature would be, would be paid at a time

8    when the term loan lenders receive the proceeds of their

9    collateral.  And that's what the order speaks to as to timing

10   and the Tiger group has put in provision to say to the extent

11   the outside date on the plan doesn't occur but the term loan

12   lenders receive a distribution, we'll be paid within "x"

13   number of days.  And that's what it says and that's the

14   agreement among the parties.  Mr. Kinel is correct; we'll

15   deal with that another day if we ever have to.

16         THE COURT:  All right I understand the mechanics on

17   that.

18         MR. SUSSBERG:  Thank you.

19         THE COURT:  All right, Mr. Hackman, I apologize for

20   the interruption but I think the clarification was helpful.

21         MR. HACKMAN:   Your Honor, unless you have any other

22   questions that's all I.

23         THE COURT:  Well I think here's where I stand on it

24   because I know we have a couple other matters and I'm

25   actually short on time that I have available.  As I noted, I

1  think that the U.S. Trustee's objection was well posited.

2  This is not a typical scenario in which a breakup fee or a

3  topping fee, whatever you want to call it, is granted or

4  approved.  But I have on the record especially frankly since

5  it's been helpfully developed by the U.S. Trustee, both as an

6  evidentiary matter and as argument, I think that there is a

7  sufficient record for me to approve the breakup fee and to

8  find that it was, in fact, a necessary cost and expense

9  incurred by the Debtors in connection with preserving the

10 value of the estate.

11      I think the record that's developed before me

12 reflects that there was a material improvement.  And if my

13 math is right it's $2.25 million to get $12.75 or something

14 like that.  That's math I can do in my head.  And, again, to

15 repeat my comment from before the break, I take a tremendous

16 amount of comfort from the position of the stakeholders.

17 We'll reserve the issue that remains in play about out of

18 whose pocket it comes.  But I think Mr. Sussberg is right

19 this is a high class problem.

20      The breakup fee is again as I said not typical or

21 traditional, but I think I understand entirely how it came

22 up.  I think that it was negotiated at arm's length, that it

23 was a suave, frankly, way to move the auction, and to achieve

24 a result that I don't think anybody here can argue with.  And

25 I would also note that I believe that the way that it was

1  handled is precisely consistent with the Court's admonition

2  at the prior hearing.  And, again, I believe the record is

3  sufficiently developed under applicable case law the backup

4  breakup fee or the backup topping fee can be and will be

5  approved and authorized.

6        If I need to deal with the issue of out of which pot

7  it comes, I'll deal with that in due time.  But as far as the

8  rights that were negotiated for and expected by Tiger, those

9  rights are, I'm prepared to approve them.  But again I

10 appreciate your developing the record in that respect, okay.

11       UNIDENTIFIED:  Thank you, Judge.

12       THE COURT:  All right thank you.  Ms. Frizzley.

13       MS. FRIZZLEY:  Your Honor, mindful of your time

14 constraints the last thing I would propose to do on this

15 matter is to walk you through the revisions to the sale order

16 other than paragraph 45 which I think has been discussed at

17 length.  And then we'll also just point out for your comfort

18 that the matters that my colleague will be going through

19 items 14 and 16 are both going forward consensually.

20       THE COURT:  Oh terrific, okay.

21       MS. FRIZZLEY:  So we have a little bit of time. But

22 if it suits Your Honor, I would turn to the blackline of the

23 approval order that we filed late last evening.

24       THE COURT:  I have it.

25       MS. FRIZZLEY:  And begin walking you through the

1  material revisions to it.  The first one will bring to light

2  the Committee's issues referenced by Mr. Kinel earlier.  As

3  the first issue comes up in the paragraph J finding on page

4  6.  The Committee is requesting that the first sentence in

5  that paragraph as to the Debtors' business judgment be struck

6  or modified.  The Debtors do not accept those comments.  We

7  think it's integral to the basis of the relief in the sale

8  motion under Section 363 which is reasonable business

9  judgment standard.

10       We think that the language is supported by the

11  record presented to Your Honor at the April 11th hearing, the

12  April 25th hearing and the April 29th hearing, as well as

13  today.  We think the request of the Committee is contrary to

14  their own actions at the auction.  Specifically, they

15  consented to going forward with the sale of the combined

16  asset classes after extensive consultation.  For the

17  Committee to come back after the conclusion of the auction

18  and make any suggestion that this sentence as described is

19  not appropriate is mystifying and, frankly, troubling to the

20  Debtors.  So rather than leave it to be discussed, we'd like

21  to have it resolved.

22       THE COURT:  All right, Mr. Kinel.

23       MS. FRIZZLEY:  Thank you.

24       MR. KINEL:  Thank you, Your Honor.  As readily

25  responded to an objection I didn't make yet but other than

1 informally.  Your Honor, our only concern and it shouldn't be

2 mystifying has nothing to do with what's happened since this

3 case has been filed in the auction and the agency agreement

4 and the like which we went along with.

5      We simply wanted, we were concerned about this Court

6 making a finding of things that happened months before the

7 filing or the year prior to the filing that may have led us

8 to where we are were, that somehow the Committee's rights to

9 look at those transactions and those decisions would be

10 prejudiced by this finding in the order.

11      THE COURT:  Well I understand your concerns and I

12 think this is consistent with the point that you raised or

13 reservation you made at the prior hearing.  And I think my

14 point is as I look at this and I've now read this several

15 times sitting here, I think that these are findings I'm

16 required to make to approve this transaction.  And what I

17 have before me is an agency agreement.  I am I think obliged

18 under Abbotts Dairies to make a finding that entry into the

19 agency agreement represents the exercise of the Debtors' best

20 business judgment and is in good faith.  And that it's

21 consistent with their fiduciary duties and it's got some

22 bells and whistles on it, but I don't think it's anything

23 different from what I'm obliged to find.  I don't believe

24 that this is anything broader than what is required for a

25 Court considering on a post-petition basis the transaction

1  before me and its approval.  And I would be prepared to

2  approve this language.

3          MR. KINEL:  And, Your Honor, in fact, we weren't

4  going to object to the language.  We wanted; I was going to

5  put on the record simply a reservation that the Committee by

6  not objecting is not waiving any rights that go beyond this

7  order and this transaction.  And that's all I really intended

8  to do.

9          THE COURT:  So noted.  Thanks; Ms. Frizzley.

10          MS. FRIZZLEY:  Thank you.  I would move next to

11  paragraph 11 on page 16 of the blackline.  And just point out

12  that the substantive language at the end of it beginning with

13  similarly is language that was requested by and I think

14  appropriate given the identification of the designee for the

15  intellectual property assets.  That's why it's showing up as

16  new language.

17          THE COURT:  Fine.

18          MS. FRIZZLEY:  And then in paragraph 16 and 17

19  similarly these are some additional language related to the

20  free and clear transfer of the IP assets requested by the

21  designee.  And I don't think it's marked in your order, but

22  in response to Mr. Hackman's concerns we've got some

23  additional language in both 16 and 17 that we will add and I

24  believe he's found acceptable.

25          THE COURT:  Okay.

1    MS. FRIZZLEY:  The next one is paragraph 20 at the

2  bottom of page 19, it also asks --

3    THE COURT:  Yeah I see that.

4    MS. FRIZZLEY:  By Mr. Hackman, so I just thought I'd

5  note quickly as you may recall the first day motion related

6  to customer programs indicated specifically that this

7  juncture, we would readdress the treatment of those so that's

8  what that does.

9    THE COURT:  Right and I think that's appropriate.

10    MS. FRIZZLEY:  Then I move on to paragraph 29 on

11  page 26.  And the language at the end that relates to the

12  abandonment of certain property was necessary to resolve

13  certain landlord objections.

14    THE COURT:  Okay I see that; that's fine.

15    MS. FRIZZLEY:  Moving to page 28, paragraph 33.

16  This is the first of the provisions you'll see in here that

17  come out of the consumer privacy --

18    THE COURT:  Dealing with the privacy policy.

19    MS. FRIZZLEY:  Yeah.  Then on the next page 29,

20  paragraph 39 is a very long paragraph that resolves the

21  objections of the various taxing authorities.  We are putting

22  proceeds in segregated accounts for their benefit.

23    THE COURT:  I've seen that before; that's fine.

24    MS. FRIZZLEY:  And then page 31 all of Section (h)

25  relates to the consumer privacy ombudsman.

1        THE COURT:  And I read this.  I'll hear from Ms.

2   Fatel in a moment.

3        MS. FRIZZLEY:  And then Section (I) relates to the

4   backup bidder.  We've focused on paragraph 45.  The other one

5   is just --

6        THE COURT:  I read the other sections.

7        MS. FRIZZLEY:  Great.  And the last one is paragraph

8   47 which is another one relating to the designation rights as

9   related to the intellectual property transfer.

10       THE COURT:  Right.  Okay.

11       MS. FRIZZLEY:  I'm sorry I misspoke; one more at

12   paragraph 54 and 55.  These are provisions that were

13   necessary to also resolved objections of two software --

14       THE COURT:  Operating software agreements.

15       MS. FRIZZLEY:  Yes.  And then 55 of Comenity Bank

16   who made a reservation of rights at the last hearing and this

17   language resolves their consent.

18       THE COURT:  That sounds fine.

19       MS. FRIZZLEY:  Thank you.

20       THE COURT:  I do note that there is specific

21   provisions that are built in here.  I assume at the direction

22   of the consumer privacy ombudsman, Ms. Fatel.  I appreciate

23   your service.  Are you here as the ombudsman or are you

24   counsel to the ombudsman?

25       MS. GLANTZ-FATEL:  I am the ombudsman.

1        THE COURT:  Wow that's a resume line for you, isn't

2  it?

3        MS. GLANTZ-FATEL:  One of my partners referred to it

4  as the hood ornament.  In any event, Your Honor, thank you.

5  I must commend the parties because the Debtors were extremely

6  cooperative in providing information and responded to me

7  promptly in addressing the concerns that I raised.  I did

8  read you the -- I'm not going to go through my whole report.

9        THE COURT:  I've read your report.  I appreciate

10  getting it.

11        MS. GLANTZ-FATEL:  Thank you.  I did review the

12  policy and was concerned that there was some inconsistency

13  and while we didn't want to debate it, that was my view and

14  so I raised the question as to whether emails could be

15  transferred under the policy.  And the parties agreed that

16  they would include provisions in the agency agreement which

17  are in 7.12 of the agreement and lay out in detail the

18  concerns that I had and addresses those concerns.  And then

19  agreed that before any email addresses would be transferred

20  that the designee would give notice to all of those customers

21  and the ability to opt out.

22        THE COURT:  An opt out.

23        MS. GLANTZ-FATEL:  And so I think that that

24  addresses the concern that I had.  And as a result my

25  recommendation is that they go forward under those provisions

1   of the agreement as well as the order.

2          THE COURT:  Very good.  Well I note you weren't

3   here, but there was a colloquy between Debtors' counsel and

4   Mr. Hackman regarding the necessity of one and, again, it

5   seemed to me the prudent course to move promptly.  And we,

6   frankly, move forward under the assumption that Mr. Hackman

7   would be able to promptly get an ombudsman appointed, and I

8   appreciate the speed with which U.S. Trustee moved with that.

9   And then, obviously, the Court and all parties appreciate the

10  speed with which you addressed these issues.  And, again, I

11  did receive your report and I appreciate getting it and

12  helping to move the process forward.  Thank you.  Ms.

13  Frizzley.

14          MS. FRIZZLEY:  Your Honor, two last items that are

15  in the nature of housekeeping before I return to the last two

16  items on the agenda.  In connection with the retention

17  application of Alvarez & Marsal, its financial advisor to the

18  Debtors, both A&M and the United States Trustee have asked

19  that I make an additional disclosure on the record.

20          THE COURT:  Okay.

21          MS. FRIZZLEY:  As previously disclosed in the

22  declaration of Scott Brubaker in support of the A&M retention

23  at Docket 103, A&M has an interim officer role at Talbots and

24  Sycamore who was identified as the designee for the

25  intellectual property assets at the auction has a controlling

1   interest in Talbots.

2            THE COURT:  Okay.

3            MS. FRIZZLEY:  I just wanted to make that

4   disclosure.

5            THE COURT:  That's fine.

6            MS. FRIZZLEY:  And the last item is when we were

7   last before you, you urged the Debtors to proceed with

8   respect to its leases in the manner that would provide their

9   large community landlords with as much notice as possible.

10  So I wanted to disclose to the Court today that the Debtors

11  are in the final stages of selecting an agent to act as their

12  consultant in the disposition of their lease hold interest.

13  The Debtors will file a motion on full notice for likely for

14  the June 11th omnibus hearing to consider that retention

15  application.  And at the same time likely file a motion

16  setting forth procedures for the assumption and assignment of

17  leases that would be consistent with procedures that have

18  been approved in this Court.

19           THE COURT:  Great that sounds fine.  I appreciate

20  the two housekeeping points. Before we move on from the

21  request for approval of the agency agreement and related

22  relief, though, I would ask if anyone else wishes to be heard

23  with respect to the relief requested by the Debtor?  Very

24  well.

25           MR. KINEL:  Your Honor, as you indicated earlier,

1  we're still working through some language on this reservation

2  and that will hopefully find its way into the final order.

3       THE COURT:  I appreciate that.  And I appreciate

4  being reminded.  Based upon the record before me, I am

5  prepared to approve the Debtors' request.  I find that the

6  record is abundantly clear that the auction process and the

7  procedures previously approved by the Bankruptcy Court

8  relating to the bidding process and the sale process have

9  been abided by.  And that, frankly, achieved a result more

10 than I would have expected or even hoped for.  So on that, I

11 certainly commend the parties.

12       I note also in the discussion about the specific

13 provisions of the form of order that the Court is prepared to

14 find that in fact the transaction represents the exercise of

15 the Debtors' business judgment, best business judgment and

16 also consistent with the Abbotts Dairy standard that the

17 transaction is proceeding in good faith.  So based upon the

18 record before me and noting that all objections have been

19 resolved, I am prepared to approve and authorize the relief

20 requested.  I understand that the final order or the terms of

21 the order are being finalized.  But it's my expectation that

22 will occur and that the Court will enter that order under

23 certification.

24       I believe it may be necessary and I will ask for

25 guidance from Debtors' counsel that I so order the finding

1  because I believe the parties are going to close and move

2  forward.  I'm prepared to enter the order as quickly as

3  possible, but I also want the parties to have a measure of

4  confidence to move forward with the transactions because

5  you're starting sales tomorrow, day after?  Thursday.

6        So the issue is, I acknowledge that there's process

7  of finalizing that order, but the relief is approved and I

8  don't see that the issues with the order would actually

9  impair the ultimate transaction.  So I am prepared to order

10 and so provide effective immediately that the transaction is

11 approved.  And I believe that this is effectively implicating

12 6004(g) and I will waive the 10 day stay and authorize the

13 Debtors to close immediately.

14       MS. CORR-IRVINE:  Good morning, Your Honor, Stacy

15 Corr-Irvine of Shearman & Sterling on behalf of the Debtors.

16 Just a few quick uncontested [indiscernible] and I will be

17 brief; mindful of your time.  With Your Honor's permission

18 I'd like to first turn to the Debtors' bar date motion.

19       THE COURT:  That will be fine.

20       MS. CORR-IRVINE:  May I approach with a blackline?

21       THE COURT:  Sure.  Very good, thank you.

22       MS. CORR-IRVINE:  Your Honor, the Debtors are

23 seeking an order approving a general bar date of June 13th

24 which is just under 40 days from now which will provide us

25 with plenty of time to serve parties, and they will have at

1    least 30 days' notice of the bar date.  We are also seeking

2    approval of a government bar date of October 8th which is a

3    180 days from the petition date.  And bar dates for claims

4    arising out of rejection of contracts or leases and the

5    amended schedules which we expect to file later today.

6                THE COURT:  Okay.

7                MS. CORR-IRVINE:  And, finally, we would seek your

8    approval of the proposed form and manner of notice thereof.

9                THE COURT:  Okay.

10               MS. CORR-IRVINE:  If I could --

11               THE COURT:  Proceed.

12               MS. CORR-IRVINE:  If I could turn your attention to

13   the blackline.  Prior to today's hearing, we received

14   informal comments from the U.S. Trustee and the Committee.

15   And I believe we have resolved them.  If you turn to page 6,

16   paragraph 13 of the blackline you will see that the included

17   provisions providing for the service of customers and holders

18   of unredeemed gift cards and merchandise credits.  As you

19   will see the Debtors propose to send an email to all known

20   customers for which we have email addresses and which have

21   not opted out of receiving emails from the Debtors.  We also

22   propose to provide notice via publication in the New York

23   Times or USA Today on the Spokesman-Revise which is a

24   regional paper near Sandpoint, Idaho.  We also will provide

25   notice by posting notice of the bar date on the Debtors'

1  website, Prime Clerk's website, and also the Debtors'

2  Facebook page.  And, finally, we would propose notice at the

3  registers in each of the stores to provide customers with

4  notice that they need to file a proof of claim on account of

5  their gift card.

6          THE COURT:  Let me ask if anyone wishes to be heard

7  with respect to the request for an order approving a bar date

8  and approving the form and manner.

9          MR. KLINE:  Your Honor, the Committee had raised

10  some issues regarding the gift cards.  I just wanted to make

11  sure that it made its way into every place it needed to be

12  and I think counsel has confirmed and asked.

13          THE COURT:  Very good, thank you.  Ms. Mersky.

14          MS. MERSKY:  Good morning, Your Honor, just a very

15  small issue which commonly rises in the context with

16  landlords.  Frequently and in this case there is prepetition

17  rent that is due in addition to sub-rent.  And there is a

18  question as a matter of law whether the landlord has an

19  obligation to file a proof of claim by the proof of claim bar

20  date as it relates to the prepetition rent and not wait and

21  have all the claim filed with a rejection damage claim.  Just

22  to clarify that they can be included in the rejection damage

23  claim; it makes a much cleaner proof of claim process.

24          THE COURT:  That work with you

25          MS. CORR-IRVINE:  Yes.

1          THE COURT:  So all claims arising out of the lease

2   whether prepetition claims or post-petition rejection claims

3   would be due by the rejection or assumption deadline.

4          MS. MERSKY:  Yes, Your Honor.  Thank you.

5          THE COURT:  In connection with that.  Okay I think

6   that makes sense; otherwise, you're going to be collecting

7   proofs of claim with different components.  That's fine.  I

8   assume that's acceptable to the Debtor?

9          MS. FRIZZLEY:  It is.

10          THE COURT:  Very good.  All right does anyone else

11   wish to be heard with respect to the bar date?  All right

12   based upon the record before me then I am satisfied that the

13   Debtors carried their burden with respect to the relief

14   requested.  And, again, I note that this case was filed with

15   a plan process and a runway, so the sooner that these steps

16   are implemented the sooner we get to that further conclusion.

17          So I am satisfied that the forms and manner of

18   notice are appropriate, that the timing is appropriate, and

19   the mechanics of the process similarly are appropriate.  The

20   order will issue.  Do you have a clean form of order?

21          MS. FRIZZLEY:  I'm sorry?

22          THE COURT:  Do you have a clean form of order?  I

23   have your blackline.

24          MS. FRIZZLEY:  Should I bring it up at the end with

25   everything?

1        THE COURT:  We'll take it at the end.

2        MS. FRIZZLEY:  The final matter on the agenda is the

3   Debtors'' motion for approval of procedures to reject

4   executory contracts and unexpired leases.

5        THE COURT:  Right.

6        MS. FRIZZLEY:  We had seven formal objections that

7   we were filed and informal comments from the U.S. Trustee and

8   the Committee.  And I am happy to report that they have all

9   been resolved.  If you turn to the blackline that I just gave

10  you.

11       THE COURT:  I have it.

12       MS. FRIZZLEY:  We can run through them quickly, but

13  you will see that most changes are on page 5, paragraph 7 is

14  just a confirmation that the Debtors will pay their rent

15  post-petition in accordance with 365(d)(3).  Again, paragraph

16  8 is that we will deliver --

17       THE COURT:  Broom clean.

18       MS. FRIZZLEY:  Broom clean.  And, finally, paragraph

19  9 relates to abandonment and it was inserted at the request

20  of several landlords.  And the final proviso in paragraph 9

21  was to resolve an objection of the tax authority.

22       THE COURT:  Okay I understand.  So I have before me

23  then the Debtors' request for an order establishing

24  procedures for the rejection of an executory contract.  So I

25  would ask if anyone else wish to be heard.  I note that there

1  were a number of objections filed and counsel represents that

2  those objections have been resolved.  Does anyone else wish

3  to be heard?  Okay based upon the record before me again I'm

4  satisfied that the Debtors have carried their burden with

5  respect to the relief requested.  I do find that the order

6  establishing procedures will benefit, frankly, the estates as

7  well as the landlords by providing a streamline and

8  consistent process for dealing with the many, many leases in

9  these cases.  And I will enter an order granting that motion.

10        Is this both orders?  All right I've signed both of

11  these orders.  We'll have these on the docket today.

12  Anything further this morning?

13        MS. FRIZZLEY:  That is it.

14        THE COURT:  All right we'll stand in recess.  Again,

15  I would thank all parties for what was a tremendous amount of

16  effort.  We stand in recess.

17      (Court Adjourned)

18

19

20

21

22

23

24

25

1                              CERTIFICATE

2

3    I certify that the foregoing is a correct transcript from the

4    electronic sound recording of the proceedings in the above-

5    entitled matter.

6    /s/Mary Zajaczkowski                    May 6, 2014
7    Mary Zajaczkowski, CET**D-531                    Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25